STATE OF NORTH DAKOTA

COUNTY OF CASS

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

Civil No. _____

Plaintiff,

**COMPLAINT**

Jury Trial Demanded

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

## COMPLAINT

1.      Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, brings this action against Defendant Sanford Medical Center Fargo ("Sanford") for retaliating against her when she engaged in protected activity by raising patient safety concerns.

## NATURE OF THE ACTION

2.      Plaintiff, Dr. Ganai, is a highly accomplished and reputable double-board certified surgical oncologist who has been practicing surgical oncology for more than twelve years. She joined Sanford in 2020 to perform complex general surgery surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery. During her tenure, she also served as Associate Professor of Surgery and Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.

1

3.      Dr. Ganai brings this action against Defendant Sanford for violation of the prohibitions against retaliation contained in North Dakota's whistleblower statute, N.D. Cent. Code, § 34-01-20.

## THE PARTIES

4.      Plaintiff, Sabha Ganai, was a resident of Fargo, North Dakota at all times relevant to this Complaint.

5.      Defendant Sanford Medical Center Fargo is a not-for-profit North Dakota corporation owned and operated by Sanford Health, an integrated multi-specialty health system. Sanford Medical Center Fargo maintains its principal place of business at 737 Broadway North, Fargo, North Dakota, 58122.

## JURISDICTION AND VENUE

6.      At all times material hereto, the Defendant, Sanford, was the owner of and operated Sanford Medical Center Fargo in the County of Cass, State of North Dakota.

7.      At all times material hereto, Defendant employed Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") at Sanford Medical Center Fargo

## FACTS RELEVANT TO ALL CLAIMS

8.      Sanford hired Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") at Sanford Medical Center Fargo in February 2020. (*See* Ex. A attached hereto, Dr. Ganai Offer Letter dated October 8, 2019).

9.      Dr. Ganai and her team in the Division routinely handled highly complex cases involving complex general surgery, surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery.

10.     These cases often came to the Division from other departments and other facilities that were unable to properly handle them and often with patients who were dying.

2

**Sanford Places Dr. Ganai On a PIP From An Unreliable Data Report**

11.    In late August 2023, Sanford began criticizing the Division on patient outcomes and made statements attributing "significantly worse outcomes" to Dr. Ganai and the Division.

12.    At the same time, the Division was facing mounting pressure and a lack of support from the General Surgery Department in planning for Bob Sticca, M.D.'s reduction in call coverage. Dr. Sticca's last day on call was January 1, 2024.

13.    On August 22, 2023, Dr. Ganai met with Steven Briggs, M.D. (Chief Medical Officer, Sanford Medical Center Fargo), Michael Traynor. M.D. (Chair, Department of Surgery, Sanford Medical Center Fargo), and Darla Dobberstein (Executive Director of Fargo Region's Surgical Services, Sanford Health). Without presenting any data, leadership told Dr. Ganai that a Vizient report reported that Dr. Ganai had a higher than desired observed to expected ratio ("O/E") for mortality rates of 1.4.

14.    If a hospital's observed rate for an indicator is higher than its expected rate (an O/E ratio greater than 1), then the hospital performed worse than the reference population. If documentation for the patient population is not complete, then any risk adjustment applied to this ratio will not be accurate and will only be done at a population level, which does not account for the Division's increased case complexity.

15.    Vizient is a health care performance improvement company that provides patient outcome data derived from administrative billing (coding) without clinical verification.

16.    Vizient was designed for benchmarking hospital quality, not surgeon quality. Surgical leaders, including Dr. Clifford Ko, M.D., MS, MSHS, FACS (Director, Division of Research and Optimal Patient Care, American College of Surgeons ("ACS")), have advised against using Vizient for benchmarking surgeon performance. In contrast, the ACS National Surgical

3

Quality Improvement Program ("NSQIP") database collects patient-specific and surgeon-specific data that accounts for surgical case complexity and allows for causal inference.

17.     Vizient had recently released a hospital ranking system based solely on patient outcome data. Sanford, desiring to improve its scores in the ranking system, had recently began to use Vizient data to look at individual surgeon outcomes. Data from literature review suggests poor intrinsic validity for this indication outside of hospital-to-hospital benchmarking. In 2020, Dr. Ganai led a quality improvement project for the Department of Surgery with chart review of all mortalities for that year that confirmed poor intrinsic validity for its use. Dr. Ganai found that only thirty (30) percent of the cases were accurate. For example, many patient deaths were not included at all. Additionally, some of the patient deaths were identified as a surgery death when they were actually due to other causes, such as COVID-19. Many patients were not operated on, yet their deaths were attributed to the surgeon who consulted on them. In 2021, Dr. Traynor repeated this analysis for that year and confirmed the same issue.

18.     During the August 22, 2023 meeting, Dr. Ganai explained that Vizient generates and compares O/E mortality rates for general surgeons, and unlike the rest of general surgery, the Division's practice includes highly complex cases not solely comprised of general surgery.

19.     Also during the August 22, 2023 meeting, leadership presented Dr. Ganai with a peer review letter ("Peer Review Letter") attached to a Performance Improvement Plan ("PIP") and asked Dr. Ganai to agree to the PIP. (*See* Ex. B attached hereto, Confidential Peer Review Document/PIP). The Peer Review Letter promised Dr. Ganai that the Care Monitoring Committee would oversee the PIP and assist Dr. Ganai in "successfully addressing the opportunities that have been identified." *Id.*

EXHIBIT A_004

20.    In response, Dr. Ganai stated that she agreed to the PIP contingent on receiving the Vizient report data.

21.    Dr. Ganai also requested a peer review meeting and was told there would be a meeting scheduled with a committee.

**Dr. Ganai Demonstrates Issues with the Validity of The Vizient Report Data**

22.    On August 30, 2023, after Dr. Briggs emailed Dr. Ganai the Vizient report data ("the Vizient Report"), and Dr. Ganai analyzed its data.

23.    On September 15, 2023, Dr. Ganai provided Sanford a comprehensive analysis in response to the Confidential Peer Review Document/PIP and the Vizient Report Sanford had relied on when it chose to place her on the PIP. (*See* Ex. C attached hereto, PIP response dated September 15, 2023).

24.    Dr. Ganai explained that Vizient's data reliability was limited in providing accurate benchmark performance and that such data is not controlled for coding error complexity, among other things.

25.    The Report failed to track patient outcomes appropriately.

26.    The Report demonstrated that Dr. Ganai's O/E ratio did not significantly differ from the expected O/E ratio given the complexity of the cases she managed.

27.    Dr. Ganai's colleague, Dr. Daniel Tuvin, M.D.'s, O/E ratio was 7, significantly higher than Dr. Ganai's. Dr. Tuvin also had a higher mortality rate. Dr. Sticca, Dr. Ganai's other colleague, had the highest readmission and reoperation rates.

28.    Dr. Ganai also explained how the Division needs to be compared for case complexity. Dr. Ganai presented ACS NSQIP data for the Division, specific for case type, that showed that the Division actually had excellent outcomes compared to National data, herself and

5

Dr. Tuvin included. She explained that NSQIP data has significantly better validity than Vizient because it is clinically verified. Sanford paid for a Research Nurse who was in charge of maintaining NSQIP data, which was presented to the Department of Surgery on a quarterly basis for quality improvement purposes.

29.     After Dr. Ganai provided Sanford her response and analysis, Sanford never scheduled a peer review meeting with her.

**Dr. Ganai Raises Patient Safety Concerns to Sanford**

30.     On or around December 11, 2023, Dr. Ganai responded to an employee survey question on PeakOn, Sanford's anonymous survey platform. (*See* Ex. D attached hereto, PeakOn response dated December 11, 2023).

31.     In response to the question: "If you were offered the same job at another organization, how likely it is that you would stay at this organization?" Dr. Ganai answered: "My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well-being. I am ashamed of the administration." *Id.*

32.     Dr. Ganai's concerns stemmed from Sanford's improper reliance on the Vizient Report that did not properly or accurately account for patient outcomes and Sanford's refusal to provide peer review avenues to address patient safety and comply with the Health Care Quality Improvement Act. *See* §42 U.S.C. 1110. By refusing to provide Dr. Ganai peer review avenues, Sanford is stripping Dr. Ganai and other physicians of the immunity provided by the peer review process under the Act.

33.     On December 26, 2023, Dr. Ganai emailed Dr. Douglas Griffin (Vice President of Fargo Region Clinic, Sanford Health) about her PeakOn comment. (*See* Ex. E attached hereto, email correspondence dated December 26, 2023).

34.    Dr. Ganai explained to Dr. Griffin that she posted her comment because she was concerned about Sanford's treatment of surgical oncologists within the Division and the General Surgery Department's increasing lack of support.

35.    She also told Dr. Griffin that Sanford had still not formally responded to her analysis and response to the August 2023 PIP, which she had submitted over three (3) months ago.

36.    Dr. Ganai affirmed her commitment to patient care as her highest priority.

37.    In response, Dr. Griffin told Dr. Ganai that he would look into the situation.

**Sanford Retaliates and Terminates Dr. Ganai a Month After She Reports Patient Safety Concerns**

38.    Instead of addressing her patient safety concerns, Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024. (*See* Ex. F attached hereto, January 23, 2024 letter).

<u>**COUNT I**</u>
<u>**RETALIATION IN VIOLATION OF N.D.C.C. § 34-01-20**</u>

39.    Dr. Ganai adopts and realleges paragraphs 1 through 38 above as if fully stated herein.

40.    N.D.C.C. § 34-01-20 prohibits employers from discharging or threatening to discharge an employee because the employee in good faith reports a violation or suspected violation of federal, state or local law, ordinance, regulation, or rule to an employer. N.D.C.C. § 34-01-20 (1)(a).

41.    At all relevant times, Dr. Ganai performed her work with diligence and was meeting her employer's legitimate expectations.

42.    Dr. Ganai was engaging in a protecting activity in reporting her concerns for patient safety on December 11, 2023, and December 26, 2023.

7

43.     Defendant Sanford knew or should have known that retaliation against an employee engaging in a protected activity was a violation of state law.

44.     Defendant Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024.

45.     Defendant Sanford's actions violated N.D.C.C. § 34-01-20.

46.     As a result of Defendant Sanford's retaliatory actions, Dr. Ganai has suffered and will continue to suffer irreparable injuries including, but not limited to, lost wages, injury to professional reputation, great mental anguish, and damage to her physical health.

## **PRAYER FOR RELIEF**

47.     Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendant as follows:

A.     Find that Defendant violated N.D.C.C. § 34-01-20 by willfully retaliating against Plaintiff in threatening to terminate her and terminating her for engaging in a protected activity;

B.     Award actual damages;

C.     Award the costs of maintaining this action, including reasonable attorney's fees and court costs; and,

D.     Any other relief this Court deems just and necessary.

[THIS SPACE INTENTIONALLY LEFT BLANK]

EXHIBIT A_008

## JURY DEMAND

48.     Plaintiff demands a trial by jury of the maximum number of jurors allowed by law

of all issues raised in this Complaint.

Dated: July 18, 2024


The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
*Pro Hac Vice Pending*
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
*Pro Hac Vice Pending*
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822


WILKING LAW FIRM

*/s/ Leo F.J. Wilking*
Leo F.J. Wilking (lwilking@wilkinglaw.com)
3003 32nd Avenue S
Fargo, ND 58103
P: (701) 356-6823
F; (701) 478-7621
ND Bar ID No. 03629
*Local Counsel*

9

EXHIBIT A_009

**SANFORD** HEALTH

October 8, 2019

Sabha Ganai, MD
1424 S Park Avenue
Springfield, IL  62704

Dear Dr. Ganai:

Upon the enthusiastic recommendation of the Surgical Oncology Department, I am pleased to invite you to join Sanford Clinic. The starting salary has been approved at $427,800 for a 1.0 FTE ($300,000 for 0.7 FTE clinical and $127,800 for 0.3 FTE research).  We are also offering a $25,000 forgivable loan over 2 years paid upon signing.

Enclosed you will find a Staff Physician Agreement for your review and consideration.  If all terms meet with your approval, please:

1. **Initial** your anticipated start date on the first page of the Agreement.

2. Sign and date the Agreement.

3. Sign the Demand Note in front of a Notary Public.

4. Return the following document/s to us in the enclosed  prepaid envelope:
   a. Staff Physician Agreement, signed and dated with your anticipated start date **initialed** on the first page of the Agreement.
   b. Demand Note signed in front of a Notary Public.

You are eligible for 28 days of time away per fiscal year and 10 days of CME time away, pro-rated based on your FTE status.  Eligible relocation expenses up to $10,000 will be paid upon submission of appropriate documentation.

My colleagues who had the opportunity to interview you feel that you will make a wonderful addition to our medical staff.  I hope to receive your favorable response to this invitation within **30** days.  In the meantime, please contact me if you have any questions; at 701-234-2610 (office) or by email at *julie.waldera@sanfordhealth.org*

Sincerely,

*Julie Waldera*

Julie Waldera
Executive Director
Sanford Health

EXHIBIT
A

***CONFIDENTIAL PEER REVIEW DOCUMENT***

Dear Dr. Ganai:

Thank you for meeting with us today to discuss areas of concern that have been brought forward as part of our ongoing improvement efforts and recredentialing process. We appreciate your input and your cooperation to evaluate clinical care concerns that have been identified and to facilitate performance improvement measures to resolve areas of opportunity.

Upon consideration of all relevant information pertaining to the issues raised, and because the concerns are ongoing and impact patient care, it has been recommended that a Performance Improvement Plan ("PIP"), overseen by the Care Monitoring Committee, be developed to assist you in successfully addressing the opportunities that have been identified. We appreciate you meeting with us today to discuss the PIP and we look forward to working with you to resolve these areas of concern.

The PIP that we are recommending to you consists of the following core elements:

1. *Collegial participation in a focused review of surgical practices;*

2. *Development of a mutually agreed upon mentoring plan with an assigned mentor to facilitate and guide improvement efforts;*

3. *Development of a personal development plan to evaluate and improve areas of identified opportunity; and*

4. *Agreement to fully engage in ongoing monitoring and peer review processes and take accountability for your own professional development and performance improvement.*

Additional details that are necessary to effectively implement these elements are addressed in the attached PIP, which is intended to be utilized by you, your mentor and the Care Monitoring Committee going forward. After you have an opportunity to review this letter and the enclosed materials, please let us know if you have any additional questions or need any further clarification regarding expectations and next steps.

Please understand that your agreement to voluntarily abide by and participate in this PIP is not considered a restriction of your privileges. It is not an adverse professional review action and of itself will not be reported to the National Practitioner Data Bank.

To demonstrate your commitment to work with us and your willingness to participate, please sign and return the attached PIP within 3 business days, keeping a copy for your reference. A copy of the PIP and your agreement to participate will be provided to your mentor and the Care Monitoring Committee as they consider your progress and completion of the PIP. Quarterly reports on your progress will be provided to the Care Monitoring Committee.



EXHIBIT B

EXHIBIT A_011

If you decide not to participate in the PIP as outlined in this letter, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to Sanford's Peer Review and Credentials policies.

Thank you for your anticipated cooperation and participation in Sanford's ongoing efforts to improve the care we provide. If you have any questions or wish to discuss this matter further, please feel free to contact me.

Sincerely,


Steven Briggs, MD
Vice President Medical Officer
Sanford Fargo Medical Center

Enclosure:     PIP Agreement

cc:     Confidential Peer Review File

**Performance Improvement Plan Agreement**
**For Sabha Ganai, MD**

Concerns have been identified and explained to me regarding the following:  prolonged operative times (especially with robotic surgery), occurrence of post-operative complications, and higher than expected rates mortality. Because these concerns are ongoing and they impact patient care, I, Sabha Ganai, MD agree to the following stipulations regarding my surgical practice at Sanford Fargo Medical Center.

1. I agree to collaboratively participate in a Focused Professional Practice Evaluation (FPPE) to further evaluate my surgical technique and acumen, and to determine measures I can take to reduce operative times and improve patient outcomes. I understand that successful completion of the FPPE will be a significant basis for determining success with this Performance Improvement Plan (PIP). I acknowledge that the following elements will be included in my FPPE.

   - ***Evaluation of Care.*** I acknowledge that any of my patient care records and quality reports may be reviewed to assist in determining opportunities to improve upon my clinical care and surgical skills.

   - ***Concurrent Collegial Consultation/Procedural Proctoring.*** I agree to seek collegial consultation pre-operatively with my assigned proctors for at least my next 20 scheduled surgical cases involving the esophagus, pancreas and hepatobiliary system, and acknowledge the following:

     o I acknowledge that my proctors will determine if additional cases or types of cases require concurrent collegial consultation.
     o I agree that collegial consultation will include discussion of patient risk factors, planned surgical approach and anticipation of potential complications, including identification of indications to convert to open if a laparoscopic or robotic approach is planned.
     o I agree that my proctors will have the autonomy to determine their level of oversight on the cases, which may include concurrent proctoring or participation as a co-surgeon. I further understand that my proctor's presence is required for at least 10 cases.
     o I understand that my proctors do not have the ability to override my decisions following a collaborative discussion. I agree that when there are unresolved differences of opinion, the matter will be referred to Dr. Briggs and my mentor for further discussion.
     o I acknowledge that my proctors will be assigned and I agree to work respectfully and collaboratively with them to successfully complete my FPPE.

   - ***Retrospective Case Review.*** I acknowledge that all cases with intra-or post-op complication and cases significantly exceeding the national average operative time will be retrospectively reviewed. I agree to collaboratively discuss the cases and any opportunity for improvement that may be identified.

2. I agree to develop a mutually agreeable mentorship plan with my assigned mentor, and work collaboratively with this individual to gain insight into my strengths and limitations, identify methods to consistently deliver high quality, safe patient care and ensure my successful completion of this PIP.

3. I agree to address concerns in clinical care identified through peer review, proctoring or mentoring processes and to make changes to my care practices accordingly. This may include continuing education or additional training. I understand the importance of self-reflection on my own performance and willingness to improve and make changes as indicated.

4. I will take accountability for my professional growth and performance improvement and agree to develop a professional development plan. This plan will include improvement strategy and goals, with timelines for completion, to address noted areas of opportunity. In addition to measurable performance indicators to improve rates of complication and mortality, I will define goals to incrementally reduce my operative time until I achieve nationally reported norms. My professional development plan will be in written form with a copy provided to my mentor and the Care Monitoring Committee by September 15, 2023. All proposed performance metrics must be accepted by the Committee.

5. I further understand that quarterly reports regarding my progress will be made to the Care Monitoring Committee, and that this Agreement will continue until such time as the Care Monitoring Committee determines otherwise.

I acknowledge this is a serious matter and that I will be monitored on an ongoing basis by (1) peers assigned to review cases in accordance with peer review process; (2) my assigned mentor and proctors; and (2) the Care Monitoring Committee. I understand that if I do not meet the performance stipulations as outlined in the PIP, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to the Sanford Peer Review and Credentialing policy.

I understand that my agreement to voluntarily abide by and participate in this PIP is not considered a restriction of my privileges and that this Agreement in and of itself is not reportable to the National Practitioner Data Bank. I further understand I am provided an opportunity to respond and to have this response also placed in my confidential peer review file along with this Agreement.

In addition, I acknowledge that the Care Monitoring Committee requests signed acknowledgement of this Performance Improvement Plan within three business days of the date of this letter. I further understand that if I choose not to participate in the PIP, the Care Monitoring Committee will determine the next appropriate steps.

Accepted this __22__ day of August 2023.

_____
Sabha Ganai, MD

EXHIBIT A_014

**Sanford Surgical Oncology**
801 Broadway N
Fargo, ND 58102
Ph: (701) 234-2251



September 15, 2023

Dear Dr. Briggs and Team,

This letter is a response as requested per our meeting on August 22, 2023 to review and reflect on quality improvement efforts and opportunities for myself and the Division of Surgical Oncology at Sanford Medical Center Fargo. I appreciate this opportunity and will discuss these in detail herein using facility data and then will provide a summary that includes a personal performance improvement plan (PIP).

**I.        Summary about myself, Sabha Ganai, MD, PhD, MPH, FACS, FSSO**

I am a 2001 graduate of the USC Keck School of Medicine and I am sub-specialty board-certified in complex general surgical oncology (CGSO) with training from University of Chicago in addition to general surgery training from Tufts University / Baystate Medical Center. I have additional training in clinical ethics from the MacLean Center for Clinical Ethics and epidemiology from the Harvard T.H Chan School of Public Health. I am a funded population-health scientist studying rural cancer disparities and have an h-index of 17 with over 80 publications and book chapters. I previously served as co-director of the Southern Illinois University (SIU) Outcomes Analysis and Research (SOAR) program, with experience using Lean Six-Sigma in the context of healthcare quality improvement. I joined Sanford Health in February 2020 and I am an Associate Professor of Surgery and the Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.

I serve on the Executive Council for the American College of Surgeons (ACS) Cancer Surgery Standards Program (CSSP), which has afforded me the opportunity to give invited national talks on improving quality and performance in complex oncologic care, including at the Alliance for Clinical Trials (2021) and the ACS Quality and Safety Conference (2022). I am the Disease Site Group leader for gastric and esophageal disease for the Commission on Cancer (COC) and I lead a multidisciplinary team of medical oncologists, radiation oncologists, gastroenterologists, and surgeons that includes experts from institutions like Mayo Clinic and MD Anderson Cancer Center. I was the 2023 recipient of the Society for Surgery of the Alimentary Tract Academy for Surgical Coaching Award and I have been previously honored with Alpha Omega Alpha and the Gold Foundation Humanism Honor Society. I am the Chair for the American Society for Bioethics and Humanities Surgical Ethics Affinity Group and I participate in the Sanford Ethics Committee including as a volunteer ethics consultant.

My clinical practice has focused on complex general surgical oncology, hepatobiliary surgery, endocrine surgery, and palliative surgery. My personal mission when joining our Surgical Oncology Division at Sanford Medical Center in Fargo was "to elevate care delivery for patients with cancer in North Dakota". I was excited and privileged to join my partners, Dr. Robert Sticca and Dr. Daniel Tuvin because I know as a team we are unique in our collaborative culture and our service orientation. My vision to provide "optimal care for cancer patients" is centered in both population health and ethics, requiring grounding in a multifaceted and multidisciplinary process for integrated care delivery and improving access as a form of justice. Part of my efforts and expertise fulfilling this mission has to do with analysis of quantitative and qualitative data, and I meet weekly with a team at Sanford Research in Sioux Falls in the conduct of these research efforts. The conceptual framework for my work has previously been summarized in the graphic included in the following ASCO _____

EXHIBIT C

https://dailynews.ascopubs.org/do/access-cancer-care-rural-populations-barriers-and-solutions

I am a values-driven leader and I strive for excellence in my team with a goal of delivery of optimal care for our cancer patients in a compassionate and patient-centered fashion. My personal behavioral style using the DISC inventory is shared by many surgeons: 'Decisive' with the subtype 'Implementing Conductor'. These are individuals who are self-motivated, expeditious, and attracted to challenges and results. Using Clifton StrengthsFinder, my top five leadership strengths are being a maximizer (a person who stimulates group excellence), a relator (maintains close relationships to achieve a goal), having self-assurance (confidence in ability to act and decide), having strong ideation (ability to find connections between disparate phenomena), and having high adaptability (ability to perform one day at a time). I am a surgical ethicist and I favor a pragmatic Aristotlean virtue ethics approach which avoids dwelling in perfectionism and designates excellence as a consequence of habitual behavior. Because the practice of good habits (virtues) becomes linked to good outcomes, I have been working to teach the residents to instill greater conscientiousness in patient care delivery as a form of quality improvement. Since coming to Sanford, I have adapted my prior protocols for complex oncologic care delivery and have documented this in the form of the "White Service Handbook" as a way to standardize the delivery of care for the surgical oncology division based on best evidence within our discipline. When I started here in 2020, I prompted and quickly implemented within my division utilization of NCCN-guideline recommended practices for extended-use post-discharge VTE prophylaxis, which they recognized as important but assumed were difficult to implement because it had never been done here at Sanford. In addition, I implemented surgical oncology clinical trials at Roger Maris Cancer Center (RMCC) including the OPTI-Surg study (preoperative geriatric frailty assessment), the OPT-IN study (neoadjuvant therapy for gallbladder cancer), ECOG-ACRIN Pancreas Cyst Surveillance Study, and the International Mel-Mart II study randomizing margins for intermediate-thickness melanoma. We are working steadily to gain national recognition through our efforts in surgery trial accruals which has gone from non-existent to above average in comparison with other academic medical centers.

**II – Vizient Data**
When we met on August 22, 2023, I was provided a data point of an O/E ratio of 1.4 and increased operative times as the rationale to proceed with a performance improvement plan (PIP) covering pancreatectomy, hepatectomy, and esophagectomy. I signed this PIP in good faith, completely understanding this was noise-laden data from Vizient, and after correcting the nonoperative and palliative cases, my O/E ratio is under 1. As you are aware, Vizient is a database that provides operational data derived from administrative coding (billing) without clinical verification. It is designed to be able to quickly compare hospital performance and safety parameters, but it is not designed to reliably benchmark surgeon performance or distinguish the quality of departments or service lines. This is known to be confounded by the quality of documentation and capturing appropriate DRG categories. Unfortunately, because of this, if the clinical documentation within a facility has failed to capture the complexity and acuity of patients through the system, a hospital or service line could be perceived as providing poor quality of care.

In January 2021, because of my prior QI expertise, I was asked by the Department of Surgery to review every mortality and patient safety indicator 'never event' attributed to General Surgery for the year 2020. Detailed chart review of every attributed mortality revealed an intrinsic validity of the report as less than 40%, with many patient deaths included that were not causally associated to any operation or were occurrences with surgeons in other Departments or Service lines. This lack of causality becomes a pitfall with Vizient as simple sequencing of events during any inpatient stay is not possible (a preop VTE is considered the same as a postop VTE since the process to tell the difference can seldom be distinguished with codes). In addition, we raised concerns on reliability of data as there were patient deaths we had discussed in M+M and QI conferences that were not included in the data set. When similar observations were discussed with Dr. Clifford Ko, Director of Quality for the American College of Surgeons during his visit to Sanford Broadway Medical Center in 2022, he reminded us that Vizient was never supposed to be used for performance benchmarking beyond hospital-to-hospital comparisons. There is simply more noise than signal by design.

Table 1 summarizes the seven deaths that were attributed to me by Vizient, along with assessment using a "Plus/Delta" approach, a Crew Resource Management technique to explore opportunities for improvement:

**Table 1: Vizient-Attributed Mortality (2022-2023)**

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2338732<br>Admit 1/5/2022<br>Surgery: Whipple<br>Death 1/15/2022<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 6cm IPMN, BMI 43.5, AF on Eliquis<br>Fistula risk score of 28.5% (high risk)<br><br>Whipple with Roux en Y recon (short mesentery), developed Pancreas fistula | Pre-habilitation<br><br>Surveillance for over a year; Tried to observe cyst, but worrisome features developed/persisted. | Failure to Rescue a POD10 aspiration event<br>Needed NGT replaced rather than diet advanced after return from IR.<br><br>Better communication with ICU: After this event, Tonya and I met with ICU charge nurse to work to improve 2E nursing communication with resident team members and attending since our team and myself were never notified when a problem did occur. |
| E1861093<br>Transfer Accepted: 2/8/2022 5pm<br>Transfer Arrived: 2/8/2022 823pm<br>Surgery: ASAP after 9pm<br>Emergent Abdominal exploration with cholangiogram<br>Death: 2/9/2022 1738<br><br>DISCUSSED IN QI AND M+M CONFERENCES<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 83M with cardiac history, prostate cancer, cholecystitis.<br><br>Accepted in transfer after Surgery completed around noon at Altru: Lap converted to Open cholecystectomy with bile leak.<br><br>This was an intraop mishap leading to transection and excision of 6cm of portal vein in addition to hepatic duct<br><br>Vein occlusion exceeded 12hrs.<br>Lactate 16 prior to OR. | I called in my partner out of bed to confirm missing anatomy and my plan for proceeding with comfort measures instead of a certain to fail attempt at vascular reconstruction.<br><br>I documented everything with Risk Management in the morning.<br><br>Withdrawal of care occurred later in the day when family arrived. | Nothing. |
| E2158042<br>Admit 3/24/2022<br>Consult for SBO 3/31/2022<br>Death 4/5/2022<br><br>NON OPERATIVE CONSULT<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 76F with Stage IV breast cancer and peritoneal carcinomatosis.<br><br>There was no plan for operative intervention. | We recommended hospice and she agreed.<br><br>This was a patient-preference concordant death. | Nothing – this was a consult with no expected benefit from surgery. |

EXHIBIT A_017

|  | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2620805<br>Admit 3/18/2022<br>Death 4/20/2022<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 77M with Stage III esophageal cancer s/p esophagectomy Oct 2021, receiving adjuvant nivolumab immunotherapy<br><br>Developed PCP pneumonitis over week prior to admission that was likely secondary to adjuvant immunotherapy. This was held by Dr. Vegunta and the patient was started on steroids. Patient ended up intubated and later received a tracheostomy by Dr. Mistry. | I visited patient's wife periodically during the hospitalization to check in. | Nothing – this was an Unfortunate situation of immunotherapy-related PCP pneumonitis >6 Months after esophagectomy |
| E1892283<br>Admit: 1/9/2023<br>Surgery: Whipple with SMV venorrhaphy<br>Death: 1/17/2023<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 74F with symptomatic main duct IPMN, prior lap chole with bile leak, frailty, malnutrition.<br><br>Postoperative delirium<br>Delayed gastric emptying<br>Fistula risk score 4.4% (low risk)<br><br>The patient had evidence of DGE when I saw her on Monday POD 7 (diet advanced over weekend by team). I made her NPO at the time and instructed on call resident to consider NGT. On POD 8, it was recognized that she needed an NGT, but she aspirated and coded around 8am. | Prehabilitation (PT and nutrition)<br>Geriatrics consultation<br><br>I initially declined surgery in Oct 2022, and I allowed patient (and family) to convince me to operate as she was symptomatic with repeat flares. We did wait until nutritional and ambulatory status improved. | Failure to Rescue a POD8 Aspiration event. We should have placed an NGT sooner to avoid aspiration.<br><br>The patient should have had her HOB elevated as part of GI aspiration precautions |
| E1812727<br>Transfer Accepted: 1/22/2023<br>Surgery: Emergent Abdominal Exploration<br>Death: 1/22/2023<br><br>PALLIATIVE CARE + HOSPICE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 62M with Stage III gastric cancer (s/p total gastrectomy, T4a N3 30/35 nodes positive); completed therapy and under surveillance via Cancer Treatment Centers of America in Chicago.<br><br>Presented with ischemic bowel Friday in Dickinson, left AMA to travel elsewhere, transferred emergently from Bismarck on Sunday am. | We took patient to OR appropriately<br><br>When we identified he had an internal volvulus with ischemia for several days and he did not have enough viable bowel available to perform an esophagojejunostomy, I talked to family while team closed, and he was made comfort care with time given to have family from Dickinson arrive to say goodbye.<br><br>There was good communication with family and death was preference-concordant. | I was later instructed by Dr. Mannuru that this patient could have been accepted/switched in transfer from Bismarck to observation status instead of inpatient status to deflect mortality reporting. I was unaware of this at the time.<br><br>We did our best to stabilize and bring to OR ASAP when team was available, so I otherwise would not have changed my approach. |

EXHIBIT A_018

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E1848027<br>Admit: 2/22/23<br>Surgery: Emergent Whipple with Double RY reconstruction 2/23-24/23<br>Death: 3/2/23<br><br>PALLIATIVE CARE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 76M s/p open RYGBP 20 y ago, recent COVID+ <3wks prior, AVR, COPD, BMI 37, presenting with obstructive jaundice from periampullary cancer, TBili 26, INR 8<br><br>Admitted after syncopal episode.<br>Drs. Meidinger/Vogels did a lap assisted ERCP.<br><br>I was called to come in after 5pm to address iatrogenic perforation.<br>Informed consent obtained from wife 5:30pm. >3hrs was spent lysing adhesions. Fistula Risk Score = 42.3% (high risk)<br><br>Washout required after heparinization restarted later that day secondary to profound coagulopathy.<br><br>Patient coded on POD7 while in ICU. He described sense of doom followed by Brady/PEA followed by CPR with ROSC. I spoke with wife and advised considering withdrawal of care given pressor requirement, hyperkalemia, etc. Possible VTE while on anticoagulation as recently switched from heparin gtt to Lovenox. | Patient wanted everything done per wife. Patient was appreciative of care he was given when he had capacity to discuss care delivered.<br><br>Good communication with patient and/or wife throughout care. | SMCF teams are not well equipped for Whipples and have difficulty locating appropriate suture, Castro-Viejos, etc, for emergencies.<br><br>We may have had a pro-thrombotic state despite anticoagulation status related to his COVID+ status and compounded by profound hyperbilirubinemia. We perhaps should have kept him on heparin gtt rather than switch him to Lovenox.<br><br>Under normal/typical circumstances he would have been stented and optimized during neoadjuvant therapy but this surgery was initiated in an emergent fashion in the wrong facility and in the middle of the night. |

### III – Cancer Quality Improvement Program (CQIP)

The goals of CQIP are to improve process and outcomes for the care of patients with specific cancers using feedback of data as entered into the National Cancer Databases (NCDB) back to facilities. Surgical Oncologists who perform mostly foregut and hepatopancreaticobiliary (HPB) procedures will understandably have higher morbitidity and mortality to that compared to those who perform breast and soft tissue procedures, and these findings may be further influenced by volume relationships. In addition, the expected survival by stage will be different for every disease site. This leads to the need to benchmark procedure-specific and cancer-specific metrics and compliance to standards rather than general outcomes for any cancer center. Long-term oncologic outcomes (overall survival, recurrence-fress survival) are also parameters of interest, requiring time-to-event analyses. Via the COC, we participate in the CQIP program, which relies on data inputted into the NCDB in a protocolized fashion by certified tumor registrars with inclusion of long-term follow-up. While the process for assessment of survival generates the robustness of the NCDB, there is a two-year delay in receipt of CQIP mortality benchmarking reports. The 2022 CQIP Annual Report data (2018-2020) showed outcomes for SMCF/SMCB/RMCC that *were not significantly* different from expected outcomes at COC facilities (Table 3). Note that confidence intervals can be wide based on sample size and small number of events.

**Table 3: CQIP Unadjusted 30-day Mortality (2018 – 2020)**

| Operation for Cancer | Fargo RMCC | All COC | P |
|---|---|---|---|
| Pancreatectomy | 2.2% (95% CI, 0.1 – 10.3%) | 2.3% (95% CI, 2.1 – 2.4%) | NS |
| Esophagectomy | 6.1% (95% CI, 1.1 – 19.1%) | 3.0% (95% CI, 2.8 – 3.3%) | NS |

*NS, not significant, p>0.05*

Table 4 demonstrates benchmarked performance standards for lymphadenectomy at SMCF/SMCB:

**Table 4: CQIP Lymphadenectomy Reports (2018-2020)**

| Measures | Fargo RMCC | All COC | P |
|---|---|---|---|
| Colectomy >12 nodes | 96.1% (95% CI, 90.8 - 100%) | 94.4% (95% CI, 94.1 – 94.6%) | NS |
| Gastrectomy > 15 nodes | 60% (95% CI, 17.1 – 100%) | 71.8% (95% CI, 70.1 – 73.5%) | NS |

*NS, not significant, p>0.05*

The best way to address the suboptimal gastrectomy lymph node harvest is for us as an institution to continue to be intentional about performing a D2 lymphadenectomy with gastric cancer resections. Recent analysis of NCDB gastric cancer data presented at the 2023 Digestive Disease Week confirms this metric is linked with long-term overall survival, and surgeons happen to have better nodal harvests with robotic approaches. The CSSP currently recommends nodal harvest >16 to be an updated performance standard based on the work of my COC disease site group team of experts. Meeting this has been an issue nationwide.


**IV – ACS NSQIP Data**

The American College of Surgeons National Surgical Quality Improvement Program (NSQIP) differs dramatically from Vizient in that data are verified and inputted by a clinical research nurse specialist. Outcomes can be risk-adjusted by facility and are standardized leading to high internal validity and generalizability. Because of the design, we are also able to stratify data so outcomes can be examined in a procedure-specific fashion or stratified to inpatient or outpatient status. Of note, we review our Department surgical performance reported through NSQIP twice yearly and this has continued to show exemplary results, including data discussed by our Surgeon Champion, Dr. Sticca, earlier this week.

Table 5 summarizes data compiled from 01/01/2020-08/31/2023 from NSQIP. The first metric, "occurrence/case ratio", takes account any morbidity, readmissions, reoperations, and mortality.

**Table 5: NSQIP Mean Occurrences/Cases, (2020 – 2023)**

| Subgroups | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|
| Outpatient Cases | 1.2 | 1.5 | P< 0.05 (better than expected) |
| Inpatient Cases | 2.1 | 2.0 | NS (as expected) |
| Pancreatectomy | 2.0 | 2.1 | P<0.05 (better than expected) |
| Hepatectomy | 1.3 | 1.9 | P<0.05 (better than expected) |
| Esophagectomy | 3.0 | 2.9 | NS (as expected) |

Note that this metric is unadjusted and does not take into account risk adjustment for complexity but has been stratified by procedure. The NSQIP General Surgery patients includes all adult cases performed by General Surgeons, Acute Care Surgeons, Bariatric Surgeons, Endocrine Surgeons, Colorectal Surgeons, Hepatobiliary Surgeons, and Surgical Oncologists. Perioperative morbidity is 44% for pancreatoduodenectomy and 46% for esophagectomy (Low 2010) so would be expected to be greater for an HPB/GI surgeon doing these procedures compared to the average general surgeon.

Further exploration of my NSQIP mortality shows these data are not significantly different from national NSQIP data, except my outpatient and hepatectomy performance is significantly better than expected (Table 6). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

EXHIBIT A_020

**Table 6: NSQIP Mortality, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 0 | 0.08% (0.07 – 0.09%) | P<0.05 |
| Inpatient Cases | 4.4% (95% CI, 0.6 – 8.1%) | 5.2% (3.0 – 7.4%) | 2.34% (2.30 – 2.37%) | NS |
| Pancreatectomy | 5.9% (95% CI, 0 – 13.8%) | 7.5% (2.2 – 12.9%) | 1.67% (1.53 – 1.81%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 1.43% (1.28 – 1.58%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 23.7%) | 8.9% (0.6 – 17.2%) | 3.1% (2.64 – 3.57%) | NS |

*NS, not significant*

The mortalities defined in Vizient with Whipples were included. My mortality for distal pancreatectomy is zero. The one esophageal mortality that is present here but was not included in Vizient was an octogenerian patient with esophageal SCC from Thief River Falls who was DNR/DNI (her surgery was indicated due to dysphagia and stricture several months after definitive chemoradiation with failure to dilate/stent secondary to Type IV paraesophageal hernia). Postdischarge she developed a pleural effusion and COPD exacerbation and elected not to travel or be readmitted. We were never contacted since she was already set up with hospice.

**Table 7: NSQIP Readmissions, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 7.0% (95% CI, 0 – 14.5%) | 6.1% (3.2 – 8.9%) | 2.2% (2.2 – 2.3%) | NS |
| Inpatient Cases | 12.3% (95% CI, 6.3 – 18.3%) | 9.3% (6.4 – 12.2%) | 8.5% (8.4 – 8.5%) | NS |
| Pancreatectomy | 14.7% (95% CI, 2.8 – 26.6%) | 12.9% (6.0 – 19.7%) | 16.5% (16.1 – 16.9%) | NS |
| Hepatectomy | 12.5% (95% CI, 0 – 25.7%) | 9.5% (3.6 – 15.4%) | 9.5% (9.1 – 9.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 10.9% (10.0 – 11.7%) | NS |

*NS, not significant*

Further exploration of readmissions shows these are as expected from NSQIP national data (Table 7). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

**Table 8: NSQIP Reoperations, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 4.9% (2.3 – 7.5%) | 0.92% (0.90 – 0.94%) | P<0.05 |
| Inpatient Cases | 2.6% (95% CI, 0 – 5.6%) | 5.4% (3.2 – 7.7%) | 4.2% (4.1 – 4.2%) | NS |
| Pancreatectomy | 2.9% (95% CI, 0 – 8.6%) | 5.4% (0.8 – 10.0%) | 1.7% (1.5 – 1.8%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 2.8% (2.6 – 3.0%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 15.5% (14.5 – 16.5%) | NS |

*NS, not significant*

Further examination of reoperations shows these are also similar to NSQIP national data (Table 8). The one reoperation I did after pancreatectomy was a 20 minute wound exploration I performed out of concern for dehiscence (fascial suture was found to have loosened but was intact and was reinforced). The reoperation after esophagectomy was secondary to anastomotic leak, and the observed rate is significantly less than expected nationally for our team.

Examination of organ space infections shows this is similar to national NSQIP data (Table 9). Composite inpatient and outpatient data are not controlled for case complexity which is why data are further stratified by procedure. This metric would be determined by placement of a drain, and can be a surrogate metric of Type B/C pancreas fistula, bile leak, and anastomotic leak.

**Table 9: NSQIP Organ Space Infections, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 2.3% (95% CI, 0 – 6.8%) | 0.4% (0.2 – 0.6%) | 0.12% (0.12 – 0.13%) | NS |
| Inpatient Cases | 7.0% (95% CI, 2.3 – 11.7%) | 7.0% (4.4 – 9.5%) | 3.0% (3.0 – 3.1%) | NS |
| Pancreatectomy | 8.8% (95% CI, 0 – 18.4%) | 11.8% (5.3 – 18.4%) | 13.4% (13.1 – 13.8%) | NS |
| Hepatectomy | 4.2% (95% CI, 0 – 12.2%) | 6.3% (1.4 – 11.2%) | 5.5% (5.3% – 5.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 8.9% (0.6 – 17.2%) | 12.3% (11.4 – 13.2%) | NS |

*NS, not significant*

My pancreatectomy and hepatectomy length of stay outcomes are better than expected (Table 10), which may be related to increased use of robotic-assisted approaches in my practice and through implementation of an ERAS protocol for pancreatectomy within the Division. My esophagectomy patients have a LOS of 10 days. I typically prepare esophagectomy patients to be in the hospital 10-14 days because of frailty concerns, care coordination for outpatient tube feeding, diet advance, and speech swallow assessments prior to discharge and the high distance travelled for our patients. Note that the Virginia Mason group of HPB/GI surgical oncologists reported a LOS of 10-12 days for esophagectomy and 8-10 days for pancreatectomy with a similar rural/regional referral catchment area (Low 2010).

**Table 10: Median Hospital Length of Stay (days) with Interquartile Ranges (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 0 (0 – 1) | 0 (0 – 1) | 0 (0 – 1) |
| Inpatient Cases | 6 (3 – 9) | 6 (3 – 9) | 4 (2 – 7) |
| Pancreatectomy | 6 (5 – 8) | 6 (5 – 9) | 7 (5 – 10) |
| Hepatectomy | 1 (0 – 2) | 3 (1 – 5) | 4 (3 – 7) |
| Esophagectomy | 10 (7 – 17) | 9 (7 – 14) | 9 (7 – 14) |

My inpatient cases and division overall do have a longer length of stay than the average US general surgeon as our practice includes complex cases including HIPEC, esophagectomy, gastrectomy, pancreatectomy, hepatectomy, ovarian cancer cytoreductions, multivisceral resections, and resections of retroperitoneal sarcoma, plus specific consultations for palliative surgery and advanced hepatobiliary reconstructions. In addition, we receive a rural referral base for cancer care where travel times often can exceed 3-8 hours.

**Table 11: Utilization of Robotic Technologies**

| | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 23.3% | 5.3% | 8.7% |
| Inpatient Cases | 32.5% | 13.1% | 7.5% |
| Pancreatectomy | 26.5% | 11.8% | 9.5% |
| Hepatectomy | 58.3% | 20.0% | 7.0% |
| Esophagectomy | 41.7% | 11.4% | 16.9% |

Overall, my utilization of robotic technologies (DaVinci Xi) is greater than the national average and encompasses the majority of robotic use in our Division of Surgical Oncology (Table 11). This use of robotic techniques probably impacts my average operative time as it typically takes longer to do the same operations robotically compared to open. In addition, I am doing oncologic robotic operations of high complexity, including those previously only performed at quaternary cancer centers (like robotic D2 lymphadenectomy). Because of this, I am the recipient of directed referrals from providers including Dr. Hannan (Altru Cancer Center), Dr. Potti (Cancer Center of North Dakota), Dr. Kurniali (Sanford Bismarck), and Dr. Gupta (Sanford RMCC) because they know I have a preference for considering minimally-invasive oncologic resections, and because of the strong relationships I have with my patients.

EXHIBIT A_022

My Whipple operative time is significantly longer than average (Table 12), but I have done a fair number of high biliary tract resections for perihilar cholangiocarcinoma including double hepaticojejunostomies and adding choledochoscopy set up into the procedures, all of which leads to increased time plus any time required waiting for frozen sections several times a case. In addition, 43% of my Whipples have coded for a vascular repair or reconstruction. I have also done several revisional Whipples after Roux en Y gastric bypass, two including gastrectomy and one maintaining the remnant stomach.

**Table 12: Operative Time (minutes)**

| | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|
| Outpatient Cases | 121 (95% CI, 100 – 142) 23% robot | 74.9 (74.8 – 75.0) 9% robot |
| Inpatient Cases | 366 (95% CI, 330 – 401) 33% robot | 150 (149.6 – 150.2) 8% robot |
| Distal Pancreatectomy | 400 (95% CI, 336 – 463) 73% robot | 242 (240 – 244) 17% robot |
| Open Whipple/Total Panc | 561 (95% CI, 508 – 614) 43% vein repair/recon 29% complex (extrahepatic BD resection or Roux recons) | 383 (381 – 385) |
| Hepatectomy | 208 (95% CI, 151 – 264) 58% robot | 230 (228 – 231) 7% robot |
| Esophagectomy | 487 (95% CI, 395 – 579) 42% robot | 384 (380 – 388) 17% robot |

Note that NSQIP data represents a sample and does not include all my cases at Sanford.

**IV – My Intuitive App**

I have completed 106 DaVinci operations at Sanford Broadway Medical Center with an average use of 3.5 hrs per patient. The precise relationships between case type and overall operative time can be difficult to correlate and tabulate since I often do redock the robot in order to complete more than one procedure under the same anesthesia (i.e. cholecystectomy and distal pancreatectomy; liver resection and oophorectomy). I am the only provider in the region who has been doing Robotic HIPECs, which adds an extra 2-2.5 hours of case time (setup time plus a 90 minute chemoperfusion). In addition, I include D2 lymphadenectomies in my complex foregut cases for their established oncologic benefit, which do take more time but are recognized to improve long-term survival.

I have performed several palliative double bypasses (hepaticojejunostomies + gastrojejunostomies) robotically, which while being longer cases than open palliative double bypasses, allows for better visualization, smaller incisions, and a goal of removal of a transhepatic catheter, thus dramatically improving quality of life considering a median LOS of 4 days. My average time for robotic cholecystectomy is 97 minutes, but notably these are radical cholecystectomies for mass or cancer (+liver/nodes) and/or remnant cholecystectomies, which is a complex reoperative operation that bears higher risk.

Of note, I have been doing a large proportion of robotic complex distal pancreatectomies, including pancreas neck lesions (tumor above SMV/portal confluence), as well as performance of splenic-preserving distal pancreatectomies in 67% of these operations. These cases are all notably more challenging than resection of tail lesions that include the spleen, so do take understandably more time to complete safely.

**V – Attribution Bias and Just Culture**

My occurrence rates are not significantly different from expected for the case complexity I am expected to manage during my clinical duties, and I do have shorter than expected hospital LOS for many of these cases. I continue long-term surveillance with my patients with maintain excellent results including great feedback from medical oncologists and patients. I have not had a concern raised to

EXHIBIT A_023

me during my performance evaluations and I have been reminded by both Dr. Traynor and Dr. Garcia that I do have great responses on patient surveys.

To be fair, statements made attributing 'significantly worse outcomes' to me or my Division are false and are not founded by data controlled for coding error, complexity, risk, and the emergent nature of care for patients seen while on call. We as a health system need to consider consultation with an external data scientist and utilize validated clinical databases (like NSQIP) preferentially while being cautious in use and presentation of partitioned Vizient data without clinical correction as we are aware as a team through our prior study and expert opinion *and the literature* that there is poor intrinsic validity with assessing a service line or individual surgeon outcomes. In 2020, the intrinsic validity was less than 40% of cases attributed to the SMCF General Surgery Service Line, which does not instill trust in the system.

Vizient is not and was never designed to be used outside of hospital-to-hospital comparisons and it is an anchoring bias to assume it is the perfect tool. Internal validity is a metric that reveals the ability of an analysis to provide meaningful results that resemble what we would consider truth. Poor internal validity means the tool provides errors in estimation just as often as there is meaningful signal. In a study from Vanderbilt University examining mortality events assigned by Vizient to the otolaryngology service line, only 32% of events were actually attributable to their department (Freeman 2021). In a study from UMass Medical Center, 20% of cases designated in the Vascular Service line did not involve a vascular surgeon and only 69% of vascular surgery cases were included in the Vizient Vascular service line data set (Fang 2020). These authors highlighted, "analytic services provide powerful tools for outcomes analysis, but [Vizient's] predetermined service lines must be used with caution and carefully scrutinized at the division level to ensure that results mirror actual practice patterns".

Moreover, our goal as a system should not be to satisfy external motivations of improving our Vizient ranking at all costs to improve our visibility, but first focus on methods to prioritize delivery of optimal care to patients, correct low hanging fruit, improve our culture of safety, and also consider documenting and coding appropriately to improve our DRGs which will optimize our Vizient ranking. Attacking the performance of individual surgeons or service lines without data review will only provoke defensiveness of surgeons, decrease the credibility of the QI process, impair the culture of QI, and can actually provoke unintended issues of impaired surgeon well-being causing increased errors. It is important to consider "balancing measures" and checks to prevent unintended consequences of trying to improve one aspect of the system at the expense of the other. Remember that the 2014 edit to the Triple Aim, henceforth, the 'Quadruple Aim' includes: improving quality of care, improving patient satisfaction, cost reduction (adding value), and improving healthcare team well-being. Well-being and purpose at work for physicians is recognized to be critically linked with improved outcomes.

I strive for patient-preference concordant care as a goal, which as a cancer provider unfortunately sometimes means aiming for a good death in accordance to patient preferences. We must accept that until there is a "cure for cancer", we will unfortunately observe death to be a proximal outcome in patients with gastrointestinal and peritoneal malignancies, despite and in disregard to our best intentions. Death of mortal humans must then be reconciled without shame or blame, particularly if we are taking care of populations and are performing surgery harboring risk. Palliative surgery is the highest risk group of operations, with a risk of mortality of 20-30%, but it is typically performed congruent to a patients goals of care while negotiating risks and benefits and alternatives and respecting individual patient autonomy.

A "Just Culture" is a preferred way to improve quality across the spectrum and improves patient safety by empowering communication rather than creating fear of punishment and team members hiding their concerns. If we punish those individuals who take care of patients who later succumb to their disease because we are mortality-averse, we are then incentivizing those who game the system and cherry pick or deny care, which is unjust. We must allow clinicians who care for high risk populations to *care* for their patients, take accountability for their actions, and responsibility for doing better, and we must make it easier for them to make these duties safer.

## VI – Failure to Rescue

Preventable death and adverse events are a central concern in my discipline. Esophagectomy and pancreatectomy are considered high-risk surgeries with understood hospital-volume relationships (Birkmeyer 2003) and surgeon-volume relationships (Birkmeyer 2003), and major complication rates exceeding 40-50% (Low 2010). Of interest, having a high risk of complications does not correlate with having high mortality (Ghaferi 2012). The concept of "Failure to Rescue" (FTR) refers to mortality after a major complication, and explains hospital variation in mortality rates across procedures with high complication rates. Variability in procedure-specific complication rates may not very different across hospitals, but FTR is significantly associated with high-mortality facilities. For pancreatectomy, FTR is inversely linked to system characteristics including teaching status, hospital size >200 beds, census greater than 50% capacity, increased nurse-to-patient ratio, and hospital technology (Ghaferi 2010). Facility characteristics that allow for early identification of problems, whether by nurses or residents, allow for prevention of complications that later spiral towards FTR. These data suggest there are structures and processes of care within hospitals that are recognized to be linked with surgical outcomes. The attached Figure demonstrates how the system influences recognition and addressing complications that lead to FTR (Ghaferi 2012).



**Fig. 2.** Conceptual model outlining the interaction between hospital resources, behaviors, and attitudes in the early recognition and effective management of major postoperative complications.

For my 2022 FTR aspiration event, the patient had delayed gastric emptying, an entity found in 20-30% of Whipple patients. He had his diet advanced automatically upon return from IR despite his distension, then aspirated and was subsequently managed without discussion or input from the surgical team. He needed an NGT and this was not recognized by team members or nursing staff. For my 2023 aspiration event, the patient also did not get an NGT placed in a timely fashion. My colleague had a similar issue where a resident advanced the diet during M+M and when this was corrected after talking to the attending during conference, the patient had already been fed and he was found down dead without a monitor. I had a near miss patient in 2020 who aspirated post esophagectomy, but he was able to be promptly intubated and after recovery is alive with no evidence of disease.

FTR in Surgical Oncology populations was investigated using the Pennsylvania cancer registry with findings of aspiration in 5% of patients and the presence led to a mortality of 16% (Friese 2008). The rescue process has been examined closely and includes the following domains: (1) Teamwork, (2) Immediate Action Taking, (3) Psychological Safety (not being afraid to speak up), (4) Recognition, (5) Communication (Smith 2018). We could have done better with all these domains across these FTR aspiration events. We have had aspiration precautions and HOB elevation mandates for our esophagectomy patients (this is a lifetime risk) but these precautions are seldom followed and it is fairly common to manually reposition patients during rounds so their HOB is elevated.

EXHIBIT A_025

**VI – Surgical Education and Communication**

One of the key concerns we had been dealing with is structural in the form of supervision of resident teams and how patients were assessed. Until July 2023, we were dealing with cross coverage concerns where often unknowingly the only person physically rounding on a patient in the morning was a PGY-1, leading to suboptimal care for our patients and an inability to rescue problems through lack of identification. We have addressed this, and the White Service is now structured with a PGY-1, PGY-3, and PGY-5, with appropriate accountability and graded supervision. We have reinforced with the residents that there must provide appropriate communication with attendings on any change in status or decisions that need to be made. Much of this is in the form of process and standards is also documented in the White Service Manual.

Our residents still have some challenges in the modern educational paradigm. Many of our senior residents have never needed to place a nasogastric tube in a patient because of nurses who can do so, and I have had to start supervising chiefs to make sure they are comfortable. I have encountered times when more than resident has preferentially tried to order IR NG tubes when nurses are not available, which is not cost-effective and puts our patients at risk of aspirating through time delays. We probably need to develop a simulation to help educate them on how to make sure the NGT is functioning and how to place them. I am always happy to place NG tubes on anyone the moment I am made aware that there is a need.

Recognition of Delayed Gastric Emptying (DGE), an entity found in 20-50% of pancreatectomy and esophagectomy patients, and the necessity for NGT placement is a critical piece of education for nurses and residents that we will need to work on. This includes symptoms like nausea, reflux, hiccups, and belching. It includes signs like distension and holding an emesis bag. The hardest challenge for trainees is that gastric motility is independent of small bowel and colonic motility, and that DGE may be present despite flatus. Many of the residents and ICU nurses often will just feed our patients without assessing for DGE because of the presence of flatus, which is a major pitfall and educational hurdle we still need to overcome.

**VII – ICU Care**

The ICU should be considered the safest place in North Dakota, so I was surprised to learn that my partners were afraid of the care delivered in the ICU at Sanford Broadway Medical Center. I was surprised to see how oversedated patients were and how we were often intentionally exacerbating postoperative delirium in our geriatric patients with inappropriate protocolized medication use with drugs like Benadryl given for bizarre indications like agitation. I do see a subtle overconfident cowboy mentality of care delivery in this unit without communication as a continued safety issue. We need to work together with the nurses so that our residents are allowed to participate in the care of these patients and that we as attendings are kept in the loop. This is a work in progress.

**VIII – Time versus Efficiency**

I proudly spend as much time as I reasonably can with my patients, in clinic, on the floors, and in the operating room. I give patients and families my time based on what they need to make a decision. My new patient blocks for patients with complex malignancies are intentionally one hour long, because I know that investing in more time to teach the patient/family and answer patient/family questions increases patient satisfaction, improves the provision of goal-concordant care, and improves the efficiency of care delivery given the complexity of what we do. Taking an appropriate amount of time is also essential for provision of optimal informed consent (a topic I have written numerous book chapters on in the scope of Surgical Ethics).

Of secondary interest, the finding of significantly longer time in the operating room has been attributed to female surgeons, and has also been associated with less technical complications, shorter LOS, and better short-term and long-term outcomes (Blohm 2023). In a reflection that conscientiousness in surgery probably does matter, the commentary on this data highlighted the Navy Seal adage, "Slow

EXHIBIT A_026

is Smooth, and Smooth is Fast." (Almquist 2023).

While I understand the valid concern about my taking more operating room time for my cases, I would remind that my cases are complex, and with this in mind, I would favor improving efficiency rather than compromising patient short-term and long-term outcomes. As a member of the CSSP, I cannot advocate skimping on the node dissection for gastrectomies as that has been significantly associated with overall survival and is an important benchmarking performance metric. I also would rather take an appropriate amount of time to perform a modified Blumgart pancreaticojejunostomy that maintains its integrity rather than use a 'quicker technique' that is haphazard and increases propensity to leak. I would rather go slow with the meticulous process of taking tumor off the SMA rather than speed up and transect the vessel or cause a problem inadvertently.

I am still challenged with certain efficiencies that can be improved on, including being sure that I have my OR preference card followed (over half the time I am still given one of my partner's preference cards). I have on numerous occasions updated these cards, but that is not the problem, it is ultimately what gets picked is off another surgeon's card, and am so tired of asking why, so I stopped complaining and just wait for my needs to be fulfilled. As teaching faculty, I can also consider giving less of the case to the resident to improve use of operating room time (although I am not clear this will be linked with outcome based on the current literature which suggests increased time and improved outcomes with resident participation).

We typically have to wait 45 minutes for a an intraoperative frozen section, which can be over 60 minutes if there is a non-GI pathologist at Broadway. This effectively can limit 90-120 minutes of progress prior to anastomosis if we have to take multiple frozen sections during the course of a case. These frozen section checkpoints are a necessity for patients with hilar/extrahepatic cholangiocarcinomas and subtotal and total gastrectomies. Having to set up for a choledochoscopy or upper endoscopy can also increase OR time by 20-40 minutes.

I recently had a giant fly land on a scrub table, which while not under my control, delayed progress of my case for at least an hour since we had to open and count new instruments and suture. I do not fault the fly, nor do I fault myself, nor do I fault the team. I accept that these things happen and that we have to move on and take care of the patient. If the system allowed the fly to get into the OR, then the system as a whole must take some accountability and allow progress to happen and support the surgeon with new instruments to take the best care of the patient they can. This exemplifies 'Just Culture'.


**VIII – Performance Improvement Plan**
1. I will monitor my cases using the ACS SSR Program and NSQIP and compare my performance metrics on a quarterly basis.
2. I will continue to track my robotic cases including operative time using the MyIntuitive app.
3. I will continue to present my cases preoperatively at GI tumor board and/or at the Broadway Case Conference. Note that I introduced this conference as a biweekly discussion of case planning with image review in order to improve resident education.
4. I will continue to collaborate with my partners and schedule them to be available as backup for complex resections such as major hepatectomies.
5. Our division has agreed to require aspiration precautions including HOB elevation for all our complex GI surgical patients (HPB, foregut, HIPEC) rather than just after esophagectomy as all of these patients have issues with delayed gastric emptying (DGE), aspiration risk and FTR.
6. I will work with our division to update our White Service Manual and protocols at least twice yearly.
7. Our division will continue to work on improving resident and nursing education on delayed gastric emptying and nasogastric tube placement.
8. I will meet with ICU nursing staff to continue to improve communication with staff and our team.
9. I will work with Dr. Zriek to provide recommendations for an aspiration prevention protocol.
10. I will work on improving efficiency of my operative cases by journaling and discussing issues with staff to address delays related to cards so that these can eventually be remedied.

EXHIBIT A_027

Sincerely,

Sabha Ganai, MD, PhD, MPH, FACS, FSSO
Associate Professor of Surgery, University of North Dakota
Clinical Investigator, Sanford Research
GI/HPB Surgical Oncologist, Sanford Health
Executive Council, American College of Surgeons Cancer Surgery Standards Program

References:

Almquist M. Are women better surgeons than men? JAMA Surg 2023; E1

Birkmeyer JD, Siewers AE, Finlayson EV, Stukel TA, Lucas FL, Batista I, Welch HG, Wennberg DE. Hospital volume and surgical mortality in the United States. *N Engl J Med* 2002; 346(15): 1128 – 1137.

Birkmeyer JD, Stukel TA, Siewers AE, Goodney PP, Wennberg DE, Lucas FL. Surgeon volume and operative mortality in the United States. *N Engl J Med* 2003; 349: 2117-2127.

Blohm M, Sandblom G, Eriochsson L, Osterberg J. Differences in cholecystectomy outcomes and operating time between male and female surgeons in Sweden. JAMA Surg 2023; E1-E10.

Fang ZB, Chao C, Durocher D, et al. Assessment of the Accuracy and Reliability of Vascular Surgery Quality Metrics. Ann Vasc Surg 2020; 67: 134-142.

Freeman MH, Slayton JM, Woods MC, et al. Improving Mortality Attribution in Otolaryngology – Head and Neck Surgery. Laryngoscope 2021; 131(6): e1805-e1810.

Friese CR, Aiken LH. Failure to Rescue in the Surgical Oncology Population: Implications for Nursing and Quality Improvement. *Oncol Nurs Forum* 2008; 35(5): 779

Ghaferi AA, Dimick JB. Variation in Mortality after High-Risk Cancer Surgery: Failure to Rescue. *Surg Oncol Clin N Am* 2012; 389-395.

Ghaferi AA, Osborne NH, Birkmeyer JD, Dimick JB. Hospital characteristics associated with failure to rescue complications after pancreatectomy. J Am Coll Surg 2010; 211: 325-330.

Low DE, MadhanKumar K, Hashimoto Y, Traverso LW. Comparing complications of esophagectomy and pancreatectomy and potential impact on hospital systems utilizing the Accordian Severity Grading System. *J Gastrointest Surg* 2010; 14: 1646-1652.

Smith ME, Wells EE, Friese CR, Krein SL, Ghaferi AA. Interpersonal and organizational dynamics are key drivers of Failure to Rescue. *Health Aff* 2018; 37(11): 1870-1876.

EXHIBIT A_028

**From:** Workday Peakon Employee Voice <app@peakon.com>
**Sent:** Monday, December 11, 2023 8:52 AM
**To:** Ganai,Sabha <Sabha.Ganai@SanfordHealth.org>
**Subject:** Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private



**Your identity is protected**

Company logo

Powered by



**If you were offered the same job at another organization, how likely is it that you would stay at this organization?**

You wrote:

My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well being. I am ashamed of the administration.

You scored:

0

Download the Workday Peakon Employee Voice mobile app to reply to conversations on the go.

 

To learn more about how to use Workday Peakon Employee Voice, visit the Help Center

If you no longer wish to receive these emails, click here

---------------------------------------------------------------------

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain privileged and confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

EXHIBIT A_030

# Douglas replied to a comment you left

Only people who can reply to your comments will see your
conversation, and your identity is not displayed.

Douglas Griffin MD

 **DG**

I am sorry to hear of your feelings on this and would welcome a chance to visit
on this. this is confidential so I don't know who is responding. You can contact
me directly via email or phone 701-417-2317. Thanks Doug Griffin

**View message and reply**

Link not working? Copy and paste the URL below into your browser

https://app.peakon.com/?mailLinkId=ehVAq4EVDYANGzxRPlYAWi4eOAxHAWdf

Your answer in the survey

EXHIBIT A_031

**Sent:** Tuesday, December 26, 2023 4:31 PM
**To:** Griffin,Douglas <Douglas.Griffin@SanfordHealth.org>
**Subject:** RE: Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

Dear Dr. Griffin.

I hope you had a good Christmas.

No need to respond if you are away through the New Year.

This PeakOn comment was mine and I feel it is not fair or constructive to leave it anonymous.

I do have concerns about how our CGSO surgical oncologists are treated and I am really worried that we will soon lose a lot of what has been built to develop our infrastructure and team.

For some context, in August, I was placed on a PIP, which I signed in good faith prior to being emailed "the data" to respond to a few weeks later, calculated with partitioned unvalidated Vizient administrative data on mortality rates, fully understanding that mortality will be proportional to the type and amount of call taken by individuals within our division since we consult on the most complex patients within the system and often admit dying patients and/or need to consider palliative operations. As a team, surgical oncology manages everything directed to us from the two time zones of North Dakota plus Northern MN/SD, plus helps with everything too complex for acute care surgery or colorectal surgery or bariatric surgery or general surgery providers to handle. After responding in the PIP document with a proper analysis explaining those results with chart review and showing additional data demonstrating better outcomes and shorter LOS than national NSQIP data for cases like hepatectomy and pancreatectomy, the intent and conversation has spiraled and diverged a bit more and more at every meeting, from outcomes, to time, to efficiency, to my lack of knowledge where stapler loads are theoretically stored in Fargo while operating on a weekend. In terms of process, I still have not received a formal response or any direction from the Sanford "Care Monitoring Committee". The documents in question were submitted over 3 months ago and are attached.

At our recent meeting earlier in the week, our discussion included our Division call schedule for 2024, which does not include Dr. Sticca since he expects to be retiring *soon*. This call schedule can be referenced here:
https://docs.google.com/document/d/1sgfirDxNFa3y2o0_cx3Al45XvnM0VzBmYZvgHDGbtj0/edit?usp=sharing

Note that only QTR 1 is final, but we chose to prepare a timeline a year in advance for planning purposes.

EXHIBIT
E

There are 3-4 days out of the entire year where I mentioned that the transplant team would help us cover (this was per speaking with Dr. Mistry). This need for support was not brought up because of personal time or vacation requests, these are days the first weekend in April where I was *invited* as a speaker at the AHPBA international meeting in Miami to discuss what Sanford Surgical Oncology has been doing optimizing prehabilitation for geriatric patients needing HPB surgery, and Dr. Tuvin also needs to speak at the ND/SD ACS chapter meeting in Aberdeen SD as he is the *President* of the ND chapter and the State Chair. Both me and Dr. Tuvin are otherwise perfectly capable of managing the remaining 362-3 days of the leap year call schedule. What was remarkable about this concern for a defect in our call schedule is we were simultaneously criticized for taking too much call, but when I clarified and requested a couple days of help from the Chair of General Surgery (I would not normally ask, but this became the point of discussion), I was told harshly we could not go to these conferences, and that we had to cover CGSO at all times, which is what we were already doing making lateral arrangements for coverage of the mentioned 3 days via Transplant Surgery. It is not worth arguing about, all these attitudes are just frustrating on basis of being the antithesis of wellness and support. There is no psychological safety because I know only in a toxic culture like this I should be avoidant of even bringing these kinds of things up, knowing it will be lambasted.


I get the idea of control, but it is clear that general surgery as a 'parent' Department does not *appreciate or care* about the contributions of myself or Dr. Tuvin within the Division of Surgical Oncology, even for an idea of support or respite (even while the group was morbidly hypothesizing out loud what would happen if the two of us were both hospitalized simultaneously). We are ABS *double* board-certified (gen surg and CGSO), and we are more than happy to help general surgery and accept all the complex cases that general surgery does not want to do or lacks training or expertise to do well. *These are patients who are in need of great support and assistance who we want to serve.*


Note that Bariatrics also has a separate call schedule and is positioned as their own Department separate from general surgery, but we are not privileged the same way here despite having a separate Board examination process. We do have a very impactful role through RMCC and remain critically aligned with the needs of medical oncology and radiation oncology and improvement of oncology care within our region.


I responded to the PeakOn survey very honestly with that comment. I remain ashamed of the attitudes and statements and practices I have seen over the past few months, and I will do my best to manage through this aiming for taking the best care of our patients as possible. I see a lot of potential for growth in our Division and for oncology as a whole, but to grow, we need to be nurtured a bit instead of trampled on.

Sabha

**Sabha Ganai, MD, PhD, MPH, FACS, FSSO**

Division of Surgical Oncology
Associate Professor of Surgery, UND

Director of Surgical Education, UND

Adjunct Professor of Pharmacology, NDSU

Clinical Investigator, Sanford Research

801 Broadway N, Fargo, ND 58122

C: 413-222-4131   mc1151



January 23, 2024

Sabha Ganai M.D.

Re:     Employment Agreement (the "Agreement") – Termination

Dr. Ganai:

This letter shall confirm that Sanford has elected to terminate your Employment Agreement (the "Agreement") pursuant to Section 12(a). Your termination will be effective immediately. In lieu of 90 days' notice, Sanford will pay to you a lump sum ninety day payment of $139,435.00. You will also be receiving information regarding continuation of any elected health and dental benefits.

You will also be receiving information regarding continuation of any elected health and dental benefits.

Sincerely,

Dr. Doug Griffin
Vice President, Clinic

1 of 1



STATE OF NORTH DAKOTA

COUNTY OF CASS

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

Civil No. _____

**SUMMONS**

Plaintiff,

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

**TO: SANFORD MEDICAL CENTER FARGO:**

[¶ 1]   YOU ARE HEREBY SUMMONED and required to appear and defemd against the Complaint in this action, which is herewith served upon you, by serving upon the undersigned an Answer or other written response within twenty-one (21) days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

Dated: July 18, 2024

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
*Pro Hac Vice Pending*
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
*Pro Hac Vice Pending*
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822

WILKING LAW FIRM

*/s/ Leo F.J. Wilking*

_____
Leo F.J. Wilking (lwilking@wilkinglaw.com)
3003 32nd Avenue S
Fargo, ND 58103
P: (701) 356-6823
F; (701) 478-7621
ND Bar ID No. 03629
*Local Counsel*

EXHIBIT A_037

STATE OF NORTH DAKOTA
COUNTY OF CASS

IN THE DISTRICT COURT
EAST CENTRAL JUDICIAL DISTRICT

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

Civil No. _____

Plaintiff,

**ADMISSION OF
SERVICE OF SUMMONS
AND COMPLAINT**

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

The undersigned, Neil J. Roesler, states that he is an attorney for Defendant Sanford Medical Center Fargo and that he is authorized to accept service of the Summons and Complaint in this matter and does hereby admit service of the Summons and Complaint dated July 18, 2024.

Dated this 19th day of July, 2024.

Neil J. Roesler (ND ID #06783)
Sanford Health
801 Broadway N.
P.O. Box 2010
Fargo, ND 58122-1000

STATE OF NORTH DAKOTA                    DISTRICT COURT

COUNTY OF CASS                    EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Sabha Ganai, M.D., Ph.D., FACS,<br><br>     Plaintiff,<br><br>          v.<br><br>Sanford Medical Center Fargo,<br><br>     Defendant. | Court File No. 09-2024-cv-03147<br><br>**DEFENDANT'S ANSWER** |

Defendant Sanford Medical Center Fargo ("Defendant")[1] as for its Answer to Plaintiff Sabha Ganai's ("Plaintiff") Complaint in the above-captioned action, denies each and every allegation set forth in the Complaint except as hereinafter admitted, qualified, explained, clarified, or otherwise pleaded, and specifically answers as follows:

## ALLEGED COMPLAINT

1.     As to paragraph 1, Defendant admits only that Plaintiff purports to assert alleged claims, but specifically denies that it violated any federal, state, or local law concerning Plaintiff's employment.

## ALLEGED NATURE OF THE ACTION

2.     As to the allegations in the first sentence of paragraph 2, Defendant admits only that Plaintiff is an oncologist who has practiced for more than 12 years, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore denies them.  As to the allegations in the second sentence of paragraph 2, Defendant admits only that Plaintiff joined Sanford Clinic North in 2020 to perform the services outlined in her Staff

---

[1] Sanford Medical Center Fargo is not the proper defendant in this case.  Plaintiff's former employer, as set forth in her Staff Physician Agreement, was Sanford Clinic North.

Physician Agreement, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore denies them.  In further responding, Defendant admits the allegations contained in the final sentence of paragraph 2, but clarifies that she was not employed by Defendant.

3.      As to paragraph 3, Defendant admits only that Plaintiff purports to assert alleged claims under N.D. Cent. Code § 34-01-20, but specifically denies that it violated any federal, state, or local law concerning Plaintiff.

## ALLEGED PARTIES

4.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 4, and therefore denies them.

5.      As to the allegations in the first sentence of paragraph 5, Defendant admits only that it is a North Dakota non-profit, but denies the remaining allegations.  In further responding, Defendant denies the allegations contained in the second sentence of paragraph 5.

## ALLEGED JURISDICTION AND VENUE

6.      Defendant denies the allegations contained in paragraph 6.

7.      Defendant denies the allegations contained in paragraph 7.

## ALLEGED FACTS RELEVANT TO ALL CLAIMS[2]

8.      Defendant denies the allegations contained in paragraph 8.  In further responding, Defendant states that the attached offer letter speaks for itself, and therefore denies the allegations contained in paragraph 8.

9.      Defendant denies the allegations contained in paragraph 9.

10.     Defendant denies the allegations contained in paragraph 10.

---

[2] Defendant denies the paragraph headings within Plaintiff's alleged "FACTS RELEVANT TO ALL CLAIMS" section.

63570387.v1-OGLETREE
EXHIBIT A_040

11.     As to the allegations contained in paragraph 11, Defendant admits only that Plaintiff entered into a Performance Improvement Plan ("PIP") in August of 2023 for the reasons outlined therein, but denies the remaining allegations in paragraph 11 as phrased.

12.     Defendant denies the allegations contained in the first sentence of paragraph 12. As to the allegations contained in the second sentence of paragraph 12, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations at this time, and therefore denies this allegation.

13.     Defendant admits only the allegations contained in the first sentence of paragraph 13, but denies the remaining allegations contained in paragraph 13.

14.     Defendant denies the allegations contained in paragraph 14.

15.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 15, and therefore denies them.

16.     Defendant denies the allegations contained in paragraph 16.

17.     Defendant denies the allegations contained in paragraph 17.

18.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 18, including what Plaintiff believes she "explained" during the August 22, 2023 meeting, and therefore denies the allegations contained in paragraph 18.

19.     The documents referred to in paragraph 19 speak for themselves, and therefore Defendant denies the allegations contained in paragraph 19.

20.     Defendant denies the allegations in paragraph 20 as phrased.

21.     Defendant denies the allegations in paragraph 21 as phrased.

EXHIBIT A_041

22.     The alleged email speaks for itself, and therefore Defendant denies the allegations contained in paragraph 22.  In further responding, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 22 regarding whether Plaintiff "analyzed" data, and therefore denies the allegations contained in paragraph 22.

23.     The alleged PIP response speaks for itself, and Defendant therefore denies the allegations contained in paragraph 23.

24.     The alleged PIP response speaks for itself, and Defendant therefore denies the allegations contained in paragraph 24.

25.     Defendant denies the allegations contained in paragraph 25.

26.     Defendant denies the allegations contained in paragraph 26.

27.     The allegations contained in paragraph 27 appear to refer to a document. Accordingly, such a document would speak for itself, and Defendant therefore denies the allegations contained in paragraph 27.

28.     The allegations contained in paragraph 28 appear to refer to a document. Accordingly, such a document would speak for itself, and Defendant therefore denies the allegations contained in paragraph 28.

29.     Defendant denies the allegations contained in paragraph 29 as phrased.

30.     The alleged document speaks for itself, and Defendant therefore denies the allegations contained in paragraph 30.

31.     The alleged document speaks for itself, and Defendant therefore denies the allegations contained in paragraph 31.

EXHIBIT A_042

32.     The allegations in paragraph 32 contain legal conclusions to which no response is required.  To the extent paragraph 32 is construed to include allegations requiring a response, such allegations are denied.

33.     The alleged email speaks for itself, and Defendant therefore denies the allegations contained in paragraph 33.

34.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 34, including what Plaintiff believed she "explained," and therefore denies the allegations contained in this paragraph.

35.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 35, including what Plaintiff believed she "informed" Dr. Griffin of, and therefore denies the allegations contained in this paragraph.

36.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 36, including what Plaintiff purported to "affirm," and therefore denies the allegations contained in this paragraph.

37.     Defendant denies the allegations contained in 37 as phrased.

38.     Defendant denies the allegations contained in paragraph 38.

**ALLEGED CIOUNT I**
**RETALIATION IN VIOLATION OF N.D.C.C. § 34-01-20**

39.     Defendant incorporates by reference herein its responses to the forgoing paragraphs.

40.     The allegations in paragraph 40 contain legal conclusions to which no response is required.  To the extent paragraph 40 is construed to include allegations requiring a response, such allegations are denied.

5

41.     Defendant denies the allegations contained in paragraph 41.

42.     The allegations in paragraph 42 contain legal conclusions to which no response is required.  To the extent paragraph 42 is construed to include allegations requiring a response, such allegations are denied.

43.     The allegations in paragraph 43 contain legal conclusions to which no response is required.  To the extent paragraph 43 is construed to include allegations requiring a response, such allegations are denied.

44.     The allegations in paragraph 44 contain legal conclusions to which no response is required.  To the extent paragraph 44 is construed to include allegations requiring a response, such allegations are denied.  In further responding, Defendant did not employ Plaintiff and did not terminate her.

45.     The allegations in paragraph 45 contain legal conclusions to which no response is required.  To the extent paragraph 45 is construed to include allegations requiring a response, such allegations are denied.

46.     The allegations in paragraph 46 contain legal conclusions to which no response is required.  To the extent paragraph 46 is construed to include allegations requiring a response, such allegations are denied.

## **ALLEGED PRAYER FOR RELIEF**

47.     Defendant denies Plaintiff is entitled to the relief set forth in Plaintiff's alleged "PRAYER FOR RELIEF" and the corresponding wherefore clause following paragraph 47, including subsections A-D.

EXHIBIT A_044

## ALLEGED JURY DEMAND

48.    The allegations in paragraph 48 contain legal conclusions to which no response is required.  To the extent this paragraph is construed to include allegations that require a response, such allegations are denied.

## AFFIRMATIVE AND OTHER DEFENSES

In further answering, Defendant alleges the following affirmative and other defenses:

1.    Plaintiff fails, in whole or in part, to state a claim for which relief may be granted. More specifically, Plaintiff cannot prove all the necessary elements of her claim.  Further, Plaintiff's Complaint fails to state sufficient facts that would support an award of actual, compensatory, treble, punitive, emotional distress, or other damages or fees against Defendant.

2.    Plaintiff's claims may be barred in whole, or in part, because of the applicable statutes of limitations, because it was not timely filed and/or served, because Plaintiff failed to name the proper defendant in her Charge and the claim is time barred, because Plaintiff failed to exhaust her administrative remedies as to the proper defendant and the claim is time barred, because Plaintiff failed to name the proper defendant in this Complaint and the claim is time barred, because Plaintiff failed to timely commence a lawsuit against the proper defendant and the claim is now time barred, and/or because of other applicable statutory or administrative filing requirements (including, but not limited to, bars to recovery such as waiver, unclean hands, laches, equitable estoppel, and/or mistake).

3.    Each action taken with respect to Plaintiff was justifiable, was for good and just cause, was within the legitimate exercise of management discretion and business necessity, and was not willful, wanton, malicious or done with a reckless or knowing manner.

EXHIBIT A_045

4.    Any purported adverse employment action occurred based on legitimate, non-discriminatory, and non-retaliatory reasons entirely unrelated to Plaintiff's exercise of any purported rights or status.

5.    Plaintiff's Complaint, and her alleged cause of action, is barred in whole or in part because Plaintiff's former employer had an honest, good-faith belief that all decisions were made solely for legitimate, business-related reasons and were reasonably related upon the facts as it understood them.

6.    Plaintiff's former employer exercised reasonable care to prevent any retaliation and to promptly correct any discriminatory or retaliatory behavior (including having in place a clear and well-disseminated policy against discrimination, harassment, and retaliation, and a reasonable and available procedure for promptly and effectively handling such complaints). Plaintiff unreasonably failed to take advantage of these preventive or corrective opportunities provided by her former employer or to avoid harm otherwise.

7.    Plaintiff's Complaint fails, in whole or in part, because Plaintiff failed to engage in protected conduct and there was no causal link between any such alleged activity and any alleged adverse action that Plaintiff's former employer took against her.

8.    Plaintiff's claimed damages, if any, were caused by her own conduct and are barred, in whole or in part, by her failure to mitigate said damages.

9.    To the extent Plaintiff is seeking punitive damages, such claim is barred because an award of such damages would violate Defendant's Constitutional rights.

10.    To the extent Plaintiff is seeking punitive damages, such a claim is barred because the alleged acts or omissions of Defendant do not rise to the level required to sustain an award of punitive damages, do not evidence malicious or reckless indifference, are not so wanton or willful

8

as to support an award of punitive damages, and do not otherwise entitle Plaintiff to punitive damages.

11.    The extent to which Plaintiff's Complaint may be barred by any remaining affirmative or other defenses, including those contemplated by the North Dakota Rules of Civil Procedure, cannot be determined at this time without the benefit of additional discovery.  Thus, as a separate and affirmative defense to Plaintiff's Complaint, Defendant reserves the right to assert all affirmative defenses and other defenses as appropriate.

WHEREFORE, having responded to the allegations in Plaintiff's Complaint, Defendant hereby requests that the Court enter an Order:

A.    Dismissing the Complaint in its entirety, with prejudice, and awarding Defendant its costs and expenses, including reasonable attorneys' fees, as set forth under the law; and

B.    Awarding Defendant such other relief as the Court deems just and proper.

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P. C.**

Dated:  August 22, 2024

*/s/ Brent D. Kettelkamp*
Brent D. Kettelkamp, ND #09600
Capella Tower
225 South Sixth Street, Suite 1800
Minneapolis, MN  55402
Telephone:  612-339-1818
Facsimile:  612-339-0061
brent.kettelkamp@ogletree.com

**Attorney for Defendant**

9

STATE OF NORTH DAKOTA

COUNTY OF CASS

DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Sabha Ganai, M.D., Ph.D., FACS,<br><br>      Plaintiff,<br><br>    v.<br><br>Sanford Medical Center Fargo,<br><br>      Defendant. | Court File No. 09-2024-cv-03147<br><br>**CERTIFICATE OF SERVICE** |

I hereby certify that on August 22, 2024, the following document:

Defendant's Answer

was served on the parties listed below by emailing and mailing to them a copy thereof, enclosed in an envelope, postage prepaid, and by depositing the same in the post office at Minneapolis, MN directed to their last known address(es):

Leo F.J. Wilking, Esq.
Wilking Law Firm
3003 32nd Avenue South
Fargo, ND 58103
lwilking@wilkinglaw.com

Kristen E. Prinz, Esq.
Rebecca E. Chmielewski, Esq.
The Prinz Law Firm, P.C.
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
kprinz@prinz-lawfirm.com
rchmielewski@prinz-lawfirm.com

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P. C.**

Dated: <u>August 22, 2024</u>

<u>/s/ Brent D. Kettelkamp</u>
Brent D. Kettelkamp, ND #09600
Capella Tower
225 South Sixth Street, Suite 1800
Minneapolis, MN 55402
Telephone: 612-339-1818
Facsimile: 612-339-0061
brent.kettelkamp@ogletree.com

**Attorney for Defendant**

STATE OF NORTH DAKOTA            IN THE DISTRICT COURT

COUNTY OF CASS            EAST CENTRAL JUDICIAL DISTRICT

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

           Civil No. 09-2024-cv03147

Plaintiff,

           Jury Trial Demanded

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

---

## PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

1.      Plaintiff Sabha Ganai seeks leave to Amend her Complaint under North Dakota Rule of Civil Procedure 15(a) in order to (1) add Defendant Sanford Clinic North, a nonprofit corporation, and (ii) accordingly amend the pleadings in the Complaint. A copy of the Complaint is attached as Exhibit 1 and a clean copy of Plaintiff's proposed First Amended Complaint is attached as Exhibit 2.

2.      Dr. Ganai seeks leave to amend her Complaint filed on July 18, 2024 against Defendant Sanford Medical Center Fargo. During all relevant times in the Complaint, Sanford Clinic North was Dr. Ganai's primary employer and is an entity affiliated with Defendant Sanford Medical Center Fargo. Defendant Sanford Medical Center Fargo as the named Defendant was a mistake of fact and confusion of the legal name of Dr. Ganai's primary employer, Sanford Clinic North. Under North Dakota Rule of Civil Procedure 15(a), "A party's pleading may be amended once as a matter of course at any time before a responsive pleading is served or, if the pleading is

one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. *Otherwise a party's pleading may be amended only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.*" (emphasis added).

3.    In addition, Dr. Ganai is seeking to attach her employment agreement ("Staff Physician Agreement") with Sanford Clinic North as an additional exhibit to the First Amended Complaint. Under the Staff Physician Agreement, Sanford Clinic North has the right to assign the Staff Physician Agreement to "its parents, subsidiaries, or corporate affiliates," which includes Defendant Sanford Medical Center Fargo. *See* First Amended Complaint, Ex. B.

4.    Defendant Sanford Medical Center Fargo will not suffer prejudice if leave is granted because it knew or should have known that Sanford Clinic North was Dr. Ganai's primary employer.

5.    Plaintiff's counsel conferred with Defendant's counsel between August 28, 2024, and September 6, 2024 regarding this Motion prior to filing it, and Defendant's counsel indicated Defendant would not object to this Motion.

6.    This is Plaintiff's first request to amend the complaint. Plaintiff submit this Motion to Amend their complaint promptly, in good faith, and without dilatory motive.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion to amend the pleadings and enter the proposed Order attached hereto.

Dated: September 9, 2024

Respectfully submitted,

By:  /s/      Kristen Prinz                       
     One of Plaintiff's Attorneys

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)**IL ID #6345342**
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com) **IL ID #6291900**
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822

STATE OF NORTH DAKOTA      IN DISTRICT COURT

COUNTY OF CASS      EAST CENTRAL JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, | ) | |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF SERVICE** |
| vs. | ) | |
| | ) | Civil No.: 09-2024-CV-03147 |
| Sanford Medical Center Fargo | ) | |
| | ) | |
| Defendant. | ) | |

---

[¶1] I, Jaiden Cutler, hereby certify that on September 10, 2024, following documents:

- Notice of Motion for Leave to File as Amended Complaint;
- Plaintiff's Motion for Leave to File as Amended Complaint;
- Exhibit 1 to Motion- Complaint;
    - Exhibit A to Exhibit 1- Dr. Ganai Offer Letter;
    - Exhibit B to Exhibit 1- Staff Physician Agreement;
    - Exhibit C to Exhibit 1- Confidential Peer Review Document/PIP;
    - Exhibit D to Exhibit 1- PIP Response, dated September 15, 2023;
    - Exhibit E to Exhibit 1- PeakOn Response;
    - Exhibit F to Exhibit 1- Email Correspondence with Dr. Griffin, dated December 26, 2023;
    - Exhibit G to Exhibit 1- Termination Letter, dated January 23, 2024;
- Exhibit 2 to Motion- First Amended Complaint; and,
- Proposed Order Granting Motion for Leave to File Amended Complaint

by sending a true and correct copy thereof pursuant to N.D.R.Ct. 3.5 by electronic means to the email addresses listed below:

| Name | (E-mail) |
|---|---|
| Brett D. Kettelkamp (ND#09600) | brent.kettelkamp@ogletree.com |
| Kristen E. Prinz | kprinz@prinz-lawfirm.com |
| Rebecca E. Chmielewski | rchmielewski@prinz-lawfirm.com |

[¶2]    To the best of affiant's knowledge, information and belief, such addresses as given above were the actual addresses of the parties intended to be so served.

[¶3]    Pursuant to N.D.R.Civ.P 11(1)(2), I declare under penalty of perjury that everything I have stated in this document is true and correct.


 Dated this September 10, 2024.


                                        */s/ Jaiden Cutler*
                                        Jaiden Cutler

2

| | |
|---|---|
| STATE OF NORTH DAKOTA | IN THE DISTRICT COURT |
| COUNTY OF CASS | EAST CENTRAL JUDICIAL DISTRICT |

| | |
|---|---|
| SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO | Civil No.09-2024-CV-01347 |
| Plaintiff, | |
| -vs- | **NOTICE OF MOTION** |
| SANFORD MEDICAL CENTER FARGO | |
| Defendant. | |

Plaintiff Sabha Ganai has filed a Motion for Leave to File an Amended Complaint. This motion will be decided on briefs, pursuant to Rule 3.2 of the North Dakota Rule of Court, unless a hearing is timely requested.

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
*Pro Hac Vice Pending*
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
*Pro Hac Vice Pending*
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822

WILKING LAW FIRM
*/s/ Leo F.J. Wilking*
Leo F.J. Wilking (lwilking@wilkinglaw.com)
3003 32nd Avenue S
Fargo, ND 58103
P: (701) 356-6823
F; (701) 478-7621
ND Bar ID No. 03629
*Local Counsel*

1

STATE OF NORTH DAKOTA

COUNTY OF CASS

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

Plaintiff,

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

Civil No. 09-2024-cv03147

Jury Trial Demanded

## PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

1.      Plaintiff Sabha Ganai seeks leave to Amend her Complaint under North Dakota Rule of Civil Procedure 15(a) in order to (1) add Defendant Sanford Clinic North, a nonprofit corporation, and (ii) accordingly amend the pleadings in the Complaint. A copy of the Complaint is attached as Exhibit 1 and a clean copy of Plaintiff's proposed First Amended Complaint is attached as Exhibit 2.

2.      Dr. Ganai seeks leave to amend her Complaint filed on July 18, 2024 against Defendant Sanford Medical Center Fargo. During all relevant times in the Complaint, Sanford Clinic North was Dr. Ganai's primary employer and is an entity affiliated with Defendant Sanford Medical Center Fargo. Defendant Sanford Medical Center Fargo as the named Defendant was a mistake of fact and confusion of the legal name of Dr. Ganai's primary employer, Sanford Clinic North. Under North Dakota Rule of Civil Procedure 15(a), "A party's pleading may be amended once as a matter of course at any time before a responsive pleading is served or, if the pleading is

one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. *Otherwise a party's pleading may be amended only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.*" (emphasis added).

3.    In addition, Dr. Ganai is seeking to attach her employment agreement ("Staff Physician Agreement") with Sanford Clinic North as an additional exhibit to the First Amended Complaint. Under the Staff Physician Agreement, Sanford Clinic North has the right to assign the Staff Physician Agreement to "its parents, subsidiaries, or corporate affiliates," which includes Defendant Sanford Medical Center Fargo. *See* First Amended Complaint, Ex. B.

4.    Defendant Sanford Medical Center Fargo will not suffer prejudice if leave is granted because it knew or should have known that Sanford Clinic North was Dr. Ganai's primary employer.

5.    Plaintiff's counsel conferred with Defendant's counsel between August 28, 2024, and September 6, 2024 regarding this Motion prior to filing it, and Defendant's counsel indicated Defendant would not object to this Motion.

6.    This is Plaintiff's first request to amend the complaint. Plaintiff submit this Motion to Amend their complaint promptly, in good faith, and without dilatory motive.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion to amend the pleadings and enter the proposed Order attached hereto.


Dated: September 9, 2024


Respectfully submitted,

STATE OF NORTH DAKOTA

COUNTY OF CASS

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO<br><br>                 Plaintiff,<br><br>-vs-<br><br>SANFORD MEDICAL CENTER FARGO<br>               Defendant. | Civil No. _____<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

## COMPLAINT

1.  Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, brings this action against Defendant Sanford Medical Center Fargo ("Sanford") for retaliating against her when she engaged in protected activity by raising patient safety concerns.

## NATURE OF THE ACTION

2.  Plaintiff, Dr. Ganai, is a highly accomplished and reputable double-board certified surgical oncologist who has been practicing surgical oncology for more than twelve years. She joined Sanford in 2020 to perform complex general surgery surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery. During her tenure, she also served as Associate Professor of Surgery and Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.



EXHIBIT A_057

3.     Dr. Ganai brings this action against Defendant Sanford for violation of the prohibitions against retaliation contained in North Dakota's whistleblower statute, N.D. Cent. Code, § 34-01-20.

## THE PARTIES

4.     Plaintiff, Sabha Ganai, was a resident of Fargo, North Dakota at all times relevant to this Complaint.

5.     Defendant Sanford Medical Center Fargo is a not-for-profit North Dakota corporation owned and operated by Sanford Health, an integrated multi-specialty health system. Sanford Medical Center Fargo maintains its principal place of business at 737 Broadway North, Fargo, North Dakota, 58122.

## JURISDICTION AND VENUE

6.     At all times material hereto, the Defendant, Sanford, was the owner of and operated Sanford Medical Center Fargo in the County of Cass, State of North Dakota.

7.     At all times material hereto, Defendant employed Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") at Sanford Medical Center Fargo

## FACTS RELEVANT TO ALL CLAIMS

8.     Sanford hired Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") at Sanford Medical Center Fargo in February 2020. (*See* Ex. A attached hereto, Dr. Ganai Offer Letter dated October 8, 2019).

9.     Dr. Ganai and her team in the Division routinely handled highly complex cases involving complex general surgery, surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery.

10.     These cases often came to the Division from other departments and other facilities that were unable to properly handle them and often with patients who were dying.

2

**Sanford Places Dr. Ganai On a PIP From An Unreliable Data Report**

11.     In late August 2023, Sanford began criticizing the Division on patient outcomes and made statements attributing "significantly worse outcomes" to Dr. Ganai and the Division.

12.     At the same time, the Division was facing mounting pressure and a lack of support from the General Surgery Department in planning for Bob Sticca, M.D.'s reduction in call coverage. Dr. Sticca's last day on call was January 1, 2024.

13.     On August 22, 2023, Dr. Ganai met with Steven Briggs, M.D. (Chief Medical Officer, Sanford Medical Center Fargo), Michael Traynor. M.D. (Chair, Department of Surgery, Sanford Medical Center Fargo), and Darla Dobberstein (Executive Director of Fargo Region's Surgical Services, Sanford Health). Without presenting any data, leadership told Dr. Ganai that a Vizient report reported that Dr. Ganai had a higher than desired observed to expected ratio ("O/E") for mortality rates of 1.4.

14.     If a hospital's observed rate for an indicator is higher than its expected rate (an O/E ratio greater than 1), then the hospital performed worse than the reference population. If documentation for the patient population is not complete, then any risk adjustment applied to this ratio will not be accurate and will only be done at a population level, which does not account for the Division's increased case complexity.

15.     Vizient is a health care performance improvement company that provides patient outcome data derived from administrative billing (coding) without clinical verification.

16.     Vizient was designed for benchmarking hospital quality, not surgeon quality. Surgical leaders, including Dr. Clifford Ko, M.D., MS, MSHS, FACS (Director, Division of Research and Optimal Patient Care, American College of Surgeons ("ACS")), have advised against using Vizient for benchmarking surgeon performance. In contrast, the ACS National Surgical

3

EXHIBIT A_059

Quality Improvement Program ("NSQIP") database collects patient-specific and surgeon-specific data that accounts for surgical case complexity and allows for causal inference.

17.     Vizient had recently released a hospital ranking system based solely on patient outcome data. Sanford, desiring to improve its scores in the ranking system, had recently began to use Vizient data to look at individual surgeon outcomes. Data from literature review suggests poor intrinsic validity for this indication outside of hospital-to-hospital benchmarking. In 2020, Dr. Ganai led a quality improvement project for the Department of Surgery with chart review of all mortalities for that year that confirmed poor intrinsic validity for its use. Dr. Ganai found that only thirty (30) percent of the cases were accurate. For example, many patient deaths were not included at all. Additionally, some of the patient deaths were identified as a surgery death when they were actually due to other causes, such as COVID-19. Many patients were not operated on, yet their deaths were attributed to the surgeon who consulted on them. In 2021, Dr. Traynor repeated this analysis for that year and confirmed the same issue.

18.     During the August 22, 2023 meeting, Dr. Ganai explained that Vizient generates and compares O/E mortality rates for general surgeons, and unlike the rest of general surgery, the Division's practice includes highly complex cases not solely comprised of general surgery.

19.     Also during the August 22, 2023 meeting, leadership presented Dr. Ganai with a peer review letter ("Peer Review Letter") attached to a Performance Improvement Plan ("PIP") and asked Dr. Ganai to agree to the PIP. (*See* Ex. B attached hereto, Confidential Peer Review Document/PIP). The Peer Review Letter promised Dr. Ganai that the Care Monitoring Committee would oversee the PIP and assist Dr. Ganai in "successfully addressing the opportunities that have been identified." *Id.*

4

20.    In response, Dr. Ganai stated that she agreed to the PIP contingent on receiving the Vizient report data.

21.    Dr. Ganai also requested a peer review meeting and was told there would be a meeting scheduled with a committee.

**Dr. Ganai Demonstrates Issues with the Validity of The Vizient Report Data**

22.    On August 30, 2023, after Dr. Briggs emailed Dr. Ganai the Vizient report data ("the Vizient Report"), and Dr. Ganai analyzed its data.

23.    On September 15, 2023, Dr. Ganai provided Sanford a comprehensive analysis in response to the Confidential Peer Review Document/PIP and the Vizient Report Sanford had relied on when it chose to place her on the PIP. (*See* Ex. C attached hereto, PIP response dated September 15, 2023).

24.    Dr. Ganai explained that Vizient's data reliability was limited in providing accurate benchmark performance and that such data is not controlled for coding error complexity, among other things.

25.    The Report failed to track patient outcomes appropriately.

26.    The Report demonstrated that Dr. Ganai's O/E ratio did not significantly differ from the expected O/E ratio given the complexity of the cases she managed.

27.    Dr. Ganai's colleague, Dr. Daniel Tuvin, M.D.'s, O/E ratio was 7, significantly higher than Dr. Ganai's. Dr. Tuvin also had a higher mortality rate. Dr. Sticca, Dr. Ganai's other colleague, had the highest readmission and reoperation rates.

28.    Dr. Ganai also explained how the Division needs to be compared for case complexity. Dr. Ganai presented ACS NSQIP data for the Division, specific for case type, that showed that the Division actually had excellent outcomes compared to National data, herself and

5

Dr. Tuvin included. She explained that NSQIP data has significantly better validity than Vizient because it is clinically verified. Sanford paid for a Research Nurse who was in charge of maintaining NSQIP data, which was presented to the Department of Surgery on a quarterly basis for quality improvement purposes.

29.     After Dr. Ganai provided Sanford her response and analysis, Sanford never scheduled a peer review meeting with her.

**Dr. Ganai Raises Patient Safety Concerns to Sanford**

30.     On or around December 11, 2023, Dr. Ganai responded to an employee survey question on PeakOn, Sanford's anonymous survey platform. (*See* Ex. D attached hereto, PeakOn response dated December 11, 2023).

31.     In response to the question: "If you were offered the same job at another organization, how likely is it that you would stay at this organization?" Dr. Ganai answered: "My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well-being. I am ashamed of the administration." *Id.*

32.     Dr. Ganai's concerns stemmed from Sanford's improper reliance on the Vizient Report that did not properly or accurately account for patient outcomes and Sanford's refusal to provide peer review avenues to address patient safety and comply with the Health Care Quality Improvement Act. *See* §42 U.S.C. 1110. By refusing to provide Dr. Ganai peer review avenues, Sanford is stripping Dr. Ganai and other physicians of the immunity provided by the peer review process under the Act.

33.     On December 26, 2023, Dr. Ganai emailed Dr. Douglas Griffin (Vice President of Fargo Region Clinic, Sanford Health) about her PeakOn comment. (*See* Ex. E attached hereto, email correspondence dated December 26, 2023).

EXHIBIT A_062

34.    Dr. Ganai explained to Dr. Griffin that she posted her comment because she was concerned about Sanford's treatment of surgical oncologists within the Division and the General Surgery Department's increasing lack of support.

35.    She also told Dr. Griffin that Sanford had still not formally responded to her analysis and response to the August 2023 PIP, which she had submitted over three (3) months ago.

36.    Dr. Ganai affirmed her commitment to patient care as her highest priority.

37.    In response, Dr. Griffin told Dr. Ganai that he would look into the situation.

**Sanford Retaliates and Terminates Dr. Ganai a Month After She Reports Patient Safety Concerns**

38.    Instead of addressing her patient safety concerns, Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024. (*See* Ex. F attached hereto, January 23, 2024 letter).

## COUNT I
## RETALIATION IN VIOLATION OF N.D.C.C. § 34-01-20

39.    Dr. Ganai adopts and realleges paragraphs 1 through 38 above as if fully stated herein.

40.    N.D.C.C. § 34-01-20 prohibits employers from discharging or threatening to discharge an employee because the employee in good faith reports a violation or suspected violation of federal, state or local law, ordinance, regulation, or rule to an employer. N.D.C.C. § 34-01-20 (1)(a).

41.    At all relevant times, Dr. Ganai performed her work with diligence and was meeting her employer's legitimate expectations.

42.    Dr. Ganai was engaging in a protecting activity in reporting her concerns for patient safety on December 11, 2023, and December 26, 2023.

7

EXHIBIT A_063

43.    Defendant Sanford knew or should have known that retaliation against an employee engaging in a protected activity was a violation of state law.

44.    Defendant Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024.

45.    Defendant Sanford's actions violated N.D.C.C. § 34-01-20.

46.    As a result of Defendant Sanford's retaliatory actions, Dr. Ganai has suffered and will continue to suffer irreparable injuries including, but not limited to, lost wages, injury to professional reputation, great mental anguish, and damage to her physical health.

**PRAYER FOR RELIEF**

47.    Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendant as follows:

A.    Find that Defendant violated N.D.C.C. § 34-01-20 by willfully retaliating against Plaintiff in threatening to terminate her and terminating her for engaging in a protected activity;

B.    Award actual damages;

C.    Award the costs of maintaining this action, including reasonable attorney's fees and court costs; and,

D.    Any other relief this Court deems just and necessary.

[THIS SPACE INTENTIONALLY LEFT BLANK]

EXHIBIT A_064

## JURY DEMAND

48.     Plaintiff demands a trial by jury of the maximum number of jurors allowed by law

of all issues raised in this Complaint.

Dated: July 18, 2024

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
*Pro Hac Vice Pending*
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
*Pro Hac Vice Pending*
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822


WILKING LAW FIRM

*/s/ Leo F.J. Wilking*
Leo F.J. Wilking (lwilking@wilkinglaw.com)
3003 32nd Avenue S
Fargo, ND 58103
P: (701) 356-6823
F; (701) 478-7621
ND Bar ID No. 03629
*Local Counsel*

9

EXHIBIT A_065



October 8, 2019

Sabha Ganai, MD
1424 S Park Avenue
Springfield, IL 62704

Dear Dr. Ganai:

Upon the enthusiastic recommendation of the Surgical Oncology Department, I am pleased to invite you to join Sanford Clinic. The starting salary has been approved at $427,800 for a 1.0 FTE ($300,000 for 0.7 FTE clinical and $127,800 for 0.3 FTE research). We are also offering a $25,000 forgivable loan over 2 years paid upon signing.

Enclosed you will find a Staff Physician Agreement for your review and consideration. If all terms meet with your approval, please:

1. ***Initial*** your anticipated start date on the first page of the Agreement.

2. Sign and date the Agreement.

3. Sign the Demand Note in front of a Notary Public.

4. Return the following document/s to us in the enclosed prepaid envelope:
   a. Staff Physician Agreement, signed and dated with your anticipated start date **initialed** on the first page of the Agreement.
   b. Demand Note signed in front of a Notary Public.

You are eligible for 28 days of time away per fiscal year and 10 days of CME time away, pro-rated based on your FTE status. Eligible relocation expenses up to $10,000 will be paid upon submission of appropriate documentation.

My colleagues who had the opportunity to interview you feel that you will make a wonderful addition to our medical staff. I hope to receive your favorable response to this invitation within **30** days. In the meantime, please contact me if you have any questions; at 701-234-2610 (office) or by email at *julie.waldera@sanfordhealth.org*

Sincerely,

*Julie Waldera*

Julie Waldera
Executive Director
Sanford Health

**EXHIBIT**
**A**

**STAFF PHYSICIAN AGREEMENT**
**BY AND BETWEEN**


Sanford Clinic North, a nonprofit corporation (hereinafter called "Sanford")


**AND**


Sabha Ganai, MD (hereinafter called the "Physician").


**WITNESSETH:**

WHEREAS, Sanford owns and operates physician offices and clinics; and

WHEREAS, Physician is a licensed physician capable of providing the services specified by this Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:


Section 1.  Employment

Sanford hereby employs Physician, and Physician hereby accepts such employment upon the terms and conditions set forth below.


Section 2.  Term

Physician's employment shall commence on January 13, 2020, or such other date as mutually agreed ("Commencement Date"), and shall continue for a period of two years unless terminated sooner as provided herein.  This Agreement shall be automatically extended for additional one-year terms unless either party notifies the other party in writing of its intent not to renew at least 90 days prior to the expiration of the then-current term.



EXHIBIT A_067

Section 3.  Provision of Services by Physician

(a)     Physician is hereby employed by Sanford on a full-time basis and agrees to allocate 0.3 FTE to research services and 0.7 FTE to providing medical services for patients of Sanford in Fargo, North Dakota and other locations as mutually agreed.  Physician shall also provide such administrative services as may be reasonably required by Sanford.  Physician will devote a portion of his/her working time to teaching of medical students, residents, fellows, or other scholarly activities for and as reasonably assigned by Sanford.  Physician's employment for the provision of medical services and Physician's employment for the provision of research services shall be separately terminable in the manner provided in Section 12 of the Agreement.

(b)     So long as Physician is so employed by Sanford, Physician will devote best efforts, skill and ability in performing said services.

(c)     Physician will acquire and maintain board certification in Physician's specialty as required by Sanford.

(d)     Physician will acquire and maintain in good standing, throughout the term of this Agreement, staff privileges at one or more Sanford hospitals to the extent required by Sanford.  Physician will consult with, and receive written approval from, Sanford prior to applying for staff privileges at any non-Sanford hospital, clinic or other medical facility.

(e)     Physician will acquire and maintain at all times during the term of this Agreement a license to practice medicine and to prescribe drugs and medication under all state, federal and local laws and regulations in effect in all jurisdictions where Physician may be required to practice under this Agreement.

(f)     This Agreement shall not affect the exercise of Physician's independent professional judgment in providing care to patients consistent with sound professional practice and the terms of this Agreement. This provision shall not affect the ability of Sanford to establish protocols, procedures, or standards for professional practice. Sanford shall also be entitled to engage in peer review, quality assurance review, and to make recommendations concerning the professional practice of Physician.

2

(g)    In all matters related to the discharge of responsibilities under this Agreement, Physician shall be accountable to Sanford's Council of Governors or its successor or designee.

(h)    Except when (i) the referral is not in the patient's best interest in the judgment of Physician; (ii) the patient expresses a preference for a different provider, practitioner, or supplier; or (iii) the patient's insurer determines the provider, practitioner, or supplier, Physician acknowledges and agrees that during the term of this Agreement he/she shall refer all of his/her patients to Sanford hospitals and to such non-hospital providers, practitioners, or suppliers as may be directed by Sanford.

(i)    Physician shall comply with all applicable bylaws, policies, rules, regulations and credentialing standards of Sanford and its subsidiaries or affiliates, including any corporate compliance policy or code of conduct now or hereafter adopted. Physician shall provide all information required by the same and shall complete all clinic and hospital records in a timely and accurate manner and in accordance with applicable Sanford policies.

### Section 4.  Facilities and Personnel

Sanford shall furnish Physician with such space, equipment and personnel as may be deemed necessary or desirable by Sanford for the performance of Physician's duties hereunder.

### Section 5.  Professional Liability Insurance

(a)    Physician shall be solely responsible for any liability arising from any act or omission of Physician occurring prior to commencement of employment by Sanford, and for purchasing or arranging for professional liability insurance coverage with respect thereto.

(b)    Sanford will provide professional liability insurance coverage for Physician for services provided under this Agreement in such amounts as may be deemed necessary or desirable by Sanford. Said coverage shall extend to claims for

3

damages made against Physician after termination of employment with Sanford so long as the claim arises from services provided by Physician pursuant to this Agreement, and Physician shall not be required to purchase an extended reporting endorsement ("tail") upon termination of this Agreement for such claims. Professional liability coverage maintained by Sanford may be provided through Sanford's self-insurance program, captive insurer, insurance trust or through policies of insurance purchased by Sanford from commercial insurers, or any combination thereof. Professional liability coverage for Physician will be subject to the limits, terms, exclusions and limitations applicable to Sanford's self-insurance program, captive insurer, insurance trust and/or any insurance policies purchased by Sanford.

Section 6.  Compensation

(a)     Physician's full compensation for all services rendered, in whatever capacity, will be determined by the compensation plan approved by Sanford. Physician compensation will be reviewed annually.

(b)     Notwithstanding the foregoing, for the first year of this Agreement, Physician's rate of annual compensation for medical services will not be less than Three Hundred Thousand and no/100 Dollars ($300,000.00) (the "Amount").

(c)     Further notwithstanding the foregoing, for the second year of this Agreement, Physician's rate of annual compensation will not be less than 95% of the Amount. Physician will be eligible for incentive compensation equal to 5% of the Amount only if Physician meets clearly defined and quantifiable non-production goals attached to every department's compensation plan. Such goals will reflect departmental performance, clinical quality, patient service, practice efficiency, safety, or other individual, departmental, or organizational goals.

(d)     Compensation hereunder will be paid in accordance with the general payroll policies of Sanford and shall be subject to required payroll deductions.

(e)     No compensation shall be payable to Physician for any period:

4

i)     Physician fails to maintain all licenses to practice medicine or prescribe drugs required by Section 3(e) of this Agreement;

ii)     Physician fails to maintain hospital privileges when required under Section 3(d);

iii)     Physician's employment is suspended by Sanford for cause; or

iv)     Physician is absent from work beyond the time authorized by Sanford's absence time policies then in effect.

(f)     Physician shall provide documentation of time spent and specific services performed as may be reasonably requested by Sanford and as required by applicable law, regulations and third-party payor contract requirements.

(g)     Physician shall also receive a loan in the amount of $25,000.00 upon Physician's execution of this Agreement. This loan shall be repaid pursuant to a Promissory Note materially in the form and substance attached hereto as Exhibit A. The loan shall be repaid in 24 monthly installments beginning on the first day of the first month following the Commencement Date and shall bear interest at the "prime rate" as published in the <u>Wall Street Journal</u> on the date of execution plus one percent; provided, however, that as long as Physician continues to provide services hereunder, each installment will be forgiven as it comes due. In the event Physician fails to satisfy the conditions embodied in Section 20, fails to become employed by Sanford on the Commencement Date or becomes employed but thereafter leaves the employ of Sanford hereunder and/or this Agreement is terminated for any reason prior to forgiveness thereof, the entire outstanding balance under said Promissory Note shall immediately become due and payable. Notwithstanding the foregoing, if Physician's employment is terminated as a result of Physician's death or permanent disability as defined in Sanford's long term disability policy, the entire outstanding balance under said Promissory Note will be forgiven. Physician understands and agrees that loan forgiveness constitutes income to Physician and will be subject to taxes and other withholdings required by law.

(h)     Physician agrees that Sanford may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to Physician by Sanford,

5

including any wages or other obligation and whether or not due, against any obligation owed by Physician to Sanford or its affiliates, including the obligations of Physician evidenced by the Promissory Note.

## Section 7.  Benefits

Subject to insurability rules and regulations, Physician shall be entitled to benefits as are generally provided to other similarly situated Sanford physicians pursuant to Sanford policies.

## Section 8.  Third-Party Reimbursement Programs and Assignment Agreements

Physician shall assign and reassign to Sanford or its designees all rights Physician may now or hereafter possess to receive income, payment and/or reimbursement for any and all professional medical services rendered by Physician pursuant to this Agreement, which shall also include any payments as a result of Physician's attestation of Meaningful Use during Physician's employment with Sanford.  Physician shall become and remain a participating provider in those public and private third-party reimbursement programs requested by Sanford.  As used in this Agreement, the term "third-party reimbursement program" shall include, but not be limited to, health maintenance organizations, preferred provider organizations, private health insurance companies, Sanford Health Plan, the federal Medicare program, and the state Medicaid program.  Under no circumstances shall Physician bill any patient or any public or private third-party reimbursement program for any services for which Physician has been compensated pursuant to this Agreement.  Any violation of any provision of this Section by Physician shall permit Sanford, at its option, to terminate this Agreement immediately.

## Section 9.  Confidentiality

Physician acknowledges that all patient charts, patient lists, and patient financial and demographic information concerning Sanford's practice are confidential, proprietary and constitute Sanford's trade secrets.  Physicians may not access Sanford patient

6

information or use Sanford patient lists to contact patients directly for solicitation purposes.  Upon termination of this Agreement, Physician shall not use or disclose any confidential information, proprietary or trade secret information, including patient list and patient financial and demographic information concerning Sanford's practice, and shall maintain confidentiality with regarding to Sanford's business.  Under no circumstances shall Physician remove patient medical records, x-rays, etc., or copies thereof, from Sanford's premises except as authorized under Sanford's policies when necessary for patient care. Physician shall complete all medical records prior to termination of this Agreement. Physician has no ownership interest in the medical records, x-rays, patient charts and other documents relating to the diagnosis and treatment of patients served by Sanford. Upon termination of Physician's employment with Sanford, Physician shall return all medical records and reports concerning patients and all copies thereof to Sanford. Physician agrees that Physician's obligations under this Section shall survive any termination of this Agreement. Additionally, you shall not directly disclose Sanford's compensation formula to any competitor of Sanford, nor shall you direct any individual or third party to disclose this information to a competitor on your behalf.

Section 10.  Assignment

This Agreement may not be assigned by either party without the express written consent of the other party; provided, however, Sanford may assign this Agreement to its parent, subsidiaries, or corporate affiliates without consent.

Section 11.  Modification

This Agreement may not be orally canceled, changed, modified or amended, and no cancellation, change, modification or amendment shall be effective or binding, unless in writing and signed by both parties to this Agreement.

Section 12.  Termination

(a)    Notwithstanding any of the provisions of this Agreement, either party may terminate this Agreement by giving 90 days' written notice to the other party.  If

7

Sanford elects to terminate under this Section, it may, at its option, give Physician 90 days' base pay in lieu of notice.

(b)   Sanford may also terminate Physician's employment immediately (without severance pay) in the event:

    i)    Physician fails to substantially perform Physician's obligations under this Agreement (as reasonably assigned or reasonably appropriate to Physician's role hereunder) and such failure is not cured to the satisfaction of Sanford within thirty (30) days after written notice thereof is given to Physician;

    ii)    Physician fails to maintain medical staff appointment or clinical privileges at any organization where Physician has provided professional services;

    iii)    Physician engages in any unethical conduct or medical misconduct as defined by State and National Medical Associations and such failure remains uncorrected after fifteen (15) days of written notice from Sanford;

    iv)    Physician is suspended or excluded from participation in the Medicare program or any other Federal Health Program;

    v)    Sanford is unable to obtain malpractice insurance on behalf of Physician, or if the cost of obtaining such insurance unreasonably exceeds the cost of obtaining such insurance for other physician employees working within the same specialty;

    vi)    Physician's professional practice presents a direct threat to the safety of patients or employees, including situations in which Physician's abuse of alcohol or drugs poses a direct threat to patient or employee safety;

    vii)    Physician fails to maintain the standard of competence reasonably deemed necessary by Sanford;

    viii)    Physician is deemed to have engaged in a material violation of Sanford policy regarding patient or employee rights after investigation;

8

EXHIBIT A_074

ix)   Physician repeatedly violates or continues to violate, after notice, any of Sanford's policies or directives and such failure remains uncorrected after fifteen (15) days of written notice from Sanford;

x)    Physician is absent from work beyond the period authorized by applicable Sanford policies;

xi)   Physician commits fraudulent or dishonest acts which involve the practice of medicine;

xii)  Physician engages in any felonious act, or misdemeanor involving moral turpitude (as defined by state or federal law) in connection with Physician's employment;

xiii) Physician is convicted of, pleads guilty or nolo contendere to any felony, or misdemeanor involving fraudulent conduct or moral turpitude (as defined by applicable state or federal law); or,

xiv)  Physician fails to maintain any license or certification required to provide services under this Agreement.

(c)   Upon termination of this Agreement for any reason, Physician agrees that Sanford may, at its sole discretion and without demand and without notice, set off any liability owed to Physician by Sanford, including compensation hereunder, against any obligation owed by Physician to Sanford or its affiliates, including obligations evidenced by the Promissory Note referenced above.

(d)   Physician acknowledges and agrees that his/her medical staff appointment and clinical privileges at one or more Sanford owned or leased hospital(s) shall automatically expire upon termination of this Agreement.  As prescribed by the medical staff bylaws of said Sanford hospital(s), such automatic expiration (i) would not give rise to hearing and appeal rights and (ii) would not constitute a professional review action adversely affecting the clinical privileges of Physician.  For purposes of this Section 12(d), said Sanford hospital(s) shall be deemed third-party beneficiaries to this Agreement.

9

Section 13.  Strict Performance

No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement or to exercise a right or remedy shall constitute a waiver.  No waiver of any breach shall affect or alter this Agreement, but each and every covenant, condition, agreement and term of this Agreement shall continue in full force and effect with respect to any other existing or subsequent breach.

Section 14.  Entire Agreement

This Agreement represents the entire Agreement between Sanford and Physician with respect to the subject matter hereof, and all prior agreements relating to the employment of Physician written or oral, are nullified and superseded hereby and neither party shall have any further rights or obligations under such superseded agreements.  Each party releases the other from all claims of any kind or nature arising from such superseded agreements.  No change or addition to, or deletion of, any portion of this Agreement shall be valid or binding upon the parties hereto unless the same is approved in writing by the parties.

Section 15.  Invalidity or Unenforceability of Particular Provisions

The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

Section 16.  Release of Information

Physician acknowledges that Sanford will release information related to any aspect of Physician's practice to third parties as authorized by law (including state agencies).  Further, Physician authorizes Sanford to release to applicable state board of medical examiners, any governmental or private insurer, hospital, health maintenance organization, self-insured employer or any other organization with which Sanford contracts to provide health care services, information relating to

10

EXHIBIT A_076

any aspect of Physician's practice, including, without limitation, information relating to professional liability claims, disciplinary proceedings, utilization, and quality review.  Physician authorizes any educational institution, hospital, clinic, government or private insurer, or other health care institution to release to Sanford all employment files, disciplinary records, and other documents relating to Physician's conduct or performance. Sanford will provide Physician the reasonable opportunity to review requests for information related to professional liability or disciplinary matters prior to release of any information.

Section 17.  Proprietary Information, Trade Secrets and Intellectual Property

    (a)    Sanford acknowledges and agrees that it shall have no right, title or interest in or to any intellectual property (whether patentable, copyrightable or not) which was registered, copyrighted or for which patents were filed or issued, prior to Physician's employment with Sanford ("Physician Intellectual Property").

    (b)    If and to the extent Physician develops intellectual property while employed by Sanford, but does not utilize Sanford resources (including Sanford staff, funds, facilities, equipment or material resources or while actively engaged in the performance of Physician services under this Agreement) to develop the intellectual property, such intellectual property shall be deemed Physician Intellectual Property under this Agreement.  Sanford hereby waives any ownership rights, title or interest it may be deemed to have in and to Physician Intellectual Property, and hereby assigns all right, title and interest in and to Physician Intellectual Property to Physician; provided, however, Physician grants to Sanford a non-exclusive, worldwide, paid-up, royalty-free, perpetual license to use that Physician Intellectual Property developed by Physician during Physician's employment with Sanford, for its own internal use only (including without limitation, research, development and educational purposes) and not for resale.

11

(c)     Physician agrees to promptly disclose in writing to Sanford all intellectual property including, without limitation, discoveries, improvements, formulas, techniques, know-how, writings, drawings, software, mask works, and other inventions and works of authorship (whether or not patentable or copyrightable) made, conceived, discovered, written, created, learned of or reduced to practice by Physician during the period of his/her employment with Sanford, which relate or result from the actual or anticipated business of Sanford or from the use of Sanford's staff, funds, equipment, premises, property, or which constitute a work made for hire ("Sanford Intellectual Property"). Physician hereby waives any ownership rights, title or interest he/she may be deemed to have in and to Sanford Intellectual Property, and hereby assigns all right, title and interest in and to Sanford Intellectual Property to Sanford. Physician shall cooperate with Sanford to enable Sanford to obtain, maintain or enforce patents, copyrights, or other legal protection for such intellectual property, including the execution of any and all documentation necessary to evidence the transfer/assignment of ownership of Sanford Intellectual Property to Sanford.

(d)     Any distribution of net income derived from commercialization of Sanford Intellectual Property developed by Physician, subject to applicable restrictions arising from any grants, contracts or other agreements with outside parties, shall be as follows:

(i)     Physician:   50% (may be shared with others at Physician's discretion)

(ii)     Sanford:   50%

"Net Income" shall be defined as gross revenue, as identified in the totality of the legal documents reflecting the transaction, less all costs incurred by Sanford or its agent(s) in commercializing the Sanford Intellectual Property and in obtaining and maintaining intellectual property protection. The amount of net income distributed to Physician will not be affected by termination of Physician's employment with Sanford.

(e)     Notwithstanding the foregoing, Physician agrees to comply with the then-current intellectual property policy of Sanford and its affiliates. In the event of a

12

conflict between this Agreement and such policy, Physician and Sanford agree that the then-current intellectual property policy will control.

## Section 18.  Governing Law

This Agreement shall be construed and enforced under and in accordance with the laws of North Dakota, with exclusive venue for resolution of disputes in the State District Court in and for Cass County.

## Section 19.  No Third-Party Rights

Except as may be expressly provided herein, nothing in this Agreement shall be construed as creating or giving rise to any rights in any third parties or any persons other than the parties hereto.

## Section 20.  Pre-Employment Post-Offer Background Check, Drug Screen, Licensure, and Privileges

Physician and Sanford acknowledge and agree that all obligations of each party hereunder shall be subject to the satisfaction of the following conditions precedent as of the Commencement Date:

(a)    Physician satisfactorily completes a background check and drug screen in accordance with Sanford policy;

(b)    Physician is granted licensure to practice medicine from the state of North Dakota;

(c)    Physician obtains medical staff appointment and clinical privileges commensurate with the services to be performed hereunder at Sanford Medical Center Fargo;

(d)    Physician obtains from Sanford Health Plan in-network status with clinical privileges commensurate with the services to be performed hereunder; and

(e)    Physician is accepted into Sanford's standard professional liability policy by Sanford's insurance carrier.

13

Section 21.  Representations

    (a)    Physician represents and warrants that all of the information and documentation which Physician has provided to Sanford is true, accurate and complete in all material respects and does not omit any material information necessary to make the information or documentation provided to Sanford not misleading.

    (b)    Physician represents and warrants that this Agreement and Physician's employment hereunder will not constitute a default or breach of any covenant or agreement to which Physician is a party and that Physician is not bound or restricted by any contract of employment, non-competition agreement, confidentiality or non-disclosure agreement, or any other agreement with a present or former employer or other third party that would conflict with this Agreement or Physician's employment with Sanford.

    (c)    Physician represents and warrants that Physician will not use any privileged information, trade secrets or other intellectual property belonging to any third party while performing services for Sanford.

Section 22.  Survival

Any provisions hereof that by their nature would be expected to survive the termination of this Agreement shall survive and not be affected by said termination.

Section 23.  Construction of Headings

The captions or headings are for convenience only and are not intended to limit or define the scope or effect of any provision of this Agreement.

14

EXHIBIT A_080

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year last written below.

SANFORD CLINIC NORTH

DATE:_____     BY:_____

_____

DATE: _____     _____

Sabha Ganai, MD

15

EXHIBIT A
DEMAND NOTE
FOR INCENTIVE LOAN
PER PHYSICIAN AGREEMENT

$ 25,000.00 _____                    _____, 2019

   After date, for value received, I promise to pay to the order of Sanford Clinic North, the sum of Twenty-Five Thousand and no/100 Dollars ($25,000.00) to be repaid ON DEMAND, or if no demand is made, in 24 monthly installments with interest thereon at the "prime rate" as published in the Wall Street Journal on the date of execution plus one percent, beginning on the first day of the first month following the Commencement Date, in accordance with the STAFF PHYSICIAN AGREEMENT dated _____, _____.

   Should any of the principal not be paid when due, such default shall, at the option of the legal holder hereof, cause all sums then remaining unpaid to become immediately due and payable, without notice (notice of the exercise of such option being hereby expressly waived).

   The Maker, endorsers, sureties and guarantors hereof hereby severally agree to pay all expenses of collection, including attorney's fees, in case payment shall not be made at maturity, and severally waive presentment for payment, notice of non-payment, protest and notice of protest and diligence in enforcing payment or bringing suit against any party hereto, the endorsers, sureties and guarantors hereof hereby severally consent that the time of payment may be extended, or this note renewed, from time to time without notice to them and without affecting their liability hereon. The Maker agrees that Sanford Clinic North may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to the Maker by Sanford Clinic North, including any wage or other obligation and whether or not due, against any obligation owed by the Maker to Sanford Clinic North or its affiliates, including the obligations of Maker evidenced by this NOTE. The payment obligations arising under this NOTE are subject to the terms of the STAFF PHYSICIAN AGREEMENT entered into by the Maker and Sanford Clinic North on _____, _____ including, without limitation, the debt forgiveness provisions set forth in Section 6(g) thereof.

   MAKER AGREES THAT ANY CLAIM OR DEMAND (OF DEFAULT OR OTHERWISE) WHICH MAKER MAY HAVE OR ASSERT AGAINST SANFORD CLINIC NORTH OR ITS AFFILIATED ENTITIES WILL NOT EXCUSE OR DELAY PAYMENT OF THIS NOTE AS PROVIDED HEREIN, AND MAKER HEREBY WAIVES ANY RIGHT OF SETOFF.

EXHIBIT DO NOT SIGN

MAKER:  Sabha Ganai, MD
SSN:_____

STATE OF _____)
            : SS
COUNTY OF _____)

   On this the _____ day of _____, 2019, before me, a Notary Public within and for said County, personally appeared Sabha Ganai, MD, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he/she executed the same as his/her free act and deed.

EXHIBIT DO NOT NOTARIZE

(SEAL)                                          Notary Public, State of _____
                                               My Commission expires: _____

DEMAND NOTE FOR
INCENTIVE LOAN
PER PHYSICIAN AGREEMENT

$ 25,000.00 _____                    _____, 2019

       After date, for value received, I promise to pay to the order of Sanford Clinic North, the sum of Twenty-Five Thousand and no/100 Dollars ($25,000.00) to be repaid ON DEMAND, or if no demand is made, in 24 monthly installments with interest thereon at the "prime rate" as published in the Wall Street Journal on the date of execution plus one percent, beginning on the first day of the first month following the Commencement Date, in accordance with the STAFF PHYSICIAN AGREEMENT dated _____, _____.

       Should any of the principal not be paid when due, such default shall, at the option of the legal holder hereof, cause all sums then remaining unpaid to become immediately due and payable, without notice (notice of the exercise of such option being hereby expressly waived).

       The Maker, endorsers, sureties and guarantors hereof hereby severally agree to pay all expenses of collection, including attorney's fees, in case payment shall not be made at maturity, and severally waive presentment for payment, notice of non-payment, protest and notice of protest and diligence in enforcing payment or bringing suit against any party hereto, the endorsers, sureties and guarantors hereof hereby severally consent that the time of payment may be extended, or this note renewed, from time to time without notice to them and without affecting their liability hereon. The Maker agrees that Sanford Clinic North may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to the Maker by Sanford Clinic North, including any wage or other obligation and whether or not due, against any obligation owed by the Maker to Sanford Clinic North or its affiliates, including the obligations of Maker evidenced by this NOTE. The payment obligations arising under this NOTE are subject to the terms of the STAFF PHYSICIAN AGREEMENT entered into by the Maker and Sanford Clinic North on _____, _____ including, without limitation, the debt forgiveness provisions set forth in Section 6(g) thereof.

       MAKER AGREES THAT ANY CLAIM OR DEMAND (OF DEFAULT OR OTHERWISE) WHICH MAKER MAY HAVE OR ASSERT AGAINST SANFORD CLINIC NORTH OR ITS AFFILIATED ENTITIES WILL NOT EXCUSE OR DELAY PAYMENT OF THIS NOTE AS PROVIDED HEREIN, AND MAKER HEREBY WAIVES ANY RIGHT OF SETOFF.

                                 _____

                                 MAKER:  Sabha Ganai, MD
                                 SSN:_____

STATE OF _____)
                            : SS
COUNTY  OF  _____)

       On this the _____ day of _____, 2019, before me, a Notary Public within and for said County, personally appeared Sabha Ganai, MD, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he/she executed the same as his/her free act and deed.

                                 _____

(SEAL)                         Notary Public, State of _____
                                 My Commission expires: _____

*CONFIDENTIAL PEER REVIEW DOCUMENT*

Dear Dr. Ganai:

Thank you for meeting with us today to discuss areas of concern that have been brought forward as part of our ongoing improvement efforts and recredentialing process. We appreciate your input and your cooperation to evaluate clinical care concerns that have been identified and to facilitate performance improvement measures to resolve areas of opportunity.

Upon consideration of all relevant information pertaining to the issues raised, and because the concerns are ongoing and impact patient care, it has been recommended that a Performance Improvement Plan ("PIP"), overseen by the Care Monitoring Committee, be developed to assist you in successfully addressing the opportunities that have been identified. We appreciate you meeting with us today to discuss the PIP and we look forward to working with you to resolve these areas of concern.

The PIP that we are recommending to you consists of the following core elements:

1. *Collegial participation in a focused review of surgical practices;*

2. *Development of a mutually agreed upon mentoring plan with an assigned mentor to facilitate and guide improvement efforts;*

3. *Development of a personal development plan to evaluate and improve areas of identified opportunity; and*

4. *Agreement to fully engage in ongoing monitoring and peer review processes and take accountability for your own professional development and performance improvement.*

Additional details that are necessary to effectively implement these elements are addressed in the attached PIP, which is intended to be utilized by you, your mentor and the Care Monitoring Committee going forward. After you have an opportunity to review this letter and the enclosed materials, please let us know if you have any additional questions or need any further clarification regarding expectations and next steps.

Please understand that your agreement to voluntarily abide by and participate in this PIP is not considered a restriction of your privileges. It is not an adverse professional review action and of itself will not be reported to the National Practitioner Data Bank.

To demonstrate your commitment to work with us and your willingness to participate, please sign and return the attached PIP within 3 business days, keeping a copy for your reference. A copy of the PIP and your agreement to participate will be provided to your mentor and the Care Monitoring Committee as they consider your progress and completion of the PIP. Quarterly reports on your progress will be provided to the Care Monitoring Committee.



If you decide not to participate in the PIP as outlined in this letter, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to Sanford's Peer Review and Credentials policies.

Thank you for your anticipated cooperation and participation in Sanford's ongoing efforts to improve the care we provide. If you have any questions or wish to discuss this matter further, please feel free to contact me.

Sincerely,


Steven Briggs, MD
Vice President Medical Officer
Sanford Fargo Medical Center

Enclosure:     PIP Agreement

cc:     Confidential Peer Review File

## Performance Improvement Plan Agreement
## For Sabha Ganai, MD

Concerns have been identified and explained to me regarding the following: prolonged operative times (especially with robotic surgery), occurrence of post-operative complications, and higher than expected rates mortality. Because these concerns are ongoing and they impact patient care, I, Sabha Ganai, MD agree to the following stipulations regarding my surgical practice at Sanford Fargo Medical Center.

1. I agree to collaboratively participate in a Focused Professional Practice Evaluation (FPPE) to further evaluate my surgical technique and acumen, and to determine measures I can take to reduce operative times and improve patient outcomes. I understand that successful completion of the FPPE will be a significant basis for determining success with this Performance Improvement Plan (PIP). I acknowledge that the following elements will be included in my FPPE.

   - **Evaluation of Care.** I acknowledge that any of my patient care records and quality reports may be reviewed to assist in determining opportunities to improve upon my clinical care and surgical skills.

   - **Concurrent Collegial Consultation/Procedural Proctoring.** I agree to seek collegial consultation pre-operatively with my assigned proctors for at least my next 20 scheduled surgical cases involving the esophagus, pancreas and hepatobiliary system, and acknowledge the following:

     o I acknowledge that my proctors will determine if additional cases or types of cases require concurrent collegial consultation.
     o I agree that collegial consultation will include discussion of patient risk factors, planned surgical approach and anticipation of potential complications, including identification of indications to convert to open if a laparoscopic or robotic approach is planned.
     o I agree that my proctors will have the autonomy to determine their level of oversight on the cases, which may include concurrent proctoring or participation as a co-surgeon. I further understand that my proctor's presence is required for at least 10 cases.
     o I understand that my proctors do not have the ability to override my decisions following a collaborative discussion. I agree that when there are unresolved differences of opinion, the matter will be referred to Dr. Briggs and my mentor for further discussion.
     o I acknowledge that my proctors will be assigned and I agree to work respectfully and collaboratively with them to successfully complete my FPPE.

   - **Retrospective Case Review.** I acknowledge that all cases with intra-or post-op complication and cases significantly exceeding the national average operative time will be retrospectively reviewed. I agree to collaboratively discuss the cases and any opportunity for improvement that may be identified.

2. I agree to develop a mutually agreeable mentorship plan with my assigned mentor, and work collaboratively with this individual to gain insight into my strengths and limitations, identify methods to consistently deliver high quality, safe patient care and ensure my successful completion of this PIP.

3. I agree to address concerns in clinical care identified through peer review, proctoring or mentoring processes and to make changes to my care practices accordingly. This may include continuing education or additional training. I understand the importance of self-reflection on my own performance and willingness to improve and make changes as indicated.

4. I will take accountability for my professional growth and performance improvement and agree to develop a professional development plan. This plan will include improvement strategy and goals, with timelines for completion, to address noted areas of opportunity. In addition to measurable performance indicators to improve rates of complication and mortality, I will define goals to incrementally reduce my operative time until I achieve nationally reported norms. My professional development plan will be in written form with a copy provided to my mentor and the Care Monitoring Committee by September 15, 2023. All proposed performance metrics must be accepted by the Committee.

5. I further understand that quarterly reports regarding my progress will be made to the Care Monitoring Committee, and that this Agreement will continue until such time as the Care Monitoring Committee determines otherwise.

I acknowledge this is a serious matter and that I will be monitored on an ongoing basis by (1) peers assigned to review cases in accordance with peer review process; (2) my assigned mentor and proctors; and (2) the Care Monitoring Committee. I understand that if I do not meet the performance stipulations as outlined in the PIP, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to the Sanford Peer Review and Credentialing policy.

I understand that my agreement to voluntarily abide by and participate in this PIP is not considered a restriction of my privileges and that this Agreement in and of itself is not reportable to the National Practitioner Data Bank. I further understand I am provided an opportunity to respond and to have this response also placed in my confidential peer review file along with this Agreement.

In addition, I acknowledge that the Care Monitoring Committee requests signed acknowledgement of this Performance Improvement Plan within three business days of the date of this letter. I further understand that if I choose not to participate in the PIP, the Care Monitoring Committee will determine the next appropriate steps.

Accepted this __22__ day of August 2023.

_____
Sabha Ganai, MD

Sanford Surgical Oncology
801 Broadway N
Fargo, ND 58102
Ph: (701) 234-2251



September 15, 2023

Dear Dr. Briggs and Team,

This letter is a response as requested per our meeting on August 22, 2023 to review and reflect on quality improvement efforts and opportunities for myself and the Division of Surgical Oncology at Sanford Medical Center Fargo. I appreciate this opportunity and will discuss these in detail herein using facility data and then will provide a summary that includes a personal performance improvement plan (PIP).

**I.      Summary about myself, Sabha Ganai, MD, PhD, MPH, FACS, FSSO**

I am a 2001 graduate of the USC Keck School of Medicine and I am sub-specialty board-certified in complex general surgical oncology (CGSO) with training from University of Chicago in addition to general surgery training from Tufts University / Baystate Medical Center. I have additional training in clinical ethics from the MacLean Center for Clinical Ethics and epidemiology from the Harvard T.H Chan School of Public Health. I am a funded population-health scientist studying rural cancer disparities and have an h-index of 17 with over 80 publications and book chapters. I previously served as co-director of the Southern Illinois University (SIU) Outcomes Analysis and Research (SOAR) program, with experience using Lean Six-Sigma in the context of healthcare quality improvement. I joined Sanford Health in February 2020 and I am an Associate Professor of Surgery and the Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.

I serve on the Executive Council for the American College of Surgeons (ACS) Cancer Surgery Standards Program (CSSP), which has afforded me the opportunity to give invited national talks on improving quality and performance in complex oncologic care, including at the Alliance for Clinical Trials (2021) and the ACS Quality and Safety Conference (2022). I am the Disease Site Group leader for gastric and esophageal disease for the Commission on Cancer (COC) and I lead a multidisciplinary team of medical oncologists, radiation oncologists, gastroenterologists, and surgeons that includes experts from institutions like Mayo Clinic and MD Anderson Cancer Center. I was the 2023 recipient of the Society for Surgery of the Alimentary Tract Academy for Surgical Coaching Award and I have been previously honored with Alpha Omega Alpha and the Gold Foundation Humanism Honor Society. I am the Chair for the American Society for Bioethics and Humanities Surgical Ethics Affinity Group and I participate in the Sanford Ethics Committee including as a volunteer ethics consultant.

My clinical practice has focused on complex general surgical oncology, hepatobiliary surgery, endocrine surgery, and palliative surgery. My personal mission when joining our Surgical Oncology Division at Sanford Medical Center in Fargo was "to elevate care delivery for patients with cancer in North Dakota". I was excited and privileged to join my partners, Dr. Robert Sticca and Dr. Daniel Tuvin because I know as a team we are unique in our collaborative culture and our service orientation. My vision to provide "optimal care for cancer patients" is centered in both population health and ethics, requiring grounding in a multifaceted and multidisciplinary process for integrated care delivery and improving access as a form of justice. Part of my efforts and expertise fulfilling this mission has to do with analysis of quantitative and qualitative data, and I meet weekly with a team at Sanford Research in Sioux Falls in the conduct of these research efforts. The conceptual framework for my work has previously been summarized in the graphic included in the following ASCO publication:

EXHIBIT
b

https://dailynews.ascopubs.org/do/access-cancer-care-rural-populations-barriers-and-solutions

I am a values-driven leader and I strive for excellence in my team with a goal of delivery of optimal care for our cancer patients in a compassionate and patient-centered fashion. My personal behavioral style using the DISC inventory is shared by many surgeons: 'Decisive' with the subtype 'Implementing Conductor'. These are individuals who are self-motivated, expeditious, and attracted to challenges and results. Using Clifton StrengthsFinder, my top five leadership strengths are being a maximizer (a person who stimulates group excellence), a relator (maintains close relationships to achieve a goal), having self-assurance (confidence in ability to act and decide), having strong ideation (ability to find connections between disparate phenomena), and having high adaptability (ability to perform one day at a time). I am a surgical ethicist and I favor a pragmatic Aristotlean virtue ethics approach which avoids dwelling in perfectionism and designates excellence as a consequence of habitual behavior. Because the practice of good habits (virtues) becomes linked to good outcomes, I have been working to teach the residents to instill greater conscientiousness in patient care delivery as a form of quality improvement. Since coming to Sanford, I have adapted my prior protocols for complex oncologic care delivery and have documented this in the form of the "White Service Handbook" as a way to standardize the delivery of care for the surgical oncology division based on best evidence within our discipline. When I started here in 2020, I prompted and quickly implemented within my division utilization of NCCN-guideline recommended practices for extended-use post-discharge VTE prophylaxis, which they recognized as important but assumed were difficult to implement because it had never been done here at Sanford. In addition, I implemented surgical oncology clinical trials at Roger Maris Cancer Center (RMCC) including the OPTI-Surg study (preoperative geriatric frailty assessment), the OPT-IN study (neoadjuvant therapy for gallbladder cancer), ECOG-ACRIN Pancreas Cyst Surveillance Study, and the International Mel-Mart II study randomizing margins for intermediate-thickness melanoma.  We are working steadily to gain national recognition through our efforts in surgery trial accruals which has gone from non-existent to above average in comparison with other academic medical centers.

**II – Vizient Data**
When we met on August 22, 2023, I was provided a data point of an O/E ratio of 1.4 and increased operative times as the rationale to proceed with a performance improvement plan (PIP) covering pancreatectomy, hepatectomy, and esophagectomy. I signed this PIP in good faith, completely understanding this was noise-laden data from Vizient, and after correcting the nonoperative and palliative cases, my O/E ratio is under 1. As you are aware, Vizient is a database that provides operational data derived from administrative coding (billing) without clinical verification. It is designed to be able to quickly compare hospital performance and safety parameters, but it is not designed to reliably benchmark surgeon performance or distinguish the quality of departments or service lines. This is known to be confounded by the quality of documentation and capturing appropriate DRG categories. Unfortunately, because of this, if the clinical documentation within a facility has failed to capture the complexity and acuity of patients through the system, a hospital or service line could be perceived as providing poor quality of care.

In January 2021, because of my prior QI expertise, I was asked by the Department of Surgery to review every mortality and  patient safety indicator 'never event' attributed to General Surgery for the year 2020. Detailed chart review of every attributed mortality revealed an intrinsic validity of the report as less than 40%, with many patient deaths included that were not causally associated to any operation or were occurrences with surgeons in other Departments or Service lines. This lack of causality becomes a pitfall with Vizient as simple sequencing of events during any inpatient stay is not possible (a preop VTE is considered the same as a postop VTE since the process to tell the difference can seldom be distinguished with codes). In addition, we raised concerns on reliability of data as there were patient deaths we had discussed in M+M and QI conferences that were not included in the data set. When similar observations were discussed with Dr. Clifford Ko, Director of Quality for the American College of Surgeons during his visit to Sanford Broadway Medical Center in 2022, he reminded us that Vizient was never supposed to be used for performance benchmarking beyond hospital-to-hospital comparisons. There is simply more noise than signal by design.

EXHIBIT A_089

Table 1 summarizes the seven deaths that were attributed to me by Vizient, along with assessment using a "Plus/Delta" approach, a Crew Resource Management technique to explore opportunities for improvement:

**Table 1: Vizient-Attributed Mortality (2022-2023)**

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2338732<br>Admit 1/5/2022<br>Surgery: Whipple<br>Death 1/15/2022<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 6cm IPMN, BMI 43.5, AF on Eliquis<br>Fistula risk score of 28.5% (high risk)<br><br>Whipple with Roux en Y recon (short mesentery), developed Pancreas fistula | Pre-habilitation<br><br>Surveillance for over a year; Tried to observe cyst, but worrisome features developed/ persisted. | Failure to Rescue a POD10 aspiration event<br>Needed NGT replaced rather than diet advanced after return from IR.<br><br>Better communication with ICU: After this event, Tonya and I met with ICU charge nurse to work to improve 2E nursing communication with resident team members and attending since our team and myself were never notified when a problem did occur. |
| E1861093<br>Transfer Accepted: 2/8/2022 5pm<br>Transfer Arrived: 2/8/2022 823pm<br>Surgery: ASAP after 9pm<br>Emergent Abdominal exploration with cholangiogram<br>Death: 2/9/2022 1738<br><br>DISCUSSED IN QI AND M+M CONFERENCES<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 83M with cardiac history, prostate cancer, cholecystitis.<br><br>Accepted in transfer after Surgery completed around noon at Altru: Lap converted to Open cholecystectomy with bile leak.<br><br>This was an intraop mishap leading to transection and excision of 6cm of portal vein in addition to hepatic duct<br><br>Vein occlusion exceeded 12hrs.<br>Lactate 16 prior to OR. | I called in my partner out of bed to confirm missing anatomy and my plan for proceeding with comfort measures instead of a certain to fail attempt at vascular reconstruction.<br><br>I documented everything with Risk Management in the morning.<br><br>Withdrawal of care occurred later in the day when family arrived. | Nothing. |
| E2158042<br>Admit 3/24/2022<br>Consult for SBO 3/31/2022<br>Death 4/5/2022<br><br>NON OPERATIVE CONSULT<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 76F with Stage IV breast cancer and peritoneal carcinomatosis.<br><br>There was no plan for operative intervention. | We recommended hospice and she agreed.<br><br>This was a patient-preference concordant death. | Nothing – this was a consult with no expected benefit from surgery. |

EXHIBIT A_090

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2620805<br>Admit 3/18/2022<br>Death 4/20/2022<br><br>PALLIATIVE CARE +<br>HOSPICE REFERRAL | 77M with Stage III esophageal cancer s/p esophagectomy Oct 2021, receiving adjuvant nivolumab immunotherapy<br><br>Developed PCP pneumonitis over week prior to admission that was likely secondary to adjuvant immunotherapy. This was held by Dr. Vegunta and the patient was started on steroids. Patient ended up intubated and later received a tracheostomy by Dr. Mistry. | I visited patient's wife periodically during the hospitalization to check in. | Nothing – this was an Unfortunate situation of immunotherapy-related PCP pneumonitis >6 Months after esophagectomy |
| E1892283<br>Admit: 1/9/2023<br>Surgery: Whipple with SMV venorrhaphy<br>Death: 1/17/2023<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 74F with symptomatic main duct IPMN, prior lap chole with bile leak, frailty, malnutrition.<br><br>Postoperative delirium<br>Delayed gastric emptying<br>Fistula risk score 4.4% (low risk)<br><br>The patient had evidence of DGE when I saw her on Monday POD 7 (diet advanced over weekend by team). I made her NPO at the time and instructed on call resident to consider NGT. On POD 8, it was recognized that she needed an NGT, but she aspirated and coded around 8am. | Prehabilitation (PT and nutrition)<br>Geriatrics consultation<br><br>I initially declined surgery in Oct 2022, and I allowed patient (and family) to convince me to operate as she was symptomatic with repeat flares. We did wait until nutritional and ambulatory status improved. | Failure to Rescue a POD8 Aspiration event. We should have placed an NGT sooner to avoid aspiration.<br><br>The patient should have had her HOB elevated as part of GI aspiration precautions |
| E1812727<br>Transfer Accepted: 1/22/2023<br>Surgery: Emergent Abdominal Exploration<br>Death: 1/22/2023<br><br>PALLIATIVE CARE + HOSPICE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 62M with Stage III gastric cancer (s/p total gastrectomy, T4a N3 30/35 nodes positive); completed therapy and under surveillance via Cancer Treatment Centers of America in Chicago.<br><br>Presented with ischemic bowel Friday in Dickinson, left AMA to travel elsewhere, transferred emergently from Bismarck on Sunday am. | We took patient to OR appropriately<br><br>When we identified he had an internal volvulus with ischemia for several days and he did not have enough viable bowel available to perform an esophagojejunostomy, I talked to family while team closed, and he was made comfort care with time given to have family from Dickinson arrive to say goodbye.<br><br>There was good communication with family and death was preference-concordant. | I was later instructed by Dr. Mannuru that this patient could have been accepted/switched in transfer from Bismarck to observation status instead of inpatient status to deflect mortality reporting. I was unaware of this at the time.<br><br>We did our best to stabilize and bring to OR ASAP when team was available, so I otherwise would not have changed my approach. |

EXHIBIT A_091

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E1848027<br>Admit: 2/22/23<br>Surgery: <u>Emergent</u> Whipple with Double RY reconstruction 2/23-24/23<br>Death: 3/2/23<br><br>PALLIATIVE CARE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 76M s/p open RYGBP 20 y ago, recent COVID+ <3wks prior. AVR, COPD, BMI 37, presenting with obstructive jaundice from periampullary cancer, TBili 26, INR 8<br><br>Admitted after syncopal episode. Drs. Meidinger/Vogels did a lap assisted ERCP.<br><br>I was called to come in after 5pm to address iatrogenic perforation.<br>Informed consent obtained from wife 5:30pm. >3hrs was spent lysing adhesions. Fistula Risk Score = 42.3% (high risk)<br><br>Washout required after heparinization restarted later that day secondary to profound coagulopathy.<br><br>Patient coded on POD7 while in ICU. He described sense of doom followed by Brady/PEA followed by CPR with ROSC. I spoke with wife and advised considering withdrawal of care given pressor requirement, hyperkalemia, etc. Possible VTE while on anticoagulation as recently switched from heparin gtt to Lovenox. | Patient wanted everything done per wife. Patient was appreciative of care he was given when he had capacity to discuss care delivered.<br><br>Good communication with patient and/or wife throughout care. | SMCF teams are not well equipped for Whipples and have difficulty locating appropriate suture, Castro-Viejos, etc. for emergencies.<br><br>We may have had a pro-thrombotic state despite anticoagulation status related to his COVID+ status and compounded by profound hyperbilirubinemia. We perhaps should have kept him on heparin gtt rather than switch him to Lovenox.<br><br>Under normal/typical circumstances he would have been stented and optimized during neoadjuvant therapy but this surgery was initiated in an emergent fashion in the wrong facility and in the middle of the night. |

**III – Cancer Quality Improvement Program (CQIP)**

The goals of CQIP are to improve process and outcomes for the care of patients with specific cancers using feedback of data as entered into the National Cancer Databases (NCDB) back to facilities. Surgical Oncologists who perform mostly foregut and hepatopancreaticobiliary (HPB) procedures will understandably have higher morbitidity and mortality to track compared to those who perform breast and soft tissue procedures, and these findings may be further influenced by volume relationships. In addition, the expected survival by stage will be different for every disease site. This leads to the need to benchmark procedure-specific and cancer-specific metrics and compliance to standards rather than general outcomes for any cancer center. Long-term oncologic outcomes (overall survival, recurrence-fress survival) are also parameters of interest, requiring time-to-event analyses. Via the COC, we participate in the CQIP program, which relies on data inputted into the NCDB in a protocolized fashion by certified tumor registrars with inclusion of long-term follow-up. While the process for assessment of survival generates the robustness of the NCDB, there is a two-year delay in receipt of CQIP mortality benchmarking reports. The 2022 CQIP Annual Report data (2018-2020) showed outcomes for SMCF/SMCB/RMCC that *were not significantly* different from expected outcomes at COC facilities (Table 3). Note that confidence intervals can be wide based on sample size and small number of events.

EXHIBIT A_092

**Table 3: CQIP Unadjusted 30-day Mortality (2018 – 2020)**

| Operation for Cancer | Fargo RMCC | All COC | P |
|---|---|---|---|
| Pancreatectomy | 2.2% (95% CI, 0.1 – 10.3%) | 2.3% (95% CI, 2.1 – 2.4%) | NS |
| Esophagectomy | 6.1% (95% CI, 1.1 – 19.1%) | 3.0% (95% CI, 2.8 – 3.3%) | NS |

*NS, not significant, p>0.05*

Table 4 demonstrates benchmarked performance standards for lymphadenectomy at SMCF/SMCB:

**Table 4: CQIP Lymphadenectomy Reports (2018-2020)**

| Measures | Fargo RMCC | All COC | P |
|---|---|---|---|
| Colectomy >12 nodes | 96.1% (95% CI, 90.8 - 100%) | 94.4% (95% CI, 94.1 – 94.6%) | NS |
| Gastrectomy > 15 nodes | 60% (95% CI, 17.1 – 100%) | 71.8% (95% CI, 70.1 – 73.5%) | NS |

*NS, not significant, p>0.05*

The best way to address the suboptimal gastrectomy lymph node harvest is for us as an institution to continue to be intentional about performing a D2 lymphadenectomy with gastric cancer resections. Recent analysis of NCDB gastric cancer data presented at the 2023 Digestive Disease Week confirms this metric is linked with long-term overall survival, and surgeons happen to have better nodal harvests with robotic approaches. The CSSP currently recommends nodal harvest >16 to be an updated performance standard based on the work of my COC disease site group team of experts. Meeting this has been an issue nationwide.

## IV – ACS NSQIP Data

The American College of Surgeons National Surgical Quality Improvement Program (NSQIP) differs dramatically from Vizient in that data are verified and inputted by a clinical research nurse specialist. Outcomes can be risk-adjusted by facility and are standardized leading to high internal validity and generalizability. Because of the design, we are also able to stratify data so outcomes can be examined in a procedure-specific fashion or stratified to inpatient or outpatient status. Of note, we review our Department surgical performance reported through NSQIP twice yearly and this has continued to show exemplary results, including data discussed by our Surgeon Champion, Dr. Sticca, earlier this week.

Table 5 summarizes data compiled from 01/01/2020-08/31/2023 from NSQIP. The first metric, "occurrence/case ratio", takes account any morbidity, readmissions, reoperations, and mortality.

**Table 5: NSQIP Mean Occurrences/Cases, (2020 – 2023)**

| Subgroups | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|
| Outpatient Cases | 1.2 | 1.5 | P< 0.05 (better than expected) |
| Inpatient Cases | 2.1 | 2.0 | NS (as expected) |
| Pancreatectomy | 2.0 | 2.1 | P<0.05 (better than expected) |
| Hepatectomy | 1.3 | 1.9 | P<0.05 (better than expected) |
| Esophagectomy | 3.0 | 2.9 | NS (as expected) |

Note that this metric is unadjusted and does not take into account risk adjustment for complexity but has been stratified by procedure. The NSQIP General Surgery patients includes all adult cases performed by General Surgeons, Acute Care Surgeons, Bariatric Surgeons, Endocrine Surgeons, Colorectal Surgeons, Hepatobiliary Surgeons, and Surgical Oncologists. Perioperative morbidity is 44% for pancreatoduodenectomy and 46% for esophagectomy (Low 2010) so would be expected to be greater for an HPB/GI surgeon doing these procedures compared to the average general surgeon.

Further exploration of my NSQIP mortality shows these data are not significantly different from national NSQIP data, except my outpatient and hepatectomy performance is significantly better than expected (Table 6). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

EXHIBIT A_093

**Table 6: NSQIP Mortality, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | | 0.08% (0.07 – 0.09%) | P<0.05 |
| Inpatient Cases | 4.4% (95% CI. 0.6 – 8.1%) | 5.2% (3.0 – 7.4%) | 2.34% (2.30 – 2.37%) | NS |
| Pancreatectomy | 5.9% (95% CI. 0 – 13.8%) | 7.5% (2.2 – 12.9%) | 1.67% (1.53 – 1.81%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 1.43% (1.28 – 1.58%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 23.7%) | 8.9% (0.6 – 17.2%) | 3.1% (2.64 – 3.57%) | NS |

*NS, not significant*

The mortalities defined in Vizient with Whipples were included.  My mortality for distal pancreatectomy is zero.  The one esophagectomy mortality that is present here but was not included in Vizient was an octogenerian patient with esophageal SCC from Thief River Falls who was DNR/DNI (her surgery was indicated due to dysphagia and stricture several months after definitive chemoradiation with failure to dilate/stent secondary to Type IV paraesophageal hernia).  Postdischarge she developed a pleural effusion and COPD exacerbation and elected not to travel or be readmitted. We were never contacted since she was already set up with hospice.

**Table 7: NSQIP Readmissions, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 7.0% (95% CI, 0 – 14.5%) | 6.1% (3.2 – 8.9%) | 2.2% (2.2 – 2.3%) | NS |
| Inpatient Cases | 12.3% (95% CI, 6.3 – 18.3%) | 9.3% (6.4 – 12.2%) | 8.5% (8.4 – 8.5%) | NS |
| Pancreatectomy | 14.7% (95% CI, 2.8 – 26.6%) | 12.9% (6.0 – 19.7%) | 16.5% (16.1 – 16.9%) | NS |
| Hepatectomy | 12.5% (95% CI, 0 – 25.7%) | 9.5% (3.6 – 15.4%) | 9.5% (9.1 – 9.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 10.9% (10.0 – 11.7%) | NS |

*NS, not significant*

Further exploration of readmissions shows these are as expected from NSQIP national data (Table 7). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

**Table 8: NSQIP Reoperations, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 4.9% (2.3 – 7.5%) | 0.92% (0.90 – 0.94%) | P<0.05 |
| Inpatient Cases | 2.6% (95% CI, 0 – 5.6%) | 5.4% (3.2 – 7.7%) | 4.2% (4.1 – 4.2%) | NS |
| Pancreatectomy | 2.9% (95% CI, 0 – 8.6%) | 5.4% (0.8 – 10.0%) | 1.7% (1.5 – 1.8%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 2.8% (2.6 – 3.0%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 15.5% (14.5 – 16.5%) | NS |

*NS, not significant*

Further examination of reoperations shows these are also similar to NSQIP national data (Table 8). The one reoperation I did after pancreatectomy was a 20 minute wound exploration I performed out of concern for dehiscence (fascial suture was found to have loosened but was intact and was reinforced). The reoperation after esophagectomy was secondary to anastomotic leak, and the observed rate is significantly less than expected nationally for our team.

Examination of organ space infections shows this is similar to national NSQIP data (Table 9). Composite inpatient and outpatient data are not controlled for case complexity which is why data are further stratified by procedure. This metric would be determined by placement of a drain, and can be a surrogate metric of Type B/C pancreas fistula, bile leak, and anastomotic leak.

EXHIBIT A_094

**Table 9: NSQIP Organ Space Infections, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 2.3% (95% CI, 0 – 6.8%) | 0.4% (0.2 – 0.6%) | 0.12% (0.12 – 0.13%) | NS |
| Inpatient Cases | 7.0% (95% CI, 2.3 – 11.7%) | 7.0% (4.4 – 9.5%) | 3.0% (3.0 – 3.1%) | NS |
| Pancreatectomy | 8.8% (95% CI, 0 – 18.4%) | 11.8% (5.3 – 18.4%) | 13.4% (13.1 – 13.8%) | NS |
| Hepatectomy | 4.2% (95% CI, 0 – 12.2%) | 6.3% (1.4 – 11.2%) | 5.5% (5.3% – 5.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 8.9% (0.6 – 17.2%) | 12.3% (11.4 – 13.2%) | NS |

*NS, not significant*

My pancreatectomy and hepatectomy length of stay outcomes are better than expected (Table 10), which may be related to increased use of robotic-assisted approaches in my practice and through implementation of an ERAS protocol for pancreatectomy within the Division. My esophagectomy patients have a LOS of 10 days. I typically prepare esophagectomy patients to be in the hospital 10-14 days because of frailty concerns, care coordination for outpatient tube feeding, diet advance, and speech swallow assessments prior to discharge and the high distance travelled for our patients. Note that the Virginia Mason group of HPB/GI surgical oncologists reported a LOS of 10-12 days for esophagectomy and 8-10 days for pancreatectomy with a similar rural/regional referral catchment area (Low 2010).

**Table 10: Median Hospital Length of Stay (days) with Interquartile Ranges (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 0 (0 – 1) | 0 (0 – 1) | 0 (0 – 1) |
| Inpatient Cases | 6 (3 – 9) | 6 (3 – 9) | 4 (2 – 7) |
| Pancreatectomy | 6 (5 – 8) | 6 (5 – 9) | 7 (5 – 10) |
| Hepatectomy | 1 (0 – 2) | 3 (1 – 5) | 4 (3 – 7) |
| Esophagectomy | 10 (7 – 17) | 9 (7 – 14) | 9 (7 – 14) |

My inpatient cases and division overall do have a longer length of stay than the average US general surgeon as our practice includes complex cases including HIPEC, esophagectomy, gastrectomy, pancreatectomy, hepatectomy, ovarian cancer cytoreductions, multivisceral resections, and resections of retroperitoneal sarcoma, plus specific consultations for palliative surgery and advanced hepatobiliary reconstructions. In addition, we receive a rural referral base for cancer care where travel times often can exceed 3-8 hours.

**Table 11: Utilization of Robotic Technologies**

| | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 23.3% | 5.3% | 8.7% |
| Inpatient Cases | 32.5% | 13.1% | 7.5% |
| Pancreatectomy | 26.5% | 11.8% | 9.5% |
| Hepatectomy | 58.3% | 20.0% | 7.0% |
| Esophagectomy | 41.7% | 11.4% | 16.9% |

Overall, my utilization of robotic technologies (DaVinci Xi) is greater than the national average and encompasses the majority of robotic use in our Division of Surgical Oncology (Table 11). This use of robotic techniques probably impacts my average operative time as it typically takes longer to do the same operations robotically compared to open. In addition, I am doing oncologic robotic operations of high complexity, including those previously only performed at quaternary cancer centers (like robotic D2 lymphadenectomy). Because of this, I am the recipient of directed referrals from providers including Dr. Hannan (Altru Cancer Center), Dr. Potti (Cancer Center of North Dakota), Dr. Kurniali (Sanford Bismarck), and Dr. Gupta (Sanford RMCC) because they know I have a preference for considering minimally-invasive oncologic resections, and because of the strong relationships I have with my patients.

EXHIBIT A_095

My Whipple operative time is significantly longer than average (Table 12), but I have done a fair number of high biliary tract resections for perihilar cholangiocarcinoma including double hepaticojejunostomies and adding choledochoscopy set up into the procedures, all of which leads to increased time plus any time required waiting for frozen sections several times a case. In addition, 43% of my Whipples have coded for a vascular repair or reconstruction. I have also done several revisional Whipples after Roux en Y gastric bypass, two including gastrectomy and one maintaining the remnant stomach.

**Table 12: Operative Time (minutes)**

|  | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|
| Outpatient Cases | 121 (95% CI, 100 – 142) 23% robot | 74.9 (74.8 – 75.0) 9% robot |
| Inpatient Cases | 366 (95% CI, 330 – 401) 33% robot | 150 (149.6 – 150.2) 8% robot |
| Distal Pancreatectomy | 400 (95% CI, 336 – 463) 73% robot | 242 (240 – 244) 17% robot |
| Open Whipple/Total Panc | 561 (95% CI, 508 – 614) 43% vein repair/recon 29% complex (extrahepatic BD resection or Roux recons) | 383 (381 – 385) |
| Hepatectomy | 208 (95% CI, 151 – 264) 58% robot | 230 (228 – 231) 7% robot |
| Esophagectomy | 487 (95% CI, 395 – 579) 42% robot | 384 (380 – 388) 17% robot |

Note that NSQIP data represents a sample and does not include all my cases at Sanford.

**IV – My Intuitive App**

I have completed 106 DaVinci operations at Sanford Broadway Medical Center with an average use of 3.5 hrs per patient. The precise relationships between case type and overall operative time can be difficult to correlate and tabulate since I often do redock the robot in order to complete more than one procedure under the same anesthesia (i.e. cholecystectomy and distal pancreatectomy; liver resection and oophorectomy). I am the only provider in the region who has been doing Robotic HIPECs, which adds an extra 2-2.5 hours of case time (setup time plus a 90 minute chemoperfusion). In addition, I include D2 lymphadenectomies in my complex foregut cases for their established oncologic benefit, which do take more time but are recognized to improve long-term survival.

I have performed several palliative double bypasses (hepaticojejunostomies + gastrojejunostomies) robotically, which while being longer cases than open palliative double bypasses, allows for better visualization, smaller incisions, and a goal of removal of a transhepatic catheter, thus dramatically improving quality of life considering a median LOS of 4 days. My average time for robotic cholecystectomy is 97 minutes, but notably these are radical cholecystectomies for mass or cancer (+liver/nodes) and/or remnant cholecystectomies, which is a complex reoperative operation that bears higher risk.

Of note, I have been doing a large proportion of robotic complex distal pancreatectomies, including pancreas neck lesions (tumor above SMV/portal confluence), as well as performance of splenic-preserving distal pancreatectomies in 67% of these operations. These cases are all notably more challenging than resection of tail lesions that include the spleen, so do take understandably more time to complete safely.

**V – Attribution Bias and Just Culture**

My occurrence rates are not significantly different from expected for the case complexity I am expected to manage during my clinical duties, and I do have shorter than expected hospital LOS for many of these cases. I continue long-term surveillance with my patients with maintain excellent results including great feedback from medical oncologists and patients. I have not had a concern raised to

EXHIBIT A_096

me during my performance evaluations and I have been reminded by both Dr. Traynor and Dr. Garcia that I do have great responses on patient surveys.

To be fair, statements made attributing 'significantly worse outcomes' to me or my Division are false and are not founded by data controlled for coding error, complexity, risk, and the emergent nature of care for patients seen while on call. We as a health system need to consider consultation with an external data scientist and utilize validated clinical databases (like NSQIP) preferentially while being cautious in use and presentation of partitioned Vizient data without clinical correction as we are aware as a team through our prior study and expert opinion *and the literature* that there is poor intrinsic validity with assessing a service line or individual surgeon outcomes. In 2020, the intrinsic validity was less than 40% of cases attributed to the SMCF General Surgery Service Line, which does not instill trust in the system.

Vizient is not and was never designed to be used outside of hospital-to-hospital comparisons and it is an anchoring bias to assume it is the perfect tool. Internal validity is a metric that reveals the ability of an analysis to provide meaningful results that resemble what we would consider truth. Poor internal validity means the tool provides errors in estimation just as often as there is meaningful signal. In a study from Vanderbilt University examining mortality events assigned by Vizient to the otolaryngology service line, only 32% of events were actually attributable to their department (Freeman 2021). In a study from UMass Medical Center, 20% of cases designated in the Vascular Service line did not involve a vascular surgeon and only 69% of vascular surgery cases were included in the Vizient Vascular service line data set (Fang 2020). These authors highlighted, "analytic services provide powerful tools for outcomes analysis, but [Vizient's] predetermined service lines must be used with caution and carefully scrutinized at the division level to ensure that results mirror actual practice patterns".

Moreover, our goal as a system should not be to satisfy external motivations of improving our Vizient ranking at all costs to improve our visibility, but first focus on methods to prioritize delivery of optimal care to patients, correct low hanging fruit, improve our culture of safety, and also consider documenting and coding appropriately to improve our DRGs which will optimize our Vizient ranking. Attacking the performance of individual surgeons or service lines without data review will only provoke defensiveness of surgeons, decrease the credibility of the QI process, impair the culture of QI, and can actually provoke unintended issues of impaired surgeon well-being causing increased errors. It is important to consider "balancing measures" and checks to prevent unintended consequences of trying to improve one aspect of the system at the expense of the other. Remember that the 2014 edit to the Triple Aim, henceforth, the 'Quadruple Aim' includes: improving quality of care, improving patient satisfaction, cost reduction (adding value), and improving healthcare team well-being. Well-being and purpose at work for physicians is recognized to be critically linked with improved outcomes.

I strive for patient-preference concordant care as a goal, which as a cancer provider unfortunately sometimes means aiming for a good death in accordance to patient preferences. We must accept that until there is a "cure for cancer", we will unfortunately observe death to be a proximal outcome in patients with gastrointestinal and peritoneal malignancies, despite and in disregard to our best intentions. Death of mortal humans must then be reconciled without shame or blame, particularly if we are taking care of populations and are performing surgery harboring risk. Palliative surgery is the highest risk group of operations, with a risk of mortality of 20-30%, but it is typically performed congruent to a patients goals of care while negotiating risks and benefits and alternatives and respecting individual patient autonomy.

A "Just Culture" is a preferred way to improve quality across the spectrum and improves patient safety by empowering communication rather than creating fear of punishment and team members hiding their concerns. If we punish those individuals who take care of patients who later succumb to their disease because we are mortality-averse, we are then incentivizing those who game the system and cherry pick or deny care, which is unjust. We must allow clinicians who care for high risk populations to care for their patients, take accountability for their actions, and responsibility for doing better, and we must make it easier for them to make these duties safer.

EXHIBIT A_097

## VI – Failure to Rescue

Preventable death and adverse events are a central concern in my discipline. Esophagectomy and pancreatectomy are considered high-risk surgeries with understood hospital-volume relationships (Birkmeyer 2003) and surgeon-volume relationships (Birkmeyer 2003), and major complication rates exceeding 40-50% (Low 2010). Of interest, having a high risk of complications does not correlate with having high mortality (Ghaferi 2012). The concept of "Failure to Rescue" (FTR) refers to mortality after a major complication, and explains hospital variation in mortality rates across procedures with high complication rates. Variability in procedure-specific complication rates may not very different across hospitals, but FTR is significantly associated with high-mortality facilities. For pancreatectomy, FTR is inversely linked to system characteristics including teaching status, hospital size >200 beds, census greater than 50% capacity, increased nurse-to-patient ratio, and hospital technology (Ghaferi 2010). Facility characteristics that allow for early identification of problems, whether by nurses or residents, allow for prevention of complications that later spiral towards FTR. These data suggest there are structures and processes of care within hospitals that are recognized to be linked with surgical outcomes. The attached Figure demonstrates how the system influences recognition and addressing complications that lead to FTR (Ghaferi 2012).



**Fig. 2.** Conceptual model outlining the interaction between hospital resources, behaviors, and attitudes in the early recognition and effective management of major postoperative complications.

For my 2022 FTR aspiration event, the patient had delayed gastric emptying, an entity found in 20-30% of Whipple patients. He had his diet advanced automatically upon return from IR despite his distension, then aspirated and was subsequently managed without discussion or input from the surgical team. He needed an NGT and this was not recognized by team members or nursing staff. For my 2023 aspiration event, the patient also did not get an NGT placed in a timely fashion. My colleague had a similar issue where a resident advanced the diet during M+M and when this was corrected after talking to the attending during conference, the patient had already been fed and he was found down dead without a monitor. I had a near miss patient in 2020 who aspirated post esophagectomy, but he was able to be promptly intubated and after recovery is alive with no evidence of disease.

FTR in Surgical Oncology populations was investigated using the Pennsylvania cancer registry with findings of aspiration in 5% of patients and the presence led to a mortality of 16% (Friese 2008). The rescue process has been examined closely and includes the following domains: (1) Teamwork, (2) Immediate Action Taking, (3) Psychological Safety (not being afraid to speak up), (4) Recognition, (5) Communication (Smith 2018). We could have done better with all these domains across these FTR aspiration events. We have had aspiration precautions and HOB elevation mandates for our esophagectomy patients (this is a lifetime risk) but these precautions are seldom followed and it is fairly common to manually reposition patients during rounds so their HOB is elevated.

EXHIBIT A_098

## VI – Surgical Education and Communication

One of the key concerns we had been dealing with is structural in the form of supervision of resident teams and how patients were assessed. Until July 2023, we were dealing with cross coverage concerns where often unknowingly the only person physically rounding on a patient in the morning was a PGY-1, leading to suboptimal care for our patients and an inability to rescue problems through lack of identification. We have addressed this, and the White Service is now structured with a PGY-1, PGY-3, and PGY-5, with appropriate accountability and graded supervision. We have reinforced with the residents that there must provide appropriate communication with attendings on any change in status or decisions that need to be made. Much of this in the form of process and standards is also documented in the White Service Manual.

Our residents still have some challenges in the modern educational paradigm. Many of our senior residents have never needed to place a nasogastric tube in a patient because of nurses who can do so, and I have had to start supervising chiefs to make sure they are comfortable. I have encountered times when more than resident has preferentially tried to order IR NG tubes when nurses are not available, which is not cost-effective and puts our patients at risk of aspirating through time delays. We probably need to develop a simulation to help educate them on how to make sure the NGT is functioning and how to place them. I am always happy to place NG tubes on anyone the moment I am made aware that there is a need.

Recognition of Delayed Gastric Emptying (DGE), an entity found in 20-50% of pancreatectomy and esophagectomy patients, and the necessity for NGT placement is a critical piece of education for nurses and residents that we will need to work on. This includes symptoms like nausea, reflux, hiccups, and belching. It includes signs like distension and holding an emesis bag. The hardest challenge for trainees is that gastric motility is independent of small bowel and colonic motility, and that DGE may be present despite flatus. Many of the residents and ICU nurses often will just feed our patients without assessing for DGE because of the presence of flatus, which is a major pitfall and educational hurdle we still need to overcome.

## VII – ICU Care

The ICU should be considered the safest place in North Dakota, so I was surprised to learn that my partners were afraid of the care delivered in the ICU at Sanford Broadway Medical Center. I was surprised to see how oversedated patients were and how we were often intentionally exacerbating postoperative delirium in our geriatric patients with inappropriate protocolized medication use with drugs like Benadryl given for bizarre indications like agitation. I do see a subtle overconfident cowboy mentality of care delivery in this unit without communication as a continued safety issue. We need to work together with the nurses so that our residents are allowed to participate in the care of these patients and that we as attendings are kept in the loop. This is a work in progress.

## VIII – Time versus Efficiency

I proudly spend as much time as I reasonably can with my patients, in clinic, on the floors, and in the operating room. I give patients and families my time based on what they need to make a decision. My new patient blocks for patients with complex malignancies are intentionally one hour long, because I know that investing in more time to teach the patient/family and answer patient/family questions increases patient satisfaction, improves the provision of goal-concordant care, and improves the efficiency of care delivery given the complexity of what we do. Taking an appropriate amount of time is also essential for provision of optimal informed consent (a topic I have written numerous book chapters on in the scope of Surgical Ethics).

Of secondary interest, the finding of significantly longer time in the operating room has been attributed to female surgeons, and has also been associated with less technical complications, shorter LOS, and better short-term and long-term outcomes (Blohm 2023). In a reflection that conscientiousness in surgery probably does matter, the commentary on this data highlighted the Navy Seal adage, "Slow

is Smooth, and Smooth is Fast." (Almquist 2023).

While I understand the valid concern about my taking more operating room time for my cases, I would remind that my cases are complex, and with this in mind, I would favor improving efficiency rather than compromising patient short-term and long-term outcomes. As a member of the CSSP, I cannot advocate skimping on the node dissection for gastrectomies as that has been significantly associated with overall survival and is an important benchmarking performance metric. I also would rather take an appropriate amount of time to perform a modified Blumgart pancreaticojejunostomy that maintains its integrity rather than use a 'quicker technique' that is haphazard and increases propensity to leak. I would rather go slow with the meticulous process of taking tumor off the SMA rather than speed up and transect the vessel or cause a problem inadvertently.

I am still challenged with certain efficiencies that can be improved on, including being sure that I have my OR preference card followed (over half the time I am still given one of my partner's preference cards). I have on numerous occasions updated these cards, but that is not the problem, it is ultimately what gets picked is off another surgeon's card, and am so tired of asking why, so I stopped complaining and just wait for my needs to be fulfilled. As teaching faculty, I can also consider giving less of the case to the resident to improve use of operating room time (although I am not clear this will be linked with outcome based on the current literature which suggests increased time and improved outcomes with resident participation).

We typically have to wait 45 minutes for a an intraoperative frozen section, which can be over 60 minutes if there is a non-GI pathologist at Broadway. This effectively can limit 90-120 minutes of progress prior to anastomosis if we have to take multiple frozen sections during the course of a case. These frozen section checkpoints are a necessity for patients with hilar/extrahepatic cholangiocarcinomas and subtotal and total gastrectomies. Having to set up for a choledochoscopy or upper endoscopy can also increase OR time by 20-40 minutes.

I recently had a giant fly land on a scrub table, which while not under my control, delayed progress of my case for at least an hour since we had to open and count new instruments and suture. I do not fault the fly, nor do I fault myself, nor do I fault the team. I accept that these things happen and that we have to move on and take care of the patient. If the system allowed the fly to get into the OR, then the system as a whole must take some accountability and allow progress to happen and support the surgeon with new instruments to take the best care of the patient they can. This exemplifies 'Just Culture'.

## VIII – Performance Improvement Plan

1. I will monitor my cases using the ACS SSR Program and NSQIP and compare my performance metrics on a quarterly basis.
2. I will continue to track my robotic cases including operative time using the MyIntuitive app.
3. I will continue to present my cases preoperatively at GI tumor board and/or at the Broadway Case Conference. Note that I introduced this conference as a biweekly discussion of case planning with image review in order to improve resident education.
4. I will continue to collaborate with my partners and schedule them to be available as backup for complex resections such as major hepatectomies.
5. Our division has agreed to require aspiration precautions including HOB elevation for all our complex GI surgical patients (HPB, foregut, HIPEC) rather than just after esophagectomy as all of these patients have issues with delayed gastric emptying (DGE), aspiration risk and FTR.
6. I will work with our division to update our White Service Manual and protocols at least twice yearly.
7. Our division will continue to work on improving resident and nursing education on delayed gastric emptying and nasogastric tube placement.
8. I will meet with ICU nursing staff to continue to improve communication with staff and our team.
9. I will work with Dr. Zriek to provide recommendations for an aspiration prevention protocol.
10. I will work on improving efficiency of my operative cases by journaling and discussing issues with staff to address delays related to cards so that these can eventually be remedied.

EXHIBIT A_100

Sincerely,

Sabha Ganai, MD, PhD, MPH, FACS, FSSO
Associate Professor of Surgery, University of North Dakota
Clinical Investigator, Sanford Research
GI/HPB Surgical Oncologist, Sanford Health
Executive Council, American Colllege of Surgeons Cancer Surgery Standards Program

References:

Almquist M. Are women better surgeons than men? JAMA Surg 2023; E1

Birkmeyer JD, Siewers AE, Finlayson EV, Stukel TA, Lucas FL, Batista I, Welch HG, Wennberg DE. Hospital volume and surgical mortality in the United States. *N Engl J Med* 2002; 346(15): 1128 – 1137.

Birkmeyer JD, Stukel TA, Siewers AE, Goodney PP, Wennberg DE, Lucas FL. Surgeon volume and operative mortality in the United States. *N Engl J Med* 2003; 349: 2117-2127.

Blohm M, Sandblom G, Eriochsson L, Osterberg J. Differences in cholecystectomy outcomes and operating time between male and female surgeons in Sweden. JAMA Surg 2023; E1-E10.

Fang ZB, Chao C, Durocher D, et al. Assessment of the Accuracy and Reliability of Vascular Surgery Quality Metrics. Ann Vasc Surg 2020; 67: 134-142.

Freeman MH, Slayton JM, Woods MC, et al. Improving Mortality Attribution in Otolaryngology – Head and Neck Surgery. Laryngoscope 2021; 131(6): e1805-e1810.

Friese CR, Aiken LH. Failure to Rescue in the Surgical Oncology Population: Implications for Nursing and Quality Improvement. *Oncol Nurs Forum* 2008; 35(5): 779

Ghaferi AA, Dimick JB. Variation in Mortality after High-Risk Cancer Surgery: Failure to Rescue. *Surg Oncol Clin N Am* 2012; 389-395.

Ghaferi AA, Osborne NH, Birkmeyer JD, Dimick JB. Hospital characteristics associated with failure to rescue complications after pancreatectomy. J Am Coll Surg 2010; 211: 325-330.

Low DE, MadhanKumar K, Hashimoto Y, Traverso LW. Comparing complications of esophagectomy and pancreatectomy and potential impact on hospital systems utilizing the Accordian Severity Grading System. *J Gastrointest Surg* 2010; 14: 1646-1652.

Smith ME, Wells EE, Friese CR, Krein SL, Ghaferi AA. Interpersonal and organizational dynamics are key drivers of Failure to Rescue. *Health Aff* 2018; 37(11): 1870-1876.

EXHIBIT A_101

**From:** Workday Peakon Employee Voice <app@peakon.com>
**Sent:** Monday, December 11, 2023 8:52 AM
**To:** Ganai,Sabha <Sabha.Ganai@SanfordHealth.org>
**Subject:** Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

**Your identity is protected**

Company logo             Powered by    



EXHIBIT A_102

**If you were offered the same job at another organization, how likely is it that you would stay at this organization?**

You wrote:

My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well being. I am ashamed of the administration.

You scored:



Download the Workday Peakon Employee Voice mobile app to reply to conversations on the go.

To learn more about how to use Workday Peakon Employee Voice, visit the Help Center

If you no longer wish to receive these emails, click here

------------------------------------------------------------------------

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain privileged and confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

EXHIBIT A_103

# Douglas replied to a comment you left

Only people who can reply to your comments will see your
conversation, and your identity is not displayed.

Douglas Griffin MD

**DG**     I am sorry to hear of your feelings on this and would welcome a chance to visit
on this. this is confidential so I don't know who is responding. You can contact
me directly via email or phone 701-417-2317. Thanks Doug Griffin

**View message and reply**

Link not working? Copy and paste the URL below into your browser

https://app.peakon.com/?mailLinkId=ehVAq4EVDYANGzxRPIYAWi4eOAxHAWdf

Your answer in the survey

EXHIBIT A_104

**Sent:** Tuesday, December 26, 2023 4:31 PM
**To:** Griffin,Douglas <Douglas.Griffin@SanfordHealth.org>
**Subject:** RE: Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

Dear Dr. Griffin.

I hope you had a good Christmas.

No need to respond if you are away through the New Year.

This PeakOn comment was mine and I feel it is not fair or constructive to leave it anonymous.

I do have concerns about how our CGSO surgical oncologists are treated and I am really worried that we will soon lose a lot of what has been built to develop our infrastructure and team.

For some context, in August, I was placed on a PIP, which I signed in good faith prior to being emailed "the data" to respond to a few weeks later, calculated with partitioned unvalidated Vizient administrative data on mortality rates, fully understanding that mortality will be proportional to the type and amount of call taken by individuals within our division since we consult on the most complex patients within the system and often admit dying patients and/or need to consider palliative operations. As a team, surgical oncology manages everything directed to us from the two time zones of North Dakota plus Northern MN/SD, plus helps with everything too complex for acute care surgery or colorectal surgery or bariatric surgery or general surgery providers to handle. After responding in the PIP document with a proper analysis explaining those results with chart review and showing additional data demonstrating better outcomes and shorter LOS than national NSQIP data for cases like hepatectomy and pancreatectomy, the intent and conversation has spiraled and diverged a bit more and more at every meeting, from outcomes, to time, to efficiency, to my lack of knowledge where stapler loads are theoretically stored in Fargo while operating on a weekend. In terms of process, I still have not received a formal response or any direction from the Sanford "Care Monitoring Committee". The documents in question were submitted over 3 months ago and are attached.

At our recent meeting earlier in the week, our discussion included our Division call schedule for 2024, which does not include Dr. Sticca since he expects to be retiring soon. This call schedule can be referenced here:
https://docs.google.com/document/d/1sgfirDxNFa3y2o0_cx3Al45XvnM0VzBmYZvgHDGbtj0/edit?usp=sharing

Note that only QTR 1 is final, but we chose to prepare a timeline a year in advance for planning purposes.

EXHIBIT

F

There are 3-4 days out of the entire year where I mentioned that the transplant team would help us cover (this was per speaking with Dr. Mistry). This need for support was not brought up because of personal time or vacation requests, these are days the first weekend in April where I was *invited* as a speaker at the AHPBA international meeting in Miami to discuss what Sanford Surgical Oncology has been doing optimizing prehabilitation for geriatric patients needing HPB surgery, and Dr. Tuvin also needs to speak at the ND/SD ACS chapter meeting in Aberdeen SD as he is the *President* of the ND chapter and the State Chair. Both me and Dr. Tuvin are otherwise perfectly capable of managing the remaining 362-3 days of the leap year call schedule. What was remarkable about this concern for a defect in our call schedule is we were simultaneously criticized for taking too much call, but when I clarified and requested a couple days of help from the Chair of General Surgery (I would not normally ask, but this became the point of discussion), I was told harshly we could not go to these conferences, and that we had to cover CGSO at all times, which is what we were already doing making lateral arrangements for coverage of the mentioned 3 days via Transplant Surgery. It is not worth arguing about, all these attitudes are just frustrating on basis of being the antithesis of wellness and support. There is no psychological safety because I know only in a toxic culture like this I should be avoidant of even bringing these kinds of things up, knowing it will be lambasted.

I get the idea of control, but it is clear that general surgery as a 'parent' Department does not *appreciate or care* about the contributions of myself or Dr. Tuvin within the Division of Surgical Oncology, even for an idea of support or respite (even while the group was morbidly hypothesizing out loud what would happen if the two of us were both hospitalized simultaneously). We are ABS *double* board-certified (gen surg and CGSO), and we are more than happy to help general surgery and accept all the complex cases that general surgery does not want to do or lacks training or expertise to do well. *These are patients who are in need of great support and assistance who we want to serve.*

Note that Bariatrics also has a separate call schedule and is positioned as their own Department separate from general surgery, but we are not privileged the same way here despite having a separate Board examination process. We do have a very impactful role through RMCC and remain critically aligned with the needs of medical oncology and radiation oncology and improvement of oncology care within our region.

I responded to the PeakOn survey very honestly with that comment. I remain ashamed of the attitudes and statements and practices I have seen over the past few months, and I will do my best to manage through this aiming for taking the best care of our patients as possible. I see a lot of potential for growth in our Division and for oncology as a whole, but to grow, we need to be nurtured a bit instead of trampled on.

Sabha

**Sabha Ganai, MD, PhD, MPH, FACS, FSSO**

Division of Surgical Oncology
Associate Professor of Surgery, UND

Director of Surgical Education, UND

Adjunct Professor of Pharmacology, NDSU

Clinical Investigator, Sanford Research

801 Broadway N, Fargo, ND 58122

C 443-222-4131  m 1151

EXHIBIT A_108



January 23, 2024

Sarosh Garcia M.D.

Re:    Employment Agreement (the "Agreement") – Termination

Dr. Garcia:

This letter shall confirm that Sanford has elected to terminate our Employment Agreement (the "Agreement") pursuant to Section 12.1.a. Your termination will be effective immediately in lieu of 90 days' notice. Sanford will pay to you a lump sum notice due payment of $135,435.00. You will also be receiving information regarding continuation of any elected health and dental benefits.

You will also be receiving information regarding continuation of any elected health and dental benefits.

Sincerely,

Dr. Benjr Griffin
Vice President, Clinic



1 of 1

EXHIBIT A_109

STATE OF NORTH DAKOTA

COUNTY OF CASS

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO | Civil No. 09-2024-cv03147 |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| | Jury Trial Demanded |
| -vs- | |
| SANFORD MEDICAL CENTER FARGO, and SANFORD CLINIC NORTH | |
| Defendants. | |

## **FIRST AMENDED COMPLAINT**

1.      Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, brings this action against Defendants Sanford Medical Center Fargo ("SMCF") and Sanford Clinic North ("SCN") (collectively "Sanford") for retaliating against her when she engaged in protected activity by raising patient safety concerns.

## **NATURE OF THE ACTION**

2.      Plaintiff, Dr. Ganai, is a highly accomplished and reputable double-board certified surgical oncologist who has been practicing surgical oncology for more than twelve years. She joined Sanford Clinic North in 2020 to perform complex general surgery surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery. During her tenure, she also served as Associate Professor of Surgery and Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.



EXHIBIT
2

EXHIBIT A_110

3.     Dr. Ganai brings this action against Defendants for violation of the prohibitions against retaliation contained in North Dakota's whistleblower statute, N.D. Cent. Code,§ 34-01-20.

## THE PARTIES

4.     Plaintiff, Sabha Ganai, was a resident of Fargo, North Dakota at all times relevant to this First Amended Complaint.

5.     Defendant SMCF is a not-for-profit North Dakota corporation. Sanford Medical Center Fargo maintains its principal place of business at 801 Broadway North, Fargo, North Dakota, 58122.

6.     Defendant SCN was a not-for-profit North Dakota corporation that was merged into Defendant SMCF as of July 31, 2024.

7.     At all times material hereto, Defendant SCN was Plaintiff's primary employer and was affiliated with or a part of Defendant SMCF.

## JURISDICTION AND VENUE

8.     At all times material hereto, Defendants employed Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division").

9.     The relationship of the Parties is governed by the Staff Physician Agreement (attached hereto as Ex. B), which specifically provides that disputes would be resolved in the North Dakota State District Court in and for Cass County.

## FACTS RELEVANT TO ALL CLAIMS

10.     Defendants hired Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") in February 2020. On or around October 8, 2019, Dr. Ganai was given an offer letter signed by Sanford Health. (*See* Ex. A, Dr. Ganai Offer Letter). Dr. Ganai was also presented with the Staff Physician Agreement (*See* Ex. B, Staff Physician Agreement).

2

11.     Under the Staff Physician Agreement, Defendant SCN had the right to assign the Staff Physician Agreement to "its parents, subsidiaries, or corporate affiliates," which includes Defendant SMCF. *Id.*

12.     Dr. Ganai and her team in the Division routinely handled highly complex cases involving complex general surgery, surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery.

13.     These cases often came to the Division from other departments and other facilities that were unable to properly handle them and often with patients who were dying.

**Sanford Places Dr. Ganai on a PIP Using an Unreliable Data Report**

14.     In late August 2023, Sanford began criticizing the Division about patient outcomes and making statements attributing "significantly worse outcomes" to Dr. Ganai and the Division.

15.     At the same time, the Division was facing mounting pressure and a lack of support from the General Surgery Department in planning for Bob Sticca, M.D.'s reduction in call coverage. Dr. Sticca was a leading surgeon in the Division and his last day on call was January 1, 2024.

16.     On August 22, 2023, Dr. Ganai met with Steven Briggs, M.D. (Chief Medical Officer, Sanford Medical Center Fargo), Michael Traynor. M.D. (Chair, Department of Surgery, Sanford Medical Center Fargo), and Darla Dobberstein (Executive Director of Fargo Region's Surgical Services, Sanford Health). Without presenting any data, these SNC administrators told Dr. Ganai that a Vizient report indicated that Dr. Ganai had a higher than desired observed to expected ratio ("O/E") for mortality rates of 1.4.

17.     If a hospital's observed rate for an indicator is higher than its expected rate (an O/E ratio greater than 1), then the hospital performed worse than the reference population. If documentation for the patient population is not complete, then any risk adjustment applied to this

<div align="center">3</div>

ratio will not be accurate and will only be done at a population level, which does not account for the Division's increased case complexity.

18.     Vizient is a health care performance improvement company that provides patient outcome data derived from administrative billing (coding) without clinical verification.

19.     Vizient was designed for benchmarking hospital quality, not surgeon quality. Surgical leaders, including Dr. Clifford Ko, M.D., MS, MSHS, FACS (Director, Division of Research and Optimal Patient Care, American College of Surgeons ("ACS")), have advised against using Vizient for benchmarking surgeon performance. In contrast, the ACS National Surgical Quality Improvement Program ("NSQIP") database collects patient-specific and surgeon-specific data that accounts for surgical case complexity and allows for causal inference.

20.     Vizient had recently released a hospital ranking system based solely on patient outcome data. Sanford, desiring to improve its scores in the ranking system, had recently began to use Vizient data to look at individual surgeon outcomes. Data from literature review suggests poor intrinsic validity for this indication outside of hospital-to-hospital benchmarking. In 2020, Dr. Ganai led a quality improvement project for the Department of Surgery with chart review of all mortalities for that year that confirmed poor intrinsic validity for its use. Dr. Ganai found that only thirty (30) percent of the cases were accurate. For example, many patient deaths were not included at all. Additionally, some of the patient deaths were identified as a surgery death when they were actually due to other causes, such as COVID-19. Many patients were not operated on, yet their deaths were attributed to the surgeon who consulted on them. In 2021, Dr. Traynor repeated this analysis for that year and confirmed the same issue.

21.     During the August 22, 2023 meeting, Dr. Ganai explained that Vizient generates and compares O/E mortality rates for general surgeons, and unlike the rest of general

surgery, the Division's practice includes highly complex cases not solely comprised of general surgery.

22.    Also during the August 22, 2023 meeting, the administrators presented Dr. Ganai with a peer review letter ("Peer Review Letter") attached to a Performance Improvement Plan ("PIP") and asked Dr. Ganai to agree to the PIP. *(See* Ex. C, Confidential Peer Review Document/PIP). The Peer Review Letter promised Dr. Ganai that the Care Monitoring Committee would oversee the PIP and assist Dr. Ganai in "successfully addressing the opportunities that have been identified." *Id.*

23.    In response, Dr. Ganai stated that she agreed to the PIP contingent on receiving the Vizient report data.

24.    Dr. Ganai also requested a peer review meeting and was told there would be a meeting scheduled with a committee.

**Dr. Ganai Demonstrates Issues with the Validity of The Vizient Report Data**

25.    On August 30, 2023, after Dr. Briggs emailed Dr. Ganai the Vizient report data ("the Vizient Report"), and Dr. Ganai analyzed its data.

26.    On September 15, 2023, Dr. Ganai provided Sanford a comprehensive analysis in response to the Confidential Peer Review Document/PIP and the Vizient Report Sanford had relied on when it chose to place her on the PIP. *(See* Ex. D, PIP response dated September 15, 2023).

27.    Dr. Ganai explained that Vizient's data reliability was limited in providing accurate benchmark performance and that such data is not controlled for coding error complexity, among other things.

28.    The Report failed to track patient outcomes appropriately.

29.    The Report demonstrated that Dr. Ganai's O/E ratio did not significantly differ from the expected O/E ratio given the complexity of the cases she managed.

5

30.     Dr. Ganai's colleague, Dr. Daniel Tuvin, M.D.'s, O/E ratio was 7, significantly higher than Dr. Ganai's. Dr. Tuvin also had a higher mortality rate. Dr. Sticca, Dr. Ganai's other colleague, had the highest readmission and reoperation rates.

31.     Dr. Ganai also explained how the Division needs to be compared for case complexity. Dr. Ganai presented ACS NSQIP data for the Division, specific for case type, that showed that the Division actually had excellent outcomes compared to National data, herself and Dr. Tuvin included. She explained that NSQIP data has significantly better validity than Vizient because it is clinically verified. Sanford paid for a Research Nurse who was in charge of maintaining NSQIP data, which was presented to the Department of Surgery on a quarterly basis for quality improvement purposes.

32.     After Dr. Ganai provided Sanford her response and analysis, Sanford never scheduled a peer review meeting with her.

**Dr. Ganai Raises Patient Safety Concerns to Sanford**

33.     On or around December 11, 2023, Dr. Ganai responded to an employee survey question on PeakOn, Sanford's anonymous survey platform. *(See* Ex. E, PeakOn response dated December 11, 2023).

34.     In response to the question: "If you were offered the same job at another organization, how likely is it that you would stay at this organization?" Dr. Ganai answered: "My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well-being. I am ashamed of the administration." *Id.*

35.     Dr. Ganai's concerns stemmed from Sanford's improper reliance on the Vizient Report that did not properly or accurately account for patient outcomes and Sanford's refusal to provide peer review avenues to address patient safety and comply with the Health Care Quality Improvement Act. *See* §42 U.S.C. 1110. By refusing to provide Dr. Ganai peer review avenues,

6

Sanford is stripping Dr. Ganai and other physicians of the immunity provided by the peer review process under the Act.

36.    On December 26, 2023, Dr. Ganai emailed Dr. Douglas Griffin (Vice President of Fargo Region Clinic, Sanford Health) about her PeakOn comment. *(See* Ex. F, email correspondence dated December 26, 2023).

37.    Dr. Ganai explained to Dr. Griffin that she posted her comment because she was concerned about Sanford's treatment of surgical oncologists within the Division and the General Surgery Department's increasing lack of support.

38.    She also told Dr. Griffin that Sanford had still not formally responded to her analysis and response to the August 2023 PIP, which she had submitted over three (3) months ago.

39.    Dr. Ganai affirmed her commitment to patient care as her highest priority.

40.    In response, Dr. Griffin told Dr. Ganai that he would look into the situation.

**Sanford Retaliates and Terminates Dr. Ganai a Month After She Reports Patient Safety Concerns**

41.    Instead of addressing her patient safety and compliance concerns, Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024. *(See* Ex. G, January 23, 2024 letter).

<div align="center">

**COUNT I**
**RETALIATION IN VIOLATION OF N.D.C.C. § 34-01-20**
**Plaintiff Against All Defendants**

</div>

42.    Dr. Ganai adopts and realleges paragraphs 1 through 41 above as if fully stated herein.

43.    N.D.C.C. § 34-01-20 prohibits employers from discharging or threatening to discharge an employee because the employee in good faith reports a violation or suspected violation of federal, state or local law, ordinance, regulation, or rule to an employer. N.D.C.C. §

<div align="center">7</div>

34-01-20 (l)(a).

44.    At all relevant times, Dr. Ganai performed her work with diligence and was meeting her employer's legitimate expectations.

45.    Dr. Ganai was engaging in a protected activity in reporting her concerns for patient safety on December 11, 2023, and December 26, 2023.

46.    Defendants knew or should have known that retaliation against an employee engaging in a protected activity was a violation of state law.

47.    Defendants retaliated against Dr. Ganai by terminating her employment on January 23, 2024.

48.    Defendants' actions violated N.D.C.C. § 34-01-20.

49.    As a result of Defendants' retaliatory actions, Dr. Ganai has suffered and will continue to suffer irreparable injuries including, but not limited to, lost wages, injury to professional reputation, great mental anguish, and damage to her physical health.

## **PRAYER FOR RELIEF**

50.    Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendants as follows:

A.    Find that Defendants violated N.D.C.C. § 34-01-20 by willfully retaliating against Plaintiff in threatening to terminate her and terminating her for engaging in a protected activity;

B.    Award actual damages;

C.    Award the costs of maintaining this action, including reasonable attorney's fees and court costs; and,

D.    Any other relief this Court deems just and necessary.

[THIS SPACE INTENTIONALLY LEFT BLANK]

9

EXHIBIT A_118

## JURY DEMAND

51.     Plaintiff demands a trial by jury of the maximum number of jurors allowed by

law of all issues raised in this First Amended Complaint.

Dated: August 28, 2024

> The Prinz Law Firm, P.C.
> Kristen E. Prinz (kprinz@prinz-lawfirm.com)
> *Pro Hae Vice Pending*
> Rebecca E. Chmielewski  (rchmielewski@prinz-lawfirm.com)
> *Pro Hae Vice Pending*
> 1 East Wacker Drive, Suite 1800
> Chicago, IL 60601
> P: (312) 212-4450
> F: (312) 284-4822
>
>
> WILKING LAW FIRM
>
> *Isl Leo F.J  Wilking*
> Leo F.J. Wilking
> (lwilking@wilkinglaw.com) 3003 32nd
> Avenue S
> Fargo, ND 58103
> P: (701) 356-6823
> F; (701) 478-7621
> ND Bar ID No.
> 03629
> *Local Counsel*

STATE OF NORTH DAKOTA            IN DISTRICT COURT

COUNTY OF CASS            EAST CENTRAL JUDICIAL DISTRICT

| | | |
|---|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, | ) | |
| | ) | |
| | ) | **ORDER GRANTING MOTION** |
| Plaintiffs, | ) | **FOR LEAVE TO FILE** |
| | ) | **AMENDED COMPLAINT** |
| vs. | ) | |
| | ) | |
| Sanford Medical Center Fargo, | ) | Civil No: 09-2024-CV-03147 |
| | ) | |
| | ) | |
| Defendants. | ) | |

[1]      Upon receiving and considering the Plaintiff's Motion for Leave to File Amended Complaint, and there being no objection to the Motion from Defendant, and there appearing good and sufficient cause for the same,

      **IT IS ORDERED** that the Motion for Leave to File Amended Complaint is **GRANTED.**

                BY THE COURT:

                _____

                Stephanie Stiel
                Judge of the District Court

52017367

STATE OF NORTH DAKOTA                          IN DISTRICT COURT

COUNTY OF CASS                      EAST CENTRAL JUDICIAL DISTRICT

| | | |
|---|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, | ) | |
| | ) | |
| Plaintiffs, | ) | **CERTIFICATE OF SERVICE** |
| vs. | ) | |
| | ) | Civil No.: 09-2024-CV-03147 |
| Sanford Medical Center Fargo | ) | |
| | ) | |
| Defendant. | ) | |

[¶1] I, Jaiden Cutler, hereby certify that on September 11, 2024, the following documents were served by sending a true and correct copies thereof pursuant to N.D.R.Ct. 3.5 by electronic means to the email addresses listed below:

| Name | (E-mail) |
|---|---|
| Brett D. Kettelkamp (ND#09600) | brent.kettelkamp@ogletree.com |
| Kristen E. Prinz | kprinz@prinz-lawfirm.com |
| Rebecca E. Chmielewski | rchmielewski@prinz-lawfirm.com |

[¶2]   To the best of affiant's knowledge, information and belief, such addresses as given above were the actual addresses of the parties intended to be so served.

- Notice of Motion for Leave to File as Amended Complaint;

- Plaintiff's Motion for Leave to File as Amended Complaint;

o  Exhibit 1 to Motion- Complaint;

  ▪  Exhibit A to Exhibit 1- Dr. Ganai Offer Letter;

  ▪  Exhibit B to Exhibit 1- Confidential Peer Review Document/PIP;

  ▪  Exhibit C to Exhibit 1- PIP Response, dated September 15, 2023;

  ▪  Exhibit D to Exhibit 1- PeakOn Response;

  ▪  Exhibit E to Exhibit 1- Email Correspondence with Dr. Griffin, dated December 26, 2023;

  ▪  Exhibit F to Exhibit 1- Termination Letter, dated January 23, 2024;

o  Exhibit 2 to Motion- First Amended Complaint;

  ▪  Exhibit A to Exhibit 2- Dr. Ganai Offer Letter;

  ▪  Exhibit B to Exhibit 2- Staff Physician Agreement;

- ▪ Exhibit C to Exhibit 2- Confidential Peer Review Document/PIP;

- ▪ Exhibit D to Exhibit 2- PIP Response, dated September 15, 2023;

- ▪ Exhibit E to Exhibit 2- PeakOn Response;

- ▪ Exhibit F to Exhibit 2- Email Correspondence with Dr. Griffin, dated December 26, 2023;

- ▪ Exhibit G to Exhibit 2- Termination Letter, dated January 23, 2024; and,

- Proposed Order Granting Motion for Leave to File Amended Complaint

[¶3]    Pursuant to N.D.R.Civ.P 11(1)(2), I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated this September 11, 2024.

*/s/ Jaiden Cutler*
Jaiden Cutler

2

STATE OF NORTH DAKOTA                          IN DISTRICT COURT

COUNTY OF CASS                        EAST CENTRAL JUDICIAL DISTRICT

|  |  |
|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, ) | |
| ) | |
| Plaintiffs, ) | **DECLARATION OF SERVICE** |
| vs. ) | |
| ) | Civil No.: 09-2024-CV-03147 |
| Sanford Medical Center Fargo ) | |
| ) | |
| Defendant. ) | |

[¶1] I, Jaiden Cutler, hereby certify that on September 11, 2024, following documents:

- **Request to Amend Docket; and,**
- **Proposed Order Granting Request to Amend Docket**

by sending a true and correct copy thereof pursuant to N.D.R.Ct. 3.5 by electronic means to the email addresses listed below:

| Name | (E-mail) |
|---|---|
| Brett D. Kettelkamp (ND#09600) | brent.kettelkamp@ogletree.com |
| Kristen E. Prinz | kprinz@prinz-lawfirm.com |
| Rebecca E. Chmielewski | rchmielewski@prinz-lawfirm.com |

[¶2]    To the best of affiant's knowledge, information and belief, such addresses as given above were the actual addresses of the parties intended to be so served.

[¶3]    Pursuant to N.D.R.Civ.P 11(1)(2), I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated this September 11, 2024.

*/s/ Jaiden Cutler*
Jaiden Cutler

STATE OF NORTH DAKOTA

COUNTY OF CASS

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

Civil No.09-2024-CV-01347

Plaintiff,

**NOTICE OF MOTION**

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

Plaintiff Sabha Ganai has filed a Motion for Leave to File an Amended Complaint. This motion will be decided on briefs, pursuant to Rule 3.2 of the North Dakota Rule of Court, unless a hearing is timely requested.

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
*Pro Hac Vice Pending*
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
*Pro Hac Vice Pending*
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822

WILKING LAW FIRM
*/s/ Leo F.J. Wilking*
Leo F.J. Wilking (lwilking@wilkinglaw.com)
3003 32nd Avenue S
Fargo, ND 58103
P: (701) 356-6823
F; (701) 478-7621
ND Bar ID No. 03629
*Local Counsel*

1

STATE OF NORTH DAKOTA

COUNTY OF CASS

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

Plaintiff,

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

Civil No. 09-2024-cv03147

Jury Trial Demanded

### PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

1.     Plaintiff Sabha Ganai seeks leave to Amend her Complaint under North Dakota Rule of Civil Procedure 15(a) in order to (1) add Defendant Sanford Clinic North, a nonprofit corporation, and (ii) accordingly amend the pleadings in the Complaint. A copy of the Complaint is attached as Exhibit 1 and a clean copy of Plaintiff's proposed First Amended Complaint is attached as Exhibit 2.

2.     Dr. Ganai seeks leave to amend her Complaint filed on July 18, 2024 against Defendant Sanford Medical Center Fargo. During all relevant times in the Complaint, Sanford Clinic North was Dr. Ganai's primary employer and is an entity affiliated with Defendant Sanford Medical Center Fargo. Defendant Sanford Medical Center Fargo as the named Defendant was a mistake of fact and confusion of the legal name of Dr. Ganai's primary employer, Sanford Clinic North. Under North Dakota Rule of Civil Procedure 15(a), "A party's pleading may be amended once as a matter of course at any time before a responsive pleading is served or, if the pleading is

one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. *Otherwise a party's pleading may be amended only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires*." (emphasis added).

3.      In addition, Dr. Ganai is seeking to attach her employment agreement ("Staff Physician Agreement") with Sanford Clinic North as an additional exhibit to the First Amended Complaint. Under the Staff Physician Agreement, Sanford Clinic North has the right to assign the Staff Physician Agreement to "its parents, subsidiaries, or corporate affiliates," which includes Defendant Sanford Medical Center Fargo. *See* First Amended Complaint, Ex. B.

4.      Defendant Sanford Medical Center Fargo will not suffer prejudice if leave is granted because it knew or should have known that Sanford Clinic North was Dr. Ganai's primary employer.

5.      Plaintiff's counsel conferred with Defendant's counsel between August 28, 2024, and September 6, 2024 regarding this Motion prior to filing it, and Defendant's counsel indicated Defendant would not object to this Motion.

6.      This is Plaintiff's first request to amend the complaint. Plaintiff submit this Motion to Amend their complaint promptly, in good faith, and without dilatory motive.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion to amend the pleadings and enter the proposed Order attached hereto.


Dated: September 9, 2024


Respectfully submitted,

STATE OF NORTH DAKOTA

COUNTY OF CASS

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

Civil No. _____

Plaintiff,

**COMPLAINT**

Jury Trial Demanded

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

## COMPLAINT

1.     Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, brings this action against Defendant Sanford Medical Center Fargo ("Sanford") for retaliating against her when she engaged in protected activity by raising patient safety concerns.

## NATURE OF THE ACTION

2.     Plaintiff, Dr. Ganai, is a highly accomplished and reputable double-board certified surgical oncologist who has been practicing surgical oncology for more than twelve years. She joined Sanford in 2020 to perform complex general surgery surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery. During her tenure, she also served as Associate Professor of Surgery and Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.

1



EXHIBIT A_127

3.     Dr. Ganai brings this action against Defendant Sanford for violation of the prohibitions against retaliation contained in North Dakota's whistleblower statute, N.D. Cent. Code, § 34-01-20.

## THE PARTIES

4.     Plaintiff, Sabha Ganai, was a resident of Fargo, North Dakota at all times relevant to this Complaint.

5.     Defendant Sanford Medical Center Fargo is a not-for-profit North Dakota corporation owned and operated by Sanford Health, an integrated multi-specialty health system. Sanford Medical Center Fargo maintains its principal place of business at 737 Broadway North, Fargo, North Dakota, 58122.

## JURISDICTION AND VENUE

6.     At all times material hereto, the Defendant, Sanford, was the owner of and operated Sanford Medical Center Fargo in the County of Cass, State of North Dakota.

7.     At all times material hereto, Defendant employed Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") at Sanford Medical Center Fargo

## FACTS RELEVANT TO ALL CLAIMS

8.     Sanford hired Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") at Sanford Medical Center Fargo in February 2020. (*See* Ex. A attached hereto, Dr. Ganai Offer Letter dated October 8, 2019).

9.     Dr. Ganai and her team in the Division routinely handled highly complex cases involving complex general surgery, surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery.

10.     These cases often came to the Division from other departments and other facilities that were unable to properly handle them and often with patients who were dying.

2

**Sanford Places Dr. Ganai On a PIP From An Unreliable Data Report**

11.    In late August 2023, Sanford began criticizing the Division on patient outcomes and made statements attributing "significantly worse outcomes" to Dr. Ganai and the Division.

12.    At the same time, the Division was facing mounting pressure and a lack of support from the General Surgery Department in planning for Bob Sticca, M.D.'s reduction in call coverage. Dr. Sticca's last day on call was January 1, 2024.

13.    On August 22, 2023, Dr. Ganai met with Steven Briggs, M.D. (Chief Medical Officer, Sanford Medical Center Fargo), Michael Traynor, M.D. (Chair, Department of Surgery, Sanford Medical Center Fargo), and Darla Dobberstein (Executive Director of Fargo Region's Surgical Services, Sanford Health). Without presenting any data, leadership told Dr. Ganai that a Vizient report reported that Dr. Ganai had a higher than desired observed to expected ratio ("O/E") for mortality rates of 1.4.

14.    If a hospital's observed rate for an indicator is higher than its expected rate (an O/E ratio greater than 1), then the hospital performed worse than the reference population. If documentation for the patient population is not complete, then any risk adjustment applied to this ratio will not be accurate and will only be done at a population level, which does not account for the Division's increased case complexity.

15.    Vizient is a health care performance improvement company that provides patient outcome data derived from administrative billing (coding) without clinical verification.

16.    Vizient was designed for benchmarking hospital quality, not surgeon quality. Surgical leaders, including Dr. Clifford Ko, M.D., MS, MSHS, FACS (Director, Division of Research and Optimal Patient Care, American College of Surgeons ("ACS")), have advised against using Vizient for benchmarking surgeon performance. In contrast, the ACS National Surgical

Quality Improvement Program ("NSQIP") database collects patient-specific and surgeon-specific data that accounts for surgical case complexity and allows for causal inference.

17.     Vizient had recently released a hospital ranking system based solely on patient outcome data. Sanford, desiring to improve its scores in the ranking system, had recently began to use Vizient data to look at individual surgeon outcomes. Data from literature review suggests poor intrinsic validity for this indication outside of hospital-to-hospital benchmarking. In 2020, Dr. Ganai led a quality improvement project for the Department of Surgery with chart review of all mortalities for that year that confirmed poor intrinsic validity for its use. Dr. Ganai found that only thirty (30) percent of the cases were accurate. For example, many patient deaths were not included at all. Additionally, some of the patient deaths were identified as a surgery death when they were actually due to other causes, such as COVID-19. Many patients were not operated on, yet their deaths were attributed to the surgeon who consulted on them. In 2021, Dr. Traynor repeated this analysis for that year and confirmed the same issue.

18.     During the August 22, 2023 meeting, Dr. Ganai explained that Vizient generates and compares O/E mortality rates for general surgeons, and unlike the rest of general surgery, the Division's practice includes highly complex cases not solely comprised of general surgery.

19.     Also during the August 22, 2023 meeting, leadership presented Dr. Ganai with a peer review letter ("Peer Review Letter") attached to a Performance Improvement Plan ("PIP") and asked Dr. Ganai to agree to the PIP. (*See* Ex. B attached hereto, Confidential Peer Review Document/PIP). The Peer Review Letter promised Dr. Ganai that the Care Monitoring Committee would oversee the PIP and assist Dr. Ganai in "successfully addressing the opportunities that have been identified." *Id.*

4

20.    In response, Dr. Ganai stated that she agreed to the PIP contingent on receiving the Vizient report data.

21.    Dr. Ganai also requested a peer review meeting and was told there would be a meeting scheduled with a committee.

**Dr. Ganai Demonstrates Issues with the Validity of The Vizient Report Data**

22.    On August 30, 2023, after Dr. Briggs emailed Dr. Ganai the Vizient report data ("the Vizient Report"), and Dr. Ganai analyzed its data.

23.    On September 15, 2023, Dr. Ganai provided Sanford a comprehensive analysis in response to the Confidential Peer Review Document/PIP and the Vizient Report Sanford had relied on when it chose to place her on the PIP. (*See* Ex. C attached hereto, PIP response dated September 15, 2023).

24.    Dr. Ganai explained that Vizient's data reliability was limited in providing accurate benchmark performance and that such data is not controlled for coding error complexity, among other things.

25.    The Report failed to track patient outcomes appropriately.

26.    The Report demonstrated that Dr. Ganai's O/E ratio did not significantly differ from the expected O/E ratio given the complexity of the cases she managed.

27.    Dr. Ganai's colleague, Dr. Daniel Tuvin, M.D.'s, O/E ratio was 7, significantly higher than Dr. Ganai's. Dr. Tuvin also had a higher mortality rate. Dr. Sticca, Dr. Ganai's other colleague, had the highest readmission and reoperation rates.

28.    Dr. Ganai also explained how the Division needs to be compared for case complexity. Dr. Ganai presented ACS NSQIP data for the Division, specific for case type, that showed that the Division actually had excellent outcomes compared to National data, herself and

5

Dr. Tuvin included. She explained that NSQIP data has significantly better validity than Vizient because it is clinically verified. Sanford paid for a Research Nurse who was in charge of maintaining NSQIP data, which was presented to the Department of Surgery on a quarterly basis for quality improvement purposes.

29.     After Dr. Ganai provided Sanford her response and analysis, Sanford never scheduled a peer review meeting with her.

**Dr. Ganai Raises Patient Safety Concerns to Sanford**

30.     On or around December 11, 2023, Dr. Ganai responded to an employee survey question on PeakOn, Sanford's anonymous survey platform. (*See* Ex. D attached hereto, PeakOn response dated December 11, 2023).

31.     In response to the question: "If you were offered the same job at another organization, how likely is it that you would stay at this organization?" Dr. Ganai answered: "My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well-being. I am ashamed of the administration." *Id.*

32.     Dr. Ganai's concerns stemmed from Sanford's improper reliance on the Vizient Report that did not properly or accurately account for patient outcomes and Sanford's refusal to provide peer review avenues to address patient safety and comply with the Health Care Quality Improvement Act. *See* §42 U.S.C. 1110. By refusing to provide Dr. Ganai peer review avenues, Sanford is stripping Dr. Ganai and other physicians of the immunity provided by the peer review process under the Act.

33.     On December 26, 2023, Dr. Ganai emailed Dr. Douglas Griffin (Vice President of Fargo Region Clinic, Sanford Health) about her PeakOn comment. (*See* Ex. E attached hereto, email correspondence dated December 26, 2023).

6

34.     Dr. Ganai explained to Dr. Griffin that she posted her comment because she was concerned about Sanford's treatment of surgical oncologists within the Division and the General Surgery Department's increasing lack of support.

35.     She also told Dr. Griffin that Sanford had still not formally responded to her analysis and response to the August 2023 PIP, which she had submitted over three (3) months ago.

36.     Dr. Ganai affirmed her commitment to patient care as her highest priority.

37.     In response, Dr. Griffin told Dr. Ganai that he would look into the situation.

**Sanford Retaliates and Terminates Dr. Ganai a Month After She Reports Patient Safety Concerns**

38.     Instead of addressing her patient safety concerns, Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024. (*See* Ex. F attached hereto, January 23, 2024 letter).

<div align="center">

**COUNT I**
**RETALIATION IN VIOLATION OF N.D.C.C. § 34-01-20**

</div>

39.     Dr. Ganai adopts and realleges paragraphs 1 through 38 above as if fully stated herein.

40.     N.D.C.C. § 34-01-20 prohibits employers from discharging or threatening to discharge an employee because the employee in good faith reports a violation or suspected violation of federal, state or local law, ordinance, regulation, or rule to an employer. N.D.C.C. § 34-01-20 (1)(a).

41.     At all relevant times, Dr. Ganai performed her work with diligence and was meeting her employer's legitimate expectations.

42.     Dr. Ganai was engaging in a protecting activity in reporting her concerns for patient safety on December 11, 2023, and December 26, 2023.

<div align="center">7</div>

43.     Defendant Sanford knew or should have known that retaliation against an employee engaging in a protected activity was a violation of state law.

44.     Defendant Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024.

45.     Defendant Sanford's actions violated N.D.C.C. § 34-01-20.

46.     As a result of Defendant Sanford's retaliatory actions, Dr. Ganai has suffered and will continue to suffer irreparable injuries including, but not limited to, lost wages, injury to professional reputation, great mental anguish, and damage to her physical health.

**PRAYER FOR RELIEF**

47.     Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendant as follows:

A.      Find that Defendant violated N.D.C.C. § 34-01-20 by willfully retaliating against Plaintiff in threatening to terminate her and terminating her for engaging in a protected activity;

B.      Award actual damages;

C.      Award the costs of maintaining this action, including reasonable attorney's fees and court costs; and,

D.      Any other relief this Court deems just and necessary.

[THIS SPACE INTENTIONALLY LEFT BLANK]

8

## JURY DEMAND

48.     Plaintiff demands a trial by jury of the maximum number of jurors allowed by law

of all issues raised in this Complaint.

Dated: July 18, 2024

> The Prinz Law Firm, P.C.
> Kristen E. Prinz (kprinz@prinz-lawfirm.com)
> *Pro Hac Vice Pending*
> Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
> *Pro Hac Vice Pending*
> 1 East Wacker Drive, Suite 1800
> Chicago, IL 60601
> P: (312) 212-4450
> F: (312) 284-4822
>
>
> WILKING LAW FIRM
>
> /s/ Leo F.J. Wilking
> Leo F.J. Wilking (lwilking@wilkinglaw.com)
> 3003 32nd Avenue S
> Fargo, ND 58103
> P: (701) 356-6823
> F; (701) 478-7621
> ND Bar ID No. 03629
> *Local Counsel*

9

# SANFORD HEALTH

October 8, 2019

Sabha Ganai, MD
1424 S Park Avenue
Springfield, IL  62704

Dear Dr. Ganai:

Upon the enthusiastic recommendation of the Surgical Oncology Department, I am pleased to invite you to join Sanford Clinic. The starting salary has been approved at $427,800 for a 1.0 FTE ($300,000 for 0.7 FTE clinical and $127,800 for 0.3 FTE research).  We are also offering a $25,000 forgivable loan over 2 years paid upon signing.

Enclosed you will find a Staff Physician Agreement for your review and consideration.  If all terms meet with your approval, please:

1. *Initial* your anticipated start date on the first page of the Agreement.

2. Sign and date the Agreement.

3. Sign the Demand Note in front of a Notary Public.

4. Return the following document/s to us in the enclosed  prepaid envelope:
   a. Staff Physician Agreement, signed and dated with your anticipated start date **initialed** on the first page of the Agreement.
   b. Demand Note signed in front of a Notary Public.

You are eligible for 28 days of time away per fiscal year and 10 days of CME time away, pro-rated based on your FTE status.  Eligible relocation expenses up to $10,000 will be paid upon submission of appropriate documentation.

My colleagues who had the opportunity to interview you feel that you will make a wonderful addition to our medical staff.  I hope to receive your favorable response to this invitation within **30** days.  In the meantime, please contact me if you have any questions; at 701-234-2610 (office) or by email at *julie.waldera@sanfordhealth.org*

Sincerely,

*Julie Waldera*

Julie Waldera
Executive Director
Sanford Health

EXHIBIT
A

*CONFIDENTIAL PEER REVIEW DOCUMENT*

Dear Dr. Ganai:

Thank you for meeting with us today to discuss areas of concern that have been brought forward as part of our ongoing improvement efforts and recredentialing process. We appreciate your input and your cooperation to evaluate clinical care concerns that have been identified and to facilitate performance improvement measures to resolve areas of opportunity.

Upon consideration of all relevant information pertaining to the issues raised, and because the concerns are ongoing and impact patient care, it has been recommended that a Performance Improvement Plan ("PIP"), overseen by the Care Monitoring Committee, be developed to assist you in successfully addressing the opportunities that have been identified. We appreciate you meeting with us today to discuss the PIP and we look forward to working with you to resolve these areas of concern.

The PIP that we are recommending to you consists of the following core elements:

1. *Collegial participation in a focused review of surgical practices;*

2. *Development of a mutually agreed upon mentoring plan with an assigned mentor to facilitate and guide improvement efforts;*

3. *Development of a personal development plan to evaluate and improve areas of identified opportunity; and*

4. *Agreement to fully engage in ongoing monitoring and peer review processes and take accountability for your own professional development and performance improvement.*

Additional details that are necessary to effectively implement these elements are addressed in the attached PIP, which is intended to be utilized by you, your mentor and the Care Monitoring Committee going forward. After you have an opportunity to review this letter and the enclosed materials, please let us know if you have any additional questions or need any further clarification regarding expectations and next steps.

Please understand that your agreement to voluntarily abide by and participate in this PIP is not considered a restriction of your privileges. It is not an adverse professional review action and of itself will not be reported to the National Practitioner Data Bank.

To demonstrate your commitment to work with us and your willingness to participate, please sign and return the attached PIP within 3 business days, keeping a copy for your reference. A copy of the PIP and your agreement to participate will be provided to your mentor and the Care Monitoring Committee as they consider your progress and completion of the PIP. Quarterly reports on your progress will be provided to the Care Monitoring Committee.



EXHIBIT
B

If you decide not to participate in the PIP as outlined in this letter, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to Sanford's Peer Review and Credentials policies.

Thank you for your anticipated cooperation and participation in Sanford's ongoing efforts to improve the care we provide. If you have any questions or wish to discuss this matter further, please feel free to contact me.

Sincerely,


Steven Briggs, MD
Vice President Medical Officer
Sanford Fargo Medical Center

Enclosure:     PIP Agreement

cc:     Confidential Peer Review File

## Performance Improvement Plan Agreement
## For Sabha Ganai, MD

Concerns have been identified and explained to me regarding the following: prolonged operative times (especially with robotic surgery), occurrence of post-operative complications, and higher than expected rates mortality. Because these concerns are ongoing and they impact patient care, I, Sabha Ganai, MD agree to the following stipulations regarding my surgical practice at Sanford Fargo Medical Center.

1. I agree to collaboratively participate in a Focused Professional Practice Evaluation (FPPE) to further evaluate my surgical technique and acumen, and to determine measures I can take to reduce operative times and improve patient outcomes. I understand that successful completion of the FPPE will be a significant basis for determining success with this Performance Improvement Plan (PIP). I acknowledge that the following elements will be included in my FPPE.

   - **Evaluation of Care.** I acknowledge that any of my patient care records and quality reports may be reviewed to assist in determining opportunities to improve upon my clinical care and surgical skills.

   - **Concurrent Collegial Consultation/Procedural Proctoring.** I agree to seek collegial consultation pre-operatively with my assigned proctors for at least my next 20 scheduled surgical cases involving the esophagus, pancreas and hepatobiliary system, and acknowledge the following:

     o I acknowledge that my proctors will determine if additional cases or types of cases require concurrent collegial consultation.
     o I agree that collegial consultation will include discussion of patient risk factors, planned surgical approach and anticipation of potential complications, including identification of indications to convert to open if a laparoscopic or robotic approach is planned.
     o I agree that my proctors will have the autonomy to determine their level of oversight on the cases, which may include concurrent proctoring or participation as a co-surgeon. I further understand that my proctor's presence is required for at least 10 cases.
     o I understand that my proctors do not have the ability to override my decisions following a collaborative discussion. I agree that when there are unresolved differences of opinion, the matter will be referred to Dr. Briggs and my mentor for further discussion.
     o I acknowledge that my proctors will be assigned and I agree to work respectfully and collaboratively with them to successfully complete my FPPE.

   - **Retrospective Case Review.** I acknowledge that all cases with intra-or post-op complication and cases significantly exceeding the national average operative time will be retrospectively reviewed. I agree to collaboratively discuss the cases and any opportunity for improvement that may be identified.

2. I agree to develop a mutually agreeable mentorship plan with my assigned mentor, and work collaboratively with this individual to gain insight into my strengths and limitations, identify methods to consistently deliver high quality, safe patient care and ensure my successful completion of this PIP.

3. I agree to address concerns in clinical care identified through peer review, proctoring or mentoring processes and to make changes to my care practices accordingly. This may include continuing education or additional training. I understand the importance of self-reflection on my own performance and willingness to improve and make changes as indicated.

4. I will take accountability for my professional growth and performance improvement and agree to develop a professional development plan. This plan will include improvement strategy and goals, with timelines for completion, to address noted areas of opportunity. In addition to measurable performance indicators to improve rates of complication and mortality, I will define goals to incrementally reduce my operative time until I achieve nationally reported norms. My professional development plan will be in written form with a copy provided to my mentor and the Care Monitoring Committee by September 15, 2023. All proposed performance metrics must be accepted by the Committee.

5. I further understand that quarterly reports regarding my progress will be made to the Care Monitoring Committee, and that this Agreement will continue until such time as the Care Monitoring Committee determines otherwise.

I acknowledge this is a serious matter and that I will be monitored on an ongoing basis by (1) peers assigned to review cases in accordance with peer review process; (2) my assigned mentor and proctors; and (2) the Care Monitoring Committee. I understand that if I do not meet the performance stipulations as outlined in the PIP, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to the Sanford Peer Review and Credentialing policy.

I understand that my agreement to voluntarily abide by and participate in this PIP is not considered a restriction of my privileges and that this Agreement in and of itself is not reportable to the National Practitioner Data Bank. I further understand I am provided an opportunity to respond and to have this response also placed in my confidential peer review file along with this Agreement.

In addition, I acknowledge that the Care Monitoring Committee requests signed acknowledgement of this Performance Improvement Plan within three business days of the date of this letter. I further understand that if I choose not to participate in the PIP, the Care Monitoring Committee will determine the next appropriate steps.

Accepted this __22__ day of August 2023.

_____

Sabha Ganai, MD

Sanford Surgical Oncology
801 Broadway N
Fargo, ND 58102
Ph: (701) 234-2251



September 15, 2023

Dear Dr. Briggs and Team,

This letter is a response as requested per our meeting on August 22, 2023 to review and reflect on quality improvement efforts and opportunities for myself and the Division of Surgical Oncology at Sanford Medical Center Fargo. I appreciate this opportunity and will discuss these in detail herein using facility data and then will provide a summary that includes a personal performance improvement plan (PIP).

**I.      Summary about myself, Sabha Ganai, MD, PhD, MPH, FACS, FSSO**
I am a 2001 graduate of the USC Keck School of Medicine and I am sub-specialty board-certified in complex general surgical oncology (CGSO) with training from University of Chicago in addition to general surgery training from Tufts University / Baystate Medical Center. I have additional training in clinical ethics from the MacLean Center for Clinical Ethics and epidemiology from the Harvard T.H Chan School of Public Health. I am a funded population-health scientist studying rural cancer disparities and have an h-index of 17 with over 80 publications and book chapters. I previously served as co-director of the Southern Illinois University (SIU) Outcomes Analysis and Research (SOAR) program, with experience using Lean Six-Sigma in the context of healthcare quality improvement. I joined Sanford Health in February 2020 and I am an Associate Professor of Surgery and the Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.

I serve on the Executive Council for the American College of Surgeons (ACS) Cancer Surgery Standards Program (CSSP), which has afforded me the opportunity to give invited national talks on improving quality and performance in complex oncologic care, including at the Alliance for Clinical Trials (2021) and the ACS Quality and Safety Conference (2022). I am the Disease Site Group leader for gastric and esophageal disease for the Commission on Cancer (COC) and I lead a multidisciplinary team of medical oncologists, radiation oncologists, gastroenterologists, and surgeons that includes experts from institutions like Mayo Clinic and MD Anderson Cancer Center. I was the 2023 recipient of the Society for Surgery of the Alimentary Tract Academy for Surgical Coaching Award and I have been previously honored with Alpha Omega Alpha and the Gold Foundation Humanism Honor Society. I am the Chair for the American Society for Bioethics and Humanities Surgical Ethics Affinity Group and I participate in the Sanford Ethics Committee including as a volunteer ethics consultant.

My clinical practice has focused on complex general surgical oncology, hepatobiliary surgery, endocrine surgery, and palliative surgery. My personal mission when joining our Surgical Oncology Division at Sanford Medical Center in Fargo was "to elevate care delivery for patients with cancer in North Dakota". I was excited and privileged to join my partners, Dr. Robert Sticca and Dr. Daniel Tuvin because I know as a team we are unique in our collaborative culture and our service orientation. My vision to provide "optimal care for cancer patients" is centered in both population health and ethics, requiring grounding in a multifaceted and multidisciplinary process for integrated care delivery and improving access as a form of justice. Part of my efforts and expertise fulfilling this mission has to do with analysis of quantitative and qualitative data, and I meet weekly with a team at Sanford Research in Sioux Falls in the conduct of these research efforts. The conceptual framework for my work has previously been summarized in the graphic included in the following ASCO [text obscured]

20230915 - Ganai - CONFIDENTIA[L]     [Pa]ge 1 of 14

**EXHIBIT**

**C**

https://dailynews.ascopubs.org/do/access-cancer-care-rural-populations-barriers-and-solutions

I am a values-driven leader and I strive for excellence in my team with a goal of delivery of optimal care for our cancer patients in a compassionate and patient-centered fashion. My personal behavioral style using the DISC inventory is shared by many surgeons: 'Decisive' with the subtype 'Implementing Conductor'. These are individuals who are self-motivated, expeditious, and attracted to challenges and results. Using Clifton StrengthsFinder, my top five leadership strengths are being a maximizer (a person who stimulates group excellence), a relator (maintains close relationships to achieve a goal), having self-assurance (confidence in ability to act and decide), having strong ideation (ability to find connections between disparate phenomena), and having high adaptability (ability to perform one day at a time). I am a surgical ethicist and I favor a pragmatic Aristotlean virtue ethics approach which avoids dwelling in perfectionism and designates excellence as a consequence of habitual behavior. Because the practice of good habits (virtues) becomes linked to good outcomes, I have been working to teach the residents to instill greater conscientiousness in patient care delivery as a form of quality improvement. Since coming to Sanford, I have adapted my prior protocols for complex oncologic care delivery and have documented this in the form of the "White Service Handbook" as a way to standardize the delivery of care for the surgical oncology division based on best evidence within our discipline. When I started here in 2020, I prompted and quickly implemented within my division utilization of NCCN-guideline recommended practices for extended-use post-discharge VTE prophylaxis, which they recognized as important but assumed were difficult to implement because it had never been done here at Sanford. In addition, I implemented surgical oncology clinical trials at Roger Maris Cancer Center (RMCC) including the OPTI-Surg study (preoperative geriatric frailty assessment), the OPT-IN study (neoadjuvant therapy for gallbladder cancer), ECOG-ACRIN Pancreas Cyst Surveillance Study, and the International Mel-Mart II study randomizing margins for intermediate-thickness melanoma. We are working steadily to gain national recognition through our efforts in surgery trial accruals which has gone from non-existent to above average in comparison with other academic medical centers.

## II – Vizient Data

When we met on August 22, 2023, I was provided a data point of an O/E ratio of 1.4 and increased operative times as the rationale to proceed with a performance improvement plan (PIP) covering pancreatectomy, hepatectomy, and esophagectomy. I signed this PIP in good faith, completely understanding this was noise-laden data from Vizient, and after correcting the nonoperative and palliative cases, my O/E ratio is under 1. As you are aware, Vizient is a database that provides operational data derived from administrative coding (billing) without clinical verification. It is designed to be able to quickly compare hospital performance and safety parameters, but it is not designed to reliably benchmark surgeon performance or distinguish the quality of departments or service lines. This is known to be confounded by the quality of documentation and capturing appropriate DRG categories. Unfortunately, because of this, if the clinical documentation within a facility has failed to capture the complexity and acuity of patients through the system, a hospital or service line could be perceived as providing poor quality of care.

In January 2021, because of my prior QI expertise, I was asked by the Department of Surgery to review every mortality and patient safety indicator 'never event' attributed to General Surgery for the year 2020. Detailed chart review of every attributed mortality revealed an intrinsic validity of the report as less than 40%, with many patient deaths included that were not causally associated to any operation or were occurrences with surgeons in other Departments or Service lines. This lack of causality becomes a pitfall with Vizient as simple sequencing of events during any inpatient stay is not possible (a preop VTE is considered the same as a postop VTE since the process to tell the difference can seldom be distinguished with codes). In addition, we raised concerns on reliability of data as there were patient deaths we had discussed in M+M and QI conferences that were not included in the data set. When similar observations were discussed with Dr. Clifford Ko, Director of Quality for the American College of Surgeons during his visit to Sanford Broadway Medical Center in 2022, he reminded us that Vizient was never supposed to be used for performance benchmarking beyond hospital-to-hospital comparisons. There is simply more noise than signal by design.

Table 1 summarizes the seven deaths that were attributed to me by Vizient, along with assessment using a "Plus/Delta" approach, a Crew Resource Management technique to explore opportunities for improvement:

**Table 1: Vizient-Attributed Mortality (2022-2023)**

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2338732<br>Admit 1/5/2022<br>Surgery: Whipple<br>Death 1/15/2022<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 6cm IPMN, BMI 43.5, AF on Eliquis<br>Fistula risk score of 28.5% (high risk)<br><br>Whipple with Roux en Y recon (short mesentery), developed Pancreas fistula | Pre-habilitation<br><br>Surveillance for over a year; Tried to observe cyst, but worrisome features developed/ persisted. | Failure to Rescue a POD10 aspiration event<br>Needed NGT replaced rather than diet advanced after return from IR.<br><br>Better communication with ICU: After this event, Tonya and I met with ICU charge nurse to work to improve 2E nursing communication with resident team members and attending since our team and myself were never notified when a problem did occur. |
| E1861093<br>Transfer Accepted: 2/8/2022 5pm<br>Transfer Arrived: 2/8/2022 823pm<br>Surgery: ASAP after 9pm<br>Emergent Abdominal exploration with cholangiogram<br>Death: 2/9/2022 1738<br><br>DISCUSSED IN QI AND M+M CONFERENCES<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 83M with cardiac history, prostate cancer, cholecystitis.<br><br>Accepted in transfer after Surgery completed around noon at Altru: Lap converted to Open cholecystectomy with bile leak.<br><br>This was an intraop mishap leading to transection and excision of 6cm of portal vein in addition to hepatic duct<br><br>Vein occlusion exceeded 12hrs.<br>Lactate 16 prior to OR. | I called in my partner out of bed to confirm missing anatomy and my plan for proceeding with comfort measures instead of a certain to fail attempt at vascular reconstruction.<br><br>I documented everything with Risk Management in the morning.<br><br>Withdrawal of care occurred later in the day when family arrived. | Nothing. |
| E2158042<br>Admit 3/24/2022<br>Consult for SBO 3/31/2022<br>Death 4/5/2022<br><br>NON OPERATIVE CONSULT<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 76F with Stage IV breast cancer and peritoneal carcinomatosis.<br><br>There was no plan for operative intervention. | We recommended hospice and she agreed.<br><br>This was a patient-preference concordant death. | Nothing – this was a consult with no expected benefit from surgery. |

EXHIBIT A_143

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2620805<br>Admit 3/18/2022<br>Death 4/20/2022<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 77M with Stage III esophageal cancer s/p esophagectomy Oct 2021, receiving adjuvant nivolumab immunotherapy<br><br>Developed PCP pneumonitis over week prior to admission that was likely secondary to adjuvant immunotherapy. This was held by Dr. Vegunta and the patient was started on steroids. Patient ended up intubated and later received a tracheostomy by Dr. Mistry. | I visited patient's wife periodically during the hospitalization to check in. | Nothing – this was an Unfortunate situation of immunotherapy-related PCP pneumonitis >6 Months after esophagectomy |
| E1892283<br>Admit: 1/9/2023<br>Surgery: Whipple with SMV venorrhaphy<br>Death: 1/17/2023<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 74F with symptomatic main duct IPMN, prior lap chole with bile leak, frailty, malnutrition.<br><br>Postoperative delirium<br>Delayed gastric emptying<br>Fistula risk score 4.4% (low risk)<br><br>The patient had evidence of DGE when I saw her on Monday POD 7 (diet advanced over weekend by team). I made her NPO at the time and instructed on call resident to consider NGT. On POD 8, it was recognized that she needed an NGT, but she aspirated and coded around 8am. | Prehabilitation (PT and nutrition)<br>Geriatrics consultation<br><br>I initially declined surgery in Oct 2022, and I allowed patient (and family) to convince me to operate as she was symptomatic with repeat flares. We did wait until nutritional and ambulatory status improved. | Failure to Rescue a POD8 Aspiration event. We should have placed an NGT sooner to avoid aspiration.<br><br>The patient should have had her HOB elevated as part of GI aspiration precautions |
| E1812727<br>Transfer Accepted: 1/22/2023<br>Surgery: Emergent Abdominal Exploration<br>Death: 1/22/2023<br><br>PALLIATIVE CARE + HOSPICE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 62M with Stage III gastric cancer (s/p total gastrectomy, T4a N3 30/35 nodes positive); completed therapy and under surveillance via Cancer Treatment Centers of America in Chicago.<br><br>Presented with ischemic bowel Friday in Dickinson, left AMA to travel elsewhere, transferred emergently from Bismarck on Sunday am. | We took patient to OR appropriately<br><br>When we identified he had an internal volvulus with ischemia for several days and he did not have enough viable bowel available to perform an esophagojejunostomy, I talked to family while team closed, and he was made comfort care with time given to have family from Dickinson arrive to say goodbye.<br><br>There was good communication with family and death was preference-concordant. | I was later instructed by Dr. Mannuru that this patient could have been accepted/switched in transfer from Bismarck to observation status instead of inpatient status to deflect mortality reporting. I was unaware of this at the time.<br><br>We did our best to stabilize and bring to OR ASAP when team was available, so I otherwise would not have changed my approach. |

EXHIBIT A_144

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E1848027<br>Admit: 2/22/23<br>Surgery: <u>Emergent</u> Whipple with Double RY reconstruction 2/23-24/23<br>Death: 3/2/23<br><br>PALLIATIVE CARE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 76M s/p open RYGBP 20 y ago, recent COVID+ <3wks prior, AVR, COPD, BMI 37, presenting with obstructive jaundice from periampullary cancer, TBili 26, INR 8<br><br>Admitted after syncopal episode.<br>Drs. Meidinger/Vogels did a lap assisted ERCP.<br><br>I was called to come in after 5pm to address iatrogenic perforation.<br>Informed consent obtained from wife 5:30pm. >3hrs was spent lysing adhesions. Fistula Risk Score = 42.3% (high risk)<br><br>Washout required after heparinization restarted later that day secondary to profound coagulopathy.<br><br>Patient coded on POD7 while in ICU. He described sense of doom followed by Brady/PEA followed by CPR with ROSC. I spoke with wife and advised considering withdrawal of care given pressor requirement, hyperkalemia, etc. Possible VTE while on anticoagulation as recently switched from heparin gtt to Lovenox. | Patient wanted everything done per wife. Patient was appreciative of care he was given when he had capacity to discuss care delivered.<br><br>Good communication with patient and/or wife throughout care. | SMCF teams are not well equipped for Whipples and have difficulty locating appropriate suture, Castro-Viejos, etc, for emergencies.<br><br>We may have had a pro-thrombotic state despite anticoagulation status related to his COVID+ status and compounded by profound hyperbilirubinemia. We perhaps should have kept him on heparin gtt rather than switch him to Lovenox.<br><br>Under normal/typical circumstances he would have been stented and optimized during neoadjuvant therapy but this surgery was initiated in an emergent fashion in the wrong facility and in the middle of the night. |

**III – Cancer Quality Improvement Program (CQIP)**

The goals of CQIP are to improve process and outcomes for the care of patients with specific cancers using feedback of data as entered into the National Cancer Databases (NCDB) back to facilities. Surgical Oncologists who perform mostly foregut and hepatopancreaticobiliary (HPB) procedures will understandably have higher morbidity and mortality to track compared to those who perform breast and soft tissue procedures, and these findings may be further influenced by volume relationships. In addition, the expected survival by stage will be different for every disease site. This leads to the need to benchmark procedure-specific and cancer-specific metrics and compliance to standards rather than general outcomes for any cancer center. Long-term oncologic outcomes (overall survival, recurrence-fress survival) are also parameters of interest, requiring time-to-event analyses. Via the COC, we participate in the CQIP program, which relies on data inputted into the NCDB in a protocolized fashion by certified tumor registrars with inclusion of long-term follow-up. While the process for assessment of survival generates the robustness of the NCDB, there is a two-year delay in receipt of CQIP mortality benchmarking reports. The 2022 CQIP Annual Report data (2018-2020) showed outcomes for SMCF/SMCB/RMCC that *were not significantly* different from expected outcomes at COC facilities (Table 3). Note that confidence intervals can be wide based on sample size and small number of events.

EXHIBIT A_145

**Table 3: CQIP Unadjusted 30-day Mortality (2018 – 2020)**

| Operation for Cancer | Fargo RMCC | All COC | P |
|---|---|---|---|
| Pancreatectomy | 2.2% (95% CI, 0.1 – 10.3%) | 2.3% (95% CI, 2.1 – 2.4%) | NS |
| Esophagectomy | 6.1% (95% CI, 1.1 – 19.1%) | 3.0% (95% CI, 2.8 – 3.3%) | NS |

*NS, not significant, p>0.05*

Table 4 demonstrates benchmarked performance standards for lymphadenectomy at SMCF/SMCB:

**Table 4: CQIP Lymphadenectomy Reports (2018-2020)**

| Measures | Fargo RMCC | All COC | P |
|---|---|---|---|
| Colectomy >12 nodes | 96.1% (95% CI, 90.8 - 100%) | 94.4% (95% CI, 94.1 – 94.6%) | NS |
| Gastrectomy > 15 nodes | 60% (95% CI, 17.1 – 100%) | 71.8% (95% CI, 70.1 – 73.5%) | NS |

*NS, not significant, p>0.05*

The best way to address the suboptimal gastrectomy lymph node harvest is for us as an institution to continue to be intentional about performing a D2 lymphadenectomy with gastric cancer resections. Recent analysis of NCDB gastric cancer data presented at the 2023 Digestive Disease Week confirms this metric is linked with long-term overall survival, and surgeons happen to have better nodal harvests with robotic approaches. The CSSP currently recommends nodal harvest >16 to be an updated performance standard based on the work of my COC disease site group team of experts. Meeting this has been an issue nationwide.

## IV – ACS NSQIP Data

The American College of Surgeons National Surgical Quality Improvement Program (NSQIP) differs dramatically from Vizient in that data are verified and inputted by a clinical research nurse specialist. Outcomes can be risk-adjusted by facility and are standardized leading to high internal validity and generalizability. Because of the design, we are also able to stratify data so outcomes can be examined in a procedure-specific fashion or stratified to inpatient or outpatient status. Of note, we review our Department surgical performance reported through NSQIP twice yearly and this has continued to show exemplary results, including data discussed by our Surgeon Champion, Dr. Sticca, earlier this week.

Table 5 summarizes data compiled from 01/01/2020-08/31/2023 from NSQIP. The first metric, "occurrence/case ratio", takes account any morbidity, readmissions, reoperations, and mortality.

**Table 5: NSQIP Mean Occurrences/Cases, (2020 – 2023)**

| Subgroups | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|
| Outpatient Cases | 1.2 | 1.5 | P< 0.05 (better than expected) |
| Inpatient Cases | 2.1 | 2.0 | NS (as expected) |
| Pancreatectomy | 2.0 | 2.1 | P<0.05 (better than expected) |
| Hepatectomy | 1.3 | 1.9 | P<0.05 (better than expected) |
| Esophagectomy | 3.0 | 2.9 | NS (as expected) |

Note that this metric is unadjusted and does not take into account risk adjustment for complexity but has been stratified by procedure. The NSQIP General Surgery patients includes all adult cases performed by General Surgeons, Acute Care Surgeons, Bariatric Surgeons, Endocrine Surgeons, Colorectal Surgeons, Hepatobiliary Surgeons, and Surgical Oncologists. Perioperative morbidity is 44% for pancreatoduodenectomy and 46% for esophagectomy (Low 2010) so would be expected to be greater for an HPB/GI surgeon doing these procedures compared to the average general surgeon.

Further exploration of my NSQIP mortality shows these data are not significantly different from national NSQIP data, except my outpatient and hepatectomy performance is significantly better than expected (Table 6). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

EXHIBIT A_146

**Table 6: NSQIP Mortality, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 0 | 0.08% (0.07 – 0.09%) | P<0.05 |
| Inpatient Cases | 4.4% (95% CI, 0.6 – 8.1%) | 5.2% (3.0 – 7.4%) | 2.34% (2.30 – 2.37%) | NS |
| Pancreatectomy | 5.9% (95% CI, 0 – 13.8%) | 7.5% (2.2 – 12.9%) | 1.67% (1.53 – 1.81%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 1.43% (1.28 – 1.58%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 23.7%) | 8.9% (0.6 – 17.2%) | 3.1% (2.64 – 3.57%) | NS |

*NS, not significant*

The mortalities defined in Vizient with Whipples were included. My mortality for distal pancreatectomy is zero. The one esophagectomy mortality that is present here but was not included in Vizient was an octogenerian patient with esophageal SCC from Thief River Falls who was DNR/DNI (her surgery was indicated due to dysphagia and stricture several months after definitive chemoradiation with failure to dilate/stent secondary to Type IV paraesophageal hernia). Postdischarge she developed a pleural effusion and COPD exacerbation and elected not to travel or be readmitted. We were never contacted since she was already set up with hospice.

**Table 7: NSQIP Readmissions, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 7.0% (95% CI, 0 – 14.5%) | 6.1% (3.2 – 8.9%) | 2.2% (2.2 – 2.3%) | NS |
| Inpatient Cases | 12.3% (95% CI, 6.3 – 18.3%) | 9.3% (6.4 – 12.2%) | 8.5% (8.4 – 8.5%) | NS |
| Pancreatectomy | 14.7% (95% CI, 2.8 – 26.6%) | 12.9% (6.0 – 19.7%) | 16.5% (16.1 – 16.9%) | NS |
| Hepatectomy | 12.5% (95% CI, 0 – 25.7%) | 9.5% (3.6 – 15.4%) | 9.5% (9.1 – 9.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 10.9% (10.0 – 11.7%) | NS |

*NS, not significant*

Further exploration of readmissions shows these are as expected from NSQIP national data (Table 7). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

**Table 8: NSQIP Reoperations, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 4.9% (2.3 – 7.5%) | 0.92% (0.90 – 0.94%) | P<0.05 |
| Inpatient Cases | 2.6% (95% CI, 0 – 5.6%) | 5.4% (3.2 – 7.7%) | 4.2% (4.1 – 4.2%) | NS |
| Pancreatectomy | 2.9% (95% CI, 0 – 8.6%) | 5.4% (0.8 – 10.0%) | 1.7% (1.5 – 1.8%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 2.8% (2.6 – 3.0%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 15.5% (14.5 – 16.5%) | NS |

*NS, not significant*

Further examination of reoperations shows these are also similar to NSQIP national data (Table 8). The one reoperation I did after pancreatectomy was a 20 minute wound exploration I performed out of concern for dehiscence (fascial suture was found to have loosened but was intact and was reinforced). The reoperation after esophagectomy was secondary to anastomotic leak, and the observed rate is significantly less than expected nationally for our team.

Examination of organ space infections shows this is similar to national NSQIP data (Table 9). Composite inpatient and outpatient data are not controlled for case complexity which is why data are further stratified by procedure. This metric would be determined by placement of a drain, and can be a surrogate metric of Type B/C pancreas fistula, bile leak, and anastomotic leak.

EXHIBIT A_147

**Table 9: NSQIP Organ Space Infections, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 2.3% (95% CI, 0 – 6.8%) | 0.4% (0.2 – 0.6%) | 0.12% (0.12 – 0.13%) | NS |
| Inpatient Cases | 7.0% (95% CI, 2.3 – 11.7%) | 7.0% (4.4 – 9.5%) | 3.0% (3.0 – 3.1%) | NS |
| Pancreatectomy | 8.8% (95% CI, 0 – 18.4%) | 11.8% (5.3 – 18.4%) | 13.4% (13.1 – 13.8%) | NS |
| Hepatectomy | 4.2% (95% CI, 0 – 12.2%) | 6.3% (1.4 – 11.2%) | 5.5% (5.3% – 5.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 8.9% (0.6 – 17.2%) | 12.3% (11.4 – 13.2%) | NS |

NS, not significant

My pancreatectomy and hepatectomy length of stay outcomes are better than expected (Table 10), which may be related to increased use of robotic-assisted approaches in my practice and through implementation of an ERAS protocol for pancreatectomy within the Division. My esophagectomy patients have a LOS of 10 days. I typically prepare esophagectomy patients to be in the hospital 10-14 days because of frailty concerns, care coordination for outpatient tube feeding, diet advance, and speech swallow assessments prior to discharge and the high distance travelled for our patients. Note that the Virginia Mason group of HPB/GI surgical oncologists reported a LOS of 10-12 days for esophagectomy and 8-10 days for pancreatectomy with a similar rural/regional referral catchment area (Low 2010).

**Table 10: Median Hospital Length of Stay (days) with Interquartile Ranges (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 0 (0 – 1) | 0 (0 – 1) | 0 (0 – 1) |
| Inpatient Cases | 6 (3 – 9) | 6 (3 – 9) | 4 (2 – 7) |
| Pancreatectomy | 6 (5 – 8) | 6 (5 – 9) | 7 (5 – 10) |
| Hepatectomy | 1 (0 – 2) | 3 (1 – 5) | 4 (3 – 7) |
| Esophagectomy | 10 (7 – 17) | 9 (7 – 14) | 9 (7 – 14) |

My inpatient cases and division overall do have a longer length of stay than the average US general surgeon as our practice includes complex cases including HIPEC, esophagectomy, gastrectomy, pancreatectomy, hepatectomy, ovarian cancer cytoreductions, multivisceral resections, and resections of retroperitoneal sarcoma, plus specific consultations for palliative surgery and advanced hepatobiliary reconstructions. In addition, we receive a rural referral base for cancer care where travel times often can exceed 3-8 hours.

**Table 11: Utilization of Robotic Technologies**

| | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 23.3% | 5.3% | 8.7% |
| Inpatient Cases | 32.5% | 13.1% | 7.5% |
| Pancreatectomy | 26.5% | 11.8% | 9.5% |
| Hepatectomy | 58.3% | 20.0% | 7.0% |
| Esophagectomy | 41.7% | 11.4% | 16.9% |

Overall, my utilization of robotic technologies (DaVinci Xi) is greater than the national average and encompasses the majority of robotic use in our Division of Surgical Oncology (Table 11). This use of robotic techniques probably impacts my average operative time as it typically takes longer to do the same operations robotically compared to open. In addition, I am doing oncologic robotic operations of high complexity, including those previously only performed at quaternary cancer centers (like robotic D2 lymphadenectomy). Because of this, I am the recipient of directed referrals from providers including Dr. Hannan (Altru Cancer Center), Dr. Potti (Cancer Center of North Dakota), Dr. Kurniali (Sanford Bismarck), and Dr. Gupta (Sanford RMCC) because they know I have a preference for considering minimally-invasive oncologic resections, and because of the strong relationships I have with my patients.

EXHIBIT A_148

My Whipple operative time is significantly longer than average (Table 12), but I have done a fair number of high biliary tract resections for perihilar cholangiocarcinoma including double hepaticojejunostomies and adding choledochoscopy set up into the procedures, all of which leads to increased time plus any time required waiting for frozen sections several times a case. In addition, 43% of my Whipples have coded for a vascular repair or reconstruction. I have also done several revisional Whipples after Roux en Y gastric bypass, two including gastrectomy and one maintaining the remnant stomach.

**Table 12: Operative Time (minutes)**

|  | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|
| Outpatient Cases | 121 (95% CI, 100 – 142) 23% robot | 74.9 (74.8 – 75.0) 9% robot |
| Inpatient Cases | 366 (95% CI, 330 – 401) 33% robot | 150 (149.6 – 150.2) 8% robot |
| Distal Pancreatectomy | 400 (95% CI, 336 – 463) 73% robot | 242 (240 – 244) 17% robot |
| Open Whipple/Total Panc | 561 (95% CI, 508 – 614) 43% vein repair/recon 29% complex (extrahepatic BD resection or Roux recons) | 383 (381 – 385) |
| Hepatectomy | 208 (95% CI, 151 – 264) 58% robot | 230 (228 – 231) 7% robot |
| Esophagectomy | 487 (95% CI, 395 – 579) 42% robot | 384 (380 – 388) 17% robot |

Note that NSQIP data represents a sample and does not include all my cases at Sanford.

**IV – My Intuitive App**

I have completed 106 DaVinci operations at Sanford Broadway Medical Center with an average use of 3.5 hrs per patient. The precise relationships between case type and overall operative time can be difficult to correlate and tabulate since I often do redock the robot in order to complete more than one procedure under the same anesthesia (i.e. cholecystectomy and distal pancreatectomy; liver resection and oophorectomy). I am the only provider in the region who has been doing Robotic HIPECs, which adds an extra 2-2.5 hours of case time (setup time plus a 90 minute chemoperfusion). In addition, I include D2 lymphadenectomies in my complex foregut cases for their established oncologic benefit, which do take more time but are recognized to improve long-term survival.

I have performed several palliative double bypasses (hepaticojejunostomies + gastrojejunostomies) robotically, which while being longer cases than open palliative double bypasses, allows for better visualization, smaller incisions, and a goal of removal of a transhepatic catheter, thus dramatically improving quality of life considering a median LOS of 4 days. My average time for robotic cholecystectomy is 97 minutes, but notably these are radical cholecystectomies for mass or cancer (+liver/nodes) and/or remnant cholecystectomies, which is a complex reoperative operation that bears higher risk.

Of note, I have been doing a large proportion of robotic complex distal pancreatectomies, including pancreas neck lesions (tumor above SMV/portal confluence), as well as performance of splenic-preserving distal pancreatectomies in 67% of these operations. These cases are all notably more challenging than resection of tail lesions that include the spleen, so do take understandably more time to complete safely.

**V – Attribution Bias and Just Culture**

My occurrence rates are not significantly different from expected for the case complexity I am expected to manage during my clinical duties, and I do have shorter than expected hospital LOS for many of these cases. I continue long-term surveillance with my patients with maintain excellent results including great feedback from medical oncologists and patients. I have not had a concern raised to

EXHIBIT A_149

me during my performance evaluations and I have been reminded by both Dr. Traynor and Dr. Garcia that I do have great responses on patient surveys.

To be fair, statements made attributing 'significantly worse outcomes' to me or my Division are false and are not founded by data controlled for coding error, complexity, risk, and the emergent nature of care for patients seen while on call. We as a health system need to consider consultation with an external data scientist and utilize validated clinical databases (like NSQIP) preferentially while being cautious in use and presentation of partitioned Vizient data without clinical correction as we are aware as a team through our prior study and expert opinion *and the literature* that there is poor intrinsic validity with assessing a service line or individual surgeon outcomes. In 2020, the intrinsic validity was less than 40% of cases attributed to the SMCF General Surgery Service Line, which does not instill trust in the system.

Vizient is not and was never designed to be used outside of hospital-to-hospital comparisons and it is an anchoring bias to assume it is the perfect tool. Internal validity is a metric that reveals the ability of an analysis to provide meaningful results that resemble what we would consider truth.  Poor internal validity means the tool provides errors in estimation just as often as there is meaningful signal. In a study from Vanderbilt University examining mortality events assigned by Vizient to the otolaryngology service line, only 32% of events were actually attributable to their department (Freeman 2021).  In a study from UMass Medical Center, 20% of cases designated in the Vascular Service line did not involve a vascular surgeon and only 69% of vascular surgery cases were included in the Vizient Vascular service line data set (Fang 2020). These authors highlighted, "analytic services provide powerful tools for outcomes analysis, but [Vizient's] predetermined service lines must be used with caution and carefully scrutinized at the division level to ensure that results mirror actual practice patterns".

Moreover, our goal as a system should not be to satisfy external motivations of improving our Vizient ranking at all costs to improve our visibility, but first focus on methods to prioritize delivery of optimal care to patients, correct low hanging fruit, improve our culture of safety, and also consider documenting and coding appropriately to improve our DRGs which will optimize our Vizient ranking. Attacking the performance of individual surgeons or service lines without data review will only provoke defensiveness of surgeons, decrease the credibility of the QI process, impair the culture of QI, and can actually provoke unintended issues of impaired surgeon well-being causing increased errors. It is important to consider "balancing measures" and checks to prevent unintended consequences of trying to improve one aspect of the system at the expense of the other.  Remember that the 2014 edit to the Triple Aim, henceforth, the 'Quadruple Aim' includes: improving quality of care, improving patient satisfaction, cost reduction (adding value), and improving healthcare team well-being.  Well-being and purpose at work for physicians is recognized to be critically linked with improved outcomes.

I strive for patient-preference concordant care as a goal, which as a cancer provider unfortunately sometimes means aiming for a good death in accordance to patient preferences. We must accept that until there is a "cure for cancer", we will unfortunately observe death to be a proximal outcome in patients with gastrointestinal and peritoneal malignancies, despite and in disregard to our best intentions. Death of mortal humans must then be reconciled without shame or blame, particularly if we are taking care of populations and are performing surgery harboring risk. Palliative surgery is the highest risk group of operations, with a risk of mortality of 20-30%, but it is typically performed congruent to a patients goals of care while negotiating risks and benefits and alternatives and respecting individual patient autonomy.

A "Just Culture" is a preferred way to improve quality across the spectrum and improves patient safety by empowering communication rather than creating fear of punishment and team members hiding their concerns. If we punish those individuals who take care of patients who later succumb to their disease because we are mortality-averse, we are then incentivizing those who game the system and cherry pick or deny care, which is unjust. We must allow clinicians who care for high risk populations to *care* for their patients, take accountability for their actions, and responsibility for doing better, and we must make it easier for them to make these duties safer.

## VI – Failure to Rescue

Preventable death and adverse events are a central concern in my discipline. Esophagectomy and pancreatectomy are considered high-risk surgeries with understood hospital-volume relationships (Birkmeyer 2003) and surgeon-volume relationships (Birkmeyer 2003), and major complication rates exceeding 40-50% (Low 2010). Of interest, having a high risk of complications does not correlate with having high mortality (Ghaferi 2012). The concept of "Failure to Rescue" (FTR) refers to mortality after a major complication, and explains hospital variation in mortality rates across procedures with high complication rates. Variability in procedure-specific complication rates may not very different across hospitals, but FTR is significantly associated with high-mortality facilities. For pancreatectomy, FTR is inversely linked to system characteristics including teaching status, hospital size >200 beds, census greater than 50% capacity, increased nurse-to-patient ratio, and hospital technology (Ghaferi 2010). Facility characteristics that allow for early identification of problems, whether by nurses or residents, allow for prevention of complications that later spiral towards FTR. These data suggest there are structures and processes of care within hospitals that are recognized to be linked with surgical outcomes. The attached Figure demonstrates how the system influences recognition and addressing complications that lead to FTR (Ghaferi 2012).



**Fig. 2.** Conceptual model outlining the interaction between hospital resources, behaviors, and attitudes in the early recognition and effective management of major postoperative complications.

For my 2022 FTR aspiration event, the patient had delayed gastric emptying, an entity found in 20-30% of Whipple patients. He had his diet advanced automatically upon return from IR despite his distension, then aspirated and was subsequently managed without discussion or input from the surgical team. He needed an NGT and this was not recognized by team members or nursing staff. For my 2023 aspiration event, the patient also did not get an NGT placed in a timely fashion. My colleague had a similar issue where a resident advanced the diet during M+M and when this was corrected after talking to the attending during conference, the patient had already been fed and he was found down dead without a monitor. I had a near miss patient in 2020 who aspirated post esophagectomy, but he was able to be promptly intubated and after recovery is alive with no evidence of disease.

FTR in Surgical Oncology populations was investigated using the Pennsylvania cancer registry with findings of aspiration in 5% of patients and the presence led to a mortality of 16% (Friese 2008). The rescue process has been examined closely and includes the following domains: (1) Teamwork, (2) Immediate Action Taking, (3) Psychological Safety (not being afraid to speak up), (4) Recognition, (5) Communication (Smith 2018). We could have done better with all these domains across these FTR aspiration events. We have had aspiration precautions and HOB elevation mandates for our esophagectomy patients (this is a lifetime risk) but these precautions are seldom followed and it is fairly common to manually reposition patients during rounds so their HOB is elevated.

EXHIBIT A_151

## VI – Surgical Education and Communication

One of the key concerns we had been dealing with is structural in the form of supervision of resident teams and how patients were assessed. Until July 2023, we were dealing with cross coverage concerns where often unknowingly the only person physically rounding on a patient in the morning was a PGY-1, leading to suboptimal care for our patients and an inability to rescue problems through lack of identification. We have addressed this, and the White Service is now structured with a PGY-1, PGY-3, and PGY-5, with appropriate accountability and graded supervision. We have reinforced with the residents that there must provide appropriate communication with attendings on any change in status or decisions that need to be made. Much of this in the form of process and standards is also documented in the White Service Manual.

Our residents still have some challenges in the modern educational paradigm. Many of our senior residents have never needed to place a nasogastric tube in a patient because of nurses who can do so, and I have had to start supervising chiefs to make sure they are comfortable. I have encountered times when more than resident has preferentially tried to order IR NG tubes when nurses are not available, which is not cost-effective and puts our patients at risk of aspirating through time delays. We probably need to develop a simulation to help educate them on how to make sure the NGT is functioning and how to place them. I am always happy to place NG tubes on anyone the moment I am made aware that there is a need.

Recognition of Delayed Gastric Emptying (DGE), an entity found in 20-50% of pancreatectomy and esophagectomy patients, and the necessity for NGT placement is a critical piece of education for nurses and residents that we will need to work on. This includes symptoms like nausea, reflux, hiccups, and belching. It includes signs like distension and holding an emesis bag. The hardest challenge for trainees is that gastric motility is independent of small bowel and colonic motility, and that DGE may be present despite flatus. Many of the residents and ICU nurses often will just feed our patients without assessing for DGE because of the presence of flatus, which is a major pitfall and educational hurdle we still need to overcome.

## VII – ICU Care

The ICU should be considered the safest place in North Dakota, so I was surprised to learn that my partners were afraid of the care delivered in the ICU at Sanford Broadway Medical Center. I was surprised to see how oversedated patients were and how we were often intentionally exacerbating postoperative delirium in our geriatric patients with inappropriate protocolized medication use with drugs like Benadryl given for bizarre indications like agitation. I do see a subtle overconfident cowboy mentality of care delivery in this unit without communication as a continued safety issue. We need to work together with the nurses so that our residents are allowed to participate in the care of these patients and that we as attendings are kept in the loop. This is a work in progress.

## VIII – Time versus Efficiency

I proudly spend as much time as I reasonably can with my patients, in clinic, on the floors, and in the operating room. I give patients and families my time based on what they need to make a decision. My new patient blocks for patients with complex malignancies are intentionally one hour long, because I know that investing in more time to teach the patient/family and answer patient/family questions increases patient satisfaction, improves the provision of goal-concordant care, and improves the efficiency of care delivery given the complexity of what we do. Taking an appropriate amount of time is also essential for provision of optimal informed consent (a topic I have written numerous book chapters on in the scope of Surgical Ethics).

Of secondary interest, the finding of significantly longer time in the operating room has been attributed to female surgeons, and has also been associated with less technical complications, shorter LOS, and better short-term and long-term outcomes (Blohm 2023). In a reflection that conscientiousness in surgery probably does matter, the commentary on this data highlighted the Navy Seal adage, "Slow

EXHIBIT A_152

is Smooth, and Smooth is Fast." (Almquist 2023).

While I understand the valid concern about my taking more operating room time for my cases, I would remind that my cases are complex, and with this in mind, I would favor improving efficiency rather than compromising patient short-term and long-term outcomes. As a member of the CSSP, I cannot advocate skimping on the node dissection for gastrectomies as that has been significantly associated with overall survival and is an important benchmarking performance metric. I also would rather take an appropriate amount of time to perform a modified Blumgart pancreaticojejunostomy that maintains its integrity rather than use a 'quicker technique' that is haphazard and increases propensity to leak. I would rather go slow with the meticulous process of taking tumor off the SMA rather than speed up and transect the vessel or cause a problem inadvertently.

I am still challenged with certain efficiencies that can be improved on, including being sure that I have my OR preference card followed (over half the time I am still given one of my partner's preference cards). I have on numerous occasions updated these cards, but that is not the problem, it is ultimately what gets picked is off another surgeon's card, and am so tired of asking why, so I stopped complaining and just wait for my needs to be fulfilled. As teaching faculty, I can also consider giving less of the case to the resident to improve use of operating room time (although I am not clear this will be linked with outcome based on the current literature which suggests increased time and improved outcomes with resident participation).

We typically have to wait 45 minutes for a an intraoperative frozen section, which can be over 60 minutes if there is a non-GI pathologist at Broadway. This effectively can limit 90-120 minutes of progress prior to anastomosis if we have to take multiple frozen sections during the course of a case. These frozen section checkpoints are a necessity for patients with hilar/extrahepatic cholangiocarcinomas and subtotal and total gastrectomies. Having to set up for a choledochoscopy or upper endoscopy can also increase OR time by 20-40 minutes.

I recently had a giant fly land on a scrub table, which while not under my control, delayed progress of my case for at least an hour since we had to open and count new instruments and suture. I do not fault the fly, nor do I fault myself, nor do I fault the team. I accept that these things happen and that we have to move on and take care of the patient. If the system allowed the fly to get into the OR, then the system as a whole must take some accountability and allow progress to happen and support the surgeon with new instruments to take the best care of the patient they can. This exemplifies 'Just Culture'.

**VIII – Performance Improvement Plan**
1. I will monitor my cases using the ACS SSR Program and NSQIP and compare my performance metrics on a quarterly basis.
2. I will continue to track my robotic cases including operative time using the MyIntuitive app.
3. I will continue to present my cases preoperatively at GI tumor board and/or at the Broadway Case Conference. Note that I introduced this conference as a biweekly discussion of case planning with image review in order to improve resident education.
4. I will continue to collaborate with my partners and schedule them to be available as backup for complex resections such as major hepatectomies.
5. Our division has agreed to require aspiration precautions including HOB elevation for all our complex GI surgical patients (HPB, foregut, HIPEC) rather than just after esophagectomy as all of these patients have issues with delayed gastric emptying (DGE), aspiration risk and FTR.
6. I will work with our division to update our White Service Manual and protocols at least twice yearly.
7. Our division will continue to work on improving resident and nursing education on delayed gastric emptying and nasogastric tube placement.
8. I will meet with ICU nursing staff to continue to improve communication with staff and our team.
9. I will work with Dr. Zriek to provide recommendations for an aspiration prevention protocol.
10. I will work on improving efficiency of my operative cases by journaling and discussing issues with staff to address delays related to cards so that these can eventually be remedied.

EXHIBIT A_153

Sincerely,

Sabha Ganai, MD, PhD, MPH, FACS, FSSO
Associate Professor of Surgery, University of North Dakota
Clinical Investigator, Sanford Research
GI/HPB Surgical Oncologist, Sanford Health
Executive Council, American Colllege of Surgeons Cancer Surgery Standards Program

References:

Almquist M. Are women better surgeons than men? JAMA Surg 2023; E1

BirkmeyerJD, Siewers AE, Finlayson EV, Stukel TA, Lucas FL, Batista I, Welch HG, Wennberg DE. Hospital volume and surgical mortality in the United States. *N Engl J Med* 2002; 346(15): 1128 – 1137.

Birkmeyer JD, Stukel TA, Siewers AE, Goodney PP, Wennberg DE, Lucas FL. Surgeon volume and operative mortality in the United States. *N Engl J Med* 2003; 349: 2117-2127.

Blohm M, Sandblom G, Eriochsson L. Osterberg J. Differences in cholecystectomy outcomes and operating time between male and female surgeons in Sweden. JAMA Surg 2023; E1-E10.

Fang ZB, Chao C, Durocher D, et al. Assessment of the Accuracy and Reliability of Vascular Surgery Quality Metrics. Ann Vasc Surg 2020; 67: 134-142.

Freeman MH, Slayton JM, Woods MC, et al. Improving Mortality Attribution in Otolaryngology – Head and Neck Surgery. Laryngoscope 2021; 131(6): e1805-e1810.

Friese CR, Aiken LH. Failure to Rescue in the Surgical Oncology Population: Implications for Nursing and Quality Improvement. *Oncol Nurs Forum* 2008; 35(5): 779

Ghaferi AA, Dimick JB. Variation in Mortality after High-Risk Cancer Surgery: Failure to Rescue. *Surg Oncol Clin N Am* 2012; 389-395.

Ghaferi AA, Osborne NH, Birkmeyer JD, Dimick JB. Hospital characteristics associated with failure to rescue complications after pancreatectomy. J Am Coll Surg 2010; 211: 325-330.

Low DE, MadhanKumar K, Hashimoto Y, Traverso LW. Comparing complications of esophagectomy and pancreatectomy and potential impact on hospital systems utilizing the Accordian Severity Grading System. *J Gastrointest Surg* 2010; 14: 1646-1652.

Smith ME, Wells EE, Friese CR, Krein SL, Ghaferi AA. Interpersonal and organizational dynamics are key drivers of Failure to Rescue. *Health Aff* 2018; 37(11): 1870-1876.

EXHIBIT A_154

**From:** Workday Peakon Employee Voice <app@peakon.com>
**Sent:** Monday, December 11, 2023 8:52 AM
**To:** Ganai,Sabha <Sabha.Ganai@SanfordHealth.org>
**Subject:** Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

**Your identity is protected**

Company logo



Powered by 



**If you were offered the same job at another organization, how likely is it that you would stay at this organization?**

You wrote:

My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well being. I am ashamed of the administration.

You scored: 

Download the Workday Peakon Employee Voice mobile app to reply to conversations on the go.



To learn more about how to use Workday Peakon Employee Voice, visit the Help Center

If you no longer wish to receive these emails, click here

--------------------------------------------------------------------------
Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain privileged and confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

EXHIBIT A_156

# Douglas replied to a comment you left

Only people who can reply to your comments will see your
conversation, and your identity is not displayed.

Douglas Griffin MD

**DG**

I am sorry to hear of your feelings on this and would welcome a chance to visit
on this. this is confidential so I don't know who is responding. You can contact
me directly via email or phone 701-417-2317. Thanks Doug Griffin

**View message and reply**

Link not working? Copy and paste the URL below into your browser

https://app.peakon.com/?mailLinkId=ehVAq4EVDYANGzxRPIYAWi4eQAxHAWdf

Your answer in the survey

**Sent:** Tuesday, December 26, 2023 4:31 PM
**To:** Griffin,Douglas <Douglas.Griffin@SanfordHealth.org>
**Subject:** RE: Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

Dear Dr. Griffin,

I hope you had a good Christmas.

No need to respond if you are away through the New Year.

This PeakOn comment was mine and I feel it is not fair or constructive to leave it anonymous.

I do have concerns about how our CGSO surgical oncologists are treated and I am really worried that we will soon lose a lot of what has been built to develop our infrastructure and team.

For some context, in August, I was placed on a PIP, which I signed in good faith prior to being emailed "the data" to respond to a few weeks later, calculated with partitioned unvalidated Vizient administrative data on mortality rates, fully understanding that mortality will be proportional to the type and amount of call taken by individuals within our division since we consult on the most complex patients within the system and often admit dying patients and/or need to consider palliative operations. As a team, surgical oncology manages everything directed to us from the two time zones of North Dakota plus Northern MN/SD, plus helps with everything too complex for acute care surgery or colorectal surgery or bariatric surgery or general surgery providers to handle. After responding in the PIP document with a proper analysis explaining those results with chart review and showing additional data demonstrating better outcomes and shorter LOS than national NSQIP data for cases like hepatectomy and pancreatectomy, the intent and conversation has spiraled and diverged a bit more and more at every meeting, from outcomes, to time, to efficiency, to my lack of knowledge where stapler loads are theoretically stored in Fargo while operating on a weekend. In terms of process, I still have not received a formal response or any direction from the Sanford "Care Monitoring Committee". The documents in question were submitted over 3 months ago and are attached.

At our recent meeting earlier in the week, our discussion included our Division call schedule for 2024, which does not include Dr. Sticca since he expects to be retiring *soon*. This call schedule can be referenced here:
https://docs.google.com/document/d/1sgfirDxNFa3y2o0_cx3Al45XvnM0VzBmYZvgHDGbtj
0/edit?usp=sharing

Note that only QTR 1 is final, but we chose to prepare a timeline a year in advance for planning purposes.

EXHIBIT
E

There are 3-4 days out of the entire year where I mentioned that the transplant team would help us cover (this was per speaking with Dr. Mistry). This need for support was not brought up because of personal time or vacation requests, these are days the first weekend in April where I was *invited* as a speaker at the AHPBA international meeting in Miami to discuss what Sanford Surgical Oncology has been doing optimizing prehabilitation for geriatric patients needing HPB surgery, and Dr. Tuvin also needs to speak at the ND/SD ACS chapter meeting in Aberdeen SD as he is the *President* of the ND chapter and the State Chair. Both me and Dr. Tuvin are otherwise perfectly capable of managing the remaining 362-3 days of the leap year call schedule. What was remarkable about this concern for a defect in our call schedule is we were simultaneously criticized for taking too much call, but when I clarified and requested a couple days of help from the Chair of General Surgery (I would not normally ask, but this became the point of discussion), I was told harshly we could not go to these conferences, and that we had to cover CGSO at all times, which is what we were already doing making lateral arrangements for coverage of the mentioned 3 days via Transplant Surgery. It is not worth arguing about, all these attitudes are just frustrating on basis of being the antithesis of wellness and support. There is no psychological safety because I know only in a toxic culture like this I should be avoidant of even bringing these kinds of things up, knowing it will be lambasted.


I get the idea of control, but it is clear that general surgery as a 'parent' Department does not *appreciate or care* about the contributions of myself or Dr. Tuvin within the Division of Surgical Oncology, even for an idea of support or respite (even while the group was morbidly hypothesizing out loud what would happen if the two of us were both hospitalized simultaneously). We are ABS *double* board-certified (gen surg and CGSO), and we are more than happy to help general surgery and accept all the complex cases that general surgery does not want to do or lacks training or expertise to do well. *These are patients who are in need of great support and assistance who we want to serve.*


Note that Bariatrics also has a separate call schedule and is positioned as their own Department separate from general surgery, but we are not privileged the same way here despite having a separate Board examination process. We do have a very impactful role through RMCC and remain critically aligned with the needs of medical oncology and radiation oncology and improvement of oncology care within our region.


I responded to the PeakOn survey very honestly with that comment. I remain ashamed of the attitudes and statements and practices I have seen over the past few months, and I will do my best to manage through this aiming for taking the best care of our patients as possible. I see a lot of potential for growth in our Division and for oncology as a whole, but to grow, we need to be nurtured a bit instead of trampled on.

Sabha

**Sabha Ganai, MD, PhD, MPH, FACS, FSSO**

Division of Surgical Oncology
Associate Professor of Surgery, UND

Director of Surgical Education, UND

Adjunct Professor of Pharmacology, NDSU

Clinical Investigator, Sanford Research

501 N Broadway N, Fargo, ND 58122

C: 413-222-4131  m:1151





January 23, 2024

Sanjay Gauta MD

Re:    Employment Agreement (the "Agreement") - Termination

Dr. Gauta:

This letter shall confirm that Sanford has elected to terminate your Employment Agreement (the "Agreement") pursuant to Section 12(a). Your termination will be effective immediately. In lieu of the days' notice Sanford will pay to you a lump sum amount, due payment of $103,435.00. You will also be receiving information regarding continuation of any elected health and dental benefits.

You will also be receiving information regarding continuation of any elected health and dental benefits.

Sincerely,

Dr. Doug Griffin
Vice President, Clinic

1 of 1



STATE OF NORTH DAKOTA

COUNTY OF CASS

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO | Civil No. 09-2024-cv03147 |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| | Jury Trial Demanded |
| -vs- | |
| SANFORD MEDICAL CENTER FARGO, and SANFORD CLINIC NORTH | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

1.    Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, brings this action against Defendants Sanford Medical Center Fargo ("SMCF") and Sanford Clinic North ("SCN") (collectively "Sanford") for retaliating against her when she engaged in protected activity by raising patient safety concerns.

## NATURE OF THE ACTION

2.    Plaintiff, Dr. Ganai, is a highly accomplished and reputable double-board certified surgical oncologist who has been practicing surgical oncology for more than twelve years. She joined Sanford Clinic North in 2020 to perform complex general surgery surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery. During her tenure, she also served as Associate Professor of Surgery and Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.



EXHIBIT A_162

3.     Dr. Ganai brings this action against Defendants for violation of the prohibitions against retaliation contained in North Dakota's whistleblower statute, N.D. Cent. Code,§ 34-01-20.

## THE PARTIES

4.     Plaintiff, Sabha Ganai, was a resident of Fargo, North Dakota at all times relevant to this First Amended Complaint.

5.     Defendant SMCF is a not-for-profit North Dakota corporation. Sanford Medical Center Fargo maintains its principal place of business at 801 Broadway North, Fargo, North Dakota, 58122.

6.     Defendant SCN was a not-for-profit North Dakota corporation that was merged into Defendant SMCF as of July 31, 2024.

7.     At all times material hereto, Defendant SCN was Plaintiff's primary employer and was affiliated with or a part of Defendant SMCF.

## JURISDICTION AND VENUE

8.     At all times material hereto, Defendants employed Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division").

9.     The relationship of the Parties is governed by the Staff Physician Agreement (attached hereto as Ex. B), which specifically provides that disputes would be resolved in the North Dakota State District Court in and for Cass County.

## FACTS RELEVANT TO ALL CLAIMS

10.     Defendants hired Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") in February 2020. On or around October 8, 2019, Dr. Ganai was given an offer letter signed by Sanford Health. (*See* Ex. A, Dr. Ganai Offer Letter). Dr. Ganai was also presented with the Staff Physician Agreement (*See* Ex. B, Staff Physician Agreement).

2

11.     Under the Staff Physician Agreement, Defendant SCN had the right to assign the Staff Physician Agreement to "its parents, subsidiaries, or corporate affiliates," which includes Defendant SMCF. *Id.*

12.     Dr. Ganai and her team in the Division routinely handled highly complex cases involving complex general surgery, surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery.

13.     These cases often came to the Division from other departments and other facilities that were unable to properly handle them and often with patients who were dying.

**Sanford Places Dr. Ganai on a PIP Using an Unreliable Data Report**

14.     In late August 2023, Sanford began criticizing the Division about patient outcomes and making statements attributing "significantly worse outcomes" to Dr. Ganai and the Division.

15.     At the same time, the Division was facing mounting pressure and a lack of support from the General Surgery Department in planning for Bob Sticca, M.D.'s reduction in call coverage. Dr. Sticca was a leading surgeon in the Division and his last day on call was January 1, 2024.

16.     On August 22, 2023, Dr. Ganai met with Steven Briggs, M.D. (Chief Medical Officer, Sanford Medical Center Fargo), Michael Traynor. M.D. (Chair, Department of Surgery, Sanford Medical Center Fargo), and Darla Dobberstein (Executive Director of Fargo Region's Surgical Services, Sanford Health). Without presenting any data, these SNC administrators told Dr. Ganai that a Vizient report indicated that Dr. Ganai had a higher than desired observed to expected ratio ("O/E") for mortality rates of 1.4.

17.     If a hospital's observed rate for an indicator is higher than its expected rate (an O/E ratio greater than 1), then the hospital performed worse than the reference population. If documentation for the patient population is not complete, then any risk adjustment applied to this

3

ratio will not be accurate and will only be done at a population level, which does not account for the Division's increased case complexity.

18.    Vizient is a health care performance improvement company that provides patient outcome data derived from administrative billing (coding) without clinical verification.

19.    Vizient was designed for benchmarking hospital quality, not surgeon quality. Surgical leaders, including Dr. Clifford Ko, M.D., MS, MSHS, FACS (Director, Division of Research and Optimal Patient Care, American College of Surgeons ("ACS")), have advised against using Vizient for benchmarking surgeon performance. In contrast, the ACS National Surgical Quality Improvement Program ("NSQIP") database collects patient-specific and surgeon-specific data that accounts for surgical case complexity and allows for causal inference.

20.    Vizient had recently released a hospital ranking system based solely on patient outcome data. Sanford, desiring to improve its scores in the ranking system, had recently began to use Vizient data to look at individual surgeon outcomes. Data from literature review suggests poor intrinsic validity for this indication outside of hospital-to-hospital benchmarking. In 2020, Dr. Ganai led a quality improvement project for the Department of Surgery with chart review of all mortalities for that year that confirmed poor intrinsic validity for its use. Dr. Ganai found that only thirty (30) percent of the cases were accurate. For example, many patient deaths were not included at all. Additionally, some of the patient deaths were identified as a surgery death when they were actually due to other causes, such as COVID-19. Many patients were not operated on, yet their deaths were attributed to the surgeon who consulted on them. In 2021, Dr. Traynor repeated this analysis for that year and confirmed the same issue.

21.    During the August 22, 2023 meeting, Dr. Ganai explained that Vizient generates and compares O/E mortality rates for general surgeons, and unlike the rest of general

4

surgery, the Division's practice includes highly complex cases not solely comprised of general surgery.

22.     Also during the August 22, 2023 meeting, the administrators presented Dr. Ganai with a peer review letter ("Peer Review Letter") attached to a Performance Improvement Plan ("PIP") and asked Dr. Ganai to agree to the PIP. *(See* Ex. C, Confidential Peer Review Document/PIP). The Peer Review Letter promised Dr. Ganai that the Care Monitoring Committee would oversee the PIP and assist Dr. Ganai in "successfully addressing the opportunities that have been identified." *Id.*

23.     In response, Dr. Ganai stated that she agreed to the PIP contingent on receiving the Vizient report data.

24.     Dr. Ganai also requested a peer review meeting and was told there would be a meeting scheduled with a committee.

**Dr. Ganai Demonstrates Issues with the Validity of The Vizient Report Data**

25.     On August 30, 2023, after Dr. Briggs emailed Dr. Ganai the Vizient report data ("the Vizient Report"), and Dr. Ganai analyzed its data.

26.     On September 15, 2023, Dr. Ganai provided Sanford a comprehensive analysis in response to the Confidential Peer Review Document/PIP and the Vizient Report Sanford had relied on when it chose to place her on the PIP. *(See* Ex. D, PIP response dated September 15, 2023).

27.     Dr. Ganai explained that Vizient's data reliability was limited in providing accurate benchmark performance and that such data is not controlled for coding error complexity, among other things.

28.     The Report failed to track patient outcomes appropriately.

29.     The Report demonstrated that Dr. Ganai's O/E ratio did not significantly differ from the expected O/E ratio given the complexity of the cases she managed.

5

30.     Dr. Ganai's colleague, Dr. Daniel Tuvin, M.D.'s, O/E ratio was 7, significantly higher than Dr. Ganai's. Dr. Tuvin also had a higher mortality rate. Dr. Sticca, Dr. Ganai's other colleague, had the highest readmission and reoperation rates.

31.     Dr. Ganai also explained how the Division needs to be compared for case complexity. Dr. Ganai presented ACS NSQIP data for the Division, specific for case type, that showed that the Division actually had excellent outcomes compared to National data, herself and Dr. Tuvin included. She explained that NSQIP data has significantly better validity than Vizient because it is clinically verified. Sanford paid for a Research Nurse who was in charge of maintaining NSQIP data, which was presented to the Department of Surgery on a quarterly basis for quality improvement purposes.

32.     After Dr. Ganai provided Sanford her response and analysis, Sanford never scheduled a peer review meeting with her.

**Dr. Ganai Raises Patient Safety Concerns to Sanford**

33.     On or around December 11, 2023, Dr. Ganai responded to an employee survey question on PeakOn, Sanford's anonymous survey platform. *(See* Ex. E, PeakOn response dated December 11, 2023).

34.     In response to the question: "If you were offered the same job at another organization, how likely is it that you would stay at this organization?" Dr. Ganai answered: "My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well-being. I am ashamed of the administration." *Id.*

35.     Dr. Ganai's concerns stemmed from Sanford's improper reliance on the Vizient Report that did not properly or accurately account for patient outcomes and Sanford's refusal to provide peer review avenues to address patient safety and comply with the Health Care Quality Improvement Act. *See* §42 U.S.C. 1110. By refusing to provide Dr. Ganai peer review avenues,

6

Sanford is stripping Dr. Ganai and other physicians of the immunity provided by the peer review process under the Act.

36.    On December 26, 2023, Dr. Ganai emailed Dr. Douglas Griffin (Vice President of Fargo Region Clinic, Sanford Health) about her PeakOn comment. *(See* Ex. F, email correspondence dated December 26, 2023).

37.    Dr. Ganai explained to Dr. Griffin that she posted her comment because she was concerned about Sanford's treatment of surgical oncologists within the Division and the General Surgery Department's increasing lack of support.

38.    She also told Dr. Griffin that Sanford had still not formally responded to her analysis and response to the August 2023 PIP, which she had submitted over three (3) months ago.

39.    Dr. Ganai affirmed her commitment to patient care as her highest priority.

40.    In response, Dr. Griffin told Dr. Ganai that he would look into the situation.

**Sanford Retaliates and Terminates Dr. Ganai a Month After She Reports Patient Safety Concerns**

41.    Instead of addressing her patient safety and compliance concerns, Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024. *(See* Ex. G, January 23, 2024 letter).

<div align="center">

**COUNT I**
**RETALIATION IN VIOLATION OF N.D.C.C. § 34-01-20**
**Plaintiff Against All Defendants**

</div>

42.    Dr. Ganai adopts and realleges paragraphs 1 through 41 above as if fully stated herein.

43.    N.D.C.C. § 34-01-20 prohibits employers from discharging or threatening to discharge an employee because the employee in good faith reports a violation or suspected violation of federal, state or local law, ordinance, regulation, or rule to an employer. N.D.C.C. §

<div align="center">7</div>

34-01-20 (l)(a).

44.     At all relevant times, Dr. Ganai performed her work with diligence and was meeting her employer's legitimate expectations.

45.     Dr. Ganai was engaging in a protected activity in reporting her concerns for patient safety on December 11, 2023, and December 26, 2023.

46.     Defendants knew or should have known that retaliation against an employee engaging in a protected activity was a violation of state law.

47.     Defendants retaliated against Dr. Ganai by terminating her employment on January 23, 2024.

48.     Defendants' actions violated N.D.C.C. § 34-01-20.

49.     As a result of Defendants' retaliatory actions, Dr. Ganai has suffered and will continue to suffer irreparable injuries including, but not limited to, lost wages, injury to professional reputation, great mental anguish, and damage to her physical health.

## **PRAYER FOR RELIEF**

50.     Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendants as follows:

A.     Find that Defendants violated N.D.C.C. § 34-01-20 by willfully retaliating against Plaintiff in threatening to terminate her and terminating her for engaging in a protected activity;

B.     Award actual damages;

C.     Award the costs of maintaining this action, including reasonable attorney's fees and court costs; and,

D.     Any other relief this Court deems just and necessary.

8

[THIS SPACE INTENTIONALLY LEFT BLANK]

9

## JURY DEMAND

51.    Plaintiff demands a trial by jury of the maximum number of jurors allowed by law of all issues raised in this First Amended Complaint.

Dated: August 28, 2024

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
*Pro Hae Vice Pending*
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
*Pro Hae Vice Pending*
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822


WILKING LAW FIRM

*Isl Leo F.J_Wilking*
Leo F.J. Wilking
(lwilking@wilkinglaw.com) 3003 32nd
Avenue S
Fargo, ND 58103
P: (701) 356-6823
F; (701) 478-7621
ND Bar ID No.
03629
*Local Counsel*

**SANFORD** HEALTH

October 8, 2019

Sabha Ganai, MD
1424 S Park Avenue
Springfield, IL 62704

Dear Dr. Ganai:

Upon the enthusiastic recommendation of the Surgical Oncology Department, I am pleased to invite you to join Sanford Clinic. The starting salary has been approved at $427,800 for a 1.0 FTE ($300,000 for 0.7 FTE clinical and $127,800 for 0.3 FTE research). We are also offering a $25,000 forgivable loan over 2 years paid upon signing.

Enclosed you will find a Staff Physician Agreement for your review and consideration. If all terms meet with your approval, please:

1. **Initial** your anticipated start date on the first page of the Agreement.

2. Sign and date the Agreement.

3. Sign the Demand Note in front of a Notary Public.

4. Return the following document/s to us in the enclosed prepaid envelope:
   a. Staff Physician Agreement, signed and dated with your anticipated start date **initialed** on the first page of the Agreement.
   b. Demand Note signed in front of a Notary Public.

You are eligible for 28 days of time away per fiscal year and 10 days of CME time away, pro-rated based on your FTE status. Eligible relocation expenses up to $10,000 will be paid upon submission of appropriate documentation.

My colleagues who had the opportunity to interview you feel that you will make a wonderful addition to our medical staff. I hope to receive your favorable response to this invitation within **30** days. In the meantime, please contact me if you have any questions; at 701-234-2610 (office) or by email at *julie.waldera@sanfordhealth.org*

Sincerely,

*Julie Waldera*

Julie Waldera
Executive Director
Sanford Health

EXHIBIT
A

EXHIBIT A_172

**STAFF PHYSICIAN AGREEMENT**
**BY AND BETWEEN**


Sanford Clinic North, a nonprofit corporation (hereinafter called "Sanford")


**AND**


Sabha Ganai, MD (hereinafter called the "Physician").


**WITNESSETH:**

WHEREAS, Sanford owns and operates physician offices and clinics; and

WHEREAS, Physician is a licensed physician capable of providing the services specified by this Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:


Section 1.  Employment

Sanford hereby employs Physician, and Physician hereby accepts such employment upon the terms and conditions set forth below.


Section 2.  Term

Physician's employment shall commence on January 13, 2020, or such other date as mutually agreed ("Commencement Date"), and shall continue for a period of two years unless terminated sooner as provided herein.  This Agreement shall be automatically extended for additional one-year terms unless either party notifies the other party in writing of its intent not to renew at least 90 days prior to the expiration of the then-current term.



EXHIBIT A_173

Section 3.  Provision of Services by Physician

(a)    Physician is hereby employed by Sanford on a full-time basis and agrees to allocate 0.3 FTE to research services and 0.7 FTE to providing medical services for patients of Sanford in Fargo, North Dakota and other locations as mutually agreed.  Physician shall also provide such administrative services as may be reasonably required by Sanford.  Physician will devote a portion of his/her working time to teaching of medical students, residents, fellows, or other scholarly activities for and as reasonably assigned by Sanford.  Physician's employment for the provision of medical services and Physician's employment for the provision of research services shall be separately terminable in the manner provided in Section 12 of the Agreement.

(b)    So long as Physician is so employed by Sanford, Physician will devote best efforts, skill and ability in performing said services.

(c)    Physician will acquire and maintain board certification in Physician's specialty as required by Sanford.

(d)    Physician will acquire and maintain in good standing, throughout the term of this Agreement, staff privileges at one or more Sanford hospitals to the extent required by Sanford.  Physician will consult with, and receive written approval from, Sanford prior to applying for staff privileges at any non-Sanford hospital, clinic or other medical facility.

(e)    Physician will acquire and maintain at all times during the term of this Agreement a license to practice medicine and to prescribe drugs and medication under all state, federal and local laws and regulations in effect in all jurisdictions where Physician may be required to practice under this Agreement.

(f)    This Agreement shall not affect the exercise of Physician's independent professional judgment in providing care to patients consistent with sound professional practice and the terms of this Agreement. This provision shall not affect the ability of Sanford to establish protocols, procedures, or standards for professional practice. Sanford shall also be entitled to engage in peer review, quality assurance review, and to make recommendations concerning the professional practice of Physician.

2

(g)    In all matters related to the discharge of responsibilities under this Agreement, Physician shall be accountable to Sanford's Council of Governors or its successor or designee.

(h)    Except when (i) the referral is not in the patient's best interest in the judgment of Physician; (ii) the patient expresses a preference for a different provider, practitioner, or supplier; or (iii) the patient's insurer determines the provider, practitioner, or supplier, Physician acknowledges and agrees that during the term of this Agreement he/she shall refer all of his/her patients to Sanford hospitals and to such non-hospital providers, practitioners, or suppliers as may be directed by Sanford.

(i)    Physician shall comply with all applicable bylaws, policies, rules, regulations and credentialing standards of Sanford and its subsidiaries or affiliates, including any corporate compliance policy or code of conduct now or hereafter adopted. Physician shall provide all information required by the same and shall complete all clinic and hospital records in a timely and accurate manner and in accordance with applicable Sanford policies.

### Section 4.  Facilities and Personnel

Sanford shall furnish Physician with such space, equipment and personnel as may be deemed necessary or desirable by Sanford for the performance of Physician's duties hereunder.

### Section 5.  Professional Liability Insurance

(a)    Physician shall be solely responsible for any liability arising from any act or omission of Physician occurring prior to commencement of employment by Sanford, and for purchasing or arranging for professional liability insurance coverage with respect thereto.

(b)    Sanford will provide professional liability insurance coverage for Physician for services provided under this Agreement in such amounts as may be deemed necessary or desirable by Sanford. Said coverage shall extend to claims for

3

damages made against Physician after termination of employment with Sanford so long as the claim arises from services provided by Physician pursuant to this Agreement, and Physician shall not be required to purchase an extended reporting endorsement ("tail") upon termination of this Agreement for such claims. Professional liability coverage maintained by Sanford may be provided through Sanford's self-insurance program, captive insurer, insurance trust or through policies of insurance purchased by Sanford from commercial insurers, or any combination thereof. Professional liability coverage for Physician will be subject to the limits, terms, exclusions and limitations applicable to Sanford's self-insurance program, captive insurer, insurance trust and/or any insurance policies purchased by Sanford.

Section 6.  Compensation

    (a)    Physician's full compensation for all services rendered, in whatever capacity, will be determined by the compensation plan approved by Sanford. Physician compensation will be reviewed annually.

    (b)    Notwithstanding the foregoing, for the first year of this Agreement, Physician's rate of annual compensation for medical services will not be less than Three Hundred Thousand and no/100 Dollars ($300,000.00) (the "Amount").

    (c)    Further notwithstanding the foregoing, for the second year of this Agreement, Physician's rate of annual compensation will not be less than 95% of the Amount. Physician will be eligible for incentive compensation equal to 5% of the Amount only if Physician meets clearly defined and quantifiable non-production goals attached to every department's compensation plan. Such goals will reflect departmental performance, clinical quality, patient service, practice efficiency, safety, or other individual, departmental, or organizational goals.

    (d)    Compensation hereunder will be paid in accordance with the general payroll policies of Sanford and shall be subject to required payroll deductions.

    (e)    No compensation shall be payable to Physician for any period:

4

i)      Physician fails to maintain all licenses to practice medicine or prescribe drugs required by Section 3(e) of this Agreement;

ii)      Physician fails to maintain hospital privileges when required under Section 3(d);

iii)      Physician's employment is suspended by Sanford for cause; or

iv)      Physician is absent from work beyond the time authorized by Sanford's absence time policies then in effect.

(f)      Physician shall provide documentation of time spent and specific services performed as may be reasonably requested by Sanford and as required by applicable law, regulations and third-party payor contract requirements.

(g)      Physician shall also receive a loan in the amount of $25,000.00 upon Physician's execution of this Agreement. This loan shall be repaid pursuant to a Promissory Note materially in the form and substance attached hereto as Exhibit A. The loan shall be repaid in 24 monthly installments beginning on the first day of the first month following the Commencement Date and shall bear interest at the "prime rate" as published in the Wall Street Journal on the date of execution plus one percent; provided, however, that as long as Physician continues to provide services hereunder, each installment will be forgiven as it comes due. In the event Physician fails to satisfy the conditions embodied in Section 20, fails to become employed by Sanford on the Commencement Date or becomes employed but thereafter leaves the employ of Sanford hereunder and/or this Agreement is terminated for any reason prior to forgiveness thereof, the entire outstanding balance under said Promissory Note shall immediately become due and payable. Notwithstanding the foregoing, if Physician's employment is terminated as a result of Physician's death or permanent disability as defined in Sanford's long term disability policy, the entire outstanding balance under said Promissory Note will be forgiven. Physician understands and agrees that loan forgiveness constitutes income to Physician and will be subject to taxes and other withholdings required by law.

(h)      Physician agrees that Sanford may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to Physician by Sanford,

including any wages or other obligation and whether or not due, against any obligation owed by Physician to Sanford or its affiliates, including the obligations of Physician evidenced by the Promissory Note.

Section 7.  Benefits

Subject to insurability rules and regulations, Physician shall be entitled to benefits as are generally provided to other similarly situated Sanford physicians pursuant to Sanford policies.

Section 8.  Third-Party Reimbursement Programs and Assignment Agreements

Physician shall assign and reassign to Sanford or its designees all rights Physician may now or hereafter possess to receive income, payment and/or reimbursement for any and all professional medical services rendered by Physician pursuant to this Agreement, which shall also include any payments as a result of Physician's attestation of Meaningful Use during Physician's employment with Sanford.  Physician shall become and remain a participating provider in those public and private third-party reimbursement programs requested by Sanford.  As used in this Agreement, the term "third-party reimbursement program" shall include, but not be limited to, health maintenance organizations, preferred provider organizations, private health insurance companies, Sanford Health Plan, the federal Medicare program, and the state Medicaid program.  Under no circumstances shall Physician bill any patient or any public or private third-party reimbursement program for any services for which Physician has been compensated pursuant to this Agreement.  Any violation of any provision of this Section by Physician shall permit Sanford, at its option, to terminate this Agreement immediately.

Section 9.  Confidentiality

Physician acknowledges that all patient charts, patient lists, and patient financial and demographic information concerning Sanford's practice are confidential, proprietary and constitute Sanford's trade secrets.  Physicians may not access Sanford patient

6

information or use Sanford patient lists to contact patients directly for solicitation purposes. Upon termination of this Agreement, Physician shall not use or disclose any confidential information, proprietary or trade secret information, including patient list and patient financial and demographic information concerning Sanford's practice, and shall maintain confidentiality with regarding to Sanford's business. Under no circumstances shall Physician remove patient medical records, x-rays, etc., or copies thereof, from Sanford's premises except as authorized under Sanford's policies when necessary for patient care. Physician shall complete all medical records prior to termination of this Agreement. Physician has no ownership interest in the medical records, x-rays, patient charts and other documents relating to the diagnosis and treatment of patients served by Sanford. Upon termination of Physician's employment with Sanford, Physician shall return all medical records and reports concerning patients and all copies thereof to Sanford. Physician agrees that Physician's obligations under this Section shall survive any termination of this Agreement. Additionally, you shall not directly disclose Sanford's compensation formula to any competitor of Sanford, nor shall you direct any individual or third party to disclose this information to a competitor on your behalf.

Section 10.  Assignment

This Agreement may not be assigned by either party without the express written consent of the other party; provided, however, Sanford may assign this Agreement to its parent, subsidiaries, or corporate affiliates without consent.

Section 11.  Modification

This Agreement may not be orally canceled, changed, modified or amended, and no cancellation, change, modification or amendment shall be effective or binding, unless in writing and signed by both parties to this Agreement.

Section 12.  Termination

(a)    Notwithstanding any of the provisions of this Agreement, either party may terminate this Agreement by giving 90 days' written notice to the other party. If

7

Sanford elects to terminate under this Section, it may, at its option, give Physician 90 days' base pay in lieu of notice.

(b)   Sanford may also terminate Physician's employment immediately (without severance pay) in the event:

    i)   Physician fails to substantially perform Physician's obligations under this Agreement (as reasonably assigned or reasonably appropriate to Physician's role hereunder) and such failure is not cured to the satisfaction of Sanford within thirty (30) days after written notice thereof is given to Physician;

    ii)   Physician fails to maintain medical staff appointment or clinical privileges at any organization where Physician has provided professional services;

    iii)   Physician engages in any unethical conduct or medical misconduct as defined by State and National Medical Associations and such failure remains uncorrected after fifteen (15) days of written notice from Sanford;

    iv)   Physician is suspended or excluded from participation in the Medicare program or any other Federal Health Program;

    v)   Sanford is unable to obtain malpractice insurance on behalf of Physician, or if the cost of obtaining such insurance unreasonably exceeds the cost of obtaining such insurance for other physician employees working within the same specialty;

    vi)   Physician's professional practice presents a direct threat to the safety of patients or employees, including situations in which Physician's abuse of alcohol or drugs poses a direct threat to patient or employee safety;

    vii)   Physician fails to maintain the standard of competence reasonably deemed necessary by Sanford;

    viii)   Physician is deemed to have engaged in a material violation of Sanford policy regarding patient or employee rights after investigation;

8

ix)    Physician repeatedly violates or continues to violate, after notice, any of Sanford's policies or directives and such failure remains uncorrected after fifteen (15) days of written notice from Sanford;

x)    Physician is absent from work beyond the period authorized by applicable Sanford policies;

xi)    Physician commits fraudulent or dishonest acts which involve the practice of medicine;

xii)    Physician engages in any felonious act, or misdemeanor involving moral turpitude (as defined by state or federal law) in connection with Physician's employment;

xiii)    Physician is convicted of, pleads guilty or nolo contendere to any felony, or misdemeanor involving fraudulent conduct or moral turpitude (as defined by applicable state or federal law); or,

xiv)    Physician fails to maintain any license or certification required to provide services under this Agreement.

(c)    Upon termination of this Agreement for any reason, Physician agrees that Sanford may, at its sole discretion and without demand and without notice, set off any liability owed to Physician by Sanford, including compensation hereunder, against any obligation owed by Physician to Sanford or its affiliates, including obligations evidenced by the Promissory Note referenced above.

(d)    Physician acknowledges and agrees that his/her medical staff appointment and clinical privileges at one or more Sanford owned or leased hospital(s) shall automatically expire upon termination of this Agreement. As prescribed by the medical staff bylaws of said Sanford hospital(s), such automatic expiration (i) would not give rise to hearing and appeal rights and (ii) would not constitute a professional review action adversely affecting the clinical privileges of Physician. For purposes of this Section 12(d), said Sanford hospital(s) shall be deemed third-party beneficiaries to this Agreement.

9

Section 13.  Strict Performance

No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement or to exercise a right or remedy shall constitute a waiver.  No waiver of any breach shall affect or alter this Agreement, but each and every covenant, condition, agreement and term of this Agreement shall continue in full force and effect with respect to any other existing or subsequent breach.

Section 14.  Entire Agreement

This Agreement represents the entire Agreement between Sanford and Physician with respect to the subject matter hereof, and all prior agreements relating to the employment of Physician written or oral, are nullified and superseded hereby and neither party shall have any further rights or obligations under such superseded agreements.  Each party releases the other from all claims of any kind or nature arising from such superseded agreements.  No change or addition to, or deletion of, any portion of this Agreement shall be valid or binding upon the parties hereto unless the same is approved in writing by the parties.

Section 15.  Invalidity or Unenforceability of Particular Provisions

The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

Section 16.  Release of Information

Physician acknowledges that Sanford will release information related to any aspect of Physician's practice to third parties as authorized by law (including state agencies).  Further, Physician authorizes Sanford to release to applicable state board of medical examiners, any governmental or private insurer, hospital, health maintenance organization, self-insured employer or any other organization with which Sanford contracts to provide health care services, information relating to

10

any aspect of Physician's practice, including, without limitation, information relating to professional liability claims, disciplinary proceedings, utilization, and quality review. Physician authorizes any educational institution, hospital, clinic, government or private insurer, or other health care institution to release to Sanford all employment files, disciplinary records, and other documents relating to Physician's conduct or performance. Sanford will provide Physician the reasonable opportunity to review requests for information related to professional liability or disciplinary matters prior to release of any information.

Section 17.  Proprietary Information, Trade Secrets and Intellectual Property

    (a)    Sanford acknowledges and agrees that it shall have no right, title or interest in or to any intellectual property (whether patentable, copyrightable or not) which was registered, copyrighted or for which patents were filed or issued, prior to Physician's employment with Sanford ("Physician Intellectual Property").

    (b)    If and to the extent Physician develops intellectual property while employed by Sanford, but does not utilize Sanford resources (including Sanford staff, funds, facilities, equipment or material resources or while actively engaged in the performance of Physician services under this Agreement) to develop the intellectual property, such intellectual property shall be deemed Physician Intellectual Property under this Agreement. Sanford hereby waives any ownership rights, title or interest it may be deemed to have in and to Physician Intellectual Property, and hereby assigns all right, title and interest in and to Physician Intellectual Property to Physician; provided, however, Physician grants to Sanford a non-exclusive, worldwide, paid-up, royalty-free, perpetual license to use that Physician Intellectual Property developed by Physician during Physician's employment with Sanford, for its own internal use only (including without limitation, research, development and educational purposes) and not for resale.

11

EXHIBIT A_183

(c)     Physician agrees to promptly disclose in writing to Sanford all intellectual property including, without limitation, discoveries, improvements, formulas, techniques, know-how, writings, drawings, software, mask works, and other inventions and works of authorship (whether or not patentable or copyrightable) made, conceived, discovered, written, created, learned of or reduced to practice by Physician during the period of his/her employment with Sanford, which relate or result from the actual or anticipated business of Sanford or from the use of Sanford's staff, funds, equipment, premises, property, or which constitute a work made for hire ("Sanford Intellectual Property"). Physician hereby waives any ownership rights, title or interest he/she may be deemed to have in and to Sanford Intellectual Property, and hereby assigns all right, title and interest in and to Sanford Intellectual Property to Sanford. Physician shall cooperate with Sanford to enable Sanford to obtain, maintain or enforce patents, copyrights, or other legal protection for such intellectual property, including the execution of any and all documentation necessary to evidence the transfer/assignment of ownership of Sanford Intellectual Property to Sanford.

(d)     Any distribution of net income derived from commercialization of Sanford Intellectual Property developed by Physician, subject to applicable restrictions arising from any grants, contracts or other agreements with outside parties, shall be as follows:

(i)      Physician:   50% (may be shared with others at Physician's discretion)

(ii)     Sanford:    50%

"Net Income" shall be defined as gross revenue, as identified in the totality of the legal documents reflecting the transaction, less all costs incurred by Sanford or its agent(s) in commercializing the Sanford Intellectual Property and in obtaining and maintaining intellectual property protection. The amount of net income distributed to Physician will not be affected by termination of Physician's employment with Sanford.

(e)     Notwithstanding the foregoing, Physician agrees to comply with the then-current intellectual property policy of Sanford and its affiliates. In the event of a

12

conflict between this Agreement and such policy, Physician and Sanford agree that the then-current intellectual property policy will control.

Section 18.  Governing Law

This Agreement shall be construed and enforced under and in accordance with the laws of North Dakota, with exclusive venue for resolution of disputes in the State District Court in and for Cass County.

Section 19.  No Third-Party Rights

Except as may be expressly provided herein, nothing in this Agreement shall be construed as creating or giving rise to any rights in any third parties or any persons other than the parties hereto.

Section 20.  Pre-Employment Post-Offer Background Check, Drug Screen, Licensure, and Privileges

Physician and Sanford acknowledge and agree that all obligations of each party hereunder shall be subject to the satisfaction of the following conditions precedent as of the Commencement Date:

(a)    Physician satisfactorily completes a background check and drug screen in accordance with Sanford policy;

(b)    Physician is granted licensure to practice medicine from the state of North Dakota;

(c)    Physician obtains medical staff appointment and clinical privileges commensurate with the services to be performed hereunder at Sanford Medical Center Fargo;

(d)    Physician obtains from Sanford Health Plan in-network status with clinical privileges commensurate with the services to be performed hereunder; and

(e)    Physician is accepted into Sanford's standard professional liability policy by Sanford's insurance carrier.

13

Section 21.  Representations

    (a)    Physician represents and warrants that all of the information and documentation which Physician has provided to Sanford is true, accurate and complete in all material respects and does not omit any material information necessary to make the information or documentation provided to Sanford not misleading.

    (b)    Physician represents and warrants that this Agreement and Physician's employment hereunder will not constitute a default or breach of any covenant or agreement to which Physician is a party and that Physician is not bound or restricted by any contract of employment, non-competition agreement, confidentiality or non-disclosure agreement, or any other agreement with a present or former employer or other third party that would conflict with this Agreement or Physician's employment with Sanford.

    (c)    Physician represents and warrants that Physician will not use any privileged information, trade secrets or other intellectual property belonging to any third party while performing services for Sanford.

Section 22.  Survival

Any provisions hereof that by their nature would be expected to survive the termination of this Agreement shall survive and not be affected by said termination.

Section 23.  Construction of Headings

The captions or headings are for convenience only and are not intended to limit or define the scope or effect of any provision of this Agreement.

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year last written below.

SANFORD CLINIC NORTH

DATE:_____          BY:_____

_____

DATE: _____          _____

Sabha Ganai, MD

15

EXHIBIT A
DEMAND NOTE
FOR INCENTIVE LOAN
PER PHYSICIAN AGREEMENT

$ 25,000.00 _____                                                    _____, 2019

        After date, for value received, I promise to pay to the order of Sanford Clinic North, the sum of Twenty-Five Thousand and no/100 Dollars ($25,000.00) to be repaid ON DEMAND, or if no demand is made, in 24 monthly installments with interest thereon at the "prime rate" as published in the Wall Street Journal on the date of execution plus one percent, beginning on the first day of the first month following the Commencement Date, in accordance with the STAFF PHYSICIAN AGREEMENT dated _____, _____.

        Should any of the principal not be paid when due, such default shall, at the option of the legal holder hereof, cause all sums then remaining unpaid to become immediately due and payable, without notice (notice of the exercise of such option being hereby expressly waived).

        The Maker, endorsers, sureties and guarantors hereof hereby severally agree to pay all expenses of collection, including attorney's fees, in case payment shall not be made at maturity, and severally waive presentment for payment, notice of non-payment, protest and notice of protest and diligence in enforcing payment or bringing suit against any party hereto, the endorsers, sureties and guarantors hereof hereby severally consent that the time of payment may be extended, or this note renewed, from time to time without notice to them and without affecting their liability hereon.  The Maker agrees that Sanford Clinic North may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to the Maker by Sanford Clinic North, including any wage or other obligation and whether or not due, against any obligation owed by the Maker to Sanford Clinic North or its affiliates, including the obligations of Maker evidenced by this NOTE.  The payment obligations arising under this NOTE are subject to the terms of the STAFF PHYSICIAN AGREEMENT entered into by the Maker and Sanford Clinic North on _____, _____ including, without limitation, the debt forgiveness provisions set forth in Section 6(g) thereof.

        MAKER AGREES THAT ANY CLAIM OR DEMAND (OF DEFAULT OR OTHERWISE) WHICH MAKER MAY HAVE OR ASSERT AGAINST SANFORD CLINIC NORTH OR ITS AFFILIATED ENTITIES WILL NOT EXCUSE OR DELAY PAYMENT OF THIS NOTE AS PROVIDED HEREIN, AND MAKER HEREBY WAIVES ANY RIGHT OF SETOFF.

EXHIBIT DO NOT SIGN

MAKER:  Sabha Ganai, MD

SSN:_____

STATE OF _____ )
                            : SS
COUNTY OF _____ )

        On this the _____ day of _____, 2019, before me, a Notary Public within and for said County, personally appeared Sabha Ganai, MD, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he/she executed the same as his/her free act and deed.

EXHIBIT DO NOT NOTARIZE

(SEAL)

Notary Public, State of _____
My Commission expires: _____

DEMAND NOTE FOR
INCENTIVE LOAN
PER PHYSICIAN AGREEMENT

$ 25,000.00                                                    _____, 2019

       After date, for value received, I promise to pay to the order of Sanford Clinic North, the sum of Twenty-Five Thousand and no/100 Dollars ($25,000.00) to be repaid ON DEMAND, or if no demand is made, in 24 monthly installments with interest thereon at the "prime rate" as published in the Wall Street Journal on the date of execution plus one percent, beginning on the first day of the first month following the Commencement Date, in accordance with the STAFF PHYSICIAN AGREEMENT dated _____, _____.

       Should any of the principal not be paid when due, such default shall, at the option of the legal holder hereof, cause all sums then remaining unpaid to become immediately due and payable, without notice (notice of the exercise of such option being hereby expressly waived).

       The Maker, endorsers, sureties and guarantors hereof hereby severally agree to pay all expenses of collection, including attorney's fees, in case payment shall not be made at maturity, and severally waive presentment for payment, notice of non-payment, protest and notice of protest and diligence in enforcing payment or bringing suit against any party hereto, the endorsers, sureties and guarantors hereof hereby severally consent that the time of payment may be extended, or this note renewed, from time to time without notice to them and without affecting their liability hereon. The Maker agrees that Sanford Clinic North may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to the Maker by Sanford Clinic North, including any wage or other obligation and whether or not due, against any obligation owed by the Maker to Sanford Clinic North or its affiliates, including the obligations of Maker evidenced by this NOTE. The payment obligations arising under this NOTE are subject to the terms of the STAFF PHYSICIAN AGREEMENT entered into by the Maker and Sanford Clinic North on _____, _____ including, without limitation, the debt forgiveness provisions set forth in Section 6(g) thereof.

       MAKER AGREES THAT ANY CLAIM OR DEMAND (OF DEFAULT OR OTHERWISE) WHICH MAKER MAY HAVE OR ASSERT AGAINST SANFORD CLINIC NORTH OR ITS AFFILIATED ENTITIES WILL NOT EXCUSE OR DELAY PAYMENT OF THIS NOTE AS PROVIDED HEREIN, AND MAKER HEREBY WAIVES ANY RIGHT OF SETOFF.

                                  _____

                                  MAKER:  Sabha Ganai, MD
                                  SSN:_____

STATE OF _____)
                         : SS
COUNTY OF _____)

       On this the _____ day of _____, 2019, before me, a Notary Public within and for said County, personally appeared Sabha Ganai, MD, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he/she executed the same as his/her free act and deed.

                                    _____

(SEAL)                              Notary Public, State of _____
                                    My Commission expires: _____

*CONFIDENTIAL PEER REVIEW DOCUMENT*

Dear Dr. Ganai:

Thank you for meeting with us today to discuss areas of concern that have been brought forward as part of our ongoing improvement efforts and recredentialing process. We appreciate your input and your cooperation to evaluate clinical care concerns that have been identified and to facilitate performance improvement measures to resolve areas of opportunity.

Upon consideration of all relevant information pertaining to the issues raised, and because the concerns are ongoing and impact patient care, it has been recommended that a Performance Improvement Plan ("PIP"), overseen by the Care Monitoring Committee, be developed to assist you in successfully addressing the opportunities that have been identified. We appreciate you meeting with us today to discuss the PIP and we look forward to working with you to resolve these areas of concern.

The PIP that we are recommending to you consists of the following core elements:

1. *Collegial participation in a focused review of surgical practices;*

2. *Development of a mutually agreed upon mentoring plan with an assigned mentor to facilitate and guide improvement efforts;*

3. *Development of a personal development plan to evaluate and improve areas of identified opportunity; and*

4. *Agreement to fully engage in ongoing monitoring and peer review processes and take accountability for your own professional development and performance improvement.*

Additional details that are necessary to effectively implement these elements are addressed in the attached PIP, which is intended to be utilized by you, your mentor and the Care Monitoring Committee going forward. After you have an opportunity to review this letter and the enclosed materials, please let us know if you have any additional questions or need any further clarification regarding expectations and next steps.

Please understand that your agreement to voluntarily abide by and participate in this PIP is not considered a restriction of your privileges. It is not an adverse professional review action and of itself will not be reported to the National Practitioner Data Bank.

To demonstrate your commitment to work with us and your willingness to participate, please sign and return the attached PIP within 3 business days, keeping a copy for your reference. A copy of the PIP and your agreement to participate will be provided to your mentor and the Care Monitoring Committee as they consider your progress and completion of the PIP. Quarterly reports on your progress will be provided to the Care Monitoring Committee.



If you decide not to participate in the PIP as outlined in this letter, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to Sanford's Peer Review and Credentials policies.

Thank you for your anticipated cooperation and participation in Sanford's ongoing efforts to improve the care we provide. If you have any questions or wish to discuss this matter further, please feel free to contact me.

Sincerely,

Steven Briggs, MD
Vice President Medical Officer
Sanford Fargo Medical Center

Enclosure:    PIP Agreement

cc:    Confidential Peer Review File

## Performance Improvement Plan Agreement
### For Sabha Ganai, MD

Concerns have been identified and explained to me regarding the following: prolonged operative times (especially with robotic surgery), occurrence of post-operative complications, and higher than expected rates mortality. Because these concerns are ongoing and they impact patient care, I, Sabha Ganai, MD agree to the following stipulations regarding my surgical practice at Sanford Fargo Medical Center.

1. I agree to collaboratively participate in a Focused Professional Practice Evaluation (FPPE) to further evaluate my surgical technique and acumen, and to determine measures I can take to reduce operative times and improve patient outcomes. I understand that successful completion of the FPPE will be a significant basis for determining success with this Performance Improvement Plan (PIP). I acknowledge that the following elements will be included in my FPPE.

   - **_Evaluation of Care._** I acknowledge that any of my patient care records and quality reports may be reviewed to assist in determining opportunities to improve upon my clinical care and surgical skills.

   - **_Concurrent Collegial Consultation/Procedural Proctoring._** I agree to seek collegial consultation pre-operatively with my assigned proctors for at least my next 20 scheduled surgical cases involving the esophagus, pancreas and hepatobiliary system, and acknowledge the following:

     o I acknowledge that my proctors will determine if additional cases or types of cases require concurrent collegial consultation.
     o I agree that collegial consultation will include discussion of patient risk factors, planned surgical approach and anticipation of potential complications, including identification of indications to convert to open if a laparoscopic or robotic approach is planned.
     o I agree that my proctors will have the autonomy to determine their level of oversight on the cases, which may include concurrent proctoring or participation as a co-surgeon. I further understand that my proctor's presence is required for at least 10 cases.
     o I understand that my proctors do not have the ability to override my decisions following a collaborative discussion. I agree that when there are unresolved differences of opinion, the matter will be referred to Dr. Briggs and my mentor for further discussion.
     o I acknowledge that my proctors will be assigned and I agree to work respectfully and collaboratively with them to successfully complete my FPPE.

   - **_Retrospective Case Review._** I acknowledge that all cases with intra-or post-op complication and cases significantly exceeding the national average operative time will be retrospectively reviewed. I agree to collaboratively discuss the cases and any opportunity for improvement that may be identified.

2. I agree to develop a mutually agreeable mentorship plan with my assigned mentor, and work collaboratively with this individual to gain insight into my strengths and limitations, identify methods to consistently deliver high quality, safe patient care and ensure my successful completion of this PIP.

3. I agree to address concerns in clinical care identified through peer review, proctoring or mentoring processes and to make changes to my care practices accordingly. This may include continuing education or additional training. I understand the importance of self-reflection on my own performance and willingness to improve and make changes as indicated.

4. I will take accountability for my professional growth and performance improvement and agree to develop a professional development plan. This plan will include improvement strategy and goals, with timelines for completion, to address noted areas of opportunity. In addition to measurable performance indicators to improve rates of complication and mortality, I will define goals to incrementally reduce my operative time until I achieve nationally reported norms. My professional development plan will be in written form with a copy provided to my mentor and the Care Monitoring Committee by September 15, 2023. All proposed performance metrics must be accepted by the Committee.

5. I further understand that quarterly reports regarding my progress will be made to the Care Monitoring Committee, and that this Agreement will continue until such time as the Care Monitoring Committee determines otherwise.

I acknowledge this is a serious matter and that I will be monitored on an ongoing basis by (1) peers assigned to review cases in accordance with peer review process; (2) my assigned mentor and proctors; and (2) the Care Monitoring Committee. I understand that if I do not meet the performance stipulations as outlined in the PIP, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to the Sanford Peer Review and Credentialing policy.

I understand that my agreement to voluntarily abide by and participate in this PIP is not considered a restriction of my privileges and that this Agreement in and of itself is not reportable to the National Practitioner Data Bank. I further understand I am provided an opportunity to respond and to have this response also placed in my confidential peer review file along with this Agreement.

In addition, I acknowledge that the Care Monitoring Committee requests signed acknowledgement of this Performance Improvement Plan within three business days of the date of this letter. I further understand that if I choose not to participate in the PIP, the Care Monitoring Committee will determine the next appropriate steps.

Accepted this __22__ day of August 2023.

_____
Sabha Ganai, MD

Sanford Surgical Oncology
801 Broadway, N
Fargo, ND 58102
Ph: (701) 234-2251



September 15, 2023

Dear Dr. Briggs and Team,

This letter is a response as requested per our meeting on August 22, 2023 to review and reflect on quality improvement efforts and opportunities for myself and the Division of Surgical Oncology at Sanford Medical Center Fargo. I appreciate this opportunity and will discuss these in detail herein using facility data and then will provide a summary that includes a personal performance improvement plan (PIP).

**I.       Summary about myself, Sabha Ganai, MD, PhD, MPH, FACS, FSSO**
I am a 2001 graduate of the USC Keck School of Medicine and I am sub-specialty board-certified in complex general surgical oncology (CGSO) with training from University of Chicago in addition to general surgery training from Tufts University / Baystate Medical Center. I have additional training in clinical ethics from the MacLean Center for Clinical Ethics and epidemiology from the Harvard T.H Chan School of Public Health. I am a funded population-health scientist studying rural cancer disparities and have an h-index of 17 with over 80 publications and book chapters. I previously served as co-director of the Southern Illinois University (SIU) Outcomes Analysis and Research (SOAR) program, with experience using Lean Six-Sigma in the context of healthcare quality improvement. I joined Sanford Health in February 2020 and I am an Associate Professor of Surgery and the Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.

I serve on the Executive Council for the American College of Surgeons (ACS) Cancer Surgery Standards Program (CSSP), which has afforded me the opportunity to give invited national talks on improving quality and performance in complex oncologic care, including at the Alliance for Clinical Trials (2021) and the ACS Quality and Safety Conference (2022). I am the Disease Site Group leader for gastric and esophageal disease for the Commission on Cancer (COC) and I lead a multidisciplinary team of medical oncologists, radiation oncologists, gastroenterologists, and surgeons that includes experts from institutions like Mayo Clinic and MD Anderson Cancer Center. I was the 2023 recipient of the Society for Surgery of the Alimentary Tract Academy for Surgical Coaching Award and I have been previously honored with Alpha Omega Alpha and the Gold Foundation Humanism Honor Society. I am the Chair for the American Society for Bioethics and Humanities Surgical Ethics Affinity Group and I participate in the Sanford Ethics Committee including as a volunteer ethics consultant.

My clinical practice has focused on complex general surgical oncology, hepatobiliary surgery, endocrine surgery, and palliative surgery. My personal mission when joining our Surgical Oncology Division at Sanford Medical Center in Fargo was "to elevate care delivery for patients with cancer in North Dakota". I was excited and privileged to join my partners, Dr. Robert Sticca and Dr. Daniel Tuvin because I know as a team we are unique in our collaborative culture and our service orientation. My vision to provide "optimal care for cancer patients" is centered in both population health and ethics, requiring grounding in a multifaceted and multidisciplinary process for integrated care delivery and improving access as a form of justice. Part of my efforts and expertise fulfilling this mission has to do with analysis of quantitative and qualitative data, and I meet weekly with a team at Sanford Research in Sioux Falls in the conduct of these research efforts. The conceptual framework for my work has previously been summarized in the graphic included in the following ASCO...

EXHIBIT
b

https://dailynews.ascopubs.org/do/access-cancer-care-rural-populations-barriers-and-solutions

I am a values-driven leader and I strive for excellence in my team with a goal of delivery of optimal care for our cancer patients in a compassionate and patient-centered fashion. My personal behavioral style using the DISC inventory is shared by many surgeons: 'Decisive' with the subtype 'Implementing Conductor'. These are individuals who are self-motivated, expeditious, and attracted to challenges and results. Using Clifton StrengthsFinder, my top five leadership strengths are being a maximizer (a person who stimulates group excellence), a relator (maintains close relationships to achieve a goal), having self-assurance (confidence in ability to act and decide), having strong ideation (ability to find connections between disparate phenomena), and having high adaptability (ability to perform one day at a time). I am a surgical ethicist and I favor a pragmatic Aristotlean virtue ethics approach which avoids dwelling in perfectionism and designates excellence as a consequence of habitual behavior. Because the practice of good habits (virtues) becomes linked to good outcomes, I have been working to teach the residents to instill greater conscientiousness in patient care delivery as a form of quality improvement. Since coming to Sanford, I have adapted my prior protocols for complex oncologic care delivery and have documented this in the form of the "White Service Handbook" as a way to standardize the delivery of care for the surgical oncology division based on best evidence within our discipline. When I started here in 2020, I prompted and quickly implemented within my division utilization of NCCN-guideline recommended practices for extended-use post-discharge VTE prophylaxis, which they recognized as important but assumed were difficult to implement because it had never been done here at Sanford. In addition, I implemented surgical oncology clinical trials at Roger Maris Cancer Center (RMCC) including the OPTI-Surg study (preoperative geriatric frailty assessment), the OPT-IN study (neoadjuvant therapy for gallbladder cancer), ECOG-ACRIN Pancreas Cyst Surveillance Study, and the International Mel-Mart II study randomizing margins for intermediate-thickness melanoma. We are working steadily to gain national recognition through our efforts in surgery trial accruals which has gone from non-existent to above average in comparison with other academic medical centers.

**II – Vizient Data**
When we met on August 22, 2023, I was provided a data point of an O/E ratio of 1.4 and increased operative times as the rationale to proceed with a performance improvement plan (PIP) covering pancreatectomy, hepatectomy, and esophagectomy. I signed this PIP in good faith, completely understanding this was noise-laden data from Vizient, and after correcting the nonoperative and palliative cases, my O/E ratio is under 1. As you are aware, Vizient is a database that provides operational data derived from administrative coding (billing) without clinical verification. It is designed to be able to quickly compare hospital performance and safety parameters, but it is not designed to reliably benchmark surgeon performance or distinguish the quality of departments or service lines. This is known to be confounded by the quality of documentation and capturing appropriate DRG categories. Unfortunately, because of this, if the clinical documentation within a facility has failed to capture the complexity and acuity of patients through the system, a hospital or service line could be perceived as providing poor quality of care.

In January 2021, because of my prior QI expertise, I was asked by the Department of Surgery to review every mortality and patient safety indicator 'never event' attributed to General Surgery for the year 2020. Detailed chart review of every attributed mortality revealed an intrinsic validity of the report as less than 40%, with many patient deaths included that were not causally associated to any operation or were occurrences with surgeons in other Departments or Service lines. This lack of causality becomes a pitfall with Vizient as simple sequencing of events during any inpatient stay is not possible (a preop VTE is considered the same as a postop VTE since the process to tell the difference can seldom be distinguished with codes). In addition, we raised concerns on reliability of data as there were patient deaths we had discussed in M+M and QI conferences that were not included in the data set. When similar observations were discussed with Dr. Clifford Ko, Director of Quality for the American College of Surgeons during his visit to Sanford Broadway Medical Center in 2022, he reminded us that Vizient was never supposed to be used for performance benchmarking beyond hospital-to-hospital comparisons. There is simply more noise than signal by design.

EXHIBIT A_195

Table 1 summarizes the seven deaths that were attributed to me by Vizient, along with assessment using a "Plus/Delta" approach, a Crew Resource Management technique to explore opportunities for improvement:

**Table 1: Vizient-Attributed Mortality (2022-2023)**

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2338732<br>Admit 1/5/2022<br>Surgery: Whipple<br>Death 1/15/2022<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 6cm IPMN, BMI 43.5, AF on Eliquis<br>Fistula risk score of 28.5% (high risk)<br><br>Whipple with Roux en Y recon (short mesentery), developed Pancreas fistula | Pre-habilitation<br><br>Surveillance for over a year; Tried to observe cyst, but worrisome features developed/persisted. | Failure to Rescue a POD10 aspiration event<br>Needed NGT replaced rather than diet advanced after return from IR.<br><br>Better communication with ICU: After this event, Tonya and I met with ICU charge nurse to work to improve 2E nursing communication with resident team members and attending since our team and myself were never notified when a problem did occur. |
| E1861093<br>Transfer Accepted: 2/8/2022 5pm<br>Transfer Arrived: 2/8/2022 823pm<br>Surgery: ASAP after 9pm<br>_Emergent_ Abdominal exploration with cholangiogram<br>Death: 2/9/2022 1738<br><br>DISCUSSED IN QI AND M+M CONFERENCES<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 83M with cardiac history, prostate cancer, cholecystitis.<br><br>Accepted in transfer after Surgery completed around noon at Altru: Lap converted to Open cholecystectomy with bile leak.<br><br>This was an intraop mishap leading to transection and excision of 6cm of portal vein in addition to hepatic duct<br><br>Vein occlusion exceeded 12hrs.<br>Lactate 16 prior to OR. | I called in my partner out of bed to confirm missing anatomy and my plan for proceeding with comfort measures instead of a certain to fail attempt at vascular reconstruction.<br><br>I documented everything with Risk Management in the morning.<br><br>Withdrawal of care occurred later in the day when family arrived. | Nothing. |
| E2158042<br>Admit 3/24/2022<br>Consult for SBO 3/31/2022<br>Death 4/5/2022<br><br>NON OPERATIVE CONSULT<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 76F with Stage IV breast cancer and peritoneal carcinomatosis.<br><br>There was no plan for operative intervention. | We recommended hospice and she agreed.<br><br>This was a patient-preference concordant death. | Nothing – This was a consult with no expected benefit from surgery. |

EXHIBIT A_196

|  | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2620805<br>Admit 3/18/2022<br>Death 4/20/2022<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 77M with Stage III esophageal cancer s/p esophagectomy Oct 2021, receiving adjuvant nivolumab immunotherapy<br><br>Developed PCP pneumonitis over week prior to admission that was likely secondary to adjuvant immunotherapy. This was held by Dr. Vegunta and the patient was started on steroids. Patient ended up intubated and later received a tracheostomy by Dr. Mistry. | I visited patient's wife periodically during the hospitalization to check in. | Nothing – this was an Unfortunate situation of immunotherapy-related PCP pneumonitis >6 Months after esophagectomy |
| E1892283<br>Admit: 1/9/2023<br>Surgery: Whipple with SMV venorrhaphy<br>Death: 1/17/2023<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 74F with symptomatic main duct IPMN, prior lap chole with bile leak, frailty, malnutrition.<br><br>Postoperative delirium<br>Delayed gastric emptying<br>Fistula risk score 4.4% (low risk)<br><br>The patient had evidence of DGE when I saw her on Monday POD 7 (diet advanced over weekend by team). I made her NPO at the time and instructed on call resident to consider NGT. On POD 8, it was recognized that she needed an NGT, but she aspirated and coded around 8am. | Prehabilitation (PT and nutrition)<br>Geriatrics consultation<br><br>I initially declined surgery in Oct 2022, and I allowed patient (and family) to convince me to operate as she was symptomatic with repeat flares. We did wait until nutritional and ambulatory status improved. | Failure to Rescue a POD8 Aspiration event. We should have placed an NGT sooner to avoid aspiration.<br><br>The patient should have had her HOB elevated as part of GI aspiration precautions |
| E1812727<br>Transfer Accepted: 1/22/2023<br>Surgery: Emergent Abdominal Exploration<br>Death: 1/22/2023<br><br>PALLIATIVE CARE + HOSPICE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 62M with Stage III gastric cancer (s/p total gastrectomy, T4a N3 30/35 nodes positive); completed therapy and under surveillance via Cancer Treatment Centers of America in Chicago.<br><br>Presented with ischemic bowel Friday in Dickinson, left AMA to travel elsewhere, transferred emergently from Bismarck on Sunday am. | We took patient to OR appropriately<br><br>When we identified he had an internal volvulus with ischemia for several days and he did not have enough viable bowel available to perform an esophagojejunostomy, I talked to family while team closed, and he was made comfort care with time given to have family from Dickinson arrive to say goodbye.<br><br>There was good communication with family and death was preference-concordant. | I was later instructed by Dr. Mannuru that this patient could have been accepted/switched in transfer from Bismarck to observation status instead of inpatient status to deflect mortality reporting. I was unaware of this at the time.<br><br>We did our best to stabilize and bring to OR ASAP when team was available, so I otherwise would not have changed my approach. |

EXHIBIT A_197

|  | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E1848027<br>Admit: 2/22/23<br>Surgery: <u>Emergent</u> Whipple with Double RY reconstruction 2/23-24/23<br>Death: 3/2/23<br><br>PALLIATIVE CARE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 76M s/p open RYGBP 20 y ago, recent COVID+ <3wks prior. AVR, COPD, BMI 37, presenting with obstructive jaundice from periampullary cancer, TBili 26, INR 8<br><br>Admitted after syncopal episode. Drs. Meidinger/Vogels did a lap assisted ERCP.<br><br>I was called to come in after 5pm to address iatrogenic perforation.<br>Informed consent obtained from wife 5:30pm. >3hrs was spent lysing adhesions. Fistula Risk Score = 42.3% (high risk)<br><br>Washout required after heparinization restarted later that day secondary to profound coagulopathy.<br><br>Patient coded on POD7 while in ICU. He described sense of doom followed by Brady/PEA followed by CPR with ROSC. I spoke with wife and advised considering withdrawal of care given pressor requirement, hyperkalemia, etc. Possible VTE while on anticoagulation as recently switched from heparin gtt to Lovenox. | Patient wanted everything done per wife. Patient was appreciative of care he was given when he had capacity to discuss care delivered.<br><br>Good communication with patient and/or wife throughout care. | SMCF teams are not well equipped for Whipples and have difficulty locating appropriate suture, Castro-Viejos, etc. for emergencies.<br><br>We may have had a pro-thrombotic state despite anticoagulation status related to his COVID+ status and compounded by profound hyperbilirubinemia. We perhaps should have kept him on heparin gtt rather than switch him to Lovenox.<br><br>Under normal/typical circumstances he would have been stented and optimized during neoadjuvant therapy but this surgery was initiated in an emergent fashion in the wrong facility and in the middle of the night. |

### III – Cancer Quality Improvement Program (CQIP)

The goals of CQIP are to improve process and outcomes for the care of patients with specific cancers using feedback of data as entered into the National Cancer Databases (NCDB) back to facilities. Surgical Oncologists who perform mostly foregut and hepatopancreaticobiliary (HPB) procedures will understandably have higher morbitidity and mortality to track compared to those who perform breast and soft tissue procedures, and these findings may be further influenced by volume relationships. In addition, the expected survival by stage will be different for every disease site. This leads to the need to benchmark procedure-specific and cancer-specific metrics and compliance to standards rather than general outcomes for any cancer center. Long-term oncologic outcomes (overall survival, recurrence-fress survival) are also parameters of interest, requiring time-to-event analyses. Via the COC, we participate in the CQIP program, which relies on data inputted into the NCDB in a protocolized fashion by certified tumor registrars with inclusion of long-term follow-up. While the process for assessment of survival generates the robustness of the NCDB, there is a two-year delay in receipt of CQIP mortality benchmarking reports. The 2022 CQIP Annual Report data (2018-2020) showed outcomes for SMCF/SMCB/RMCC that *were not significantly* different from expected outcomes at COC facilities (Table 3). Note that confidence intervals can be wide based on sample size and small number of events.

**Table 3: CQIP Unadjusted 30-day Mortality (2018 – 2020)**

| Operation for Cancer | Fargo RMCC | All COC | P |
|---|---|---|---|
| Pancreatectomy | 2.2% (95% CI, 0.1 – 10.3%) | 2.3% (95% CI, 2.1 – 2.4%) | NS |
| Esophagectomy | 6.1% (95% CI, 1.1 – 19.1%) | 3.0% (95% CI, 2.8 – 3.3%) | NS |

*NS, not significant, p>0.05*

Table 4 demonstrates benchmarked performance standards for lymphadenectomy at SMCF/SMCB:

**Table 4: CQIP Lymphadenectomy Reports (2018-2020)**

| Measures | Fargo RMCC | All COC | P |
|---|---|---|---|
| Colectomy >12 nodes | 96.1% (95% CI, 90.8 - 100%) | 94.4% (95% CI, 94.1 – 94.6%) | NS |
| Gastrectomy > 15 nodes | 60% (95% CI, 17.1 – 100%) | 71.8% (95% CI, 70.1 – 73.5%) | NS |

*NS, not significant, p>0.05*

The best way to address the suboptimal gastrectomy lymph node harvest is for us as an institution to continue to be intentional about performing a D2 lymphadenectomy with gastric cancer resections. Recent analysis of NCDB gastric cancer data presented at the 2023 Digestive Disease Week confirms this metric is linked with long-term overall survival, and surgeons happen to have better nodal harvests with robotic approaches. The CSSP currently recommends nodal harvest >16 to be an updated performance standard based on the work of my COC disease site group team of experts. Meeting this has been an issue nationwide.

## IV – ACS NSQIP Data

The American College of Surgeons National Surgical Quality Improvement Program (NSQIP) differs dramatically from Vizient in that data are verified and inputted by a clinical research nurse specialist. Outcomes can be risk-adjusted by facility and are standardized leading to high internal validity and generalizability. Because of the design, we are also able to stratify data so outcomes can be examined in a procedure-specific fashion or stratified to inpatient or outpatient status. Of note, we review our Department surgical performance reported through NSQIP twice yearly and this has continued to show exemplary results, including data discussed by our Surgeon Champion, Dr. Sticca, earlier this week.

Table 5 summarizes data compiled from 01/01/2020-08/31/2023 from NSQIP. The first metric, "occurrence/case ratio", takes account any morbidity, readmissions, reoperations, and mortality.

**Table 5: NSQIP Mean Occurrences/Cases, (2020 – 2023)**

| Subgroups | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|
| Outpatient Cases | 1.2 | 1.5 | P< 0.05 (better than expected) |
| Inpatient Cases | 2.1 | 2.0 | NS (as expected) |
| Pancreatectomy | 2.0 | 2.1 | P<0.05 (better than expected) |
| Hepatectomy | 1.3 | 1.9 | P<0.05 (better than expected) |
| Esophagectomy | 3.0 | 2.9 | NS (as expected) |

Note that this metric is unadjusted and does not take into account risk adjustment for complexity but has been stratified by procedure. The NSQIP General Surgery patients includes all adult cases performed by General Surgeons, Acute Care Surgeons, Bariatric Surgeons, Endocrine Surgeons, Colorectal Surgeons, Hepatobiliary Surgeons, and Surgical Oncologists. Perioperative morbidity is 44% for pancreatoduodenectomy and 46% for esophagectomy (Low 2010) so would be expected to be greater for an HPB/GI surgeon doing these procedures compared to the average general surgeon.

Further exploration of my NSQIP mortality shows these data are not significantly different from national NSQIP data, except my outpatient and hepatectomy performance is significantly better than expected (Table 6). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

EXHIBIT A_199

**Table 6: NSQIP Mortality, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 0 | 0.08% (0.07 – 0.09%) | P<0.05 |
| Inpatient Cases | 4.4% (95% CI, 0.6 – 8.1%) | 5.2% (3.0 – 7.4%) | 2.34% (2.30 – 2.37%) | NS |
| Pancreatectomy | 5.9% (95% CI, 0 – 13.8%) | 7.5% (2.2 – 12.9%) | 1.67% (1.53 – 1.81%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 1.43% (1.28 – 1.58%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 23.7%) | 8.9% (0.6 – 17.2%) | 3.1% (2.64 – 3.57%) | NS |

*NS, not significant*

The mortalities defined in Vizient with Whipples were included. My mortality for distal pancreatectomy is zero. The one esophagectomy mortality that is present here but was not included in Vizient was an octogenerian patient with esophageal SCC from Thief River Falls who was DNR/DNI (her surgery was indicated due to dysphagia and stricture several months after definitive chemoradiation with failure to dilate/stent secondary to Type IV paraesophageal hernia). Postdischarge she developed a pleural effusion and COPD exacerbation and elected not to travel or be readmitted. We were never contacted since she was already set up with hospice.

**Table 7: NSQIP Readmissions, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 7.0% (95% CI, 0 – 14.5%) | 6.1% (3.2 – 8.9%) | 2.2% (2.2 – 2.3%) | NS |
| Inpatient Cases | 12.3% (95% CI, 6.3 – 18.3%) | 9.3% (6.4 – 12.2%) | 8.5% (8.4 – 8.5%) | NS |
| Pancreatectomy | 14.7% (95% CI, 2.8 – 26.6%) | 12.9% (6.0 – 19.7%) | 16.5% (16.1 – 16.9%) | NS |
| Hepatectomy | 12.5% (95% CI, 0 – 25.7%) | 9.5% (3.6 – 15.4%) | 9.5% (9.1 – 9.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 10.9% (10.0 – 11.7%) | NS |

*NS, not significant*

Further exploration of readmissions shows these are as expected from NSQIP national data (Table 7). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

**Table 8: NSQIP Reoperations, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 4.9% (2.3 – 7.5%) | 0.92% (0.90 – 0.94%) | P<0.05 |
| Inpatient Cases | 2.6% (95% CI, 0 – 5.6%) | 5.4% (3.2 – 7.7%) | 4.2% (4.1 – 4.2%) | NS |
| Pancreatectomy | 2.9% (95% CI, 0 – 8.6%) | 5.4% (0.8 – 10.0%) | 1.7% (1.5 – 1.8%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 2.8% (2.6 – 3.0%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 15.5% (14.5 – 16.5%) | NS |

*NS, not significant*

Further examination of reoperations shows these are also similar to NSQIP national data (Table 8). The one reoperation I did after pancreatectomy was a 20 minute wound exploration I performed out of concern for dehiscence (fascial suture was found to have loosened but was intact and was reinforced). The reoperation after esophagectomy was secondary to anastomotic leak, and the observed rate is significantly less than expected nationally for our team.

Examination of organ space infections shows this is similar to national NSQIP data (Table 9). Composite inpatient and outpatient data are not controlled for case complexity which is why data are further stratified by procedure. This metric would be determined by placement of a drain, and can be a surrogate metric of Type B/C pancreas fistula, bile leak, and anastomotic leak.

EXHIBIT A_200

**Table 9: NSQIP Organ Space Infections, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 2.3% (95% CI, 0 – 6.8%) | 0.4% (0.2 – 0.6%) | 0.12% (0.12 – 0.13%) | NS |
| Inpatient Cases | 7.0% (95% CI, 2.3 – 11.7%) | 7.0% (4.4 – 9.5%) | 3.0% (3.0 – 3.1%) | NS |
| Pancreatectomy | 8.8% (95% CI, 0 – 18.4%) | 11.8% (5.3 – 18.4%) | 13.4% (13.1 – 13.8%) | NS |
| Hepatectomy | 4.2% (95% CI, 0 – 12.2%) | 6.3% (1.4 – 11.2%) | 5.5% (5.3% – 5.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 8.9% (0.6 – 17.2%) | 12.3% (11.4 – 13.2%) | NS |

NS, not significant

My pancreatectomy and hepatectomy length of stay outcomes are better than expected (Table 10), which may be related to increased use of robotic-assisted approaches in my practice and through implementation of an ERAS protocol for pancreatectomy within the Division. My esophagectomy patients have a LOS of 10 days. I typically prepare esophagectomy patients to be in the hospital 10-14 days because of frailty concerns, care coordination for outpatient tube feeding, diet advance, and speech swallow assessments prior to discharge and the high distance travelled for our patients. Note that the Virginia Mason group of HPB/GI surgical oncologists reported a LOS of 10-12 days for esophagectomy and 8-10 days for pancreatectomy with a similar rural/regional referral catchment area (Low 2010).

**Table 10: Median Hospital Length of Stay (days) with Interquartile Ranges (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 0 (0 – 1) | 0 (0 – 1) | 0 (0 – 1) |
| Inpatient Cases | 6 (3 – 9) | 6 (3 – 9) | 4 (2 – 7) |
| Pancreatectomy | 6 (5 – 8) | 6 (5 – 9) | 7 (5 – 10) |
| Hepatectomy | 1 (0 – 2) | 3 (1 – 5) | 4 (3 – 7) |
| Esophagectomy | 10 (7 – 17) | 9 (7 – 14) | 9 (7 – 14) |

My inpatient cases and division overall do have a longer length of stay than the average US general surgeon as our practice includes complex cases including HIPEC, esophagectomy, gastrectomy, pancreatectomy, hepatectomy, ovarian cancer cytoreductions, multivisceral resections, and resections of retroperitoneal sarcoma, plus specific consultations for palliative surgery and advanced hepatobiliary reconstructions. In addition, we receive a rural referral base for cancer care where travel times often can exceed 3-8 hours.

**Table 11: Utilization of Robotic Technologies**

| | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 23.3% | 5.3% | 8.7% |
| Inpatient Cases | 32.5% | 13.1% | 7.5% |
| Pancreatectomy | 26.5% | 11.8% | 9.5% |
| Hepatectomy | 58.3% | 20.0% | 7.0% |
| Esophagectomy | 41.7% | 11.4% | 16.9% |

Overall, my utilization of robotic technologies (DaVinci Xi) is greater than the national average and encompasses the majority of robotic use in our Division of Surgical Oncology (Table 11). This use of robotic techniques probably impacts my average operative time as it typically takes longer to do the same operations robotically compared to open. In addition, I am doing oncologic robotic operations of high complexity, including those previously only performed at quaternary cancer centers (like robotic D2 lymphadenectomy). Because of this, I am the recipient of directed referrals from providers including Dr. Hannan (Altru Cancer Center), Dr. Potti (Cancer Center of North Dakota), Dr. Kurniali (Sanford Bismarck), and Dr. Gupta (Sanford RMCC) because they know I have a preference for considering minimally-invasive oncologic resections, and because of the strong relationships I have with my patients.

EXHIBIT A_201

My Whipple operative time is significantly longer than average (Table 12), but I have done a fair number of high biliary tract resections for perihilar cholangiocarcinoma including double hepaticojejunostomies and adding choledochoscopy set up into the procedures, all of which leads to increased time plus any time required waiting for frozen sections several times a case. In addition, 43% of my Whipples have coded for a vascular repair or reconstruction. I have also done several revisional Whipples after Roux en Y gastric bypass, two including gastrectomy and one maintaining the remnant stomach.

**Table 12: Operative Time (minutes)**

|  | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|
| Outpatient Cases | 121 (95% CI, 100 – 142) 23% robot | 74.9 (74.8 – 75.0) 9% robot |
| Inpatient Cases | 366 (95% CI, 330 – 401) 33% robot | 150 (149.6 – 150.2) 8% robot |
| Distal Pancreatectomy | 400 (95% CI, 336 – 463) 73% robot | 242 (240 – 244) 17% robot |
| Open Whipple/Total Panc | 561 (95% CI, 508 – 614) 43% vein repair/recon 29% complex (extrahepatic BD resection or Roux recons) | 383 (381 – 385) |
| Hepatectomy | 208 (95% CI, 151 – 264) 58% robot | 230 (228 – 231) 7% robot |
| Esophagectomy | 487 (95% CI, 395 – 579) 42% robot | 384 (380 – 388) 17% robot |

Note that NSQIP data represents a sample and does not include all my cases at Sanford.

**IV – My Intuitive App**
I have completed 106 DaVinci operations at Sanford Broadway Medical Center with an average use of 3.5 hrs per patient. The precise relationships between case type and overall operative time can be difficult to correlate and tabulate since I often do redock the robot in order to complete more than one procedure under the same anesthesia (i.e. cholecystectomy and distal pancreatectomy; liver resection and oophorectomy). I am the only provider in the region who has been doing Robotic HIPECs, which adds an extra 2-2.5 hours of case time (setup time plus a 90 minute chemoperfusion). In addition, I include D2 lymphadenectomies in my complex foregut cases for their established oncologic benefit, which do take more time but are recognized to improve long-term survival.

I have performed several palliative double bypasses (hepaticojejunostomies + gastrojejunostomies) robotically, which while being longer cases than open palliative double bypasses, allows for better visualization, smaller incisions, and a goal of removal of a transhepatic catheter, thus dramatically improving quality of life considering a median LOS of 4 days. My average time for robotic cholecystectomy is 97 minutes, but notably these are radical cholecystectomies for mass or cancer (+liver/nodes) and/or remnant cholecystectomies, which is a complex reoperative operation that bears higher risk.

Of note, I have been doing a large proportion of robotic complex distal pancreatectomies, including pancreas neck lesions (tumor above SMV/portal confluence), as well as performance of splenic-preserving distal pancreatectomies in 67% of these operations. These cases are all notably more challenging than resection of tail lesions that include the spleen, so do take understandably more time to complete safely.

**V – Attribution Bias and Just Culture**
My occurrence rates are not significantly different from expected for the case complexity I am expected to manage during my clinical duties, and I do have shorter than expected hospital LOS for many of these cases. I continue long-term surveillance with my patients with maintain excellent results including great feedback from medical oncologists and patients. I have not had a concern raised to

EXHIBIT A_202

me during my performance evaluations and I have been reminded by both Dr. Traynor and Dr. Garcia that I do have great responses on patient surveys.

To be fair, statements made attributing 'significantly worse outcomes' to me or my Division are false and are not founded by data controlled for coding error, complexity, risk, and the emergent nature of care for patients seen while on call. We as a health system need to consider consultation with an external data scientist and utilize validated clinical databases (like NSQIP) preferentially while being cautious in use and presentation of partitioned Vizient data without clinical correction as we are aware as a team through our prior study and expert opinion *and the literature* that there is poor intrinsic validity with assessing a service line or individual surgeon outcomes. In 2020, the intrinsic validity was less than 40% of cases attributed to the SMCF General Surgery Service Line, which does not instill trust in the system.

Vizient is not and was never designed to be used outside of hospital-to-hospital comparisons and it is an anchoring bias to assume it is the perfect tool. Internal validity is a metric that reveals the ability of an analysis to provide meaningful results that resemble what we would consider truth. Poor internal validity means the tool provides errors in estimation just as often as there is meaningful signal. In a study from Vanderbilt University examining mortality events assigned by Vizient to the otolaryngology service line, only 32% of events were actually attributable to their department (Freeman 2021). In a study from UMass Medical Center, 20% of cases designated in the Vascular Service line did not involve a vascular surgeon and only 69% of vascular surgery cases were included in the Vizient Vascular service line data set (Fang 2020). These authors highlighted, "analytic services provide powerful tools for outcomes analysis, but [Vizient's] predetermined service lines must be used with caution and carefully scrutinized at the division level to ensure that results mirror actual practice patterns".

Moreover, our goal as a system should not be to satisfy external motivations of improving our Vizient ranking at all costs to improve our visibility, but first focus on methods to prioritize delivery of optimal care to patients, correct low hanging fruit, improve our culture of safety, and also consider documenting and coding appropriately to improve our DRGs which will optimize our Vizient ranking. Attacking the performance of individual surgeons or service lines without data review will only provoke defensiveness of surgeons, decrease the credibility of the QI process, impair the culture of QI, and can actually provoke unintended issues of impaired surgeon well-being causing increased errors. It is important to consider "balancing measures" and checks to prevent unintended consequences of trying to improve one aspect of the system at the expense of the other. Remember that the 2014 edit to the Triple Aim, henceforth, the 'Quadruple Aim' includes: improving quality of care, improving patient satisfaction, cost reduction (adding value), and improving healthcare team well-being. Well-being and purpose at work for physicians is recognized to be critically linked with improved outcomes.

I strive for patient-preference concordant care as a goal, which as a cancer provider unfortunately sometimes means aiming for a good death in accordance to patient preferences. We must accept that until there is a "cure for cancer", we will unfortunately observe death to be a proximal outcome in patients with gastrointestinal and peritoneal malignancies, despite and in disregard to our best intentions. Death of mortal humans must then be reconciled without shame or blame, particularly if we are taking care of populations and are performing surgery harboring risk. Palliative surgery is the highest risk group of operations, with a risk of mortality of 20-30%, but it is typically performed congruent to a patients goals of care while negotiating risks and benefits and alternatives and respecting individual patient autonomy.

A "Just Culture" is a preferred way to improve quality across the spectrum and improves patient safety by empowering communication rather than creating fear of punishment and team members hiding their concerns. If we punish those individuals who take care of patients who later succumb to their disease because we are mortality-averse, we are then incentivizing those who game the system and cherry pick or deny care, which is unjust. We must allow clinicians who care for high risk populations to care for their patients, take accountability for their actions, and responsibility for doing better, and we must make it easier for them to make these duties safer.

## VI – Failure to Rescue

Preventable death and adverse events are a central concern in my discipline. Esophagectomy and pancreatectomy are considered high-risk surgeries with understood hospital-volume relationships (Birkmeyer 2003) and surgeon-volume relationships (Birkmeyer 2003), and major complication rates exceeding 40-50% (Low 2010). Of interest, having a high risk of complications does not correlate with having high mortality (Ghaferi 2012). The concept of "Failure to Rescue" (FTR) refers to mortality after a major complication, and explains hospital variation in mortality rates across procedures with high complication rates. Variability in procedure-specific complication rates may not very different across hospitals, but FTR is significantly associated with high-mortality facilities. For pancreatectomy, FTR is inversely linked to system characteristics including teaching status, hospital size >200 beds, census greater than 50% capacity, increased nurse-to-patient ratio, and hospital technology (Ghaferi 2010). Facility characteristics that allow for early identification of problems, whether by nurses or residents, allow for prevention of complications that later spiral towards FTR. These data suggest there are structures and processes of care within hospitals that are recognized to be linked with surgical outcomes. The attached Figure demonstrates how the system influences recognition and addressing complications that lead to FTR (Ghaferi 2012).



**Fig. 2.** Conceptual model outlining the interaction between hospital resources, behaviors, and attitudes in the early recognition and effective management of major postoperative complications.

For my 2022 FTR aspiration event, the patient had delayed gastric emptying, an entity found in 20-30% of Whipple patients. He had his diet advanced automatically upon return from IR despite his distension, then aspirated and was subsequently managed without discussion or input from the surgical team. He needed an NGT and this was not recognized by team members or nursing staff. For my 2023 aspiration event, the patient also did not get an NGT placed in a timely fashion. My colleague had a similar issue where a resident advanced the diet during M+M and when this was corrected after talking to the attending during conference, the patient had already been fed and he was found down dead without a monitor. I had a near miss patient in 2020 who aspirated post esophagectomy, but he was able to be promptly intubated and after recovery is alive with no evidence of disease.

FTR in Surgical Oncology populations was investigated using the Pennsylvania cancer registry with findings of aspiration in 5% of patients and the presence led to a mortality of 16% (Friese 2008). The rescue process has been examined closely and includes the following domains: (1) Teamwork, (2) Immediate Action Taking, (3) Psychological Safety (not being afraid to speak up), (4) Recognition, (5) Communication (Smith 2018). We could have done better with all these domains across these FTR aspiration events. We have had aspiration precautions and HOB elevation mandates for our esophagectomy patients (this is a lifetime risk) but these precautions are seldom followed and it is fairly common to manually reposition patients during rounds so their HOB is elevated.

EXHIBIT A_204

## VI – Surgical Education and Communication

One of the key concerns we had been dealing with is structural in the form of supervision of resident teams and how patients were assessed. Until July 2023, we were dealing with cross coverage concerns where often unknowingly the only person physically rounding on a patient in the morning was a PGY-1, leading to suboptimal care for our patients and an inability to rescue problems through lack of identification. We have addressed this, and the White Service is now structured with a PGY-1, PGY-3, and PGY-5, with appropriate accountability and graded supervision. We have reinforced with the residents that there must provide appropriate communication with attendings on any change in status or decisions that need to be made. Much of this in the form of process and standards is also documented in the White Service Manual.

Our residents still have some challenges in the modern educational paradigm. Many of our senior residents have never needed to place a nasogastric tube in a patient because of nurses who can do so, and I have had to start supervising chiefs to make sure they are comfortable. I have encountered times when more than resident has preferentially tried to order IR NG tubes when nurses are not available, which is not cost-effective and puts our patients at risk of aspirating through time delays. We probably need to develop a simulation to help educate them on how to make sure the NGT is functioning and how to place them. I am always happy to place NG tubes on anyone the moment I am made aware that there is a need.

Recognition of Delayed Gastric Emptying (DGE), an entity found in 20-50% of pancreatectomy and esophagectomy patients, and the necessity for NGT placement is a critical piece of education for nurses and residents that we will need to work on. This includes symptoms like nausea, reflux, hiccups, and belching. It includes signs like distension and holding an emesis bag. The hardest challenge for trainees is that gastric motility is independent of small bowel and colonic motility, and that DGE may be present despite flatus. Many of the residents and ICU nurses often will just feed our patients without assessing for DGE because of the presence of flatus, which is a major pitfall and educational hurdle we still need to overcome.

## VII – ICU Care

The ICU should be considered the safest place in North Dakota, so I was surprised to learn that my partners were afraid of the care delivered in the ICU at Sanford Broadway Medical Center. I was surprised to see how oversedated patients were and how we were often intentionally exacerbating postoperative delirium in our geriatric patients with inappropriate protocolized medication use with drugs like Benadryl given for bizarre indications like agitation. I do see a subtle overconfident cowboy mentality of care delivery in this unit without communication as a continued safety issue. We need to work together with the nurses so that our residents are allowed to participate in the care of these patients and that we as attendings are kept in the loop. This is a work in progress.

## VIII – Time versus Efficiency

I proudly spend as much time as I reasonably can with my patients, in clinic, on the floors, and in the operating room. I give patients and families my time based on what they need to make a decision. My new patient blocks for patients with complex malignancies are intentionally one hour long, because I know that investing in more time to teach the patient/family and answer patient/family questions increases patient satisfaction, improves the provision of goal-concordant care, and improves the efficiency of care delivery given the complexity of what we do. Taking an appropriate amount of time is also essential for provision of optimal informed consent (a topic I have written numerous book chapters on in the scope of Surgical Ethics).

Of secondary interest, the finding of significantly longer time in the operating room has been attributed to female surgeons, and has also been associated with less technical complications, shorter LOS, and better short-term and long-term outcomes (Blohm 2023). In a reflection that conscientiousness in surgery probably does matter, the commentary on this data highlighted the Navy Seal adage, "Slow

EXHIBIT A_205

is Smooth, and Smooth is Fast." (Almquist 2023).

While I understand the valid concern about my taking more operating room time for my cases, I would remind that my cases are complex, and with this in mind, I would favor improving efficiency rather than compromising patient short-term and long-term outcomes. As a member of the CSSP, I cannot advocate skimping on the node dissection for gastrectomies as that has been significantly associated with overall survival and is an important benchmarking performance metric. I also would rather take an appropriate amount of time to perform a modified Blumgart pancreaticojejunostomy that maintains its integrity rather than use a 'quicker technique' that is haphazard and increases propensity to leak. I would rather go slow with the meticulous process of taking tumor off the SMA rather than speed up and transect the vessel or cause a problem inadvertently.

I am still challenged with certain efficiencies that can be improved on, including being sure that I have my OR preference card followed (over half the time I am still given one of my partner's preference cards). I have on numerous occasions updated these cards, but that is not the problem, it is ultimately what gets picked is off another surgeon's card, and am so tired of asking why, so I stopped complaining and just wait for my needs to be fulfilled. As teaching faculty, I can also consider giving less of the case to the resident to improve use of operating room time (although I am not clear this will be linked with outcome based on the current literature which suggests increased time and improved outcomes with resident participation).

We typically have to wait 45 minutes for a an intraoperative frozen section, which can be over 60 minutes if there is a non-GI pathologist at Broadway. This effectively can limit 90-120 minutes of progress prior to anastomosis if we have to take multiple frozen sections during the course of a case. These frozen section checkpoints are a necessity for patients with hilar/extrahepatic cholangiocarcinomas and subtotal and total gastrectomies. Having to set up for a choledochoscopy or upper endoscopy can also increase OR time by 20-40 minutes.

I recently had a giant fly land on a scrub table, which while not under my control, delayed progress of my case for at least an hour since we had to open and count new instruments and suture. I do not fault the fly, nor do I fault myself. nor do I fault the team. I accept that these things happen and that we have to move on and take care of the patient. If the system allowed the fly to get into the OR, then the system as a whole must take some accountability and allow progress to happen and support the surgeon with new instruments to take the best care of the patient they can. This exemplifies 'Just Culture'.

## VIII – Performance Improvement Plan

1. I will monitor my cases using the ACS SSR Program and NSQIP and compare my performance metrics on a quarterly basis.
2. I will continue to track my robotic cases including operative time using the MyIntuitive app.
3. I will continue to present my cases preoperatively at GI tumor board and/or at the Broadway Case Conference. Note that I introduced this conference as a biweekly discussion of case planning with image review in order to improve resident education.
4. I will continue to collaborate with my partners and schedule them to be available as backup for complex resections such as major hepatectomies.
5. Our division has agreed to require aspiration precautions including HOB elevation for all our complex GI surgical patients (HPB, foregut, HIPEC) rather than just after esophagectomy as all of these patients have issues with delayed gastric emptying (DGE), aspiration risk and FTR.
6. I will work with our division to update our White Service Manual and protocols at least twice yearly.
7. Our division will continue to work on improving resident and nursing education on delayed gastric emptying and nasogastric tube placement.
8. I will meet with ICU nursing staff to continue to improve communication with staff and our team.
9. I will work with Dr. Zriek to provide recommendations for an aspiration prevention protocol.
10. I will work on improving efficiency of my operative cases by journaling and discussing issues with staff to address delays related to cards so that these can eventually be remedied.

EXHIBIT A_206

Sincerely,

Sabha Ganai, MD, PhD, MPH, FACS, FSSO
Associate Professor of Surgery, University of North Dakota
Clinical Investigator, Sanford Research
GI/HPB Surgical Oncologist, Sanford Health
Executive Council, American Colllege of Surgeons Cancer Surgery Standards Program

References:

Almquist M. Are women better surgeons than men? JAMA Surg 2023; E1

Birkmeyer JD, Siewers AE, Finlayson EV, Stukel TA, Lucas FL, Batista I, Welch HG, Wennberg DE. Hospital volume and surgical mortality in the United States. *N Engl J Med* 2002; 346(15): 1128 – 1137.

Birkmeyer JD, Stukel TA, Siewers AE, Goodney PP, Wennberg DE, Lucas FL. Surgeon volume and operative mortality in the United States. *N Engl J Med* 2003; 349: 2117-2127.

Blohm M, Sandblom G, Eriochsson L, Osterberg J. Differences in cholecystectomy outcomes and operating time between male and female surgeons in Sweden. JAMA Surg 2023; E1-E10.

Fang ZB, Chao C, Durocher D, et al. Assessment of the Accuracy and Reliability of Vascular Surgery Quality Metrics. Ann Vasc Surg 2020; 67: 134-142.

Freeman MH, Slayton JM, Woods MC. et al. Improving Mortality Attribution in Otolaryngology – Head and Neck Surgery. Laryngoscope 2021; 131(6): e1805-e1810.

Friese CR, Aiken LH. Failure to Rescue in the Surgical Oncology Population: Implications for Nursing and Quality Improvement. *Oncol Nurs Forum* 2008; 35(5): 779

Ghaferi AA, Dimick JB. Variation in Mortality after High-Risk Cancer Surgery: Failure to Rescue. *Surg Oncol Clin N Am* 2012; 389-395.

Ghaferi AA, Osborne NH, Birkmeyer JD, Dimick JB. Hospital characteristics associated with failure to rescue complications after pancreatectomy. J Am Coll Surg 2010; 211: 325-330.

Low DE, MadhanKumar K, Hashimoto Y, Traverso LW. Comparing complications of esophagectomy and pancreatectomy and potential impact on hospital systems utilizing the Accordian Severity Grading System. *J Gastrointest Surg* 2010; 14: 1646-1652.

Smith ME, Wells EE, Friese CR, Krein SL, Ghaferi AA. Interpersonal and organizational dynamics are key drivers of Failure to Rescue. *Health Aff* 2018; 37(11): 1870-1876.

EXHIBIT A_207

**From:** Workday Peakon Employee Voice <app@peakon.com>
**Sent:** Monday, December 11, 2023 8:52 AM
**To:** Ganai,Sabha <Sabha.Ganai@SanfordHealth.org>
**Subject:** Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

**Your identity is protected**

Company logo

Powered by



**If you were offered the same job at another organization, how likely is it that you would stay at this organization?**

You wrote:

My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well being. I am ashamed of the administration.

You scored:

**0**

Download the Workday Peakon Employee Voice mobile app to reply to conversations on the go.



To learn more about how to use Workday Peakon Employee Voice, visit the Help Center

If you no longer wish to receive these emails, click here

-----------------------------------------------------------------------

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain privileged and confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

EXHIBIT A_209

# Douglas replied to a comment you left

Only people who can reply to your comments will see your
conversation, and your identity is not displayed.

Douglas Griffin MD

**DG**      I am sorry to hear of your feelings on this and would welcome a chance to visit
on this. this is confidential so I don't know who is responding. You can contact
me directly via email or phone 701-417-2317. Thanks Doug Griffin

**View message and reply**

Link not working? Copy and paste the URL below into your browser

https://app.peakon.com/?mailLinkId=ehVAq4EVDYANGzxRPIYAWi4eOAxHAWdf

Your answer in the survey

**Sent:** Tuesday, December 26, 2023 4:31 PM
**To:** Griffin,Douglas <Douglas.Griffin@SanfordHealth.org>
**Subject:** RE: Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

Dear Dr. Griffin,

I hope you had a good Christmas.

No need to respond if you are away through the New Year.

This PeakOn comment was mine and I feel it is not fair or constructive to leave it anonymous.

I do have concerns about how our CGSO surgical oncologists are treated and I am really worried that we will soon lose a lot of what has been built to develop our infrastructure and team.

For some context, in August, I was placed on a PIP, which I signed in good faith prior to being emailed "the data" to respond to a few weeks later, calculated with partitioned unvalidated Vizient administrative data on mortality rates, fully understanding that mortality will be proportional to the type and amount of call taken by individuals within our division since we consult on the most complex patients within the system and often admit dying patients and/or need to consider palliative operations. As a team, surgical oncology manages everything directed to us from the two time zones of North Dakota plus Northern MN/SD, plus helps with everything too complex for acute care surgery or colorectal surgery or bariatric surgery or general surgery providers to handle. After responding in the PIP document with a proper analysis explaining those results with chart review and showing additional data demonstrating better outcomes and shorter LOS than national NSQIP data for cases like hepatectomy and pancreatectomy, the intent and conversation has spiraled and diverged a bit more and more at every meeting, from outcomes, to time, to efficiency, to my lack of knowledge where stapler loads are theoretically stored in Fargo while operating on a weekend. In terms of process, I still have not received a formal response or any direction from the Sanford "Care Monitoring Committee". The documents in question were submitted over 3 months ago and are attached.

At our recent meeting earlier in the week, our discussion included our Division call schedule for 2024, which does not include Dr. Sticca since he expects to be retiring *soon*. This call schedule can be referenced here:
https://docs.google.com/document/d/1sgfirDxNFa3y2o0_cx3Al45XvnM0VzBmYZvgHDGbtj0/edit?usp=sharing

Note that only QTR 1 is final, but we chose to prepare a timeline a year in advance for planning purposes.

EXHIBIT
F

There are 3-4 days out of the entire year where I mentioned that the transplant team would help us cover (this was per speaking with Dr. Mistry). This need for support was not brought up because of personal time or vacation requests, these are days the first weekend in April where I was *invited* as a speaker at the AHPBA international meeting in Miami to discuss what Sanford Surgical Oncology has been doing optimizing prehabilitation for geriatric patients needing HPB surgery, and Dr. Tuvin also needs to speak at the ND/SD ACS chapter meeting in Aberdeen SD as he is the *President* of the ND chapter and the State Chair. Both me and Dr. Tuvin are otherwise perfectly capable of managing the remaining 362-3 days of the leap year call schedule. What was remarkable about this concern for a defect in our call schedule is we were simultaneously criticized for taking too much call, but when I clarified and requested a couple days of help from the Chair of General Surgery (I would not normally ask, but this became the point of discussion), I was told harshly we could not go to these conferences, and that we had to cover CGSO at all times, which is what we were already doing making lateral arrangements for coverage of the mentioned 3 days via Transplant Surgery. It is not worth arguing about, all these attitudes are just frustrating on basis of being the antithesis of wellness and support. There is no psychological safety because I know only in a toxic culture like this I should be avoidant of even bringing these kinds of things up, knowing it will be lambasted.

I get the idea of control, but it is clear that general surgery as a 'parent' Department does not *appreciate or care* about the contributions of myself or Dr. Tuvin within the Division of Surgical Oncology, even for an idea of support or respite (even while the group was morbidly hypothesizing out loud what would happen if the two of us were both hospitalized simultaneously). We are ABS *double* board-certified (gen surg and CGSO), and we are more than happy to help general surgery and accept all the complex cases that general surgery does not want to do or lacks training or expertise to do well. *These are patients who are in need of great support and assistance who we want to serve.*

Note that Bariatrics also has a separate call schedule and is positioned as their own Department separate from general surgery, but we are not privileged the same way here despite having a separate Board examination process. We do have a very impactful role through RMCC and remain critically aligned with the needs of medical oncology and radiation oncology and improvement of oncology care within our region.

I responded to the PeakOn survey very honestly with that comment. I remain ashamed of the attitudes and statements and practices I have seen over the past few months, and I will do my best to manage through this aiming for taking the best care of our patients as possible. I see a lot of potential for growth in our Division and for oncology as a whole, but to grow, we need to be nurtured a bit instead of trampled on.

Sabha

**Sabha Ganai, MD, PhD, MPH, FACS, FSSO**

Division of Surgical Oncology
Associate Professor of Surgery, UND

Director of Surgical Education, UND

Adjunct Professor of Pharmacology, NDSU

Clinical Investigator, Sanford Research

501 Broadway N, Fargo, ND 58122

O: 413-222-4131  ext 1151

EXHIBIT A_214

**SANFORD**™
**HEALTH**

January 23, 2024

Sabha Ganai M.D.

Re:     Employment Agreement (the "Agreement") // Termination

Dr. Ganai:

This letter shall confirm that Sanford has elected to terminate your Employment Agreement (the "Agreement") pursuant to Section 12(a).  Your termination will be effective immediately.  In lieu of 90 days' notice, Sanford will pay to you a lump sum ninety-day payment of $139,435.00.  You will also be receiving information regarding continuation of any elected health and dental benefits.

You will also be receiving information regarding continuation of any elected health and dental benefits.

Sincerely,

Dr. Doug Griffin
Vice President, Clinic



EXHIBIT A_215

STATE OF NORTH DAKOTA                                    IN DISTRICT COURT

COUNTY OF CASS                              EAST CENTRAL JUDICIAL DISTRICT

---

Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO,     )
                                               )
                                               )      **ORDER GRANTING MOTION**
                       Plaintiffs,             )      **FOR LEAVE TO FILE**
                                               )      **AMENDED COMPLAINT**
          vs.                                  )
                                               )
Sanford Medical Center Fargo,                  )         Civil No: 09-2024-CV-03147
                                               )
                                               )
                       Defendants.             )

---

[1]      Upon receiving and considering the Plaintiff's Motion for Leave to File Amended

Complaint, and there being no objection to the Motion from Defendant, and there appearing

good and sufficient cause for the same,

       **IT IS ORDERED** that the Motion for Leave to File Amended Complaint

is **GRANTED.**

                              BY THE COURT:


                              _____

                              Stephanie Stiel
                              Judge of the District Court


52017367

STATE OF NORTH DAKOTA                                    IN DISTRICT COURT

COUNTY OF CASS                          EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>Sanford Medical Center Fargo )<br><br>Defendant. ) | **ORDER GRANTING REQUEST TO AMEND DOCKET**<br><br>Civil No.: 09-2024-CV-03147 |

[¶1] Upon receiving the Request to Amend the docket, eliminating docket entries 22 through 34, I hereby allow it.

　　　**IT IS SO ORDERED.**

　　　　　　　　　　　　　　BY THE COURT:


　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Stephanie Stiel
　　　　　　　　　　　　　　Judge of the District Court

STATE OF NORTH DAKOTA                                    IN DISTRICT COURT

COUNTY OF CASS                                EAST CENTRAL JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, | ) | |
| | ) | |
| Plaintiffs, | ) | **REQUEST TO AMEND DOCKET** |
| vs. | ) | |
| | ) | Civil No.: 09-2024-CV-03147 |
| Sanford Medical Center Fargo | ) | |
| | ) | |
| Defendant. | ) | |

---

[¶1]    I, Leo Wilking, request that the docket in this case matter be amended.

[¶2]    Docket entries indexed as 22 through 34, entered on September 10, 2024, are as such:

> 22. Notice of Motion for Leave to File as Amended Complaint;
>
> 23. Plaintiff's Motion for Leave to File as Amended Complaint;
>
> 24. Exhibit 1 to Motion- Complaint;
>
> 25. Exhibit A to Exhibit 1- Dr. Ganai Offer Letter;
>
> 26. Exhibit B to Exhibit 1- Staff Physician Agreement;
>
> 27. Exhibit C to Exhibit 1- Confidential Peer Review Document/PIP;
>
> 28. Exhibit D to Exhibit 1- PIP Response, dated September 15, 2023;
>
> 29. Exhibit E to Exhibit 1- PeakOn Response;
>
> 30. Exhibit F to Exhibit 1- Email Correspondence with Dr. Griffin, dated December 26, 2023;
>
> 31. Exhibit G to Exhibit 1- Termination Letter, dated January 23, 2024;
>
> 32. Exhibit 2 to Motion- First Amended Complaint;
>
> 33. Proposed Order Granting Motion for Leave to File Amended Complaint; and,
>
> 34. Declaration of Service on Kettelkamp, Prinz and Chmielewski.

[¶3]    I request the docket eliminates entries 22 through 34.

[¶4]    Once the elimination is completed, I will file the correctly labeled and numbered exhibits.

[¶5]    I, Leo Wilking, request that the docket in this case be amended as follows:

        22. Notice of Motion for Leave to File as Amended Complaint;

        23. Plaintiff's Motion for Leave to File as Amended Complaint;

        24. Exhibit 1 to Motion- Complaint;

        25. Exhibit A to Exhibit 1- Dr. Ganai Offer Letter;

        27. Exhibit B to Exhibit 1- Confidential Peer Review Document/PIP;

        28. Exhibit C to Exhibit 1- PIP Response, dated September 15, 2023;

        29. Exhibit D to Exhibit 1- PeakOn Response;

        30. Exhibit E to Exhibit 1- Email Correspondence with Dr. Griffin, dated December 26, 2023;

        31. Exhibit F to Exhibit 1- Termination Letter, dated January 23, 2024;

        32. Exhibit 2 to Motion- First Amended Complaint;

        33. Exhibit A to Exhibit 2- Dr. Ganai Offer Letter;

        34. Exhibit B to Exhibit 2- Staff Physician Agreement;

        35. Exhibit C to Exhibit 2- Confidential Peer Review Document/PIP;

        36. Exhibit D to Exhibit 2- PIP Response, dated September 15, 2023;

        37. Exhibit E to Exhibit 2- PeakOn Response;

        38. Exhibit F to Exhibit 2- Email Correspondence with Dr. Griffin, dated December 26, 2023;

        39. Exhibit G to Exhibit 2- Termination Letter, dated January 23, 2024;

        40. Proposed Order Granting Motion for Leave to File Amended Complaint; and,

        41. Declaration of Service on Kettelkamp, Prinz and Chmielewski.

Dated this 11th day of September 2024.

        */s/ Leo F.J. Wilking*_____
        Leo F.J. Wilking #03629
        WILKING LAW FIRM
        3003 32nd Avenue South, Suite 240
        Fargo, North Dakota 58108
        Telephone: (701) 356-6823
        Email: *lwilking@wilkinglaw.com*
        ATTORNEY FOR PLAINTIFF SABHA GANAI

STATE OF NORTH DAKOTA      IN DISTRICT COURT

COUNTY OF CASS      EAST CENTRAL JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, | ) | |
| | ) | |
| Plaintiffs, | ) | **CERTIFICATE OF SERVICE** |
| vs. | ) | |
| | ) | Civil No.: 09-2024-CV-03147 |
| Sanford Medical Center Fargo | ) | |
| | ) | |
| Defendant. | ) | |

---

[¶1] I, Jaiden Cutler, hereby certify that on October 10, 2024, the following documents were served by sending a true and correct copies thereof pursuant to N.D.R.Ct. 3.5 by electronic means to the email addresses listed below:

| Name | (E-mail) |
|---|---|
| Brett D. Kettelkamp (ND#09600) | brent.kettelkamp@ogletree.com |
| Kristen E. Prinz | kprinz@prinz-lawfirm.com |
| Rebecca E. Chmielewski | rchmielewski@prinz-lawfirm.com |

[¶2]  To the best of affiant's knowledge, information and belief, such addresses as given above were the actual addresses of the parties intended to be so served.

- Plaintiff's Amended Motion for Leave to File as Amended Complaint;

[¶3]  Pursuant to N.D.R.Civ.P 11(1)(2), I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated this October 10, 2024.

*/s/ Jaiden Cutler*
Jaiden Cutler

STATE OF NORTH DAKOTA                    IN DISTRICT COURT

COUNTY OF CASS                    EAST CENTRAL JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, | ) | |
| | ) | |
| Plaintiffs, | ) | **CERTIFICATE OF SERVICE** |
| vs. | ) | |
| | ) | Civil No.: 09-2024-CV-03147 |
| Sanford Medical Center Fargo | ) | |
| | ) | |
| Defendant. | ) | |

---

[¶1] I, Jaiden Cutler, hereby certify that on October 10, 2024, the following documents were served by sending a true and correct copies thereof pursuant to N.D.R.Ct. 3.5 by electronic means to the email addresses listed below:

| Name | (E-mail) |
|---|---|
| Brett D. Kettelkamp (ND#09600) | brent.kettelkamp@ogletree.com |
| Kristen E. Prinz | kprinz@prinz-lawfirm.com |
| Rebecca E. Chmielewski | rchmielewski@prinz-lawfirm.com |

[¶2]    To the best of affiant's knowledge, information and belief, such addresses as given above were the actual addresses of the parties intended to be so served.

- Plaintiff's Second Amended Motion for Leave to File as Amended Complaint;

[¶3]    Pursuant to N.D.R.Civ.P 11(1)(2), I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated this October 10, 2024.

*/s/ Jaiden Cutler*
Jaiden Cutler

STATE OF NORTH DAKOTA

COUNTY OF CASS

SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO

Plaintiff,

-vs-

SANFORD MEDICAL CENTER FARGO

Defendant.

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

Civil No. 09-2024-cv03147

Jury Trial Demanded

## PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

1.     Plaintiff Sabha Ganai seeks leave to Amend her Complaint under North Dakota Rule of Civil Procedure 15(a) in order to (1) add Defendant Sanford Clinic North, a nonprofit corporation, and (ii) accordingly amend the pleadings in the Complaint. A copy of the Complaint is attached as Exhibit 1 and a clean copy of Plaintiff's proposed First Amended Complaint is attached as Exhibit 2.

2.     Dr. Ganai seeks leave to amend her Complaint filed on July 18, 2024 against Defendant Sanford Medical Center Fargo. During all relevant times in the Complaint, Sanford Clinic North was Dr. Ganai's primary employer and is an entity affiliated with Defendant Sanford Medical Center Fargo. Defendant Sanford Medical Center Fargo as the named Defendant was a mistake of fact and confusion of the legal name of Dr. Ganai's primary employer, Sanford Clinic North. Under North Dakota Rule of Civil Procedure 15(a), "A party's pleading may be amended once as a matter of course at any time before a responsive pleading is served or, if the pleading is

one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. *Otherwise a party's pleading may be amended only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.*" (emphasis added).

3.    In addition, Dr. Ganai is seeking to attach her employment agreement ("Staff Physician Agreement") with Sanford Clinic North as an additional exhibit to the First Amended Complaint. Under the Staff Physician Agreement, Sanford Clinic North has the right to assign the Staff Physician Agreement to "its parents, subsidiaries, or corporate affiliates," which includes Defendant Sanford Medical Center Fargo. *See* First Amended Complaint, Ex. B.

4.    Defendant Sanford Medical Center Fargo will not suffer prejudice if leave is granted because it knew or should have known that Sanford Clinic North was Dr. Ganai's primary employer.

5.    Plaintiff's counsel conferred with Defendant's counsel between August 28, 2024, and September 6, 2024 regarding this Motion prior to filing it, and Defendant's counsel indicated Defendant would not object to this Motion.

6.    This is Plaintiff's first request to amend the complaint. Plaintiff submit this Motion to Amend their complaint promptly, in good faith, and without dilatory motive.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion to amend the pleadings and enter the proposed Order attached hereto.


Dated: September 9, 2024


Respectfully submitted,

By:    /s/      Kristen Prinz          
One of Plaintiff's Attorneys

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822

EXHIBIT A_224

STATE OF NORTH DAKOTA                                    IN DISTRICT COURT

COUNTY OF CASS                          EAST CENTRAL JUDICIAL DISTRICT

Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO,  )
                                            )
                Plaintiffs,                 )    **ORDER GRANTING MOTION**
                                            )    **FOR LEAVE TO FILE**
        vs.                                 )    **AMENDED COMPLAINT**
                                            )
Sanford Medical Center Fargo,               )    Civil No: 09-2024-CV-03147
                                            )
                Defendants.                 )

[1]    Upon receiving and considering the Plaintiff's Motion for Leave to File Amended

Complaint, and there being no objection to the Motion from Defendant, and there appearing

good and sufficient cause for the same,

        **IT IS ORDERED** that the Motion for Leave to File Amended Complaint

is **GRANTED.**

                                        BY THE COURT:

                                        10/11/2024 8:52:48 AM

                                        _Stephanie A. Stiel_

                                        _____
                                        Stephanie Stiel
                                        Judge of the District Court

52017367

EXHIBIT A_225

STATE OF NORTH DAKOTA

COUNTY OF CASS

DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Sabha Ganai, M.D., Ph.D., FACS,<br><br>                    Plaintiff,<br><br>        v.<br><br>Sanford Medical Center Fargo,<br><br>                    Defendant. | Court File No. 09-2024-cv-03147<br><br>**DECLARATION OF<br>ELECTRONIC SERVICE** |

[¶1]    Stephanie A. Bechtel hereby certifies that she is of legal age, not a party to the above-entitled matter, and that on November 12, 2024, a copy of the following document:

<div align="center">Notice of Appearance</div>

was electronically served via Odyssey directed to the last known email address of the below persons:

> Leo F.J. Wilking, Esq. – Attorney for Plaintiff
> **lwilking@wilkinglaw.com**
>
> Kristen E. Prinz, Esq. – Attorney for Plaintiff
> **kprinz@prinz-lawfirm.com**
>
> Rebecca E. Chmielewski, Esq. – Attorney for Plaintiff
> **rchmielewski@prinz-lawfirm.com**

[¶2]    To the best of declarant's knowledge, information, and belief, such address as given above is the actual address of the party intended to be served.

[¶1]    I declare, under penalty of perjury of the law of North Dakota, that the foregoing is true and correct.

Signed on this 12th day of November, 2024, in Minneapolis, MN, United States.


*/s/ Stephanie A. Bechtel*
Stephanie A. Bechtel

STATE OF NORTH DAKOTA                    DISTRICT COURT

COUNTY OF CASS                    EAST CENTRAL JUDICIAL DISTRICT

|  |  |
|---|---|
| Sabha Ganai, M.D., Ph.D., FACS,<br><br>    Plaintiff,<br><br>  v.<br><br>Sanford Medical Center Fargo,<br><br>    Defendant. | Court File No. 09-2024-cv-03147<br><br>**NOTICE OF APPEARANCE** |

[¶1] Please take notice that Brent D. Kettelkamp and Tyler W. Hartney of the law firm of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., will appear as counsel of record for Defendant Sanford Medical Center Fargo in the above-entitled matter.  All correspondence and pleadings directed to Defendant should be sent to the undersigned at the address below.

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P. C.**

Dated:  November 12, 2024

/s/ Brent D. Kettelkamp
Brent D. Kettelkamp, ND #09600
Tyler W. Hartney, ND #09226
Capella Tower
225 South Sixth Street, Suite 1800
Minneapolis, MN  55402
Telephone:  612-339-1818
Facsimile:  612-339-0061
brent.kettelkamp@ogletree.com
tyler.hartney@ogletree.com

**Attorneys for Defendant**

EXHIBIT A_227

STATE OF NORTH DAKOTA                                    IN DISTRICT COURT

COUNTY OF CASS                              EAST CENTRAL JUDICIAL DISTRICT

_____

| | |
|---|---|
| Sabha Ganal, M.D., Ph.D., MPH, FACS, FSSO, | ) |
| | ) |
| Plaintiffs, | ) **CERTIFICATE OF SERVICE** |
| vs. | ) |
| | ) Civil No.: 09-2024-CV-03147 |
| Sanford Medical Center Fargo | ) |
| | ) |
| Defendant. | ) |

_____

[¶1] I, Jaiden Cutler, hereby certify that on November 14, 2024, the following documents were served by sending a true and correct copies thereof pursuant to N.D.R.Ct. 3.5 by electronic means to the email addresses listed below:

| Name | (E-mail) |
|---|---|
| Brett D. Kettelkamp (ND#09600) | brent.kettelkamp@ogletree.com |
| Tyler W. Hartney (ND#09226) | tyler.hartney@ogletreedeakins.com |
| Kristen E. Prinz (IL#635342) | kprinz@prinz-lawfirm.com |
| Rebecca E. Chmielewski (IL#6291900) | rchmielewski@prinz-lawfirm.com |

[¶2]    To the best of affiant's knowledge, information and belief, such addresses as given above were the actual addresses of the parties intended to be so served.

- First Amended Complaint and Jury Trial Demanded (with Exhibits A-G);

[¶3]    Pursuant to N.D.R.Civ.P 11(1)(2), I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated November 14, 2024.

*/s/ Jaiden Cutler*
Jaiden Cutler

EXHIBIT A_228

STATE OF NORTH DAKOTA

COUNTY OF CASS

IN THE DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO | Civil No. 09-2024-cv03147 |
| Plaintiff, | **FIRST AMENDED COMPLAINT AND JURY TRIAL DEMANDED** |
| -vs- | |
| SANFORD MEDICAL CENTER FARGO, and SANFORD CLINIC NORTH | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

1.      Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, brings this action against Defendants Sanford Medical Center Fargo ("SMCF") and Sanford Clinic North ("SCN") (collectively "Sanford") for retaliating against her when she engaged in protected activity by raising patient safety concerns.

## NATURE OF THE ACTION

2.      Plaintiff, Dr. Ganai, is a highly accomplished and reputable double-board certified surgical oncologist who has been practicing surgical oncology for more than twelve years. She joined Sanford Clinic North in 2020 to perform complex general surgery surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery. During her tenure, she also served as Associate Professor of Surgery and Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.

3.      Dr. Ganai brings this action against Defendants for violation of the prohibitions against retaliation contained in North Dakota's whistleblower statute, N.D. Cent. Code,§ 34-01-20.

## THE PARTIES

4.      Plaintiff, Sabha Ganai, was a resident of Fargo, North Dakota at all times relevant to this First Amended Complaint.

5.      Defendant SMCF is a not-for-profit North Dakota corporation. Sanford Medical Center Fargo maintains its principal place of business at 801 Broadway North, Fargo, North Dakota, 58122.

6.      Defendant SCN was a not-for-profit North Dakota corporation that was merged into Defendant SMCF as of July 31, 2024.

7.      At all times material hereto, Defendant SCN was Plaintiff's primary employer and was affiliated with or a part of Defendant SMCF.

## JURISDICTION AND VENUE

8.      At all times material hereto, Defendants employed Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division").

9.      The relationship of the Parties is governed by the Staff Physician Agreement (attached hereto as Ex. B), which specifically provides that disputes would be resolved in the North Dakota State District Court in and for Cass County.

## FACTS RELEVANT TO ALL CLAIMS

10.      Defendants hired Dr. Ganai as a surgical oncologist in the Division of Surgical Oncology ("Division") in February 2020. On or around October 8, 2019, Dr. Ganai was given an offer letter signed by Sanford Health. (*See* Ex. A, Dr. Ganai Offer Letter). Dr. Ganai was also presented with the Staff Physician Agreement (*See* Ex. B, Staff Physician Agreement).

2

11.     Under the Staff Physician Agreement, Defendant SCN had the right to assign the Staff Physician Agreement to "its parents, subsidiaries, or corporate affiliates," which includes Defendant SMCF. *Id.*

12.     Dr. Ganai and her team in the Division routinely handled highly complex cases involving complex general surgery, surgical oncology, endocrine surgery, hepatobiliary surgery, and palliative surgery.

13.     These cases often came to the Division from other departments and other facilities that were unable to properly handle them and often with patients who were dying.

**Sanford Places Dr. Ganai on a PIP Using an Unreliable Data Report**

14.     In late August 2023, Sanford began criticizing the Division about patient outcomes and making statements attributing "significantly worse outcomes" to Dr. Ganai and the Division.

15.     At the same time, the Division was facing mounting pressure and a lack of support from the General Surgery Department in planning for Bob Sticca, M.D.'s reduction in call coverage. Dr. Sticca was a leading surgeon in the Division and his last day on call was January 1, 2024.

16.     On August 22, 2023, Dr. Ganai met with Steven Briggs, M.D. (Chief Medical Officer, Sanford Medical Center Fargo), Michael Traynor, M.D. (Chair, Department of Surgery, Sanford Medical Center Fargo), and Darla Dobberstein (Executive Director of Fargo Region's Surgical Services, Sanford Health). Without presenting any data, these SNC administrators told Dr. Ganai that a Vizient report indicated that Dr. Ganai had a higher than desired observed to expected ratio ("O/E") for mortality rates of 1.4.

17.     If a hospital's observed rate for an indicator is higher than its expected rate (an O/E ratio greater than 1), then the hospital performed worse than the reference population. If documentation for the patient population is not complete, then any risk adjustment applied to this

3

ratio will not be accurate and will only be done at a population level, which does not account for the Division's increased case complexity.

18.    Vizient is a health care performance improvement company that provides patient outcome data derived from administrative billing (coding) without clinical verification.

19.    Vizient was designed for benchmarking hospital quality, not surgeon quality. Surgical leaders, including Dr. Clifford Ko, M.D., MS, MSHS, FACS (Director, Division of Research and Optimal Patient Care, American College of Surgeons ("ACS")), have advised against using Vizient for benchmarking surgeon performance. In contrast, the ACS National Surgical Quality Improvement Program ("NSQIP") database collects patient-specific and surgeon-specific data that accounts for surgical case complexity and allows for causal inference.

20.    Vizient had recently released a hospital ranking system based solely on patient outcome data. Sanford, desiring to improve its scores in the ranking system, had recently began to use Vizient data to look at individual surgeon outcomes. Data from literature review suggests poor intrinsic validity for this indication outside of hospital-to-hospital benchmarking. In 2020, Dr. Ganai led a quality improvement project for the Department of Surgery with chart review of all mortalities for that year that confirmed poor intrinsic validity for its use. Dr. Ganai found that only thirty (30) percent of the cases were accurate. For example, many patient deaths were not included at all. Additionally, some of the patient deaths were identified as a surgery death when they were actually due to other causes, such as COVID-19. Many patients were not operated on, yet their deaths were attributed to the surgeon who consulted on them. In 2021, Dr. Traynor repeated this analysis for that year and confirmed the same issue.

21.    During the August 22, 2023 meeting, Dr. Ganai explained that Vizient generates and compares O/E mortality rates for general surgeons, and unlike the rest of general

4

surgery, the Division's practice includes highly complex cases not solely comprised of general surgery.

22.     Also during the August 22, 2023 meeting, the administrators presented Dr. Ganai with a peer review letter ("Peer Review Letter") attached to a Performance Improvement Plan ("PIP") and asked Dr. Ganai to agree to the PIP. (*See* Ex. C, Confidential Peer Review Document/PIP). The Peer Review Letter promised Dr. Ganai that the Care Monitoring Committee would oversee the PIP and assist Dr. Ganai in "successfully addressing the opportunities that have been identified." *Id.*

23.     In response, Dr. Ganai stated that she agreed to the PIP contingent on receiving the Vizient report data.

24.     Dr. Ganai also requested a peer review meeting and was told there would be a meeting scheduled with a committee.

**Dr. Ganai Demonstrates Issues with the Validity of The Vizient Report Data**

25.     On August 30, 2023, after Dr. Briggs emailed Dr. Ganai the Vizient report data ("the Vizient Report"), and Dr. Ganai analyzed its data.

26.     On September 15, 2023, Dr. Ganai provided Sanford a comprehensive analysis in response to the Confidential Peer Review Document/PIP and the Vizient Report Sanford had relied on when it chose to place her on the PIP. (*See* Ex. D, PIP response dated September 15, 2023).

27.     Dr. Ganai explained that Vizient's data reliability was limited in providing accurate benchmark performance and that such data is not controlled for coding error complexity, among other things.

28.     The Report failed to track patient outcomes appropriately.

29.     The Report demonstrated that Dr. Ganai's O/E ratio did not significantly differ from the expected O/E ratio given the complexity of the cases she managed.

5

30.    Dr. Ganai's colleague, Dr. Daniel Tuvin, M.D.'s, O/E ratio was 7, significantly higher than Dr. Ganai's. Dr. Tuvin also had a higher mortality rate. Dr. Sticca, Dr. Ganai's other colleague, had the highest readmission and reoperation rates.

31.    Dr. Ganai also explained how the Division needs to be compared for case complexity. Dr. Ganai presented ACS NSQIP data for the Division, specific for case type, that showed that the Division actually had excellent outcomes compared to National data, herself and Dr. Tuvin included. She explained that NSQIP data has significantly better validity than Vizient because it is clinically verified. Sanford paid for a Research Nurse who was in charge of maintaining NSQIP data, which was presented to the Department of Surgery on a quarterly basis for quality improvement purposes.

32.    After Dr. Ganai provided Sanford her response and analysis, Sanford never scheduled a peer review meeting with her.

**Dr. Ganai Raises Patient Safety Concerns to Sanford**

33.    On or around December 11, 2023, Dr. Ganai responded to an employee survey question on PeakOn, Sanford's anonymous survey platform. (*See* Ex. E, PeakOn response dated December 11, 2023).

34.    In response to the question: "If you were offered the same job at another organization, how likely it is that you would stay at this organization?" Dr. Ganai answered: "My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well-being. I am ashamed of the administration." *Id.*

35.    Dr. Ganai's concerns stemmed from Sanford's improper reliance on the Vizient Report that did not properly or accurately account for patient outcomes and Sanford's refusal to provide peer review avenues to address patient safety and comply with the Health Care Quality Improvement Act. *See* §42 U.S.C. 1110. By refusing to provide Dr. Ganai peer review avenues,

6

Sanford is stripping Dr. Ganai and other physicians of the immunity provided by the peer review process under the Act.

36.     On December 26, 2023, Dr. Ganai emailed Dr. Douglas Griffin (Vice President of Fargo Region Clinic, Sanford Health) about her PeakOn comment. *(See* Ex. F, email correspondence dated December 26, 2023).

37.     Dr. Ganai explained to Dr. Griffin that she posted her comment because she was concerned about Sanford's treatment of surgical oncologists within the Division and the General Surgery Department's increasing lack of support.

38.     She also told Dr. Griffin that Sanford had still not formally responded to her analysis and response to the August 2023 PIP, which she had submitted over three (3) months ago.

39.     Dr. Ganai affirmed her commitment to patient care as her highest priority.

40.     In response, Dr. Griffin told Dr. Ganai that he would look into the situation.

**Sanford Retaliates and Terminates Dr. Ganai a Month After She Reports Patient Safety Concerns**

41.     Instead of addressing her patient safety and compliance concerns, Sanford retaliated against Dr. Ganai by terminating her employment on January 23, 2024. *(See* Ex. G, January 23, 2024 letter).

<div align="center">

**COUNT I**
**RETALIATION IN VIOLATION OF N.D.C.C. § 34-01-20**
**Plaintiff Against All Defendants**

</div>

42.     Dr. Ganai adopts and realleges paragraphs 1 through 41 above as if fully stated herein.

43.     N.D.C.C. § 34-01-20 prohibits employers from discharging or threatening to discharge an employee because the employee in good faith reports a violation or suspected violation of federal, state or local law, ordinance, regulation, or rule to an employer. N.D.C.C. §

<div align="center">7</div>

34-01-20 (l)(a).

44.    At all relevant times, Dr. Ganai performed her work with diligence and was meeting her employer's legitimate expectations.

45.    Dr. Ganai was engaging in a protected activity in reporting her concerns for patient safety on December 11, 2023, and December 26, 2023.

46.    Defendants knew or should have known that retaliation against an employee engaging in a protected activity was a violation of state law.

47.    Defendants retaliated against Dr. Ganai by terminating her employment on January 23, 2024.

48.    Defendants' actions violated N.D.C.C. § 34-01-20.

49.    As a result of Defendants' retaliatory actions, Dr. Ganai has suffered and will continue to suffer irreparable injuries including, but not limited to, lost wages, injury to professional reputation, great mental anguish, and damage to her physical health.

## **PRAYER FOR RELIEF**

50.    Wherefore, Plaintiff prays that this Court enter judgment in her favor and against Defendants as follows:

A.    Find that Defendants violated N.D.C.C. § 34-01-20 by willfully retaliating against Plaintiff in threatening to terminate her and terminating her for engaging in a protected activity;

B.    Award actual damages;

C.    Award the costs of maintaining this action, including reasonable attorney's fees and court costs; and,

D.    Any other relief this Court deems just and necessary.

8

## JURY DEMAND

51.    Plaintiff demands a trial by jury of the maximum number of jurors allowed by law of all issues raised in this First Amended Complaint.

Dated: November 14, 2024

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
*Pro Hac Vice*
Rebecca E. Chmielewski (rchmielewski@prinz-lawfirm.com)
*Pro Hac Vice*
1 East Wacker Drive, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822


WILKING LAW FIRM

*Isl Leo FJ  Wilking*
Leo F.J. Wilking
(lwilking@wilkinglaw.com) 3003 32nd
Avenue S
Fargo, ND 58103
P: (701) 356-6823
F; (701) 478-7621
ND Bar ID No.
03629
*Local Counsel*

9

**SANFORD**

H E A L T H

October 8, 2019

Sabha Ganai, MD
1424 S Park Avenue
Springfield, IL 62704

Dear Dr. Ganai:

Upon the enthusiastic recommendation of the Surgical Oncology Department, I am pleased to invite you to join Sanford Clinic. The starting salary has been approved at $427,800 for a 1.0 FTE ($300,000 for 0.7 FTE clinical and $127,800 for 0.3 FTE research). We are also offering a $25,000 forgivable loan over 2 years paid upon signing.

Enclosed you will find a Staff Physician Agreement for your review and consideration. If all terms meet with your approval, please:

1. ***Initial*** your anticipated start date on the first page of the Agreement.

2. Sign and date the Agreement.

3. Sign the Demand Note in front of a Notary Public.

4. Return the following document/s to us in the enclosed prepaid envelope:
   a. Staff Physician Agreement, signed and dated with your anticipated start date **initialed** on the first page of the Agreement.
   b. Demand Note signed in front of a Notary Public.

You are eligible for 28 days of time away per fiscal year and 10 days of CME time away, pro-rated based on your FTE status. Eligible relocation expenses up to $10,000 will be paid upon submission of appropriate documentation.

My colleagues who had the opportunity to interview you feel that you will make a wonderful addition to our medical staff. I hope to receive your favorable response to this invitation within **30** days. In the meantime, please contact me if you have any questions; at 701-234-2610 (office) or by email at *julie.waldera@sanfordhealth.org*

Sincerely,

*Julie Waldera*

Julie Waldera
Executive Director
Sanford Health

**EXHIBIT**

*A*

**STAFF PHYSICIAN AGREEMENT**

**BY AND BETWEEN**

Sanford Clinic North, a nonprofit corporation (hereinafter called "Sanford")

**AND**

Sabha Ganai, MD (hereinafter called the "Physician").

**WITNESSETH:**

WHEREAS, Sanford owns and operates physician offices and clinics; and

WHEREAS, Physician is a licensed physician capable of providing the services specified by this Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

Section 1.  Employment

Sanford hereby employs Physician, and Physician hereby accepts such employment upon the terms and conditions set forth below.

Section 2.  Term

Physician's employment shall commence on January 13, 2020, or such other date as mutually agreed ("Commencement Date"), and shall continue for a period of two years unless terminated sooner as provided herein.  This Agreement shall be automatically extended for additional one-year terms unless either party notifies the other party in writing of its intent not to renew at least 90 days prior to the expiration of the then-current term.



EXHIBIT A_239

Section 3.  Provision of Services by Physician

    (a)    Physician is hereby employed by Sanford on a full-time basis and agrees to allocate 0.3 FTE to research services and 0.7 FTE to providing medical services for patients of Sanford in Fargo, North Dakota and other locations as mutually agreed.  Physician shall also provide such administrative services as may be reasonably required by Sanford.  Physician will devote a portion of his/her working time to teaching of medical students, residents, fellows, or other scholarly activities for and as reasonably assigned by Sanford.  Physician's employment for the provision of medical services and Physician's employment for the provision of research services shall be separately terminable in the manner provided in Section 12 of the Agreement.

    (b)    So long as Physician is so employed by Sanford, Physician will devote best efforts, skill and ability in performing said services.

    (c)    Physician will acquire and maintain board certification in Physician's specialty as required by Sanford.

    (d)    Physician will acquire and maintain in good standing, throughout the term of this Agreement, staff privileges at one or more Sanford hospitals to the extent required by Sanford.  Physician will consult with, and receive written approval from, Sanford prior to applying for staff privileges at any non-Sanford hospital, clinic or other medical facility.

    (e)    Physician will acquire and maintain at all times during the term of this Agreement a license to practice medicine and to prescribe drugs and medication under all state, federal and local laws and regulations in effect in all jurisdictions where Physician may be required to practice under this Agreement.

    (f)    This Agreement shall not affect the exercise of Physician's independent professional judgment in providing care to patients consistent with sound professional practice and the terms of this Agreement. This provision shall not affect the ability of Sanford to establish protocols, procedures, or standards for professional practice. Sanford shall also be entitled to engage in peer review, quality assurance review, and to make recommendations concerning the professional practice of Physician.

2

EXHIBIT A_240

(g)     In all matters related to the discharge of responsibilities under this Agreement, Physician shall be accountable to Sanford's Council of Governors or its successor or designee.

(h)     Except when (i) the referral is not in the patient's best interest in the judgment of Physician; (ii) the patient expresses a preference for a different provider, practitioner, or supplier; or (iii) the patient's insurer determines the provider, practitioner, or supplier, Physician acknowledges and agrees that during the term of this Agreement he/she shall refer all of his/her patients to Sanford hospitals and to such non-hospital providers, practitioners, or suppliers as may be directed by Sanford.

(i)     Physician shall comply with all applicable bylaws, policies, rules, regulations and credentialing standards of Sanford and its subsidiaries or affiliates, including any corporate compliance policy or code of conduct now or hereafter adopted.  Physician shall provide all information required by the same and shall complete all clinic and hospital records in a timely and accurate manner and in accordance with applicable Sanford policies.

## Section 4.  Facilities and Personnel

Sanford shall furnish Physician with such space, equipment and personnel as may be deemed necessary or desirable by Sanford for the performance of Physician's duties hereunder.

## Section 5.  Professional Liability Insurance

(a)     Physician shall be solely responsible for any liability arising from any act or omission of Physician occurring prior to commencement of employment by Sanford, and for purchasing or arranging for professional liability insurance coverage with respect thereto.

(b)     Sanford will provide professional liability insurance coverage for Physician for services provided under this Agreement in such amounts as may be deemed necessary or desirable by Sanford.  Said coverage shall extend to claims for

EXHIBIT A_241

damages made against Physician after termination of employment with Sanford so long as the claim arises from services provided by Physician pursuant to this Agreement, and Physician shall not be required to purchase an extended reporting endorsement ("tail") upon termination of this Agreement for such claims. Professional liability coverage maintained by Sanford may be provided through Sanford's self-insurance program, captive insurer, insurance trust or through policies of insurance purchased by Sanford from commercial insurers, or any combination thereof. Professional liability coverage for Physician will be subject to the limits, terms, exclusions and limitations applicable to Sanford's self-insurance program, captive insurer, insurance trust and/or any insurance policies purchased by Sanford.

### Section 6.  Compensation

(a)     Physician's full compensation for all services rendered, in whatever capacity, will be determined by the compensation plan approved by Sanford. Physician compensation will be reviewed annually.

(b)     Notwithstanding the foregoing, for the first year of this Agreement, Physician's rate of annual compensation for medical services will not be less than Three Hundred Thousand and no/100 Dollars ($300,000.00) (the "Amount").

(c)     Further notwithstanding the foregoing, for the second year of this Agreement, Physician's rate of annual compensation will not be less than 95% of the Amount. Physician will be eligible for incentive compensation equal to 5% of the Amount only if Physician meets clearly defined and quantifiable non-production goals attached to every department's compensation plan. Such goals will reflect departmental performance, clinical quality, patient service, practice efficiency, safety, or other individual, departmental, or organizational goals.

(d)     Compensation hereunder will be paid in accordance with the general payroll policies of Sanford and shall be subject to required payroll deductions.

(e)     No compensation shall be payable to Physician for any period:

4

    i)      Physician fails to maintain all licenses to practice medicine or prescribe drugs required by Section 3(e) of this Agreement;

    ii)     Physician fails to maintain hospital privileges when required under Section 3(d);

    iii)    Physician's employment is suspended by Sanford for cause; or

    iv)    Physician is absent from work beyond the time authorized by Sanford's absence time policies then in effect.

(f)    Physician shall provide documentation of time spent and specific services performed as may be reasonably requested by Sanford and as required by applicable law, regulations and third-party payor contract requirements.

(g)    Physician shall also receive a loan in the amount of $25,000.00 upon Physician's execution of this Agreement. This loan shall be repaid pursuant to a Promissory Note materially in the form and substance attached hereto as Exhibit A. The loan shall be repaid in 24 monthly installments beginning on the first day of the first month following the Commencement Date and shall bear interest at the "prime rate" as published in the Wall Street Journal on the date of execution plus one percent; provided, however, that as long as Physician continues to provide services hereunder, each installment will be forgiven as it comes due. In the event Physician fails to satisfy the conditions embodied in Section 20, fails to become employed by Sanford on the Commencement Date or becomes employed but thereafter leaves the employ of Sanford hereunder and/or this Agreement is terminated for any reason prior to forgiveness thereof, the entire outstanding balance under said Promissory Note shall immediately become due and payable. Notwithstanding the foregoing, if Physician's employment is terminated as a result of Physician's death or permanent disability as defined in Sanford's long term disability policy, the entire outstanding balance under said Promissory Note will be forgiven. Physician understands and agrees that loan forgiveness constitutes income to Physician and will be subject to taxes and other withholdings required by law.

(h)    Physician agrees that Sanford may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to Physician by Sanford,

<div align="center">5</div>

including any wages or other obligation and whether or not due, against any obligation owed by Physician to Sanford or its affiliates, including the obligations of Physician evidenced by the Promissory Note.

Section 7.  Benefits

Subject to insurability rules and regulations, Physician shall be entitled to benefits as are generally provided to other similarly situated Sanford physicians pursuant to Sanford policies.

Section 8.  Third-Party Reimbursement Programs and Assignment Agreements

Physician shall assign and reassign to Sanford or its designees all rights Physician may now or hereafter possess to receive income, payment and/or reimbursement for any and all professional medical services rendered by Physician pursuant to this Agreement, which shall also include any payments as a result of Physician's attestation of Meaningful Use during Physician's employment with Sanford.  Physician shall become and remain a participating provider in those public and private third-party reimbursement programs requested by Sanford.  As used in this Agreement, the term "third-party reimbursement program" shall include, but not be limited to, health maintenance organizations, preferred provider organizations, private health insurance companies, Sanford Health Plan, the federal Medicare program, and the state Medicaid program.  Under no circumstances shall Physician bill any patient or any public or private third-party reimbursement program for any services for which Physician has been compensated pursuant to this Agreement.  Any violation of any provision of this Section by Physician shall permit Sanford, at its option, to terminate this Agreement immediately.

Section 9.  Confidentiality

Physician acknowledges that all patient charts, patient lists, and patient financial and demographic information concerning Sanford's practice are confidential, proprietary and constitute Sanford's trade secrets.  Physicians may not access Sanford patient

6

information or use Sanford patient lists to contact patients directly for solicitation purposes. Upon termination of this Agreement, Physician shall not use or disclose any confidential information, proprietary or trade secret information, including patient list and patient financial and demographic information concerning Sanford's practice, and shall maintain confidentiality with regarding to Sanford's business. Under no circumstances shall Physician remove patient medical records, x-rays, etc., or copies thereof, from Sanford's premises except as authorized under Sanford's policies when necessary for patient care. Physician shall complete all medical records prior to termination of this Agreement. Physician has no ownership interest in the medical records, x-rays, patient charts and other documents relating to the diagnosis and treatment of patients served by Sanford. Upon termination of Physician's employment with Sanford, Physician shall return all medical records and reports concerning patients and all copies thereof to Sanford. Physician agrees that Physician's obligations under this Section shall survive any termination of this Agreement. Additionally, you shall not directly disclose Sanford's compensation formula to any competitor of Sanford, nor shall you direct any individual or third party to disclose this information to a competitor on your behalf.

## Section 10. Assignment

This Agreement may not be assigned by either party without the express written consent of the other party; provided, however, Sanford may assign this Agreement to its parent, subsidiaries, or corporate affiliates without consent.

## Section 11. Modification

This Agreement may not be orally canceled, changed, modified or amended, and no cancellation, change, modification or amendment shall be effective or binding, unless in writing and signed by both parties to this Agreement.

## Section 12. Termination

    (a)     Notwithstanding any of the provisions of this Agreement, either party may terminate this Agreement by giving 90 days' written notice to the other party. If

<div align="center">7</div>

Sanford elects to terminate under this Section, it may, at its option, give Physician 90 days' base pay in lieu of notice.

(b)    Sanford may also terminate Physician's employment immediately (without severance pay) in the event:

i)    Physician fails to substantially perform Physician's obligations under this Agreement (as reasonably assigned or reasonably appropriate to Physician's role hereunder) and such failure is not cured to the satisfaction of Sanford within thirty (30) days after written notice thereof is given to Physician;

ii)    Physician fails to maintain medical staff appointment or clinical privileges at any organization where Physician has provided professional services;

iii)    Physician engages in any unethical conduct or medical misconduct as defined by State and National Medical Associations and such failure remains uncorrected after fifteen (15) days of written notice from Sanford;

iv)    Physician is suspended or excluded from participation in the Medicare program or any other Federal Health Program;

v)    Sanford is unable to obtain malpractice insurance on behalf of Physician, or if the cost of obtaining such insurance unreasonably exceeds the cost of obtaining such insurance for other physician employees working within the same specialty;

vi)    Physician's professional practice presents a direct threat to the safety of patients or employees, including situations in which Physician's abuse of alcohol or drugs poses a direct threat to patient or employee safety;

vii)    Physician fails to maintain the standard of competence reasonably deemed necessary by Sanford;

viii)    Physician is deemed to have engaged in a material violation of Sanford policy regarding patient or employee rights after investigation;

8

ix)    Physician repeatedly violates or continues to violate, after notice, any of Sanford's policies or directives and such failure remains uncorrected after fifteen (15) days of written notice from Sanford;

x)    Physician is absent from work beyond the period authorized by applicable Sanford policies;

xi)    Physician commits fraudulent or dishonest acts which involve the practice of medicine;

xii)    Physician engages in any felonious act, or misdemeanor involving moral turpitude (as defined by state or federal law) in connection with Physician's employment;

xiii)    Physician is convicted of, pleads guilty or nolo contendere to any felony, or misdemeanor involving fraudulent conduct or moral turpitude (as defined by applicable state or federal law); or,

xiv)    Physician fails to maintain any license or certification required to provide services under this Agreement.

(c)    Upon termination of this Agreement for any reason, Physician agrees that Sanford may, at its sole discretion and without demand and without notice, set off any liability owed to Physician by Sanford, including compensation hereunder, against any obligation owed by Physician to Sanford or its affiliates, including obligations evidenced by the Promissory Note referenced above.

(d)    Physician acknowledges and agrees that his/her medical staff appointment and clinical privileges at one or more Sanford owned or leased hospital(s) shall automatically expire upon termination of this Agreement.  As prescribed by the medical staff bylaws of said Sanford hospital(s), such automatic expiration (i) would not give rise to hearing and appeal rights and (ii) would not constitute a professional review action adversely affecting the clinical privileges of Physician.  For purposes of this Section 12(d), said Sanford hospital(s) shall be deemed third-party beneficiaries to this Agreement.

9

EXHIBIT A_247

Section 13.  Strict Performance

No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement or to exercise a right or remedy shall constitute a waiver.  No waiver of any breach shall affect or alter this Agreement, but each and every covenant, condition, agreement and term of this Agreement shall continue in full force and effect with respect to any other existing or subsequent breach.

Section 14.  Entire Agreement

This Agreement represents the entire Agreement between Sanford and Physician with respect to the subject matter hereof, and all prior agreements relating to the employment of Physician written or oral, are nullified and superseded hereby and neither party shall have any further rights or obligations under such superseded agreements.  Each party releases the other from all claims of any kind or nature arising from such superseded agreements.  No change or addition to, or deletion of, any portion of this Agreement shall be valid or binding upon the parties hereto unless the same is approved in writing by the parties.

Section 15.  Invalidity or Unenforceability of Particular Provisions

The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

Section 16.  Release of Information

Physician acknowledges that Sanford will release information related to any aspect of Physician's practice to third parties as authorized by law (including state agencies).  Further, Physician authorizes Sanford to release to applicable state board of medical examiners, any governmental or private insurer, hospital, health maintenance organization, self-insured employer or any other organization with which Sanford contracts to provide health care services, information relating to

10

any aspect of Physician's practice, including, without limitation, information relating to professional liability claims, disciplinary proceedings, utilization, and quality review.  Physician authorizes any educational institution, hospital, clinic, government or private insurer, or other health care institution to release to Sanford all employment files, disciplinary records, and other documents relating to Physician's conduct or performance. Sanford will provide Physician the reasonable opportunity to review requests for information related to professional liability or disciplinary matters prior to release of any information.

Section 17.  Proprietary Information, Trade Secrets and Intellectual Property

    (a)    Sanford acknowledges and agrees that it shall have no right, title or interest in or to any intellectual property (whether patentable, copyrightable or not) which was registered, copyrighted or for which patents were filed or issued, prior to Physician's employment with Sanford ("Physician Intellectual Property").

    (b)    If and to the extent Physician develops intellectual property while employed by Sanford, but does not utilize Sanford resources (including Sanford staff, funds, facilities, equipment or material resources or while actively engaged in the performance of Physician services under this Agreement) to develop the intellectual property, such intellectual property shall be deemed Physician Intellectual Property under this Agreement.  Sanford hereby waives any ownership rights, title or interest it may be deemed to have in and to Physician Intellectual Property, and hereby assigns all right, title and interest in and to Physician Intellectual Property to Physician; provided, however, Physician grants to Sanford a non-exclusive, worldwide, paid-up, royalty-free, perpetual license to use that Physician Intellectual Property developed by Physician during Physician's employment with Sanford, for its own internal use only (including without limitation, research, development and educational purposes) and not for resale.

11

(c)   Physician agrees to promptly disclose in writing to Sanford all intellectual property including, without limitation, discoveries, improvements, formulas, techniques, know-how, writings, drawings, software, mask works, and other inventions and works of authorship (whether or not patentable or copyrightable) made, conceived, discovered, written, created, learned of or reduced to practice by Physician during the period of his/her employment with Sanford, which relate or result from the actual or anticipated business of Sanford or from the use of Sanford's staff, funds, equipment, premises, property, or which constitute a work made for hire ("Sanford Intellectual Property"). Physician hereby waives any ownership rights, title or interest he/she may be deemed to have in and to Sanford Intellectual Property, and hereby assigns all right, title and interest in and to Sanford Intellectual Property to Sanford. Physician shall cooperate with Sanford to enable Sanford to obtain, maintain or enforce patents, copyrights, or other legal protection for such intellectual property, including the execution of any and all documentation necessary to evidence the transfer/assignment of ownership of Sanford Intellectual Property to Sanford.

(d)   Any distribution of net income derived from commercialization of Sanford Intellectual Property developed by Physician, subject to applicable restrictions arising from any grants, contracts or other agreements with outside parties, shall be as follows:

(i)     Physician:   50% (may be shared with others at Physician's discretion)

(ii)    Sanford:     50%

"Net Income" shall be defined as gross revenue, as identified in the totality of the legal documents reflecting the transaction, less all costs incurred by Sanford or its agent(s) in commercializing the Sanford Intellectual Property and in obtaining and maintaining intellectual property protection. The amount of net income distributed to Physician will not be affected by termination of Physician's employment with Sanford.

(e)   Notwithstanding the foregoing, Physician agrees to comply with the then-current intellectual property policy of Sanford and its affiliates. In the event of a

12

conflict between this Agreement and such policy, Physician and Sanford agree that the then-current intellectual property policy will control.

### Section 18.  Governing Law

This Agreement shall be construed and enforced under and in accordance with the laws of North Dakota, with exclusive venue for resolution of disputes in the State District Court in and for Cass County.

### Section 19.  No Third-Party Rights

Except as may be expressly provided herein, nothing in this Agreement shall be construed as creating or giving rise to any rights in any third parties or any persons other than the parties hereto.

### Section 20.  Pre-Employment Post-Offer Background Check, Drug Screen, Licensure, and Privileges

Physician and Sanford acknowledge and agree that all obligations of each party hereunder shall be subject to the satisfaction of the following conditions precedent as of the Commencement Date:

(a)     Physician satisfactorily completes a background check and drug screen in accordance with Sanford policy;

(b)     Physician is granted licensure to practice medicine from the state of North Dakota;

(c)     Physician obtains medical staff appointment and clinical privileges commensurate with the services to be performed hereunder at Sanford Medical Center Fargo;

(d)     Physician obtains from Sanford Health Plan in-network status with clinical privileges commensurate with the services to be performed hereunder; and

(e)     Physician is accepted into Sanford's standard professional liability policy by Sanford's insurance carrier.

13

<u>Section 21.  Representations</u>

    (a)    Physician represents and warrants that all of the information and documentation which Physician has provided to Sanford is true, accurate and complete in all material respects and does not omit any material information necessary to make the information or documentation provided to Sanford not misleading.

    (b)    Physician represents and warrants that this Agreement and Physician's employment hereunder will not constitute a default or breach of any covenant or agreement to which Physician is a party and that Physician is not bound or restricted by any contract of employment, non-competition agreement, confidentiality or non-disclosure agreement, or any other agreement with a present or former employer or other third party that would conflict with this Agreement or Physician's employment with Sanford.

    (c)    Physician represents and warrants that Physician will not use any privileged information, trade secrets or other intellectual property belonging to any third party while performing services for Sanford.

<u>Section 22.  Survival</u>

Any provisions hereof that by their nature would be expected to survive the termination of this Agreement shall survive and not be affected by said termination.

<u>Section 23.  Construction of Headings</u>

The captions or headings are for convenience only and are not intended to limit or define the scope or effect of any provision of this Agreement.

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year last written below.

SANFORD CLINIC NORTH

DATE:_____          BY:_____

                                                        _____

DATE: _____          _____

                                                        Sabha Ganai, MD

15

EXHIBIT A_253

EXHIBIT A
DEMAND NOTE
FOR INCENTIVE LOAN
PER PHYSICIAN AGREEMENT

$ 25,000.00                                    _____, 2019

       After date, for value received, I promise to pay to the order of Sanford Clinic North, the sum of Twenty-Five Thousand and no/100 Dollars ($25,000.00) to be repaid ON DEMAND, or if no demand is made, in 24 monthly installments with interest thereon at the "prime rate" as published in the Wall Street Journal on the date of execution plus one percent, beginning on the first day of the first month following the Commencement Date, in accordance with the STAFF PHYSICIAN AGREEMENT dated _____, _____.

       Should any of the principal not be paid when due, such default shall, at the option of the legal holder hereof, cause all sums then remaining unpaid to become immediately due and payable, without notice (notice of the exercise of such option being hereby expressly waived).

       The Maker, endorsers, sureties and guarantors hereof hereby severally agree to pay all expenses of collection, including attorney's fees, in case payment shall not be made at maturity, and severally waive presentment for payment, notice of non-payment, protest and notice of protest and diligence in enforcing payment or bringing suit against any party hereto, the endorsers, sureties and guarantors hereof hereby severally consent that the time of payment may be extended, or this note renewed, from time to time without notice to them and without affecting their liability hereon.  The Maker agrees that Sanford Clinic North may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to the Maker by Sanford Clinic North, including any wage or other obligation and whether or not due, against any obligation owed by the Maker to Sanford Clinic North or its affiliates, including the obligations of Maker evidenced by this NOTE.  The payment obligations arising under this NOTE are subject to the terms of the STAFF PHYSICIAN AGREEMENT entered into by the Maker and Sanford Clinic North on _____, _____ including, without limitation, the debt forgiveness provisions set forth in Section 6(g) thereof.

       MAKER AGREES THAT ANY CLAIM OR DEMAND (OF DEFAULT OR OTHERWISE) WHICH MAKER MAY HAVE OR ASSERT AGAINST SANFORD CLINIC NORTH OR ITS AFFILIATED ENTITIES WILL NOT EXCUSE OR DELAY PAYMENT OF THIS NOTE AS PROVIDED HEREIN, AND MAKER HEREBY WAIVES ANY RIGHT OF SETOFF.

<div style="margin-left:40%">EXHIBIT DO NOT SIGN</div>

MAKER:  Sabha Ganai, MD

SSN:_____

STATE OF _____)
                                : SS
COUNTY  OF _____)

       On this the _____ day of _____, 2019, before me, a Notary Public within and for said County, personally appeared Sabha Ganai, MD, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he/she executed the same as his/her free act and deed.

<div style="margin-left:40%">EXHIBIT DO NOT NOTARIZE</div>

(SEAL)
Notary Public, State of _____
My Commission expires: _____

DEMAND NOTE FOR
INCENTIVE LOAN
PER PHYSICIAN AGREEMENT

$ 25,000.00 _____                          _____, 2019

        After date, for value received, I promise to pay to the order of Sanford Clinic North, the sum of Twenty-Five Thousand and no/100 Dollars ($25,000.00) to be repaid ON DEMAND, or if no demand is made, in 24 monthly installments with interest thereon at the "prime rate" as published in the Wall Street Journal on the date of execution plus one percent, beginning on the first day of the first month following the Commencement Date, in accordance with the STAFF PHYSICIAN AGREEMENT dated _____, _____.

        Should any of the principal not be paid when due, such default shall, at the option of the legal holder hereof, cause all sums then remaining unpaid to become immediately due and payable, without notice (notice of the exercise of such option being hereby expressly waived).

        The Maker, endorsers, sureties and guarantors hereof hereby severally agree to pay all expenses of collection, including attorney's fees, in case payment shall not be made at maturity, and severally waive presentment for payment, notice of non-payment, protest and notice of protest and diligence in enforcing payment or bringing suit against any party hereto, the endorsers, sureties and guarantors hereof hereby severally consent that the time of payment may be extended, or this note renewed, from time to time without notice to them and without affecting their liability hereon.  The Maker agrees that Sanford Clinic North may, at its sole discretion and without demand and without notice to anyone, set off any liability owed to the Maker by Sanford Clinic North, including any wage or other obligation and whether or not due, against any obligation owed by the Maker to Sanford Clinic North or its affiliates, including the obligations of Maker evidenced by this NOTE.  The payment obligations arising under this NOTE are subject to the terms of the STAFF PHYSICIAN AGREEMENT entered into by the Maker and Sanford Clinic North on _____, _____ including, without limitation, the debt forgiveness provisions set forth in Section 6(g) thereof.

        MAKER AGREES THAT ANY CLAIM OR DEMAND (OF DEFAULT OR OTHERWISE) WHICH MAKER MAY HAVE OR ASSERT AGAINST SANFORD CLINIC NORTH OR ITS AFFILIATED ENTITIES WILL NOT EXCUSE OR DELAY PAYMENT OF THIS NOTE AS PROVIDED HEREIN, AND MAKER HEREBY WAIVES ANY RIGHT OF SETOFF.

                               _____

                               MAKER:  Sabha Ganai, MD
                               SSN:_____

STATE OF _____)
                             : SS
COUNTY  OF _____)

        On this the _____ day of _____, 2019, before me, a Notary Public within and for said County, personally appeared Sabha Ganai, MD, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he/she executed the same as his/her free act and deed.

                               _____

(SEAL)                        Notary Public, State of _____
                              My Commission expires: _____

EXHIBIT A_255

*CONFIDENTIAL PEER REVIEW DOCUMENT*

Dear Dr. Ganai:

Thank you for meeting with us today to discuss areas of concern that have been brought forward as part of our ongoing improvement efforts and recredentialing process. We appreciate your input and your cooperation to evaluate clinical care concerns that have been identified and to facilitate performance improvement measures to resolve areas of opportunity.

Upon consideration of all relevant information pertaining to the issues raised, and because the concerns are ongoing and impact patient care, it has been recommended that a Performance Improvement Plan ("PIP"), overseen by the Care Monitoring Committee, be developed to assist you in successfully addressing the opportunities that have been identified. We appreciate you meeting with us today to discuss the PIP and we look forward to working with you to resolve these areas of concern.

The PIP that we are recommending to you consists of the following core elements:

1.  *Collegial participation in a focused review of surgical practices;*

2.  *Development of a mutually agreed upon mentoring plan with an assigned mentor to facilitate and guide improvement efforts;*

3.  *Development of a personal development plan to evaluate and improve areas of identified opportunity; and*

4.  *Agreement to fully engage in ongoing monitoring and peer review processes and take accountability for your own professional development and performance improvement.*

Additional details that are necessary to effectively implement these elements are addressed in the attached PIP, which is intended to be utilized by you, your mentor and the Care Monitoring Committee going forward. After you have an opportunity to review this letter and the enclosed materials, please let us know if you have any additional questions or need any further clarification regarding expectations and next steps.

Please understand that your agreement to voluntarily abide by and participate in this PIP is not considered a restriction of your privileges. It is not an adverse professional review action and of itself will not be reported to the National Practitioner Data Bank.

To demonstrate your commitment to work with us and your willingness to participate, please sign and return the attached PIP within 3 business days, keeping a copy for your reference. A copy of the PIP and your agreement to participate will be provided to your mentor and the Care Monitoring Committee as they consider your progress and completion of the PIP. Quarterly reports on your progress will be provided to the Care Monitoring Committee.


EXHIBIT C

If you decide not to participate in the PIP as outlined in this letter, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to Sanford's Peer Review and Credentials policies.

Thank you for your anticipated cooperation and participation in Sanford's ongoing efforts to improve the care we provide. If you have any questions or wish to discuss this matter further, please feel free to contact me.

Sincerely,


Steven Briggs, MD
Vice President Medical Officer
Sanford Fargo Medical Center

Enclosure:    PIP Agreement

cc:    Confidential Peer Review File

EXHIBIT A_257

## Performance Improvement Plan Agreement
### For Sabha Ganai, MD

Concerns have been identified and explained to me regarding the following: prolonged operative times (especially with robotic surgery), occurrence of post-operative complications, and higher than expected rates mortality. Because these concerns are ongoing and they impact patient care, I, Sabha Ganai, MD agree to the following stipulations regarding my surgical practice at Sanford Fargo Medical Center.

1. I agree to collaboratively participate in a Focused Professional Practice Evaluation (FPPE) to further evaluate my surgical technique and acumen, and to determine measures I can take to reduce operative times and improve patient outcomes. I understand that successful completion of the FPPE will be a significant basis for determining success with this Performance Improvement Plan (PIP). I acknowledge that the following elements will be included in my FPPE.

   - ***Evaluation of Care.*** I acknowledge that any of my patient care records and quality reports may be reviewed to assist in determining opportunities to improve upon my clinical care and surgical skills.

   - ***Concurrent Collegial Consultation/Procedural Proctoring.*** I agree to seek collegial consultation pre-operatively with my assigned proctors for at least my next 20 scheduled surgical cases involving the esophagus, pancreas and hepatobiliary system, and acknowledge the following:

     o I acknowledge that my proctors will determine if additional cases or types of cases require concurrent collegial consultation.
     o I agree that collegial consultation will include discussion of patient risk factors, planned surgical approach and anticipation of potential complications, including identification of indications to convert to open if a laparoscopic or robotic approach is planned.
     o I agree that my proctors will have the autonomy to determine their level of oversight on the cases, which may include concurrent proctoring or participation as a co-surgeon. I further understand that my proctor's presence is required for at least 10 cases.
     o I understand that my proctors do not have the ability to override my decisions following a collaborative discussion. I agree that when there are unresolved differences of opinion, the matter will be referred to Dr. Briggs and my mentor for further discussion.
     o I acknowledge that my proctors will be assigned and I agree to work respectfully and collaboratively with them to successfully complete my FPPE.

   - ***Retrospective Case Review.*** I acknowledge that all cases with intra-or post-op complication and cases significantly exceeding the national average operative time will be retrospectively reviewed. I agree to collaboratively discuss the cases and any opportunity for improvement that may be identified.

EXHIBIT A_258

2. I agree to develop a mutually agreeable mentorship plan with my assigned mentor, and work collaboratively with this individual to gain insight into my strengths and limitations, identify methods to consistently deliver high quality, safe patient care and ensure my successful completion of this PIP.

3. I agree to address concerns in clinical care identified through peer review, proctoring or mentoring processes and to make changes to my care practices accordingly. This may include continuing education or additional training. I understand the importance of self-reflection on my own performance and willingness to improve and make changes as indicated.

4. I will take accountability for my professional growth and performance improvement and agree to develop a professional development plan. This plan will include improvement strategy and goals, with timelines for completion, to address noted areas of opportunity. In addition to measurable performance indicators to improve rates of complication and mortality, I will define goals to incrementally reduce my operative time until I achieve nationally reported norms. My professional development plan will be in written form with a copy provided to my mentor and the Care Monitoring Committee by September 15, 2023. All proposed performance metrics must be accepted by the Committee.

5. I further understand that quarterly reports regarding my progress will be made to the Care Monitoring Committee, and that this Agreement will continue until such time as the Care Monitoring Committee determines otherwise.

I acknowledge this is a serious matter and that I will be monitored on an ongoing basis by (1) peers assigned to review cases in accordance with peer review process; (2) my assigned mentor and proctors; and (2) the Care Monitoring Committee. I understand that if I do not meet the performance stipulations as outlined in the PIP, the Care Monitoring Committee will have no further authority in this matter and will defer to the Physician Executive Council for its independent review pursuant to the Sanford Peer Review and Credentialing policy.

I understand that my agreement to voluntarily abide by and participate in this PIP is not considered a restriction of my privileges and that this Agreement in and of itself is not reportable to the National Practitioner Data Bank. I further understand I am provided an opportunity to respond and to have this response also placed in my confidential peer review file along with this Agreement.

In addition, I acknowledge that the Care Monitoring Committee requests signed acknowledgement of this Performance Improvement Plan within three business days of the date of this letter. I further understand that if I choose not to participate in the PIP, the Care Monitoring Committee will determine the next appropriate steps.

Accepted this _22_ day of August 2023.

_____
Sabha Ganai, MD

Sanford Surgical Oncology



September 15, 2023

Dear Dr. Briggs and Team,

This letter is a response as requested per our meeting on August 22, 2023 to review and reflect on quality improvement efforts and opportunities for myself and the Division of Surgical Oncology at Sanford Medical Center Fargo. I appreciate this opportunity and will discuss these in detail herein using facility data and then will provide a summary that includes a personal performance improvement plan (PIP).

**I.        Summary about myself, Sabha Ganai, MD, PhD, MPH, FACS, FSSO**

I am a 2001 graduate of the USC Keck School of Medicine and I am sub-specialty board-certified in complex general surgical oncology (CGSO) with training from University of Chicago in addition to general surgery training from Tufts University / Baystate Medical Center. I have additional training in clinical ethics from the MacLean Center for Clinical Ethics and epidemiology from the Harvard T.H Chan School of Public Health. I am a funded population-health scientist studying rural cancer disparities and have an h-index of 17 with over 80 publications and book chapters. I previously served as co-director of the Southern Illinois University (SIU) Outcomes Analysis and Research (SOAR) program, with experience using Lean Six-Sigma in the context of healthcare quality improvement. I joined Sanford Health in February 2020 and I am an Associate Professor of Surgery and the Director of Surgical Education at the University of North Dakota School of Medicine and Health Sciences.

I serve on the Executive Council for the American College of Surgeons (ACS) Cancer Surgery Standards Program (CSSP), which has afforded me the opportunity to give invited national talks on improving quality and performance in complex oncologic care, including at the Alliance for Clinical Trials (2021) and the ACS Quality and Safety Conference (2022). I am the Disease Site Group leader for gastric and esophageal disease for the Commission on Cancer (COC) and I lead a multidisciplinary team of medical oncologists, radiation oncologists, gastroenterologists, and surgeons that includes experts from institutions like Mayo Clinic and MD Anderson Cancer Center. I was the 2023 recipient of the Society for Surgery of the Alimentary Tract Academy for Surgical Coaching Award and I have been previously honored with Alpha Omega Alpha and the Gold Foundation Humanism Honor Society. I am the Chair for the American Society for Bioethics and Humanities Surgical Ethics Affinity Group and I participate in the Sanford Ethics Committee including as a volunteer ethics consultant.

My clinical practice has focused on complex general surgical oncology, hepatobiliary surgery, endocrine surgery, and palliative surgery. My personal mission when joining our Surgical Oncology Division at Sanford Medical Center in Fargo was "to elevate care delivery for patients with cancer in North Dakota". I was excited and privileged to join my partners, Dr. Robert Sticca and Dr. Daniel Tuvin because I know as a team we are unique in our collaborative culture and our service orientation. My vision to provide "optimal care for cancer patients" is centered in both population health and ethics, requiring grounding in a multifaceted and multidisciplinary process for integrated care delivery and improving access as a form of justice. Part of my efforts and expertise fulfilling this mission has to do with analysis of quantitative and qualitative data, and I meet weekly with a team at Sanford Research in Sioux Falls in the conduct of these research efforts. The conceptual framework for my work has previously been summarized in the graphic included in the following ASCO

20230915 - Ganai - CONFIDENTIAL     Page 1 of 14

**EXHIBIT**

**b**

https://dailynews.ascopubs.org/do/access-cancer-care-rural-populations-barriers-and-solutions

I am a values-driven leader and I strive for excellence in my team with a goal of delivery of optimal care for our cancer patients in a compassionate and patient-centered fashion. My personal behavioral style using the DISC inventory is shared by many surgeons: 'Decisive' with the subtype 'Implementing Conductor'. These are individuals who are self-motivated, expeditious, and attracted to challenges and results. Using Clifton StrengthsFinder, my top five leadership strengths are being a maximizer (a person who stimulates group excellence), a relator (maintains close relationships to achieve a goal), having self-assurance (confidence in ability to act and decide), having strong ideation (ability to find connections between disparate phenomena), and having high adaptability (ability to perform one day at a time). I am a surgical ethicist and I favor a pragmatic Aristotlean virtue ethics approach which avoids dwelling in perfectionism and designates excellence as a consequence of habitual behavior. Because the practice of good habits (virtues) becomes linked to good outcomes, I have been working to teach the residents to instill greater conscientiousness in patient care delivery as a form of quality improvement. Since coming to Sanford, I have adapted my prior protocols for complex oncologic care delivery and have documented this in the form of the "White Service Handbook" as a way to standardize the delivery of care for the surgical oncology division based on best evidence within our discipline. When I started here in 2020, I prompted and quickly implemented within my division utilization of NCCN-guideline recommended practices for extended-use post-discharge VTE prophylaxis, which they recognized as important but assumed were difficult to implement because it had never been done here at Sanford. In addition, I implemented surgical oncology clinical trials at Roger Maris Cancer Center (RMCC) including the OPTI-Surg study (preoperative geriatric frailty assessment), the OPT-IN study (neoadjuvant therapy for gallbladder cancer), ECOG-ACRIN Pancreas Cyst Surveillance Study, and the International Mel-Mart II study randomizing margins for intermediate-thickness melanoma. We are working steadily to gain national recognition through our efforts in surgery trial accruals which has gone from non-existent to above average in comparison with other academic medical centers.

**II – Vizient Data**
When we met on August 22, 2023, I was provided a data point of an O/E ratio of 1.4 and increased operative times as the rationale to proceed with a performance improvement plan (PIP) covering pancreatectomy, hepatectomy, and esophagectomy. I signed this PIP in good faith, completely understanding this was noise-laden data from Vizient, and after correcting the nonoperative and palliative cases, my O/E ratio is under 1. As you are aware, Vizient is a database that provides operational data derived from administrative coding (billing) without clinical verification. It is designed to be able to quickly compare hospital performance and safety parameters, but it is not designed to reliably benchmark surgeon performance or distinguish the quality of departments or service lines. This is known to be confounded by the quality of documentation and capturing appropriate DRG categories. Unfortunately, because of this, if the clinical documentation within a facility has failed to capture the complexity and acuity of patients through the system, a hospital or service line could be perceived as providing poor quality of care.

In January 2021, because of my prior QI expertise, I was asked by the Department of Surgery to review every mortality and patient safety indicator 'never event' attributed to General Surgery for the year 2020. Detailed chart review of every attributed mortality revealed an intrinsic validity of the report as less than 40%, with many patient deaths included that were not causally associated to any operation or were occurrences with surgeons in other Departments or Service lines. This lack of causality becomes a pitfall with Vizient as simple sequencing of events during any inpatient stay is not possible (a preop VTE is considered the same as a postop VTE since the process to tell the difference can seldom be distinguished with codes). In addition, we raised concerns on reliability of data as there were patient deaths we had discussed in M+M and QI conferences that were not included in the data set. When similar observations were discussed with Dr. Clifford Ko, Director of Quality for the American College of Surgeons during his visit to Sanford Broadway Medical Center in 2022, he reminded us that Vizient was never supposed to be used for performance benchmarking beyond hospital-to-hospital comparisons. There is simply more noise than signal by design.

Table 1 summarizes the seven deaths that were attributed to me by Vizient, along with assessment using a "Plus/Delta" approach, a Crew Resource Management technique to explore opportunities for improvement:

**Table 1: Vizient-Attributed Mortality (2022-2023)**

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2338732<br>Admit 1/5/2022<br>Surgery: Whipple<br>Death 1/15/2022<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 6cm IPMN, BMI 43.5, AF on Eliquis<br><br>Fistula risk score of 28.5% (high risk)<br><br>Whipple with Roux en Y recon (short mesentery), developed Pancreas fistula | Pre-habilitation<br><br>Surveillance for over a year; Tried to observe cyst, but worrisome features developed/ persisted. | Failure to Rescue a POD10 aspiration event<br>Needed NGT replaced rather than diet advanced after return from IR.<br><br>Better communication with ICU: After this event, Tonya and I met with ICU charge nurse to work to improve 2E nursing communication with resident team members and attending since our team and myself were never notified when a problem did occur. |
| E1861093<br>Transfer Accepted: 2/8/2022 5pm<br>Transfer Arrived: 2/8/2022 2pm<br>Surgery: ASAP after 9pm<br>Emergent Abdominal exploration with cholangiogram<br>Death: 2/9/2022 1738<br><br>DISCUSSED IN QI AND M+M CONFERENCES<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 83M with cardiac history, prostate cancer, cholecystitis.<br><br>Accepted in transfer after Surgery completed around noon at Altru: Lap converted to Open cholecystectomy with bile leak.<br><br>This was an intraop mishap leading to transection and excision of 6cm of portal vein in addition to hepatic duct<br><br>Vein occlusion exceeded 12hrs.<br>Lactate 16 prior to OR. | I called in my partner out of bed to confirm missing anatomy and my plan for proceeding with comfort measures instead of a certain to fail attempt at vascular reconstruction.<br><br>I documented everything with Risk Management in the morning.<br><br>Withdrawal of care occurred later in the day when family arrived. | Nothing. |
| E2158042<br>Admit 3/24/2022<br>Consult for SBO 3/31/2022<br>Death 4/5/2022<br><br>NON OPERATIVE CONSULT<br><br>PALLIATIVE CARE + HOSPICE REFERRAL | 76F with Stage IV breast cancer and peritoneal carcinomatosis.<br><br>There was no plan for operative intervention. | We recommended hospice and she agreed.<br><br>This was a patient-preference concordant death. | Nothing – this was a consult with no expected benefit from surgery. |

EXHIBIT A_262

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E2620805<br>Admit 3/18/2022<br>Death 4/20/2022<br><br>PALLIATIVE CARE +<br>HOSPICE REFERRAL | 77M with Stage III esophageal cancer s/p esophagectomy Oct 2021, receiving adjuvant nivolumab immunotherapy<br><br>Developed PCP pneumonitis over week prior to admission that was likely secondary to adjuvant immunotherapy. This was held by Dr. Vegunta and the patient was started on steroids. Patient ended up intubated and later received a tracheostomy by Dr. Mistry. | I visited patient's wife periodically during the hospitalization to check in. | Nothing – this was an Unfortunate situation of immunotherapy-related PCP pneumonitis >6 Months after esophagectomy |
| E1892283<br>Admit: 1/9/2023<br>Surgery: Whipple with SMV venorrhaphy<br>Death: 1/17/2023<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 74F with symptomatic main duct IPMN, prior lap chole with bile leak, frailty, malnutrition.<br><br>Postoperative delirium<br>Delayed gastric emptying<br>Fistula risk score 4.4% (low risk)<br><br>The patient had evidence of DGE when I saw her on Monday POD 7 (diet advanced over weekend oy team), I made her NPO at the time and instructed on call resident to consider NGT. On POD 8, it was recognized that she needed an NGT, but she aspirated and coded around 8am. | Prehabilitation (PT and nutrition)<br>Geriatrics consultation<br><br>I initially declined surgery in Oct 2022. and I allowed patient (and family) to convince me to operate as she was symptomatic with repeat flares. We did wait until nutritional and ambulatory status improved. | Failure to Rescue a POD8 Aspiration event. We should have placed an NGT sooner to avoid aspiration.<br><br>The patient should have had her HOB elevated as part of GI aspiration precautions |
| E1812727<br>Transfer Accepted: 1/22/2023<br>Surgery: Emergent Abdominal Exploration<br>Death: 1/22/2023<br><br>PALLIATIVE CARE + HOSPICE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 62M with Stage III gastric cancer (s/p total gastrectomy, T4a N3 30/35 nodes positive); completed therapy and under surveillance via Cancer Treatment Centers of America in Chicago.<br><br>Presented with ischemic bowel Friday in Dickinson, left AMA to travel elsewhere, transferred emergently from Bismarck on Sunday am. | We took patient to OR appropriately<br><br>When we identified he had an internal volvulus with ischemia for several days and he did not have enough viable bowel available to perform an esophagojejunostomy, I talked to family while team closed, and he was made comfort care with time given to have family from Dickinson arrive to say goodbye.<br><br>There was good communication with family and death was preference-concordant. | I was later instructed by Dr. Mannuru that this patient could have been accepted/switched in transfer from Bismarck to observation status instead of inpatient status to deflect mortality reporting. I was unaware of this at the time.<br><br>We did our best to stabilize and bring to OR ASAP when team was available, so I otherwise would not have changed my approach. |

EXHIBIT A_263

| | Situation/Conditions | + (what went well) | Δ (what we should have changed) |
|---|---|---|---|
| E1848027<br>Admit: 2/22/23<br>Surgery: <u>Emergent</u> Whipple with Double RY reconstruction 2/23-24/23<br>Death: 3/2/23<br><br>PALLIATIVE CARE REFERRAL<br><br>DISCUSSED IN QI AND M+M CONFERENCES | 76M s/p open RYGBP 20 y ago, recent COVID+ <3wks prior, AVR, COPD, BMI 37, presenting with obstructive jaundice from periampullary cancer. TBili 26, INR 8<br><br>Admitted after syncopal episode.<br>Drs. Meidinger/Vogels did a lap assisted ERCP.<br><br>I was called to come in after 5pm to address iatrogenic perforation.<br>Informed consent obtained from wife 5:30pm. >3hrs was spent lysing adhesions.  Fistula Risk Score = 42.3% (high risk)<br><br>Washout required after heparinization restarted later that day secondary to profound coagulopathy.<br><br>Patient coded on POD7 while in ICU. He described sense of doom followed by Brady/PEA followed by CPR with ROSC. I spoke with wife and advised considering withdrawal of care given pressor requirement, hyperkalemia, etc. Possible VTE while on ant-coagulation as recently switched from heparin gtt to Lovenox. | Patient wanted everything done per wife. Patient was appreciative of care he was given when he had capacity to discuss care delivered.<br><br>Good communication with patient and/or wife throughout care. | SMCF teams are not well equipped for Whipples and have difficulty locating appropriate suture. Castro-Viejos, etc. for emergencies.<br><br>We may have had a pro-thrombotic state despite anticoagulation status related to his COVID+ status and compounded by profound hyperbilirubinemia. We perhaps should have kept him on heparin gtt rather than switch him to Lovenox.<br><br>Under normal/typical circumstances he would have been stented and optimized during neoadjuvant therapy but this surgery was initiated in an emergent fashion in the wrong facility and in the middle of the night. |

## III – Cancer Quality Improvement Program (CQIP)

The goals of CQIP are to improve process and outcomes for the care of patients with specific cancers using feedback of data as entered into the National Cancer Databases (NCDB) back to facilities. Surgical Oncologists who perform mostly foregut and hepatopancreaticobiliary (HPB) procedures will understandably have higher morbidity and mortality to track compared to those who perform breast and soft tissue procedures, and these findings may be further influenced by volume relationships. In addition, the expected survival by stage will be different for every disease site. This leads to the need to benchmark procedure-specific and cancer-specific metrics and compliance to standards rather than general outcomes for any cancer center. Long-term oncologic outcomes (overall survival, recurrence-free survival) are also parameters of interest, requiring time-to-event analyses. Via the COC, we participate in the CQIP program, which relies on data inputted into the NCDB in a protocolized fashion by certified tumor registrars with inclusion of long-term follow-up. While the process for assessment of survival generates the robustness of the NCDB, there is a two-year delay in receipt of CQIP mortality benchmarking reports. The 2022 CQIP Annual Report data (2018-2020) showed outcomes for SMCF/SMCB/RMCC that were *not significantly different* from expected outcomes at COC facilities (Table 3). Note that confidence intervals can be wide based on sample size and small number of events.

EXHIBIT A_264

**Table 3: CQIP Unadjusted 30-day Mortality (2018 – 2020)**

| Operation for Cancer | Fargo RMCC | All COC | P |
|---|---|---|---|
| Pancreatectomy | 2.2% (95% CI, 0.1 – 10.3%) | 2.3% (95% CI, 2.1 – 2.4%) | NS |
| Esophagectomy | 6.1% (95% CI, 1.1 – 19.1%) | 3.0% (95% CI, 2.8 – 3.3%) | NS |

*NS, not significant, p>0.05*

Table 4 demonstrates benchmarked performance standards for lymphadenectomy at SMCF/SMCB:

**Table 4: CQIP Lymphadenectomy Reports (2018-2020)**

| Measures | Fargo RMCC | All COC | P |
|---|---|---|---|
| Colectomy >12 nodes | 96.1% (95% CI, 90.8 - 100%) | 94.4% (95% CI, 94.1 – 94.6%) | NS |
| Gastrectomy > 15 nodes | 60% (95% CI, 17.1 – 100%) | 71.8% (95% CI, 70.1 – 73.5%) | NS |

*NS, not significant, p>0.05*

The best way to address the suboptimal gastrectomy lymph node harvest is for us as an institution to continue to be intentional about performing a D2 lymphadenectomy with gastric cancer resections. Recent analysis of NCDB gastric cancer data presented at the 2023 Digestive Disease Week confirms this metric is linked with long-term overall survival, and surgeons happen to have better nodal harvests with robotic approaches. The CSSP currently recommends nodal harvest >16 to be an updated performance standard based on the work of my COC disease site group team of experts. Meeting this has been an issue nationwide.


## IV – ACS NSQIP Data

The American College of Surgeons National Surgical Quality Improvement Program (NSQIP) differs dramatically from Vizient in that data are verified and inputted by a clinical research nurse specialist. Outcomes can be risk-adjusted by facility and are standardized leading to high internal validity and generalizability. Because of the design, we are also able to stratify data so outcomes can be examined in a procedure-specific fashion or stratified to inpatient or outpatient status. Of note, we review our Department surgical performance reported through NSQIP twice yearly and this has continued to show exemplary results, including data discussed by our Surgeon Champion, Dr. Sticca, earlier this week.

Table 5 summarizes data compiled from 01/01/2020-08/31/2023 from NSQIP. The first metric, "occurrence/case ratio", takes account any morbidity, readmissions, reoperations, and mortality.

**Table 5: NSQIP Mean Occurrences/Cases, (2020 – 2023)**

| Subgroups | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|
| Outpatient Cases | 1.2 | 1.5 | P< 0.05 (better than expected) |
| Inpatient Cases | 2.1 | 2.0 | NS (as expected) |
| Pancreatectomy | 2.0 | 2.1 | P<0.05 (better than expected) |
| Hepatectomy | 1.3 | 1.9 | P<0.05 (better than expected) |
| Esophagectomy | 3.0 | 2.9 | NS (as expected) |

Note that this metric is unadjusted and does not take into account risk adjustment for complexity but has been stratified by procedure. The NSQIP General Surgery patients includes all adult cases performed by General Surgeons, Acute Care Surgeons, Bariatric Surgeons, Endocrine Surgeons, Colorectal Surgeons, Hepatobiliary Surgeons, and Surgical Oncologists. Perioperative morbidity is 44% for pancreatoduodenectomy and 46% for esophagectomy (Low 2010) so would be expected to be greater for an HPB/GI surgeon doing these procedures compared to the average general surgeon.

Further exploration of my NSQIP mortality shows these data are not significantly different from national NSQIP data, except my outpatient and hepatectomy performance is significantly better than expected (Table 6). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

EXHIBIT A_265

**Table 6: NSQIP Mortality, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 0 | 0.08% (0.07 – 0.09%) | P<0.05 |
| Inpatient Cases | 4.4% (95% CI, 0.6 – 8.1%) | 5.2% (3.0 – 7.4%) | 2.34% (2.30 – 2.37%) | NS |
| Pancreatectomy | 5.9% (95% CI, 0 – 13.8%) | 7.5% (2.2 – 12.9%) | 1.67% (1.53 – 1.81%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 1.43% (1.28 – 1.58%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 23.7%) | 8.9% (0.6 – 17.2%) | 3.1% (2.64 – 3.57%) | NS |

*NS, not significant*

The mortalities defined in Vizient with Whipples were included. My mortality for distal pancreatectomy is zero. The one esophagectomy mortality that is present here but was not included in Vizient was an octogenarian patient with esophageal SCC from Thief River Falls who was DNR/DNI (her surgery was indicated due to dysphagia and stricture several months after definitive chemoradiation with failure to dilate/stent secondary to Type IV paraesophageal hernia). Postdischarge she developed a pleural effusion and COPD exacerbation and elected not to travel or be readmitted. We were never contacted since she was already set up with hospice.

**Table 7: NSQIP Readmissions, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 7.0% (95% CI, 0 – 14.5%) | 6.1% (3.2 – 8.9%) | 2.2% (2.2 – 2.3%) | NS |
| Inpatient Cases | 12.3% (95% CI, 6.3 – 18.3%) | 9.3% (6.4 – 12.2%) | 8.5% (8.4 – 8.5%) | NS |
| Pancreatectomy | 14.7% (95% CI, 2.8 – 26.6%) | 12.9% (6.0 – 19.7%) | 16.5% (16.1 – 16.9%) | NS |
| Hepatectomy | 12.5% (95% CI, 0 – 25.7%) | 9.5% (3.6 – 15.4%) | 9.5% (9.1 – 9.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 10.9% (10.0 – 11.7%) | NS |

*NS, not significant*

Further exploration of readmissions shows these are as expected from NSQIP national data (Table 7). Note that the confidence intervals are wide because of sample size considerations when analyzing subgroups.

**Table 8: NSQIP Reoperations, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo Surg Onc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 0 | 4.9% (2.3 – 7.5%) | 0.92% (0.90 – 0.94%) | P<0.05 |
| Inpatient Cases | 2.6% (95% CI, 0 – 5.6%) | 5.4% (3.2 – 7.7%) | 4.2% (4.1 – 4.2%) | NS |
| Pancreatectomy | 2.9% (95% CI, 0 – 8.6%) | 5.4% (0.8 – 10.0%) | 1.7% (1.5 – 1.8%) | NS |
| Hepatectomy | 0 | 1.1% (0 – 3.1%) | 2.8% (2.6 – 3.0%) | P<0.05 |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 6.7% (0 – 14.0%) | 15.5% (14.5 – 16.5%) | NS |

*NS, not significant*

Further examination of reoperations shows these are also similar to NSQIP national data (Table 8). The one reoperation I did after pancreatectomy was a 20 minute wound exploration I performed out of concern for dehiscence (fascial suture was found to have loosened but was intact and was reinforced). The reoperation after esophagectomy was secondary to anastomotic leak, and the observed rate is significantly less than expected nationally for our team.

Examination of organ space infections shows this is similar to national NSQIP data (Table 9). Composite inpatient and outpatient data are not controlled for case complexity which is why data are further stratified by procedure. This metric would be determined by placement of a drain, and can be a surrogate metric of Type B/C pancreas fistula, bile leak, and anastomotic leak.

EXHIBIT A_266

**Table 9: NSQIP Organ Space Infections, 95% CI (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) | P |
|---|---|---|---|---|
| Outpatient Cases | 2.3% (95% CI, 0 – 6.8%) | 0.4% (0.2 – 0.6%) | 0.12% (0.12 – 0.13%) | NS |
| Inpatient Cases | 7.0% (95% CI, 2.3 – 11.7%) | 7.0% (4.4 – 9.5%) | 3.0% (3.0 – 3.1%) | NS |
| Pancreatectomy | 8.8% (95% CI, 0 – 18.4%) | 11.8% (5.3 – 18.4%) | 13.4% (13.1 – 13.8%) | NS |
| Hepatectomy | 4.2% (95% CI, 0 – 12.2%) | 6.3% (1.4 – 11.2%) | 5.5% (5.3% – 5.8%) | NS |
| Esophagectomy | 8.3% (95% CI, 0 – 24.0%) | 8.9% (0.6 – 17.2%) | 12.3% (11.4 – 13.2%) | NS |

NS, not significant

My pancreatectomy and hepatectomy length of stay outcomes are better than expected (Table 10), which may be related to increased use of robotic-assisted approaches in my practice and through implementation of an ERAS protocol for pancreatectomy within the Division. My esophagectomy patients have a LOS of 10 days. I typically prepare esophagectomy patients to be in the hospital 10-14 days because of frailty concerns, care coordination for outpatient tube feeding, diet advance, and speech swallow assessments prior to discharge and the high distance travelled for our patients. Note that the Virginia Mason group of HPB/GI surgical oncologists reported a LOS of 10-12 days for esophagectomy and 8-10 days for pancreatectomy with a similar rural/regional referral catchment area (Low 2010).

**Table 10: Median Hospital Length of Stay (days) with Interquartile Ranges (2020 – 2023)**

| Subgroups | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 0 (0 – 1) | 0 (0 – 1) | 0 (0 – 1) |
| Inpatient Cases | 6 (3 – 9) | 6 (3 – 9) | 4 (2 – 7) |
| Pancreatectomy | 6 (5 – 8) | 6 (5 – 9) | 7 (5 – 10) |
| Hepatectomy | 1 (0 – 2) | 3 (1 – 5) | 4 (3 – 7) |
| Esophagectomy | 10 (7 – 17) | 9 (7 – 14) | 9 (7 – 14) |

My inpatient cases and division overall do have a longer length of stay than the average US general surgeon as our practice includes complex cases including HIPEC, esophagectomy, gastrectomy, pancreatectomy, hepatectomy, ovarian cancer cytoreductions, multivisceral resections, and resections of retroperitoneal sarcoma, plus specific consultations for palliative surgery and advanced hepatobiliary reconstructions. In addition, we receive a rural referral base for cancer care where travel times often can exceed 3-8 hours.

**Table 11: Utilization of Robotic Technologies**

| | Ganai (n=157) | Fargo SurgOnc (n=652) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|---|
| Outpatient Cases | 23.3% | 5.3% | 8.7% |
| Inpatient Cases | 32.5% | 13.1% | 7.5% |
| Pancreatectomy | 26.5% | 11.8% | 9.5% |
| Hepatectomy | 58.3% | 20.0% | 7.0% |
| Esophagectomy | 41.7% | 11.4% | 16.9% |

Overall, my utilization of robotic technologies (DaVinci Xi) is greater than the national average and encompasses the majority of robotic use in our Division of Surgical Oncology (Table 11). This use of robotic techniques probaoly impacts my average operative time as it typically takes longer to do the same operations robotically compared to open. In addition, I am doing oncologic robotic operations of high complexity, including those previously only performed at quaternary cancer centers (like robotic D2 lymphadenectomy). Because of this, I am the recipient of directed referrals from providers including Dr. Hannan (Altru Cancer Center), Dr. Potti (Cancer Center of North Dakota), Dr. Kurniali (Sanford Bismarck), and Dr. Gupta (Sanford RMCC) because they know I have a preference for considering minimally-invasive oncologic resections, and because of the strong relationships I have with my patients.

EXHIBIT A_267

My Whipple operative time is significantly longer than average (Table 12), but I have done a fair number of high biliary tract resections for perihilar cholangiocarcinoma including double hepaticojejunostomies and adding choledochoscopy set up into the procedures, all of which leads to increased time plus any time required waiting for frozen sections several times a case. In addition, 43% of my Whipples have coded for a vascular repair or reconstruction. I have also done several revisional Whipples after Roux en Y gastric bypass, two including gastrectomy and one maintaining the remnant stomach.

**Table 12: Operative Time (minutes)**

| | Ganai (n=157) | NSQIP Gen Surg (n=1,406,734) |
|---|---|---|
| Outpatient Cases | 121 (95% CI, 100 – 142) 23% robot | 74.9 (74.8 – 75.0) 9% robot |
| Inpatient Cases | 366 (95% CI, 330 – 401) 33% robot | 150 (149.6 – 150.2) 8% robot |
| Distal Pancreatectomy | 400 (95% CI, 336 – 463) 73% robot | 242 (240 – 244) 17% robot |
| Open Whipple/Total Panc | 561 (95% CI, 508 – 614) 43% vein repair/recon 29% complex (extrahepatic BD resection or Roux recons) | 383 (381 – 385) |
| Hepatectomy | 208 (95% CI, 151 – 264) 58% robot | 230 (228 – 231) 7% robot |
| Esophagectomy | 487 (95% CI, 395 – 579) 42% robot | 384 (380 – 388) 17% robot |

Note that NSQIP data represents a sample and does not include all my cases at Sanford.

## IV – My Intuitive App

I have completed 106 DaVinci operations at Sanford Broadway Medical Center with an average use of 3.5 hrs per patient. The precise relationships between case type and overall operative time can be difficult to correlate and tabulate since I often do redock the robot in order to complete more than one procedure under the same anesthesia (i.e. cholecystectomy and distal pancreatectomy; liver resection and oophorectomy). I am the only provider in the region who has been doing Robotic HIPECs, which adds an extra 2-2.5 hours of case time (setup time plus a 90 minute chemoperfusion). In addition, I include D2 lymphadenectomies in my complex foregut cases for their established oncologic benefit, which do take more time but are recognized to improve long-term survival.

I have performed several palliative double bypasses (hepaticojejunostomies + gastrojejunostomies) robotically, which while being longer cases than open palliative double bypasses, allows for better visualization, smaller incisions, and a goal of removal of a transhepatic catheter, thus dramatically improving quality of life considering a median LOS of 4 days. My average time for robotic cholecystectomy is 97 minutes, but notably these are radical cholecystectomies for mass or cancer (+liver/nodes) and/or remnant cholecystectomies, which is a complex reoperative operation that bears higher risk.

Of note, I have been doing a large proportion of robotic complex distal pancreatectomies, including pancreas neck lesions (tumor above SMV/portal confluence), as well as performance of splenic-preserving distal pancreatectomies in 67% of these operations. These cases are all notably more challenging than resection of tail lesions that include the spleen, so do take understandably more time to complete safely.

## V – Attribution Bias and Just Culture

My occurrence rates are not significantly different from expected for the case complexity I am expected to manage during my clinical duties, and I do have shorter than expected hospital LOS for many of these cases. I continue long-term surveillance with my patients with maintain excellent results including great feedback from medical oncologists and patients. I have not had a concern raised to

EXHIBIT A_268

me during my performance evaluations and I have been reminded by both Dr. Traynor and Dr. Garcia that I do have great responses on patient surveys.

To be fair, statements made attributing 'significantly worse outcomes' to me or my Division are false and are not founded by data controlled for coding error, complexity, risk, and the emergent nature of care for patients seen while on call. We as a health system need to consider consultation with an external data scientist and utilize validated clinical databases (like NSQIP) preferentially while being cautious in use and presentation of partitioned Vizient data without clinical correction as we are aware as a team through our prior study and expert opinion *and the literature* that there is poor intrinsic validity with assessing a service line or individual surgeon outcomes. In 2020, the intrinsic validity was less than 40% of cases attributed to the SMCF General Surgery Service Line, which does not instill trust in the system.

Vizient is not and was never designed to be used outside of hospital-to-hospital comparisons and it is an anchoring bias to assume it is the perfect tool. Internal validity is a metric that reveals the ability of an analysis to provide meaningful results that resemble what we would consider truth. Poor internal validity means the tool provides errors in estimation just as often as there is meaningful signal. In a study from Vanderbilt University examining mortality events assigned by Vizient to the otolaryngology service line, only 32% of events were actually attributable to their department (Freeman 2021). In a study from UMass Medical Center, 20% of cases designated in the Vascular Service line did not involve a vascular surgeon and only 69% of vascular surgery cases were included in the Vizient Vascular service line data set (Fang 2020). These authors highlighted, "analytic services provide powerful tools for outcomes analysis, but [Vizient's] predetermined service lines must be used with caution and carefully scrutinized at the division level to ensure that results mirror actual practice patterns".

Moreover, our goal as a system should not be to satisfy external motivations of improving our Vizient ranking at all costs to improve our visibility, but first focus on methods to prioritize delivery of optimal care to patients, correct low hanging fruit, improve our culture of safety, and also consider documenting and coding appropriately to improve our DRGs which will optimize our Vizient ranking. Attacking the performance of individual surgeons or service lines without data review will only provoke defensiveness of surgeons, decrease the credibility of the QI process, impair the culture of QI, and can actually provoke unintended issues of impaired surgeon well-being causing increased errors. It is important to consider "balancing measures" and checks to prevent unintended consequences of trying to improve one aspect of the system at the expense of the other. Remember that the 2014 edit to the Triple Aim, henceforth, the 'Quadruple Aim' includes: improving quality of care, improving patient satisfaction, cost reduction (adding value), and improving healthcare team well-being. Well-being and purpose at work for physicians is recognized to be critically linked with improved outcomes.

I strive for patient-preference concordant care as a goal, which as a cancer provider unfortunately sometimes means aiming for a good death in accordance to patient preferences. We must accept that until there is a "cure for cancer", we will unfortunately observe death to be a proximal outcome in patients with gastrointestinal and peritoneal malignancies, despite and in disregard to our best intentions. Death of mortal humans must then be reconciled without shame or blame, particularly if we are taking care of populations and are performing surgery harboring risk. Palliative surgery is the highest risk group of operations, with a risk of mortality of 20-30%, but it is typically performed congruent to a patients goals of care while negotiating risks and benefits and alternatives and respecting individual patient autonomy.

A "Just Culture" is a preferred way to improve quality across the spectrum and improves patient safety by empowering communication rather than creating fear of punishment and team members hiding their concerns. If we punish those individuals who take care of patients who later succumb to their disease because we are mortality-averse, we are then incentivizing those who game the system and cherry pick or deny care, which is unjust. We must allow clinicians who care for high risk populations to care for their patients, take accountability for their actions, and responsibility for doing better, and we must make it easier for them to make these duties safer.

## VI – Failure to Rescue

Preventable death and adverse events are a central concern in my discipline. Esophagectomy and pancreatectomy are considered high-risk surgeries with understood hospital-volume relationships (Birkmeyer 2003) and surgeon-volume relationships (Birkmeyer 2003), and major complication rates exceeding 40-50% (Low 2010). Of interest, having a high risk of complications does not correlate with having high mortality (Ghaferi 2012). The concept of "Failure to Rescue" (FTR) refers to mortality after a major complication, and explains hospital variation in mortality rates across procedures with high complication rates. Variability in procedure-specific complication rates may not very different across hospitals, but FTR is significantly associated with high-mortality facilities. For pancreatectomy, FTR is inversely linked to system characteristics including teaching status, hospital size >200 beds, census greater than 50% capacity, increased nurse-to-patient ratio, and hospital technology (Ghaferi 2010). Facility characteristics that allow for early identification of problems, whether by nurses or residents, allow for prevention of complications that later spiral towards FTR. These data suggest there are structures and processes of care within hospitals that are recognized to be linked with surgical outcomes. The attached Figure demonstrates how the system influences recognition and addressing complications that lead to FTR (Ghaferi 2012).



Fig. 2. Conceptual model outlining the interaction between hospital resources, behaviors, and attitudes in the early recognition and effective management of major postoperative complications.

For my 2022 FTR aspiration event, the patient had delayed gastric emptying, an entity found in 20-30% of Whipple patients. He had his diet advanced automatically upon return from IR despite his distension, then aspirated and was subsequently managed without discussion or input from the surgical team. He needed an NGT and this was not recognized by team members or nursing staff. For my 2023 aspiration event, the patient also did not get an NGT placed in a timely fashion. My colleague had a similar issue where a resident advanced the diet during M+M and when this was corrected after talking to the attending during conference, the patient had already been fed and he was found down dead without a monitor. I had a near miss patient in 2020 who aspirated post esophagectomy, but he was able to be promptly intubated and after recovery is alive with no evidence of disease.

FTR in Surgical Oncology populations was investigated using the Pennsylvania cancer registry with findings of aspiration in 5% of patients and the presence led to a mortality of 16% (Friese 2008). The rescue process has been examined closely and includes the following domains: (1) Teamwork, (2) Immediate Action Taking, (3) Psychological Safety (not being afraid to speak up), (4) Recognition, (5) Communication (Smith 2018). We could have done better with all these domains across these FTR aspiration events. We have had aspiration precautions and HOB elevation mandates for our esophagectomy patients (this is a lifetime risk) but these precautions are seldom followed and it is fairly common to manually reposition patients during rounds so their HOB is elevated.

EXHIBIT A_270

## VI – Surgical Education and Communication

One of the key concerns we had been dealing with is structural in the form of supervision of resident teams and how patients were assessed. Until July 2023, we were dealing with cross coverage concerns where often unknowingly the only person physically rounding on a patient in the morning was a PGY-1, leading to suboptimal care for our patients and an inability to rescue problems through lack of identification. We have addressed this, and the White Service is now structured with a PGY-1, PGY-3, and PGY-5, with appropriate accountability and graded supervision. We have reinforced with the residents that there must provide appropriate communication with attendings on any change in status or decisions that need to be made. Much of this in the form of process and standards is also documented in the White Service Manual.

Our residents still have some challenges in the modern educational paradigm. Many of our senior residents have never needed to place a nasogastric tube in a patient because of nurses who can do so, and I have had to start supervising chiefs to make sure they are comfortable. I have encountered times when more than resident has preferentially tried to order IR NG tubes when nurses are not available, which is not cost-effective and puts our patients at risk of aspirating through time delays. We probably need to develop a simulation to help educate them on how to make sure the NGT is functioning and how to place them. I am always happy to place NG tubes on anyone the moment I am made aware that there is a need.

Recognition of Delayed Gastric Emptying (DGE), an entity found in 20-50% of pancreatectomy and esophagectomy patients, and the necessity for NGT placement is a critical piece of education for nurses and residents that we will need to work on. This includes symptoms like nausea, reflux, hiccups, and belching. It includes signs like distension and holding an emesis bag. The hardest challenge for trainees is that gastric motility is independent of small bowel and colonic motility, and that DGE may be present despite flatus. Many of the residents and ICU nurses often will just feed our patients without assessing for DGE because of the presence of flatus, which is a major pitfall and educational hurdle we still need to overcome.

## VII – ICU Care

The ICU should be considered the safest place in North Dakota, so I was surprised to learn that my partners were afraid of the care delivered in the ICU at Sanford Broadway Medical Center. I was surprised to see how oversedated patients were and how we were often intentionally exacerbating postoperative delirium in our geriatric patients with inappropriate protocolized medication use with drugs like Benadryl given for bizarre indications like agitation. I do see a subtle overconfident cowboy mentality of care delivery in this unit without communication as a continued safety issue. We need to work together with the nurses so that our residents are allowed to participate in the care of these patients and that we as attendings are kept in the loop. This is a work in progress.

## VIII – Time versus Efficiency

I proudly spend as much time as I reasonably can with my patients, in clinic, on the floors, and in the operating room. I give patients and families my time based on what they need to make a decision. My new patient blocks for patients with complex malignancies are intentionally one hour long, because I know that investing in more time to teach the patient/family and answer patient/family questions increases patient satisfaction, improves the provision of goal-concordant care, and improves the efficiency of care delivery given the complexity of what we do. Taking an appropriate amount of time is also essential for provision of optimal informed consent (a topic I have written numerous book chapters on in the scope of Surgical Ethics).

Of secondary interest, the finding of significantly longer time in the operating room has been attributed to female surgeons, and has also been associated with less technical complications, shorter LOS, and better short-term and long-term outcomes (Blohm 2023). In a reflection that conscientiousness in surgery probably does matter, the commentary on this data highlighted the Navy Seal adage, "Slow

EXHIBIT A_271

is Smooth, and Smooth is Fast." (Almquist 2023).

While I understand the valid concern about my taking more operating room time for my cases, I would remind that my cases are complex, and with this in mind, I would favor improving efficiency rather than compromising patient short-term and long-term outcomes. As a member of the CSSP, I cannot advocate skimping on the node dissection for gastrectomies as that has been significantly associated with overall survival and is an important benchmarking performance metric. I also would rather take an appropriate amount of time to perform a modified Blumgart pancreaticojejunostomy that maintains its integrity rather than use a 'quicker technique' that is haphazard and increases propensity to leak. I would rather go slow with the meticulous process of taking tumor off the SMA rather than speed up and transect the vessel or cause a problem inadvertently.

I am still challenged with certain efficiencies that can be improved on, including being sure that I have my OR preference card followed (over half the time I am still given one of my partner's preference cards). I have on numerous occasions updated these cards, but that is not the problem, it is ultimately what gets picked is off another surgeon's card, and am so tired of asking why, so I stopped complaining and just wait for my needs to be fulfilled. As teaching faculty, I can also consider giving less of the case to the resident to improve use of operating room time (although I am not clear this will be linked with outcome based on the current literature which suggests increased time and improved outcomes with resident participation).

We typically have to wait 45 minutes for a an intraoperative frozen section, which can be over 60 minutes if there is a non-GI pathologist at Broadway. This effectively can limit 90-120 minutes of progress prior to anastomosis if we have to take multiple frozen sections during the course of a case. These frozen section checkpoints are a necessity for patients with hilar/extrahepatic cholangiocarcinomas and subtotal and total gastrectomies. Having to set up for a choledochoscopy or upper endoscopy can also increase OR time by 20-40 minutes.

I recently had a giant fly land on a scrub table, which while not under my control, delayed progress of my case for at least an hour since we had to open and count new instruments and suture. I do not fault the fly, nor do I fault myself, nor do I fault the team. I accept that these things happen and that we have to move on and take care of the patient. If the system allowed the fly to get into the OR, then the system as a whole must take some accountability and allow progress to happen and support the surgeon with new instruments to take the best care of the patient they can. This exemplifies 'Just Culture'.

**VIII – Performance Improvement Plan**
1. I will monitor my cases using the ACS SSR Program and NSQIP and compare my performance metrics on a quarterly basis.
2. I will continue to track my robotic cases including operative time using the MyIntuitive app.
3. I will continue to present my cases preoperatively at GI tumor board and/or at the Broadway Case Conference. Note that I introduced this conference as a biweekly discussion of case planning with image review in order to improve resident education.
4. I will continue to collaborate with my partners and schedule them to be available as backup for complex resections such as major hepatectomies.
5. Our division has agreed to require aspiration precautions including HOB elevation for all our complex GI surgical patients (HPB, foregut, HIPEC) rather than just after esophagectomy as all of these patients have issues with delayed gastric emptying (DGE), aspiration risk and FTR.
6. I will work with our division to update our White Service Manual and protocols at least twice yearly.
7. Our division will continue to work on improving resident and nursing education on delayed gastric emptying and nasogastric tube placement.
8. I will meet with ICU nursing staff to continue to improve communication with staff and our team.
9. I will work with Dr. Zriek to provide recommendations for an aspiration prevention protocol.
10. I will work on improving efficiency of my operative cases by journaling and discussing issues with staff to address delays related to cards so that these can eventually be remedied.

Sincerely,

*[signature]*

Sabha Ganai, MD, PhD, MPH, FACS, FSSO
Associate Professor of Surgery, University of North Dakota
Clinical Investigator, Sanford Research
GI/HPB Surgical Oncologist, Sanford Health
Executive Council, American Colllege of Surgeons Cancer Surgery Standards Program

References:
Almquist M. Are women better surgeons than men? JAMA Surg 2023; E1

Birkmeyer JD, Siewers AE, Finlayson EV, Stukel TA, Lucas FL, Batista I, Welch HG, Wennberg DE. Hospital volume and surgical mortality in the United States. *N Engl J Med* 2002; 346(15): 1128 – 1137.

Birkmeyer JD, Stukel TA, Siewers AE, Goodney PP, Wennberg DE, Lucas FL. Surgeon volume and operative mortality in the United States. *N Engl J Med* 2003; 349: 2117-2127.

Blohm M, Sandblom G, Eriochsson L, Osterberg J. Differences in cholecystectomy outcomes and operating time between male and female surgeons in Sweden. JAMA Surg 2023; E1-E10.

Fang ZB, Chao C, Durocher D, et al. Assessment of the Accuracy and Reliability of Vascular Surgery Quality Metrics. Ann Vasc Surg 2020; 67: 134-142.

Freeman MH, Slayton JM, Woods MC, et al. Improving Mortality Attribution in Otolaryngology – Head and Neck Surgery. Laryngoscope 2021; 131(6): e1805-e1810.

Friese CR, Aiken LH. Failure to Rescue in the Surgical Oncology Population: Implications for Nursing and Quality Improvement. *Oncol Nurs Forum* 2008; 35(5): 779

Ghaferi AA, Dimick JB. Variation in Mortality after High-Risk Cancer Surgery: Failure to Rescue. *Surg Oncol Clin N Am* 2012; 389-395.

Ghaferi AA, Osborne NH, Birkmeyer JD, Dimick JB. Hospital characteristics associated with failure to rescue complications after pancreatectomy. J Am Coll Surg 2010; 211: 325-330.

Low DE, MaahanKumar K, Hashimoto Y, Traverso LW. Comparing complications of esophagectomy and pancreatectomy and potential impact on hospital systems utilizing the Accordion Severity Grading System. *J Gastrointest Surg* 2010; 14: 1646-1652.

Smith ME, Wells EE, Friese CR, Krein SL, Ghaferi AA. Interpersonal and organizational dynamics are key drivers of Failure to Rescue. *Health Aff* 2018; 37(11): 1870-1876.

EXHIBIT A_273

**From:** Workday Peakon Employee Voice <app@peakon.com>
**Sent:** Monday, December 11, 2023 8:52 AM
**To:** Ganai,Sabha <Sabha.Ganai@SanfordHealth.org>
**Subject:** Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

**Your identity is protected**





**If you were offered the same job at another organization, how likely is it that you would stay at this organization?**

You wrote:

My view has only changed on this in the last 6 months. The administration is toxic and does not care about patients or physician well being. I am ashamed of the administration.

You scored:



Download the Workday Peakon Employee Voice mobile app to reply to conversations on the go.

 

To learn more about how to use Workday Peakon Employee Voice, visit the Help Center

If you no longer wish to receive these emails, click here

------------------------------------------------------------------------
Confidentiality Notice: This e-mail message, including any attachments,
is for the sole use of the intended recipient(s) and may contain
privileged and confidential information. Any unauthorized review, use,
disclosure or distribution is prohibited. If you are not
the intended recipient, please contact the sender by reply e-mail and destroy
all copies of the original message.

EXHIBIT A_275

# Douglas replied to a comment you left

Only people who can reply to your comments will see your
conversation, and your identity is not displayed.

Douglas Griffin MD

**DG**     I am sorry to hear of your feelings on this and would welcome a chance to visit
on this. this is confidential so I don't know who is responding. You can contact
me directly via email or phone 701-417-2317. Thanks Doug Griffin

**View message and reply**

Link not working? Copy and paste the URL below into your browser

https://app.peakon.com/?mailLinkId=ehVAq4EVDYANGzxRPIYAWi4eOAxHAWdf

Your answer in the survey

**Sent:** Tuesday, December 26, 2023 4:31 PM
**To:** Griffin,Douglas <Douglas.Griffin@SanfordHealth.org>
**Subject:** RE: Douglas Griffin MD replied to a comment that you left.
**Sensitivity:** Private

Dear Dr. Griffin,

I hope you had a good Christmas.

No need to respond if you are away through the New Year.

This PeakOn comment was mine and I feel it is not fair or constructive to leave it anonymous.

I do have concerns about how our CGSO surgical oncologists are treated and I am really worried that we will soon lose a lot of what has been built to develop our infrastructure and team.

For some context, in August, I was placed on a PIP, which I signed in good faith prior to being emailed "the data" to respond to a few weeks later, calculated with partitioned unvalidated Vizient administrative data on mortality rates, fully understanding that mortality will be proportional to the type and amount of call taken by individuals within our division since we consult on the most complex patients within the system and often admit dying patients and/or need to consider palliative operations. As a team, surgical oncology manages everything directed to us from the two time zones of North Dakota plus Northern MN/SD, plus helps with everything too complex for acute care surgery or colorectal surgery or bariatric surgery or general surgery providers to handle. After responding in the PIP document with a proper analysis explaining those results with chart review and showing additional data demonstrating better outcomes and shorter LOS than national NSQIP data for cases like hepatectomy and pancreatectomy, the intent and conversation has spiraled and diverged a bit more and more at every meeting, from outcomes, to time, to efficiency, to my lack of knowledge where stapler loads are theoretically stored in Fargo while operating on a weekend. In terms of process, I still have not received a formal response or any direction from the Sanford "Care Monitoring Committee". The documents in question were submitted over 3 months ago and are attached.

At our recent meeting earlier in the week, our discussion included our Division call schedule for 2024, which does not include Dr. Sticca since he expects to be retiring *soon*. This call schedule can be referenced here: https://docs.google.com/document/d/1sgfirDxNFa3y2o0_cx3Al45XvnM0VzBmYZvgHDGbtj0/edit?usp=sharing

Note that only QTR 1 is final, but we chose to prepare a timeline a year in advance for planning purposes.

EXHIBIT
F

There are 3-4 days out of the entire year where I mentioned that the transplant team would help us cover (this was per speaking with Dr. Mistry). This need for support was not brought up because of personal time or vacation requests, these are days the first weekend in April where I was *invited* as a speaker at the AHPBA international meeting in Miami to discuss what Sanford Surgical Oncology has been doing optimizing prehabilitation for geriatric patients needing HPB surgery, and Dr. Tuvin also needs to speak at the ND/SD ACS chapter meeting in Aberdeen SD as he is the *President* of the ND chapter and the State Chair. Both me and Dr. Tuvin are otherwise perfectly capable of managing the remaining 362-3 days of the leap year call schedule. What was remarkable about this concern for a defect in our call schedule is we were simultaneously criticized for taking too much call, but when I clarified and requested a couple days of help from the Chair of General Surgery (I would not normally ask, but this became the point of discussion), I was told harshly we could not go to these conferences, and that we had to cover CGSO at all times, which is what we were already doing making lateral arrangements for coverage of the mentioned 3 days via Transplant Surgery. It is not worth arguing about, all these attitudes are just frustrating on basis of being the antithesis of wellness and support. There is no psychological safety because I know only in a toxic culture like this I should be avoidant of even bringing these kinds of things up, knowing it will be lambasted.

I get the idea of control, but it is clear that general surgery as a 'parent' Department does not *appreciate or care* about the contributions of myself or Dr. Tuvin within the Division of Surgical Oncology, even for an idea of support or respite (even while the group was morbidly hypothesizing out loud what would happen if the two of us were both hospitalized simultaneously). We are ABS *double* board-certified (gen surg and CGSO), and we are more than happy to help general surgery and accept all the complex cases that general surgery does not want to do or lacks training or expertise to do well. *These are patients who are in need of great support and assistance who we want to serve.*

Note that Bariatrics also has a separate call schedule and is positioned as their own Department separate from general surgery, but we are not privileged the same way here despite having a separate Board examination process. We do have a very impactful role through RMCC and remain critically aligned with the needs of medical oncology and radiation oncology and improvement of oncology care within our region.

I responded to the PeakOn survey very honestly with that comment. I remain ashamed of the attitudes and statements and practices I have seen over the past few months, and I will do my best to manage through this aiming for taking the best care of our patients as possible. I see a lot of potential for growth in our Division and for oncology as a whole, but to grow, we need to be nurtured a bit instead of trampled on.

EXHIBIT A_278

Sabha

**Sabha Ganai, MD, PhD, MPH, FACS, FSSO**

Division of Surgical Oncology
Associate Professor of Surgery, UND

Director of Surgical Education, UND

Adjunct Professor of Pharmacology, NDSU

Clinical Investigator, Sanford Research



January 23, 2024

Sabha Ganai M.D.

Re:     Employment Agreement (the "Agreement") // Termination

Dr. Ganai:

This letter shall confirm that Sanford has elected to terminate your Employment Agreement (the "Agreement") pursuant to Section 12(a).  Your termination will be effective immediately.  In lieu of 90 days' notice, Sanford will pay to you a lump sum ninety-day payment of $139,435.00.  You will also be receiving information regarding continuation of any elected health and dental benefits.

You will also be receiving information regarding continuation of any elected health and dental benefits.

Sincerely,

Dr. Doug Griffin
Vice President, Clinic



STATE OF NORTH DAKOTA          DISTRICT COURT

COUNTY OF CASS          EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Sabha Ganai, M.D., Ph.D., FACS, <br><br> Plaintiff, <br><br> v. <br><br> Sanford Medical Center Fargo, <br><br> Defendant. | Court File No. 09-2024-cv-03147 <br><br> **PROTECTIVE ORDER** |

Based on the parties' Stipulation for Protective Order, and the reasons cited therein, the Court, being fully advised in the matter, makes the following Order:

1. **Definitions.** As used in this protective order:

    (a)      "attorney" means an attorney who has appeared in this action;

    (b)      "confidential document" means a document designated as confidential under this protective order;

    (c)      to "destroy" electronically stored information means to delete from all databases, applications, and file systems so that the information is not accessible without the use of specialized tools or techniques typically used by a forensic expert;

    (d)      "document" means information disclosed or produced in discovery, including at a deposition;

    (e)      "notice" or "notify" means written notice;

    (f)      "party" means a party to this action; and

    (g)      "protected document" means a document protected by a privilege or the work-product doctrine.

2. **Designating a Document or Deposition as Confidential.**

(a)    A party or non-party disclosing or producing a document may designate it as confidential if the party or non-party contends that it contains confidential or proprietary information.

(b)    A party or non-party may designate a document as confidential by conspicuously marking each page with the word "confidential."

(c)    Deposition testimony may be designated as confidential:

(1)    on the record at the deposition; or

(2)    after the deposition, by promptly notifying the parties and those who were present at the deposition within fourteen days after the deposition.

(d)    If a witness is expected to testify as to confidential or proprietary information, a party or non-party may request that the witness's deposition be taken in the presence of only those persons entitled to receive confidential documents.

**4.    Who May Receive a Confidential Document.**

(a)    A confidential document may be used only in this action.

(b)    No person receiving a confidential document may reveal it, except to:

(1)    the court and its staff;

(2)    an attorney or an attorney's partner, associate, or staff;

(3)    a person shown on the face of the confidential document to have authored or received it;

(4)    a court reporter or videographer retained in connection with this action;

(5)    a party (subject to paragraph 3(c)); and

(6)    any person who:

(A)    is retained to assist a party or attorney with this action; and

2

(B)     signs a declaration that contains the person's name, address, employer, and title, and that is in substantially this form:

> I have read, and agree to be bound by, the protective order in the case captioned *Sabha Ganai, M.D., Ph. D., FACS v. Sanford Medical Center Fargo*, Case No. 09-2024-CV-03147 in the East Central Judicial District Court in Cass County, North Dakota.  As soon as my work in connection with that action has ended, but not later than 30 days after the termination of that action (including any appeals), I will return or destroy any confidential document that I received, any copy of or excerpt from a confidential document, and any notes or other document that contains information from a confidential document.
>
> I declare under penalty of perjury that the foregoing is true and correct.

(c)     A party may supplement the "confidential" mark (see paragraph 2(b)) with the words "attorney's eyes only," in which case a confidential document so designated may not be revealed to another party. Any party to this litigation and any third party shall have the right to designate as "Attorneys' Eyes Only" any information, document, or thing, or portion of any document or thing that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause harm to an individual or to the business or competitive position of a party, including but not limited to the following categories of documents: (a) information prohibited from disclosure by statute; (b) information that reveals trade secrets; (c) medical information concerning any individual; (d) personal identity information; or (e) income tax returns (including attached schedules and forms), W-2 forms and 1099 forms.

(d)     If a confidential document is revealed to someone not entitled to receive it, the parties must make reasonable efforts to retrieve it.

3

4.    **Serving This Protective Order on a Non-Party.**  A party serving a subpoena on a non-party must simultaneously serve a copy of this protective order.

5.    **Correcting an Error in Designation.**  A party or non-party who discloses or produces a confidential document not designated as confidential may, within 7 days after discovering the error, provide notice of the error and produce a copy of the document designated as confidential.

6.    **Use of a Confidential Document in Court.**

   (a)    Filing.  If a party seeks to file documents designated as "Confidential," the party must first file a motion for leave to file under seal, accompanied by a memorandum in support, setting forth the legal basis for sealing the documents, in accordance with the Administrative Policy Governing Electronic Filing and Service.  If only portions of the documents designated as "Confidential" contain sensitive information and a party seeks to file the documents with the court, that party must (1) file a motion for leave to file under seal and a memorandum in support of the motion, which provides an explanation of the legal basis for redacting information from the document, and (2) attach to the motion for leave to file under seal an unredacted copy of the document and a proposed redacted copy of the document. The proposed redactions shall be highlighted or otherwise identified in a manner that enables the Court and the other party to easily review the proposed redactions.

   (b)    Presentation at a hearing or trial.  A party intending to present another party's or a non-party's confidential document at a hearing or trial must promptly notify the other party or the non-party so that the other party or the non-party may seek relief

4

from the court. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

7.     **Changing a Confidential Document's Designation.**

(a)     Document disclosed or produced by a party.  A confidential document disclosed or produced by a party remains confidential unless the parties agree to change its designation or the court orders otherwise.

(b)     Document produced by a non-party.  A confidential document produced by a non-party remains confidential unless the non-party agrees to change its designation or the court orders otherwise after providing an opportunity for the non-party to be heard.

(c)     Changing a designation by court order.  A party who cannot obtain agreement to change a designation may move the court for an order changing the designation. A party who has designated a document as confidential or "attorney's eyes only" must respond to a challenge to the designation within five (5) business days. If the motion affects a document produced by a non-party then, with respect to the motion, that non-party is entitled to the same notice and opportunity to be heard as a party.  The party or non-party who designated a document as confidential must show that the designation satisfies N.D. R. Civ. P. 26(c).

8.     **Objecting to a Document's Designation.**

(a)     If Counsel for a party receiving documents or information designated as Confidential or Attorneys' Eyes Only hereunder objects to such designation of any or all such items, the following procedure shall apply:

5

     (1)    Counsel for the objecting party shall promptly serve on the designating party or third party a written objection to such designation, which shall describe with particularity the documents or information in questions and shall state the grounds for objection.

     (2)    Counsel for the designating party or third party shall respond in writing to such objection within five (5) business days, and shall state with particularity the grounds for asserting that the document or information is Confidential or Attorneys' Eyes Only.

     (3)    If the designating party or nonparty makes a timely response to such objection asserting the propriety of the designation, counsel shall then confer in good faith in an effort to resolve the dispute.

(c)    If a dispute as to a Confidential or Attorneys' Eyes Only designation of a document or item of information cannot be resolved by agreement, the proponent of the designation being challenged shall seek to present the dispute to the Court in~~itially by telephone before~~ by filing a formal motion for an order regarding the challenged designation. A confidential document may be filed only in accordance with the court's rules. If Attorneys' Eyes Only information is to be filed with the Court, all such information shall be filed under seal. The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

Although the parties agreed to present the dispute by telephone, the Court requires the parties to follow motion procedure

**9.    Handling a Confidential Document after Termination of Litigation.**

(a)    Within 60 days after the termination of this action (including any appeals), each party must:

     (1)    return or destroy all confidential documents; and

6

(2)    notify the disclosing or producing party that it has returned or destroyed all confidential documents within the 60-day period.

(b)    Notwithstanding paragraph 8(a), each attorney may retain a copy of any confidential document submitted to the court.

**10.    Inadvertent Disclosure or Production to a Party of a Protected Document.**

(a)    Notice.

(1)    A party or non-party who discovers that it has inadvertently disclosed or produced a protected document must promptly notify the receiving party and describe the basis of the claim of privilege or protection. If the party or non-party provides such notice and description, the privilege or protection is not waived.

(2)    A party who discovers that it may have received an inadvertently disclosed or produced protected document must promptly notify the disclosing or producing party or non-party.

(b)    Handling of Protected Document. A party who is notified or discovers that it may have received a protected document must comply with N.D. R. Civ. P. 26(b)(5)(B).

**11.    Security Precautions and Data Breaches.**

(a)    Each party must make reasonable efforts to protect the confidentiality of any confidential document disclosed or produced to that party.

(b)    A party who learns of a breach of confidentiality must promptly notify the disclosing or producing party of the scope and nature of that breach and make reasonable efforts to remedy the breach.

7

12.     **Use of Confidential Documents at Trial.** Subject to the provisions of Paragraph 6, nothing in this protective order shall be construed to affect the use of any document, material, or information at any trial or hearing.

13.     **Survival of Obligations.** The obligations imposed by this protective order survive the termination of this action.

**SO ORDERED:**

Dated: _____

12/13/2024 11:45:46 AM

_Stephanie N. Stiel_

_____
Hon. Stephannie Stiel
Judge of District Court

8

STATE OF NORTH DAKOTA

COUNTY OF CASS

DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Sabha Ganai, M.D., Ph.D., FACS,<br><br>        Plaintiff,<br><br>   v.<br><br>Sanford Medical Center Fargo, and Sanford Clinic North,<br><br>        Defendants. | Court File No. 09-2024-cv-03147<br><br>**DEFENDANTS' ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT** |

Defendants Sanford Medical Center Fargo ("SMCF")[1] and Sanford Clinic North ("SCN") (collectively, "Defendants"), as for their joint and separate Answer to Plaintiff Sabha Ganai's ("Plaintiff") First Amended Complaint in the above-captioned action, denies each and every allegation set forth in the First Amended Complaint except as hereinafter admitted, qualified, explained, clarified, or otherwise pleaded, and specifically answers as follows:

## ALLEGED FIRST AMENDED COMPLAINT

1.    As to paragraph 1, Defendants admit only that Plaintiff purports to assert alleged claims, but specifically denies that it violated any federal, state, or local law concerning Plaintiff's employment.

## ALLEGED NATURE OF THE ACTION

2.    As to the allegations in the first sentence of paragraph 2, Defendants admits only that Plaintiff is an oncologist who has practiced for more than 12 years, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore

---

[1] Sanford Medical Center Fargo is not the proper defendant in this case. Plaintiff's former employer, as set forth in her Staff Physician Agreement, was Sanford Clinic North.

denies them.  As to the allegations in the second sentence of paragraph 2, Defendants admit only that Plaintiff joined Sanford Clinic North in 2020 to perform the services outlined in her Staff Physician Agreement, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore denies them.  In further responding, Defendants admit the allegations contained in the final sentence of paragraph 2 but clarify that Plaintiff was employed only by Defendant Sanford Clinic North; Plaintiff was not employed by Defendant Sanford Medical Center Fargo.

3.     As to paragraph 3, Defendants admit only that Plaintiff purports to assert alleged claims under N.D. Cent. Code § 34-01-20, but specifically denies that it violated any federal, state, or local law concerning Plaintiff.

## ALLEGED PARTIES

4.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 4, and therefore denies them.

5.     As to the allegations in the first sentence of paragraph 5, Defendants admit only that SMCF is a North Dakota non-profit, but denies the remaining allegations.  In further responding, Defendants deny the allegations contained in the second sentence of paragraph 5.

6.     As to the allegations in paragraph 6, Defendants admit only that SCN is a North Dakota non-profit, but denies the remaining allegations.

7.     Defendants deny the allegations contained in paragraph 7.

## ALLEGED JURISDICTION AND VENUE

8.     As to paragraph 8, Defendants admit only that Defendant SCN employed Plaintiff as a surgical oncologist in the Division of Surgical Oncology, but deny the remaining allegations.

EXHIBIT A_290

9.      The alleged document speaks for itself, and Defendants therefore deny the allegations contained in paragraph 9.

## **ALLEGED FACTS RELEVANT TO ALL CLAIMS**[2]

10.      As to the allegations contained in the first sentence of paragraph 10, Defendants admit only that Defendant SCN employed Plaintiff, but deny the remaining allegations of the same. As to the remaining allegations contained in paragraph 10, Defendants state that the offer letter and Staff Physician Agreement speak for themselves, and therefore deny the remaining allegations.

11.      Defendants state that the Staff Physician Agreement speaks for itself, and therefore deny the allegations contained in paragraph 11.

12.      Defendants deny the allegations contained in paragraph 12.

13.      Defendants deny the allegations contained in paragraph 13.

14.      As to the allegations contained in paragraph 14, Defendants admit only that Plaintiff entered into a Performance Improvement Plan ("PIP") in August of 2023 for the reasons outlined therein, but denies the remaining allegations in paragraph 14 as phrased.

15.      Defendants deny the allegations contained in paragraph 15.

16.      Defendants admit only the allegations contained in the first sentence of paragraph 16, but deny the remaining allegations contained in paragraph 16.

17.      Defendants deny the allegations contained in paragraph 17.

18.      Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 18, and therefore denies them.

19.      Defendants deny the allegations contained in paragraph 19.

20.      Defendants deny the allegations contained in paragraph 20.

---

[2] Defendants deny the paragraph headings within Plaintiff's alleged "FACTS RELEVANT TO ALL CLAIMS" section.

EXHIBIT A_291

21.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 21, including what Plaintiff believes she "explained" during the August 22, 2023 meeting, and therefore deny the allegations contained in paragraph 21.

22.     The documents referred to in paragraph 22 speak for themselves, and therefore Defendants deny the allegations contained in paragraph 22.

23.     Defendants deny the allegations in paragraph 23 as phrased.

24.     Defendants deny the allegations in paragraph 24 as phrased.

25.     The alleged email speaks for itself, and therefore Defendants deny the allegations contained in paragraph 25.  In further responding, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 25 regarding whether Plaintiff "analyzed" data, and therefore deny the allegations contained in paragraph 25.

26.     The alleged PIP response speaks for itself, and Defendants therefore deny the allegations contained in paragraph 26.

27.     The alleged PIP response speaks for itself, and Defendants therefore deny the allegations contained in paragraph 27.

28.     Defendants deny the allegations contained in paragraph 28.

29.     Defendants deny the allegations contained in paragraph 29.

30.     The allegations contained in paragraph 30 appear to refer to a document. Accordingly, such a document would speak for itself, and Defendants therefore deny the allegations contained in paragraph 30.

31.     The allegations contained in paragraph 31 appear to refer to a document. Accordingly, such a document would speak for itself, and Defendants therefore deny the allegations contained in paragraph 31.

EXHIBIT A_292

32.     Defendants deny the allegations contained in paragraph 32 as phrased.

33.     The alleged document speaks for itself, and Defendants therefore deny the allegations contained in paragraph 33.

34.     The alleged document speaks for itself, and Defendants therefore deny the allegations contained in paragraph 34.

35.     The allegations in paragraph 35 contain legal conclusions to which no response is required.  To the extent paragraph 35 is construed to include allegations requiring a response, such allegations are denied.

36.     The alleged email speaks for itself, and Defendants therefore deny the allegations contained in paragraph 36.

37.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 7, including what Plaintiff believed she "explained," and therefore deny the allegations contained in this paragraph.

38.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 38, including what Plaintiff believes she "informed" Dr. Griffin of, and therefore deny the allegations contained in this paragraph.

39.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 39, including what Plaintiff purported to "affirm," and therefore deny the allegations contained in this paragraph.

40.     Defendants deny the allegations contained in paragraph 40 as phrased.

41.     Defendants deny the allegations contained in paragraph 41.

EXHIBIT A_293

### ALLEGED COUNT I
### RETALIATION IN VIOLATION OF N.D.C.C. § 34-01-20
### Plaintiff Against All Defendants

42.     Defendants incorporate by reference herein its responses to the forgoing paragraphs.

43.     The allegations in paragraph 43 contain legal conclusions to which no response is required.  To the extent paragraph 43 is construed to include allegations requiring a response, such allegations are denied.

44.     Defendants deny the allegations contained in paragraph 44.

45.     The allegations in paragraph 45 contain legal conclusions to which no response is required.  To the extent paragraph 45 is construed to include allegations requiring a response, such allegations are denied.

46.     The allegations in paragraph 46 contain legal conclusions to which no response is required.  To the extent paragraph 46 is construed to include allegations requiring a response, such allegations are denied.

47.     The allegations in paragraph 47 contain legal conclusions to which no response is required.  To the extent paragraph 47 is construed to include allegations requiring a response, such allegations are denied.

48.     The allegations in paragraph 48 contain legal conclusions to which no response is required.  To the extent paragraph 48 is construed to include allegations requiring a response, such allegations are denied.

49.     The allegations in paragraph 49 contain legal conclusions to which no response is required.  To the extent paragraph 49 is construed to include allegations requiring a response, such allegations are denied.

6

## **ALLEGED PRAYER FOR RELIEF**

50.    Defendants deny Plaintiff is entitled to the relief set forth in Plaintiff's alleged "PRAYER FOR RELIEF" and the corresponding wherefore clause following paragraph 50, including subsections A-D.

## **ALLEGED JURY DEMAND**

51.    The allegations in paragraph 51 contain legal conclusions to which no response is required.  To the extent this paragraph is construed to include allegations that require a response, such allegations are denied.

## **AFFIRMATIVE AND OTHER DEFENSES**

In further answering, Defendants allege the following affirmative and other defenses:

1.    Plaintiff fails, in whole or in part, to state a claim for which relief may be granted. More specifically, Plaintiff cannot prove all the necessary elements of her claim.  Further, Plaintiff's Complaint fails to state sufficient facts that would support an award of actual, compensatory, treble, punitive, emotional distress, or other damages or fees against Defendants.

2.    Plaintiff's claims may be barred in whole, or in part, because of the applicable statutes of limitations, because it was not timely filed and/or served, because Plaintiff failed to name the proper defendant in her Charge and the claim is time barred, because Plaintiff failed to exhaust her administrative remedies as to the proper defendant and the claim is time barred, because Plaintiff failed to name the proper defendant in this Complaint and the claim is time barred, because Plaintiff failed to timely commence a lawsuit against the proper defendant and the claim is now time barred, and/or because of other applicable statutory or administrative filing requirements (including, but not limited to, bars to recovery such as waiver, unclean hands, laches, equitable estoppel, and/or mistake).

7

3.      Each action taken with respect to Plaintiff was justifiable, was for good and just cause, was within the legitimate exercise of management discretion and business necessity, and was not willful, wanton, malicious or done with a reckless or knowing manner.

4.      Any purported adverse employment action occurred based on legitimate, non-discriminatory, and non-retaliatory reasons entirely unrelated to Plaintiff's exercise of any purported rights or status.

5.      Plaintiff's Complaint, and her alleged cause of action, is barred in whole or in part because Plaintiff's former employer had an honest, good-faith belief that all decisions were made solely for legitimate, business-related reasons and were reasonably related upon the facts as it understood them.

6.      Plaintiff's former employer exercised reasonable care to prevent any retaliation and to promptly correct any discriminatory or retaliatory behavior (including having in place a clear and well-disseminated policy against discrimination, harassment, and retaliation, and a reasonable and available procedure for promptly and effectively handling such complaints). Plaintiff unreasonably failed to take advantage of these preventive or corrective opportunities provided by her former employer or to avoid harm otherwise.

7.      Plaintiff's Complaint fails, in whole or in part, because Plaintiff failed to engage in protected conduct and there was no causal link between any such alleged activity and any alleged adverse action that Plaintiff's former employer took against her.

8.      Plaintiff's claimed damages, if any, were caused by her own conduct and are barred, in whole or in part, by her failure to mitigate said damages.

9.      To the extent Plaintiff is seeking punitive damages, such claim is barred because an award of such damages would violate Defendants' Constitutional rights.

EXHIBIT A_296

10.    To the extent Plaintiff is seeking punitive damages, such a claim is barred because the alleged acts or omissions of each respective Defendant do not rise to the level required to sustain an award of punitive damages, do not evidence malicious or reckless indifference, are not so wanton or willful as to support an award of punitive damages, and do not otherwise entitle Plaintiff to punitive damages.

11.    The extent to which Plaintiff's Complaint may be barred by any remaining affirmative or other defenses, including those contemplated by the North Dakota Rules of Civil Procedure, cannot be determined at this time without the benefit of additional discovery.  Thus, as a separate and affirmative defense to Plaintiff's Complaint, Defendants reserves the right to assert all affirmative defenses and other defenses as appropriate.

WHEREFORE, having responded to the allegations in Plaintiff's Complaint, Defendants hereby requests that the Court enter an Order:

A.    Dismissing the Complaint in its entirety, with prejudice, and awarding Defendants their costs and expenses, including reasonable attorneys' fees, as set forth under the law; and

B.    Awarding Defendants such other relief as the Court deems just and proper.

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P. C.**

Dated:  November 27, 2024            /s/ Brent D. Kettelkamp
                                                        Brent D. Kettelkamp, ND #09600
                                                        Tyler W. Hartney, ND #09226
                                                        Capella Tower
                                                        225 South Sixth Street, Suite 1800
                                                        Minneapolis, MN  55402
                                                        Telephone:  612-339-1818
                                                        Facsimile:  612-339-0061
                                                        brent.kettelkamp@ogletree.com
                                                        tyler.hartney@ogletree.com

                                                        **Attorneys for Defendants**

9

STATE OF NORTH DAKOTA                                              IN DISTRICT COURT

COUNTY OF CASS                                            EAST CENTRAL JUDICIAL DISTRICT

Sabha Ganal vs. Sanford Medical Center Fargo
09-2024-CV-03147

Notice of Zoom Hearing

[¶1]  The Plaintiff (s) and Defendant (s) are hereby notified that a **Scheduling Conference** has been scheduled in the above entitled case on the  **3rd day of March, 2025 at 2:15 PM.**

[¶2]  This hearing will be held by **Zoom Video Conference,** <u>and</u> at the courthouse.

[¶3]  You can go to www.zoom.us and click "**Join Meeting.**"  You will be prompted to enter the following **Meeting ID 895 7409 4352** and **Passcode 846796.**  You will be placed into a virtual waiting room until the Court connects you into the meeting.

[¶4]  If you do not have the technology to connect via video as instructed above, you must call into the Zoom meeting at the following **Phone Number** <u>1 (669) 900-9128.</u>  You will be prompted to enter the **Meeting ID 895 7409 4352** and **Passcode 846796** followed by **#.**  Participants will then be asked to press **#** again to continue into the meeting.

[¶5]  All parties have the right to appear personally in Court on the above date and time at the Cass County Courthouse, 211 9th St. S., Fargo, ND.

[¶6]  For information on the East Central Judicial District's procedures for proceedings by Reliable Electronic Means, please go to https://www.ndcourts.gov/court-locations/East-Central/REM

[¶7]  If a party objects to video/telephonic appearance, a written request must be submitted to 09clerk@ndcourts.gov for review by a Judge or Judicial Referee. If you have any questions, you may call the Clerk's Office at (701)451-6900.

Dated this 23rd day of January, 2025.

Linda Fatland
Cass County Clerk's Office
P.O. Box 2806
Fargo, ND  58108

Cc:

STATE OF NORTH DAKOTA                                    IN DISTRICT COURT

COUNTY OF CASS                              EAST CENTRAL JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| Sabha Ganai, M.D., Ph.D., MPH, FACS, FSSO, | ) | |
| | ) | |
| Plaintiffs, | ) | **CERTIFICATE OF SERVICE** |
| vs. | ) | |
| | ) | Civil No.: 09-2024-CV-03147 |
| Sanford Medical Center Fargo | ) | |
| | ) | |
| Defendant. | ) | |

---

[¶1] I, Jaiden Cutler, hereby certify that on March 4, 2025, the following document was served by sending a true and correct copy thereof pursuant to N.D.R.Ct. 3.5 by electronic means to the email addresses listed below:

| Name | (E-mail) |
|---|---|
| Brett D. Kettelkamp (ND#09600) | brent.kettelkamp@ogletree.com |
| Kristen E. Prinz | kprinz@prinz-lawfirm.com |
| Rebecca E. Chmielewski | rchmielewski@prinz-lawfirm.com |

[¶2]    To the best of affiant's knowledge, information and belief, such addresses as given above were the actual addresses of the parties intended to be so served.

- **Proposed Rule 16 Order**

[¶3]    Pursuant to N.D.R.Civ.P 11(1)(2), I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated: March 4, 2025.

*/s/ Jaiden Cutler*
Jaiden Cutler

STATE OF NORTH DAKOTA                                    IN DISTRICT COURT

COUNTY OF CASS                                    EAST CENTRAL JUDICIAL DISTRICT

---

| | |
|---|---|
| SABHA GANAI, M.D., Ph.D., MPH, FACS, FSSO , | File No. 09-2024-CV-03147 |
| Plaintiff, | **[PROPOSED]** |
| vs. | **RULE 16 ORDER** |
| SANFORD MEDICAL CENTER FARGO and SANFORD CLINIC NORTH, a non-profit corporation | |
| Defendants. | |

[¶1]    A Rule 16 Conference was held pursuant to N.D.R.Civ.P. 16.

Plaintiff's counsel:  Leo Wilking and Rebecca Chmielewski (Baba)

Defendants' counsel:  Tyler Hartney

[¶2]    **IT IS ORDERED:**

[¶3]    Written fact discovery requests are to be served so that responses are due no later than **September 30, 2025**.

[¶4]    Fact discovery depositions are to be completed no later than **September 30, 2025**.

[¶5]    Responses to discovery requests shall be served pursuant to the Rules of Civil Procedure.

[¶6]    The parties shall have until **June 1, 2025** to file non-dispositive motions (e.g., consolidation, bifurcation but excluding discovery motions).

[¶7]    The parties shall have until **July 1, 2025** to file threshold motions (e.g., jurisdiction, qualified immunity, statute of limitations). Discovery <u>shall not</u> be stayed during the pendency of such motions.

EXHIBIT A_300

[¶8]    The parties shall have until **March 1, 2026** to file non-dispositive motions (discovery motions).

[¶9]    Dispositive motions, supporting documents, and the notice of hearing shall be filed no later than 120 days before the day set for trial and 45 days before the day set for hearing.

[¶10]    Replies to dispositive motions shall be filed pursuant to the Rules of Civil Procedure.

[¶11]    The Plaintiff shall disclose the identity of Plaintiff's expert witnesses and the substance and factual basis of their opinions no later than **November 15, 2025.**

[¶12]    The Defendants shall disclose the identity of Defendants' expert witnesses and the substance and factual basis of their opinions no later than **December 15, 2025.**

[¶13]    Plaintiff shall disclose the identity of any rebuttal expert(s) expected to testify at trial in rebuttal to the expert report(s) of Defendants' expert(s), and the substance and factual basis of such opinions by **January 15, 2026.**

[¶14]    The parties shall have until **February 15, 2026** to complete depositions of expert witnesses.

[¶15]    Parties must complete alternative dispute resolution by **February 15, 2026.**

[¶16]    The parties shall be allowed to take depositions to preserve testimony  20 days before the trial, unless otherwise ordered by the Court.

[¶17]    This case is a **9-person** Jury Trial.  **A pretrial conference will be scheduled by the Calendar Control Clerk**. Each party must comply with the separate Order for Pretrial Conference that will follow.  Conflict sheets are to be sent out and a trial date set in accordance with this Order.

[¶18]    Estimated length of trial is **4** days.

EXHIBIT A_301

[¶19]   The above case will be ready for trial no later than **September 15, 2026**.  **This case is presently a lead-off / back-up case.  The Court is to be notified immediately if this case is settled.**

[¶20]   If the parties desire to utilize a juror questionnaire, they must submit a fully-executed Stipulation and proposed Order regarding the same by no later than 4 weeks prior to the date of trial.  This Stipulation and proposed Order must include:

    a.    The instructions to be given to the prospective jurors in the correspondence enclosing the juror questionnaire, including the date the prospective juror must return the questionnaire and the use to which the completed questionnaire will be put;

    b.    A copy of the agreed-upon juror questionnaire;

    c.    A provision that the parties will provide the Clerk with as many copies of the juror questionnaire (along with self-addressed, stamped, return envelopes) as the Clerk directs;

    d.    The date the completed juror questionnaire will be picked up from the Clerk's office by the parties, which party will pick up the completed juror questionnaires, and the fact that this party will be responsible for providing copies of the completed juror questionnaires to all other parties in the case as soon as possible; and

    e.    A provision that all parties shall keep the prospective jurors' answers to the juror questionnaire confidential and shall only use the information for the purposes of jury selection in this case.

**A Note of Issue and Certificate of Readiness is not required**.  The case will be scheduled in accordance with this Order.

    Dated this 4th day of March, 2025.

                    BY THE COURT:

                    _____

3

Honorable Stephannie N. Stiel
Judge of the District Court

4